# COMPOSITE EXHIBIT A



BRENDA D. FORMAN
CLERK OF THE CIRCUIT AND COUNTY COURT



eportaluser

Collapse All

| Case Number | Filed Date | Disposition Date | County | Case Type | Status | Contested | Jury Trial |
|---|---|---|---|---|---|---|---|
| 062022CA017416AXXXCE [CACE-22-017416] | 11/23/2022 | | BROWARD | Other - Libel/Slander | Pending | No | Yes |

| Party Name | Party Type | Attorney | Bar ID |
|---|---|---|---|
| LEVENSON, JEFFREY RICHARD | JUDGE | | |
| Kon, Joshua R | ATTORNEY | | |
| MONARCH AIR GROUP, LLC | PLAINTIFF | KON, JOSHUA R | 56147 |
| JOURNALISM DEVELOPMENT NETWORK | DEFENDANT | MCELROY, DANA JANE | 845906 |
| DOBROVOLSKAYA, LILY | DEFENDANT | MCELROY, DANA JANE | 845906 |
| McGuire, James J | ATTORNEY | | |
| McElroy, Dana Jane | ATTORNEY | | |

### Dockets

Page : 1        ALL ∨

| Image | Doc # | Action Date | Description | Pages |
|---|---|---|---|---|
| | 44 | 06/21/2023 | Notice of Taking Deposition Duces Tecum | 5 |
| | 43 | 06/21/2023 | Notice of Taking Deposition Duces Tecum | 5 |
| | 42 | 06/15/2023 | Notice of Service of Interrogs | 2 |
| | 41 | 06/15/2023 | Request for Production | 9 |
| | 40 | 06/14/2023 | Notice SELECTION OF MEDIATOR, Howard Tescher, esq. | 2 |
| | 39 | 06/10/2023 | Order Extending Time will have 60 days from the date of the hearing (June 8,2023 | 2 |
| | 38 | 06/01/2023 | Motion to Strike Affirmative Defenses | 5 |
| | 37 | 05/31/2023 | Response IN OPPOSITION TO PLAINTIFF'S MOTION FOR EXTENSION OF TIME TO SERVE DEFENDANT WITH PROCESS | 4 |
| | 36 | 05/31/2023 | Notice of Serving Proposal for Settlement | 2 |
| | 35 | 05/23/2023 | Uniform Order Setting Pretrial Deadline 03-22-2024 at 9:00 AM | 7 |
| | 34 | 05/19/2023 | Affidavit OF COMPLIANCE UNDER SECTION 48.161 FLORIDA STATUTES | 18 |
| | 33 | 05/17/2023 | Answer & Affirmative Defenses | 10 |
| | 32 | 05/17/2023 | Re-Notice of Hearing | 2 |
| | 31 | 05/17/2023 | Motion for Extension of Time | 2 |
| | 30 | 05/12/2023 | Notice of Hearing | 2 |
| | 29 | 05/05/2023 | Notice of Service of Interrogs | 4 |
| | 28 | 05/05/2023 | Request for Admissions | 2 |
| | 27 | 04/26/2023 | Order Granting in Part and Denying in Part | 2 |
| | 26 | 04/20/2023 | Motion for Extension of Time | 12 |
| | 25 | 04/20/2023 | Summons Returned Unserved | 2 |
| | 24 | 04/19/2023 | Summons Returned Unserved/Unexecuted Lily Dobrovolskaya | 2 |
| | 23 | 04/14/2023 | Reply OF DEFENDANT JOURNALISM DEVELOPMENT NETWORK, INC. IN SUPPORT OF ITS COMBINED MOTION TO DISMISS COMPLAINT AND TO STRIKE DEMAND FOR ATTORNEY'S FEES | 14 |
| | 22 | 04/10/2023 | eSummons Issuance - Alias LILY DOBROVOLSKAYA | 2 |
| | 21 | 04/04/2023 | Order Granting in Part and Denying in Part MOTION FOR COURT TO RECOGNIZE SERVICE BY OTHER | 2 |
| | 20 | 03/31/2023 | Response to Motion | 16 |
| | 19 | 03/30/2023 | Notice of Appearance | 2 |
| | 18 | 03/30/2023 | Response | 6 |
| | 17 | 03/22/2023 | Notice of Hearing | 2 |
| | 16 | 03/20/2023 | Motion for Order MOTION FOR COURT TO RECOGNIZE SERVICE BY OTHER 1MEANS UNDERSECTION 48.102, FLORIDA STATUTES | 14 |
| | 15 | 03/01/2023 | Agreed Order | 2 |
| | 14 | 03/01/2023 | Motion for Extension of Time | 2 |
| | 13 | 02/28/2023 | Notice of Hearing | 2 |
| | 12 | 02/15/2023 | Order On Case Status Conference | 2 |
| | 11 | 02/02/2023 | Notice of Hearing | 2 |
| | 10 | 01/26/2023 | Motion to Dismiss | 114 |
| | 9 | 01/26/2023 | Notice of Appearance THOMAS &amp; LOCICERO PL | 2 |
| | 8 | 12/29/2022 | Order Extending Time | 2 |
| | 7 | 12/12/2022 | eSummons Issuance | 2 |
| | 6 | 12/08/2022 | Summons Returned Served 12/2/2022 | 1 |
| | 5 | 11/29/2022 | eSummons Issuance | 2 |
| | 4 | 11/28/2022 | Clerk's Certificate of Compliance W-2020-73CIV/2020-74-UFC NONE | 1 |
| | 3 | 11/23/2022 | Complaint (eFiled) | 75 |
| | 2 | 11/23/2022 | Civil Cover Sheet | 3 |
| | 1 | 11/23/2022 | Per AOSC20-23 Amd12, Case is determined General | |

### Judge Assignment History

No records found.

**Court Events**

| Event Date | Judge | Docket Type | Location | Prosecutor | Defendant Attorney |
|---|---|---|---|---|---|

No records found.

**Financial Summary**

| Financial Summary | | |
|---|---|---|
| Assessment | Total: $431.00 | Paid to Date: $431.00 | Balance Due: $0.00 |
| Restitution | Total: $0.00 | Paid to Date: $0.00 | Balance Due: $0.00 |

| Financial Details | | | | | |
|---|---|---|---|---|---|
| Count | Assessment Due | Assessment Paid to Date | Restitution Due | Restitution Paid to Date | Last Payment Date |
| 0 | $431.00 | $431.00 | $0.00 | $0.00 | - |

This information reflects the financial obligations shown on the Florida Comprehensive Case Information System (CCIS) for THIS CASE ONLY. For the current balances of your financial obligations, you should contact the Clerk of the Court in the county where the financial obligation was imposed. Nothing in CCIS alters any financial obligation imposed by a court.

**Reopen History**

| Reopen Date | Reopen Close Date | Reopen Reason |
|---|---|---|

No records found.

2/2

Case Number: CACE-22-017416 Division: 09

Filing # 161836731 E-Filed 11/23/2022 05:09:14 PM

**FORM 1.997.   CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

**I.      CASE STYLE**

IN THE CIRCUIT/COUNTY COURT OF THE SEVENTEENTH  JUDICIAL CIRCUIT, IN AND FOR BROWARD   COUNTY, FLORIDA

Monarch Air Group, LLC
Plaintiff

Case # _____
Judge _____

vs.

JOURNALISM DEVELOPMENT NETWORK, INC., LILY DOBROVOLSKAYA
Defendant

**II.     AMOUNT OF CLAIM**
Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐  $8,000 or less
☐  $8,001 - $30,000
☐  $30,001- $50,000
☐  $50,001- $75,000
☐  $75,001 - $100,000
☒  over $100,000.00

**III.    TYPE OF CASE**      (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

- 1 -

*** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN,  CLERK 11/23/2022 05:09:11 PM.****

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
    ☐ Business governance
    ☐ Business torts
    ☐ Environmental/Toxic tort
    ☐ Third party indemnification
    ☐ Construction defect
    ☐ Mass tort
    ☐ Negligent security
    ☐ Nursing home negligence
    ☐ Premises liability—commercial
    ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
    ☐ Commercial foreclosure
    ☐ Homestead residential foreclosure
    ☐ Non-homestead residential foreclosure
    ☐ Other real property actions

☐ Professional malpractice
    ☐ Malpractice—business
    ☐ Malpractice—medical
    ☐ Malpractice—other professional
☒ Other
    ☐ Antitrust/Trade regulation
    ☐ Business transactions
    ☐ Constitutional challenge—statute or ordinance
    ☐ Constitutional challenge—proposed amendment
    ☐ Corporate trusts
    ☐ Discrimination—employment or other
    ☐ Insurance claims
    ☐ Intellectual property
    ☒ Libel/Slander
    ☐ Shareholder derivative action
    ☐ Securities litigation
    ☐ Trade secrets
    ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

## COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**IV.**    **REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☐ Nonmonetary declaratory or injunctive relief;
☐ Punitive.

**V.**    **NUMBER OF CAUSES OF ACTION:** [　]
(Specify)

   3

**VI.**    **IS THIS CASE A CLASS ACTION LAWSUIT?**
    ☐ yes
    ☒ no

**VII.**    **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
    ☒ no
    ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.**    **IS JURY TRIAL DEMANDED IN COMPLAINT?**
    ☒ yes
    ☐ no

**IX.**    **DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
    ☐ yes
    ☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: s/ Robert A. Stok      Fla. Bar # 857051
     Attorney or party         (Bar # if attorney)

Robert A. Stok         11/23/2022
(type or print name)     Date

- 3 -

Case Number: CACE-22-017416 Division: 09

Filing # 161836731 E-Filed 11/23/2022 05:09:14 PM

MONARCH AIR GROUP, LLC
a Florida Limited Liability Company,

    Plaintiff,

v.

JOURNALISM DEVELOPMENT
NETWORK INC., A Maryland Corporation,
and LILY DOBROVOLSKAYA

    Defendants.

_____/

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

CASE NO.:

## COMPLAINT

Plaintiff MONARCH AIR GROUP, LLC ("Monarch") sues Defendants, JOURNALISM

DEVELOPMENT NETWORK, INC. ("JDN"), a Maryland corporation, and LILY

DOBROVOLSKAYA ("Author"), an individual and allege the following:

### Introduction

1.    On November 27, 2020, Defendants, via Organized Crime and Corruption Report Project

("OCCRP"), knowingly/maliciously/negligently published a defamatory article (the "Article")

about Plaintiff. The original November 27, 2020 Article is attached hereto as **Exhibit A**.

2.    The Article contained multiple factually false statements, misleading innuendos, and

unsupported claims about criminal activity and corruption.

3.    Defendants admittedly used statements from disgruntled employees who did not have

firsthand knowledge of the reported events.

4.    Defendants did not provide Plaintiff an opportunity to respond on many of the claims in

the Article, and even on the matters that Defendants did request Plaintiff's comment, Defendants

altered and misrepresented Plaintiff's response.

\*\*\* FILED: BROWARD COUNTY, FL BRENDA D. FORMAN, CLERK 11/23/2022 05:09:11 PM.\*\*\*\*

5.     When confronted by Plaintiff during March 2021, Mr. Andrew ("Drew") Sullivan, JDN's principal officer and OCCRP's co-founder and editor, confirmed that the Article contained multiple inaccuracies and promised to amend them within 48 hours.

6.     Yet, Sullivan had not made any changes until June of 2021, after Plaintiff submitted a formal complaint with the relevant authorities.

7.     In fact, on June 16, Sullivan wrote the following in an email to Plaintiff:

> I do apologize. I ordered changes made in the [A]rticle after your suggestion that the [A]rticle be taken down. I have just become aware that **they were not made** . . . . There is still an outstanding issue that is not resolved that the fact checker is working on.

Andrew Sullivan's June 16, 2021 email (emphasis added) attached hereto as **Composite Exhibit B.**

8.     Thus, from at least March of 2021 until June of 2021 Defendants knowingly and admittingly maintained false and defamatory information on OCCRP's website.

9.     Even after Defendants made some changes to the Article, that Article remains defamatory.

10.    Despite JDN being aware of false and defamatory statements in the generally defamatory Article, and despite Plaintiff requesting that the Article be temporarily taken down until the agreed upon changes could be made, JDN/OCCRP chose to keep those false statements on the World Wide Web—causing Plaintiff harm and damage as a result.

11.    To illustrate, on May 11, 2021, David Gitman, Plaintiff's manager, wrote the following email to JDN/OCCRP regarding the Article.

> Mr. Sullivan, nearly two months have passed since March 16, after you have advised me that this will take approximately 2 weeks to fact check. Nearly 6 weeks have passed since March 31st, when you have advised that you will get back [to] me in 48 hours . . . . **We all know that there are many flaws with this article, why is it not taken down until you resolve these flaws?**

David Gitman's May 11, 2021 email (emphasis added) attached hereto as **Composite Exhibit B.**

12.   On May 12, 2021, Sullivan responded as follows:

> Mr. Gitman. **I agree with you** and we are trying to resolve this but everyone has a very full schedule . . . . **I also have to deal with staff vacations** and the normal emergencies we face that are unpredictable. I apologize for the delay and when I get staff together we will sort out the remaining issues which are few.

Andrew Sullivan's May 12, 2021 email (emphasis added) attached hereto as **Composite Exhibit B.**

13.   Gitman's reply to this email is attached hereto as **Composite Exhibit B.**

14.   The rest of the email chains between Gitman and Sullivan is attached hereto as **Composite Exhibit B.**

15.   Sullivan told Plaintiff that OCCRP procedure is to have an **independent** fact checker look into disputed matters. Instead, OCCRP had **a member of its own staff** serve as "the independent fact checker," when Plaintiff confronted Sullivan on this issue, Sullivan explained that while indeed on OCCRP's staff, this person is an "independent fact checker" because she has "no editorial stake in [the] work." See **Composite Exhibit B.**

16.   The Article was republished on Defendants' social media thus spreading the false and defamatory statements to a wider audience.

17.   As a result of JDN/OCCRP's malice, negligence and/or incompetence in first publishing the defamatory Article and then failing to timely rectify the situation, Plaintiff's business was harmed and damaged, and is continuing to suffer harm and damage.

18.   The Article falsely paints Plaintiff to be involved in criminal activity.

19.   Accordingly, the Article constitutes defamation *per se.*

### Jurisdiction and Venue

20.   This is an action to recover damages in excess of $30,000 for the reputational damage that Monarch suffered because of the defamatory Article, based on innuendo and false information,

that Defendants published.

21.     Plaintiff, Monarch is a Florida limited liability company with its principal place of business in Fort Lauderdale, Florida.

22.     Defendant, JDN is a Maryland corporation that owns and controls OCCRP.

23.     Defendant, Author, is a freelance investigative journalist operating, conducting, engaging or carrying on a business in Florida, she is believed to be a Florida resident, and is otherwise *sui juris*.

24.     Author and OCCRP published the Article about Monarch and Gitman on the World Wide Web. The Article was accessible in Florida, was accessed in Florida, and caused harm in Florida. Accordingly, jurisdiction is proper under § 48.193(1)(a)(2) *Fla. Stat.* and the Florida Supreme Court's interpretation thereof.

25.     The About page on OCCRP's website explains that its purpose is to expose the subject(s) of its articles and to promote action by advocates, law enforcement, policy makers, and citizens, based on OCCRP's exposés. Accordingly, both Author and JDN via OCCRP purposely directed their defamatory Article to Florida and Defendant thus has sufficient minimum contacts with the State of Florida to satisfy personal jurisdiction. *See* **Exhibit C.**

26.     Venue is proper in Broward County pursuant to §§ 47.011 and 47.051 *Fla. Stat.* because the cause of action accrued in Broward County.

27.     All conditions precedent to the institution of this action have been satisfied or otherwise excused, including the service of statutory notice on JDN and OCCRP pursuant to § 770.01 *Fla. Stat.*

## General Allegations

28.     David Gitman has been Monarch's sole manager since 2016.

29.     On or around June of 2021, Defendants republished the Article on OCCRP's website

currently titled *The Flight of the Monarch: US Gov't Contracted Airline Once Owned by Criminals with Ties to Russian Mob*. A copy of The Article in its current form is attached hereto as **Exhibit D**.

30.     The Article contained numerous false and defamatory statements about Monarch most of which are defamatory *per se*.

31.     For example, Defendants published the Article via OCCRP, which reports on crime and corruption. Therefore, by publishing the Article about Monarch on OCCRP's website, Defendants are insinuating that Monarch is involved in criminal activity.

32.     Neither Gitman nor Monarch have been charged with any crime. Yet, Defendants concealed this fact from its readers and deliberately implied that Monarch is involved in criminal activity. To do so, is defamation *per se*.

33.     The Article's premise is that Monarch and Gitman are connected with the Russian Mafia and the Government should thus not award them contracts, and the Government, by awarding Monarch and Gitman with government contracts, is corrupt or engaged in corruption.

34.     The Article was published in 2020. At that time, Gitman had been the sole owner and CEO for four years. By publishing the Article in 2020, Defendants insinuate that Monarch, under the control of Gitman, is connected with criminal activity, and should thus not be awarded Government contracts.

35.     The Article claims that a prosecutor in 2013 stated that "We do not believe this business [Monarch] is legitimate." The Article deliberately omitted the other part of the story—that the prosecutor subsequently, in the same proceeding, apologized for misspeaking and calling Monarch an illegitimate business.

36.     By omitting the prosecutor's retraction and deliberately concealing the full context of those

remarks and retraction, Defendants published a defamatory statement.

37.     The Article also accuses Monarch of drug smuggling and that the border control turned a blind eye to it.

38.     The Article states that Florida customs agents discovered 16 kilograms of cocaine hidden in one of [Monarch's] planes"—insinuating that Monarch was involved in drug smuggling.

39.     When OCCRP reached out to Monarch for comment, Monarch sent the following: "[i]n 2011, a charter passenger was apprehended by the U.S. Customs and Boarder Protection for items in his personal possession . . . ." Monarch's statement explains that the drug smuggling had nothing to do with Monarch, and was entirely the responsibility of a passenger.

40.     Despite Monarch's statement, OCCRP changed Monarch's response to obfuscate that the cocaine was in a passenger's personal possession and instead wrote that "Monarch's spokesperson said that the cocaine belonged to a passenger."

41.     OCCRP's statement still connotes that Monarch was involved in the drug smuggling, and that the cocaine happened to belong to a passenger. Thus, not only is OCCRP's narrative of event defamatory; their misquoting Monarch's spokesperson is defamatory, and it shows a continuing pattern of deliberately hiding the truth from their readers to defame Monarch.

42.     The Article asserted that the Government should not have allowed Monarch to transport people in the witness protection program in 2017, given the reputation of Monarch's former owners. To publish this claim in 2020, is to insinuate that in 2017, Gitman and Monarch were still associated with Monarch's former owners—some who were criminals—and should not have been trusted with transporting people in the witness protection program.

43.     Trincher and Golubchik were part owners of Monarch up until 2012. In 2013, a year after they were no longer associated with Monarch, Trincher and Golubchik were charged for crimes

unrelated to Monarch, and Monarch was not at all implicated in the charges. As a matter of fact, as stated above, the prosecutor apologized for implying any association between Monarch and Trincher/Golubchik—a fact that Defendants chose to omit.

44.     Despite this, in 2020—eight years after Trincher and Golubchik were no longer associated with the company—Defendants insinuated that just three years prior, and five years since Trincher/Golubchik had been involved in the company, Monarch was presently associated with criminals. In doing so, Defendants painted Monarch as guilty-by-association.

45.     The Article also contained the following are false and disparaging statements that defame Plaintiffs:

   a.   "At first [Slavin] stayed on as [Monarch's] director of operations, but he left when he felt that the new owners started cutting corners on safety." Despite OCCRP requesting Monarch's comment/response on other issues, OCCRP did not give Monarch an opportunity to respond to this allegation. Defendants are thus publishing a biased defamatory narrative and leading its readers to believe that Monarch does not care about the safety of its passengers.

   b.   "the company is currently owned by the son of Golubchik and Trincher's former business partner." By specifically juxtaposing Gitman to these convicted criminals— who were charged after they left Monarch, and were not partners in Monarch for over seven years—insinuates these criminals were connected to Monarch and Gitman when the Article was published.

   c.   "Employees resigned after Monarch stopped paying them." This falsely accuses Monarch of not paying its employees. Despite OCCRP requesting Monarch's comment/response on other issues, OCCRP did not give Monarch an opportunity to

respond to this allegation. Defendants are thus publishing a biased defamatory narrative and leading its readers to believe that Monarch does not pay its employees.

46.     As indicated above on March 16, 2021, Gitman reached out to Andrew Sullivan—JDN's principal officer and director, and the editor for OCCRP—informing him of defamatory statements in the Article.

47.     On March 31, 2021, Sullivan admitted to Gitman that there were indeed mistakes in the Article, and that they would correct them.

48.     Despite this, no corrections were made until June of 2021—more than the 10 days afforded to media publicists to retract defamatory statements. § 836.08 *Fla. Stat.* In addition, the corrections that were made in June, were insufficient to cure the defamatory statements, and were not sufficiently "as conspicuous" as it was when the Article was originally published. *See id.*

49.     Accordingly, even the false statements that were corrected were done too late, and not in the proper method to comply with Florida Statutes Section 836.08, and still constitute actionable defamation.

50.     The Article, as a whole, is defamatory, and even the true statements contained therein are defamatory because of the context and the light in which they are published.

51.     The defamatory statements contained in this Complaint is not an exhaustive list of all the false and defamatory statements contained in the Article and/or published by defendants.

52.     The publication of the Article caused Plaintiff financial harm and damage as a direct result of its publication.

## COUNT I–DEFAMATION *PER SE*

53.     Plaintiff realleges and incorporates by reference the allegations in paragraphs 1–44, and all subparts.

54.     On or about November 27, 2020 Defendants published the Article which contained

numerous statements that were false and defamatory and/or defamatory *per se,* as more fully described in paragraphs 11–28, including all subparts.

55.     The aforementioned false and defamatory statements were of and concerning Monarch, and were published to third parties when they accessed the Article in Florida.

56.     The false and defamatory statements were defamatory per se because they charged Monarch committed a crime and/or tended to subject Monarch to hatred, distrust, ridicule, contempt, or disgrace, and/or tended to injure Monarch in its profession.

57.     Defendants published the Article and the statements contained therein while they knew/should have reasonably known they were false; with reckless disregard for their truth; or, at least, with a negligent disregard of its truth.

58.     As a direct and proximate cause of the aforementioned defamatory statements, Monarch has suffered and will continue to suffer damage to its reputation, as well as loss of income, diminution in value of its shares, loss of goodwill, and other economic losses.

       **WHEREFORE**, Monarch respectfully demands judgment against Defendants for (a) compensatory and consequential damages, (b) court costs, (c) pre- and post-judgment interest, (d) attorney's fees and (e) any such other and further relief as this Court deems just and proper. Monarch reserves its right to amend its complaint to seek punitive damages upon the making of an evidentiary proffer.

## COUNT II – DEFAMATION BY IMPLICATION

59.     Plaintiff realleges and reincorporates the allegations in paragraphs 1 through 44 as if fully set forth herein.

60.     Defendants published information about Monarch, as set out in the general allegations, by juxtaposing and/or conveying incomplete information and/or omitting facts to imply a defamatory

connection between Monarch, criminals, and/or criminal activity.

61.     Defendants published the Article and the statements contained therein while they knew/should have reasonably known they were false; with reckless disregard for their truth; or, at least, with a negligent disregard for its truth.

62.     As a direct and proximate result of Defendants' defamatory statements, Monarch suffered substantial damages.

        **WHEREFORE**, Monarch respectfully demands judgment against Defendants for (a) compensatory and consequential damages, (b) court costs, (c) pre- and post-judgment interest, (d) attorney's fees and (e) any such other and further relief as this Court deems just and proper. Monarch reserves its right to amend its complaint to seek punitive damages upon the making of an evidentiary proffer.

### COUNT III–DEFAMATION *PER SE* AGAINST AUTHOR

63.     Plaintiff realleges and reincorporates the allegations in paragraphs 12 through 44 as if fully set forth herein.

64.     On November 28, 2020, Author published the following false and defamatory statement: "Monarch has a division called Mercury Jets which has no legal presence in the U.S. Mercury's website domain info shows it was registered by an eponymous company in Moscow and lists a contact email address of a Moscow-based commercial bank Sibcontact bank." Statement is attached hereto as **Exhibit E.**

65.     The aforementioned false and defamatory statement was of, and concerned Monarch, and were published to third parties when they accessed the defamatory statement in Florida.

66.     The false and defamatory statement constituted defamation per se because it charged that Monarch committed a crime and/or tended to subject Monarch to hatred, distrust, ridicule, contempt, or disgrace, and/or tended to injure Monarch in its profession.

67.    Author published the defamatory statement while she knew/should have reasonably known they were false; with reckless disregard for their truth; or, at least, with a negligent disregard of its truth.

68.    As a direct and proximate cause of the aforementioned defamatory statement, Monarch suffered and will continue to suffer damage to its reputation, as well as loss of income, diminution in value of its shares, loss of goodwill, and other economic losses.

**WHEREFORE**, Monarch respectfully demands judgment against Author for (a) compensatory and consequential damages, (b) court costs, (c) pre- and post-judgment interest, (d) attorney's fees and (e) any such other and further relief as this Court deems just and proper. Monarch reserves its right to amend its complaint to seek punitive damages upon the making of an evidentiary proffer.

### DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all issues so triable.

Dated: November 23, 2022.

Respectfully submitted,

**STOK KON+ BRAVERMAN**
Attorneys for Plaintiff
One East Broward Boulevard, Suite 915
Fort Lauderdale, Florida 33301
Tel.: (954) 237-1777
Fax: (954) 237-1737
Email: service@stoklaw.com

*/s/ Peretz Laine*
ROBERT A. STOK, ESQ.
Florida Bar No. 857051
rstok@stoklaw.com
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
jkon@stoklaw.com

YOSEF Y. KUDAN, ESQ.
Florida Bar No. 1010261
ykudan@stoklaw.com
PERETZ LAINE, ESQ.
Florida Bar No. 1038556
plaine@stoklaw.com

# Exhibit A
### Original November 27, 2020 Article

NOT AN OFFICIAL COPY – CCIS – ATTORNEY OF RECORD

# Flight of the Monarch: US Gov't Contracted Airline Once Owned by Russian Criminals

🖼 Credit: Facebook

by **Lily Dobrovolskaya**

*27 November 2020*

🐦 (https://web.archive.org/web/20201127190413/http://twitter.com/intent/tweet?text=U.S. authorities awarded Monarch Air Group over 100 contract

f (https://web.archive.org/web/20201127190413/http://www.facebook.com/share.php?u=https://www.occrp.org/en/investigations/flight-of-the-mona

💜 DONATE (https://web.archive.org/web/20201127190413/https://www.occrp.org/en/donate)

An American airline that has been transporting protected witnesses for the U.S. government was once part-owned by two Russian organized crime figures, and is still owned by the son of their business partner, an OCCRP investigation has found.

These men, Anatoly Golubchik and Vadim Trincher, were jailed in 2014 for operating an illegal gambling and extortion ring (https://web.archive.org/web/20201127190413/https://www.fbi.gov/contact-us/field-offices/newyork/news/press-releases/two-defendants-sentenced-for-participating-in-racketeering-conspiracy-with-russian-american-organized-crime-enterprise-operating-international-sportsbook-that-laundered-more-than-100-million) out of an apartment in Trump Tower in New York City. U.S. prosecutors said they were part of a "far-reaching Russian-American organized crime ring" known as the Taiwanchik-Trincher Organization, under the protection of notorious Russian crime boss Alimzhan "Taiwanchik" Tokhtakhounov.

We use cookies to improve your experience on our website. Find out more or opt-out.
(/web/20201127190413/http://www.occrp.org/en/aboutus/privacy-policy#optout).          Accept

## Пролетая над Америкой

Read a version of this story in Russian from our partner IStories.

 
Read more

(https://web.archive.org/web/20201127190413/https://istories.media/investigations/2020/11/27/proletaya-nad-amerikoi/)

Read OCCRP's coverage of how the Taiwanchik-Trincher Organization was busted wide open
(https://web.archive.org/web/20201127190413/https://www.occrp.org/en/investigations/1953-international-russian-organized-crime-ring-does-old-school-gambling-in-a-new-way).

Two other investors who ran the airline afterwards also had legal troubles, and one fled a warrant for his arrest in the U.S. and remains on the lam.

Nonetheless, an OCCRP investigation shows Monarch Air Group has won more than 120 U.S. government contracts worth over $6 million, and was making government flights as recently as September.

The airline and its affiliate, WAB International, have been awarded contracts for sensitive jobs such as moving fuel in Israel for the Department of Defense (DoD), flying people around Afghanistan, and transporting protected witnesses in the U.S. for the Marshals Service. WAB International reported earning some $70 million from work for the U.S. military in 2013 alone.

"The negligence is startling," said Gary Kalman, director of the U.S. chapter of Transparency International. "Airlines with a history of criminal affiliation contracted by the government to transport protected witnesses is something we'd expect to see in a spy novel, not in a news report."





Credit: Twitter

Vadim Trincher, on the left, was sentenced to five years in prison in 2014 for operating an illegal gambling, money laundering, and extortion ring.

In a 2013 court document, prosecutors claimed Golubchik acted as Tokhtakhounov's "enforcer," and accused the men of laundering about $100 million on behalf of "high-level criminals" — some of it through Monarch and another airline company Golubchik and Trincher owned in the U.S. called Skyway International.

On one occasion, customs agents in Miami discovered 16 kilograms of cocaine on one of Monarch's planes. Prosecutors noted the seizure at Golubchik's bail hearing in 2013, adding of the airline: "We do not believe this business is legitimate."

The U.S. Marshals Service told reporters that it placed protected witnesses on Monarch planes through contracts overseen by the General Services Administration (GSA), which provides leasing, management, and other professional services to U.S. government agencies. The GSA did not respond to a request for comment.

Golubchik and Trincher both left Monarch in 2012, before the airline won the DoD and the GSA contracts. Monarch was audited by the GSA in 2013, the same year Golubchik and Trincher's arrest was widely reported, and the agency awarded the airline a 10-year contract in 2014 under which the U.S. Marshals service employed them to transport protected witnesses. The company is curre We use cookies to improve Golubchik and Trincher's have. Find out more or opt-out.
                         (/web/20201127190413/http://www.occrp.org/en/aboutus/privacy-policy#optout).        Accept

11/22/22, 1:50 PM                    Flight of the Monarch: US Gov't Contracted Airline Once Owned by Russian Criminals - OCCRP

A spokesperson for the Defense Logistics Agency, which manages the U.S. military's supply chains, said the agency followed the proper procedures when vetting Monarch for a contract awarded in 2012 to deliver fuel to a military base in Israel. Neither Golubchik nor Trincher were "involved in the bidding or performance of the contract," he added in an email.

Federal Acquisition Regulations require contractors like Monarch to provide details of any criminal offenses by its employees, even if they don't relate directly to the contract, according to Jessica Tillipman, a professor at George Washington University Law School with expertise in anti-corruption and government contracting. The agency is then required to make further enquiries, and it is at their discretion to decide whether to work with the company.

Alina Gavrushenko, Monarch's director of marketing and public relations, said the airline has not been affiliated with Golubchik or Trincher since 2012.

"Like many startups, especially in aviation, the company has changed ownership and evolved its business model over the years," she said, adding: "Our business operations are conducted with full integrity and transparency."

The current owner of Monarch, David Gitman, did not respond to a request for comment.

Credit: Facebook
U.S. authorities have awarded Monarch more than 120 contracts over the past eight years.

## A Russian Takeover

With the 2008 financial crisis threatening to ground Monarch Air, then a small Florida-based air cargo company, its owner, career pilot Paul Slavin needed an injection of funds.

Slavin, who had worked in the aviation industry for 35 years, started looking around for backers. A "trusted aircraft broker" he knew introduced him to two Russians, who agreed to invest while staying out of the airline's day-to-day operations. For a while, it seemed an ideal solution.

But they soon invited more investors on board, and within three years the clique had taken control of the company. According to Slavin, they started withholding funds and making "operational decisions that conflicted with my standards." He says he sold his shares in 2011 for a token amount. The new group began aggressively expanding the business, opening new offices and bidding for U.S. government contracts.

Slavin says he didn't know that two of his investors had ties to Russian organized crime. "If they were involved in any illegal activity outside of the airline it was never revealed to me," he said in an email to OCCRP.

David Gitman's father, Jacob Gitman, was among the first investors to join Monarch Air after it hit financial turbulence in 2008.

The elder Gitman was born in the Soviet Union, where he worked as an engineer before immigrating to the U.S. in the early 1990s. He has been linked to dozens of U.S. businesses (https://web.archive.org/web/20201127190413/https://www.azcentral.com/story/money/business/jobs/2019/08/16/la-paz-county-residents-fighting-plans-aluminum-smelter-alliance-metals/1928485001/) in everything from logistics and healthcare to aluminium smelting.

We use cookies to improve your experience on our website. Find out more or opt-out.

In 2017, Gitman was one of several individuals who built a business empire based on technology and potential profits

11/22/22, 1:50 PM                    Flight of the Monarch: US Gov't Contracted Airline Once Owned by Russian Criminals - OCCRP



Credit: Twitter

**Antoly Golubchik was convicted of operating what New York prosecutors described as an illegal "large-scale sports book."**

from an operation to supposedly convert used tires into fuel. The plaintiff, Blizzard Energy, was awarded $3.8 million in damages, and the case is now under appeal. Gitman declined to comment as the case is still ongoing.

Golubchik also joined as an investor in 2008, while Trincher, his criminal partner in the gambling, money laundering, and extortion ring, came aboard in 2011. Another immigrant from the former Soviet Union, Trincher was a professional card player who has reportedly made more than $1.2 million in live tournament earnings during his career, including winning the 2009 World Poker Tour Foxwoods Poker Classic.

Along with Tokhtakhounov, the Russian crime boss who is still on the run, the two men operated what New York prosecutors described as an illegal "large-scale sports book" that was used to launder approximately $100 million from former Soviet Union countries through Cyprus-registered shell companies. Prosecutors said around $50 million of that sum found its way to the U.S.

We use cookies to improve your experience on our website. Find out more or opt-out.
(/web/20201127190413/http://www.occrp.org/en/about/ourprivacypolicy#optout).   Accept

"Their clients were multi-millionaires and billionaires, oligarchs in Russia," the prosecutors noted in court documents.

11/22/22, 1:50 PM                    Flight of the Monarch: US Gov't Contracted Airline Once Owned by Russian Criminals - OCCRP



Credit: Evan Agostini/Invision/AP

**Molly Bloom, left, was among 34 people indicted for being part of the illegal gambling rings. Here she poses with actress Jessica Chastain, who played her in the film chronicling her experiences, "Molly's Game."**

We use cookies to improve your experience on our website. Find out more or opt-out.
(/web/20201127190413/http://www.occrp.org/en/aboutus/privacy-policy#optout).      Accept

Their group also ran a high-stakes poker game that attracted not only clients from Russia, but also major American actors like Ben Affleck, Leonardo DiCaprio, and Matt Damon, according to the industry publication Poker News. The rise and fall of the star-studded poker game was later made into the film "Molly's Game," featuring Jessica Chastain and Idris Elba.

The Taiwanchik-Trincher Organization and its sister crime ring, co-run by Trincher's son Illya, were broken up in 2013, reportedly (https://web.archive.org/web/20201127190413/https://abcnews.go.com/US/story-fbi-wiretap-russians-trump-tower/story?id=46266198) after the FBI spent two years collecting information on the Russian money-laundering network using a wiretap hidden inside unit 63A in Trump Tower.

Jacob Gitman told OCCRP he had met Golubchik in 2006, but declined to explain how. He said he had never met or spoken with Trincher. "I don't have any business relations with them since 2013," he said in an email.

However, public records show that Gitman partnered with Golubchik and Trincher in at least four aviation companies. Panama-based SkyWay International Holding still lists all three men as corporate officers. Gitman said the Panamanian company was never active, and had never facilitated any transactions or opened bank accounts.

An important addition to Monarch's team was businessman Boruch "Bob" Freedman, who joined the company in April 2011. Freedman was already involved in air transport in Afghanistan, but he did not have the certificate or experience to procure direct government contracts. Monarch did. The two decided to join forces and, along with Gitman's son, David, they formed WAB International, which signed a profit-sharing and reimbursement arrangement with Monarch.

Freedman was well-known in the aviation world as the nephew of Alexander Mashkevich, a Kazakh business titan with links to the Eurasian Natural Resources Corporation (see box below (https://web.archive.org/web/20201127190413/https://new.occrp.org/en/investigations/flight-of-the-monarch-us-govt-contracted-airline-once-owned-by-russian-criminals#occrp-inset-box-burundaiavia-s-controversial-owners)), according to John Dawkins, the head of a logistics company that worked with Freedman on a government contract in Afghanistan.

"Boruch was a middleman," Dawkins said. "He was plugged into everyone using his uncle's reputation to gain entry and relevance."

Freedman, who fled the U.S. after a warrant was issued for his arrest for not paying a court-mandated fine, did not respond to a request for comment.

### A Kyrgyz Investor With a Troubled Airline of His Own

In 2011, Gennady Gryaznov, a former director of Kyrgyzstan's Department of Civil Aviation, also bought into Monarch. Gryaznov already owned Sky KG Airlines, a Kyrgyz airline that is banned from operating in the European Union due to safety concerns.

Sky KG caught the attention of the United Nations Security Council the following year when it began leasing the aircraft that reportedly served as the former presidential plane of Romanian dictator Nicolae Ceaușescu to the powerful Somali pirate boss Mohamed Abdi Hassan. A U.N. report alleged that Hassan added Gryaznov's plane to his own small airline — which he used, along with other businesses, for the "laundering of piracy proceeds" — before he was arrested in Belgium.

Gryaznov did not respond to a request for comment.

Golubchik and Trincher appeared in Monarch's paperwork until 2012, the year the airline won its first contract with the DoD. They are last mentioned as investors in a report from April that year, and records show they were gradually replaced as managers by Freedman-controlled entities.

By 2015, corporate records show that Jacob Gitman owned 90 percent of Monarch, but he said he sold his majority shareholder position the following year. His 37-year-old son, David — who did not respond to a request for comment — is now listed as the CEO and sole owner of the airline.

We use cookies to improve your experience on our website. Find out more or opt-out.
(/web/20201127190413/http://www.occrp.org/en/aboutus/privacy-policy#optout).    Accept



Credit: Edin Pasovic/OCCRP

While Slavin had initially welcomed his new investors, the partnership turned sour.

"Unfortunately for me it became obvious that Boruch Freedman wanted control of the airline and used withholding of funds to affect the daily operation of the airline," said Slavin. "I was then double-crossed by Jacob Gitman, who gave his and Golubchick's voting shares to Freedman."

Slavin said he was voted out as CEO in 2011. At first he stayed on as director of operations, but left when he felt the new owners started cutting corners on safety.

Credit: Facebook

Monarch posted this image on the company's Facebook account last year, accompanied by a quote attributed to Henry Ford: "When everything seems to be going against you, remember that aircraft take off against the wind, not with it."

We use cookies to improve your experience on our website. Find out more or opt-out.
(web 2020 1127 190413 http://www.occrp.org/en/about/us/privacy-policy#optout).     Accept

## Federal Contracts

When Slavin first launched Monarch Air Group in 2005, his cargo planes flew to just one destination: the Bahamas, a Caribbean island chain beginning 80 kilometers off the southeast Florida coast, and known as an easy-access playground for American tourists, celebrities, and global elites.



Credit: Facebook
This Monarch brochure from 2009 says the company flew cargo mainly to the Bahamas, Puerto Rico and the Dominican Republic.

Monarch expanded its flight routes when the new investors came on board, and began carrying passengers as well as cargo. Then in 2011, according to a submission from prosecutors at Golubchick's bail hearing two years later, Florida customs agents discovered 16 kilograms of cocaine hidden in one of its planes.

A former Monarch pilot, who was not on the flight, told OCCRP the plane was searched by customs agents when it returned to Fort Lauderdale International Airport from Haiti. They found a duffle bag full of cocaine inside. The crew was detained for several hours, he said, along with the person who had chartered the flight, a frequent customer whose name he did not recall. The pilot thought it was strange that the aircraft was then released.

"I've seen in previous years, when the airplane was involved with drugs and it was in a hanger and it was not to be moved," he said. "It was under the control of customs."

The U.S. Customs and Border Protection agency refused to release any information about the discovery of the cocaine, or explain why no one was arrested.

We use cookies to improve your experience on our website. Find out more about
(/web/20201127190413/http://www.occrp.org/en/aboutus/privacy-policy#optout).          Accept

Gavrushenko, Monarch's spokesperson, said the cocaine belonged to a passenger. "We have worked with the relevant authorities to develop and enhance existing procedures, to prevent this from happening again," she said. "In our 15 years of operations, this was the only occurrence."

In the two years following the bust, U.S. government agencies continued contracting Monarch. The DoD kept up its subcontracts with WAB to provide helicopter transport for passengers and cargo in Afghanistan. Court records show WAB subcontracted the jobs to a small Kazakhstan-based aviation company, JSC Airline Burundaiavia.

The DoD contracts ceased after a helicopter crash in Afghanistan, according to court documents. In early May 2013, two Burundaiavia choppers took off from a U.S. military forward operating base about 40 miles outside Kandahar, in southern Afghanistan. A short time later, the engines failed in one of the helicopters and it went down over a populated area, "causing much damage and destruction to the village."

The court documents say Burundaiavia failed to investigate the incident, as was required under international, Afghan, and U.S. law. The crash "tarnished" the company's reputation, according to a court submission made by Burundaiavia, and it was never awarded another U.S. government contract.

The incident appears to have led to a falling out between the business partners, culminating in a lawsuit in Florida. Burundaiavia successfully sued WAB in 2015 for failing to pay almost $8 million in fees it owed. A warrant was issued for Freedman's arrest the following year after he was held in contempt of court for not paying the fine. U.S. Marshals were unable to track him down, and he now lives in Israel, according to a court document.



Credit: burundaiavia.kz (https://web.archive.org/web/20201127190413/https://burundaiavia.kz/)
Two Burundaiavia choppers crashed in southern Afghanistan in 2013.

## Burundaiavia's Controversial Owners

The Florida case involving WAB revealed who owns JSC Airline Burundaiavia: three oligarchs from Kazakhstan who have faced corruption allegations in various places.

▾ SHOW

In 2017, the Marshals Service twice hired Monarch to transport people in the witness protection program and the Justice Prisoner and Alien Transportation System, which moves prisoners around the country.

We use cookies to improve your experience on our website. Find out more or opt-out.
(/web/20201127190413/http://www.occrp.org/en/aboutus/privacy-policy#optout).      Accept

Gary Kalman of Transparency International said the fact that Monarch was able to transport protected witnesses, despite the dubious backgrounds of its former owners, shows the need for more thorough checks on companies that are awarded public contracts.

"Common sense says that contracts should be clearly vetted before going to entities with a history of criminal affiliation, but there is no legal mandate that we check," he said. "That is a significant gap in the law, and this story is a prime example of how such a gap might be dangerously exploited."

The Marshals declined to comment, saying the GSA was responsible for vetting the company. Monarch's spokesperson said the company was audited by the GSA as a vendor in 2013 and won its contracts "with full transparency and open competition."

The GSA did not reply to a request for comment.



Credit: Facebook

Monarch's air carrier license was revoked in 2016, though it is still able to broker charter flights with other FAA certified airlines.

## No-Fly Zone

Between January and April 2016, Monarch's director of operations, chief pilot, and maintenance director all quit. A pilot who spoke to OCCRP anonymously said employees resigned after Monarch stopped paying them, and the airline struggled to find replacements.

In May that year, the airline requested the FAA remove its only aircraft from its "Operation Specifications," a legal designation that allowed it to run commercial operations like private chartered flights. Without any planes that met FAA requirements, or key staff members to run them, its air carrier certificate was revoked in February 2018.

But Monarch is still authorized to broker charter flights with other FAA certified airlines.

We use cookies to improve your experience on our website. Find out more or opt-out.
(Private Internet Access privacy policy privacy policy about).    Accept

Analysis of public documents found U.S. authorities have awarded Monarch more than 120 contracts over the past eight years, totalling more than $6 million. The airline is still making flights under an open-ended 10-year contract awarded in 2014.

The bulk of Monarch's contracts were with the DoD and involved transporting fuel to Har Keren in Israel, where the U.S. military has a mountaintop radar facility known as Site 512. Those gigs took place between 2012 — the last year Golubchik and Trincher were known to be involved in the company — and 2015.

Seto Bagdoyan, director for audit services at the U.S. Government Accountability Office's (GAO) Forensic Audits & Investigative Service, said the lack of transparency in contracting structures presents a risk to the government.

"A recent GAO report ... flagged a number of fraud and national-security risks to DoD acquisition posed by contractor ownership structures that may not be fully transparent," he said. "While GAO didn't specifically focus on background checks, this could be an important aspect of DoD's assessment of its various controls."

In addition to U.S. federal contracts, the Monarch Air Group lists international clients including the United Nations World Food Program, and Canada's Department of National Defence. Most recently, David Gitman boasted (https://web.archive.org/web/20201127190413/https://www.traveldailynews.com/post/repatriation-flights-and-the-key-role-of-private-aviation-during-pandemic) in a travel publication of Monarch's "great synergy" with U.S. embassies to bring home citizens stranded in Latin America due to the COVID-19 crisis.

In the 12 years since Slavin welcomed new investors, his small air cargo company has grown from a struggling start up, with just one route to the Bahamas, into a global operation. But even though he has not been able to "share in the prosperity," he said he is not bitter.

"I am done reliving this chapter of my life that I closed 10 years ago," Slavin said.

🐦 (https://web.archive.org/web/20201127190413/http://twitter.com/intent/tweet?text=U.S. authorities awarded Monarch Air Group over 100 contract

f (https://web.archive.org/web/20201127190413/http://www.facebook.com/share.php?u=https://www.occrp.org/en/investigations/flight-of-the-mona

Join the fight.
Hold power to account.

Support from readers like you helps OCCRP expose organized crime and corruption around the world.

By donating, you'll be directly supporting investigative journalism as a public good. You'll also gain access to exclusive insights and benefits.

DONATE TODAY

(https://web.archive.org/web/20201127190413/https://checkout.fundjournalism.org/memberform?org_id=occrp&campaign=7011U000000ylyDQAQ)

RELATED STORIES

'I Already Knew Who Was Behind Her': A Mysterious Woman, a Top Russian Official, and Contracts Worth Millions

Cuban's First Family Stashed Cash in DC

Luxury London Resid Official's Son Purchas Accept Mysterious Payment

11/22/22, 1:50 PM                                Flight of the Monarch: US Gov't Contracted Airline Once Owned by Russian Criminals - OCCRP

RECENT STORIES

## Flight of the Monarch: US Gov't Contracted Airline Once Owned by Russian Criminals

U.S. authorities awarded Monarch Air Group over 100 contracts, including transporting protected witnesses and fuel for the military.

⊙ 27 NOVEMBER 2020          → READ THE ARTICLE

(/web/20201127190413/http://www.occrp.org/en/investigations/flight-of-the-monarch-us-govt-contracted-airline-once-owned-by-russian-criminals)

## 'I Already Knew Who Was Behind Her': A Mysterious Woman, a Top Russian Official, and Contracts Worth Millions

A mysterious woman negotiates state contracts for a major security company and owns firms that do lucrative business with the help of Russia's Interior Ministry. Sources say she was once the romantic partner of Viktor Zolotov, Putin's former top bodyguard and now the head of Russia's National Guard.

⊙ 24 NOVEMBER 2020          → READ THE ARTICLE

(/web/20201127190413/http://www.occrp.org/en/already-knew-who-was-behind-her)

## Gabon's First Family Stashed Cash in DC Property

Gabon's ruling Bongo family and their inner circle have bought at least seven properties worth over US$4.2 million in and near the U.S. capital, a destination whose real estate has long attracted African dictators.

⊙ 23 NOVEMBER 2020          → READ THE ARTICLE

(/web/20201127190413/http://www.occrp.org/en/first-family-stashed-cash-in-dc-property)

## Prevezon Holdings: The Black Money Collector

A small Russian-owned real estate investment company based in Cyprus leaves an unusually large footprint in stories about global crime and politics.

⊙ 17 NOVEMBER 2020          → READ THE ARTICLE

(/web/20201127190413/http://www.occrp.org/en/fincen-files/prevezon-holdings-the-black-money-collector)

Contact (/web/20201127190413/http://www.occrp.org/en/aboutus/contact-us)

Privacy Policy (/web/20201127190413/http://www.occrp.org/en/aboutus/privacy-policy)

Bypassing Censorship (/web/20201127190413/http://www.occrp.org/en/aboutus/bypassing-censorship)

About (/web/20201127190413/http://www.occrp.org/en/about-us)

Member Centers (/web/20201127190413/http://www.occrp.org/en/members)

History of OCCRP (/web/20201127190413/http://www.occrp.org/en/history-of-occrp)

Team (/web/20201127190413/http://www.occrp.org/en/aboutus/staff)

Board of Directors (/web/20201127190413/http://www.occrp.org/en/aboutus/board-of-directors)

Awards (/web/20201127190413/http://www.occrp.org/en/aboutus/awards)

Our Supporters (/web/20201127190413/http://www.occrp.org/en/aboutus/who-supports-

Subscribe to our weekly newsletter (/web/20201127190413/http://newsletter?campaign=footer)

(https://web.archive.org/web/20201127190413/https://twitter.com/occrp)

(https://web.archive.org/web/20201127190413/https://www.facebook.com/occrp)

(https://web.archive.org/web/6WQOxmDHK3saMD8A?feature=watch)

We use cookies to improve your experience on our website. Find out more or opt-out.

privacy-policy#optout).     Accept

https://web.archive.org/web/20201127190413/www.occrp.org/en/investigations/flight-of-the-monarch-us-govt-contracted-airline-once-owned-by-russ…     13/14

our-work)

NOT AN OFFICIAL COPY – CCIS – ATTORNEY OF RECORD

We use cookies to improve your experience on our website. Find out more or opt-out.
(/web/20201127190413/http://www.occrp.org/en/aboutus/privacy-policy#optout).        Accept

## Composite Exhibit B
### E-mail Thread

**From:** Drew Sullivan <drew@occrp.org>
**Sent:** Saturday, August 21, 2021 7:45 PM
**To:** David Gitman <david@monarchairgroup.com>
**Subject:** Re: issues

Dear Mr. Gitman:

I am in receipt of your email from August 12, 2021. We see no reason to consider further revisions to the story, having dealt with many concerns that you have expressed.  If you wish to raise further

concerns about the story, you may have your lawyer contact OCCRP's attorneys directly: Alex Papachristou (apapachristou@nycbar.org) and Carla Pierini (cpierini@nycbar.org).

Regards,

**Drew Sullivan - Editor**
**Organized Crime and Corruption Reporting Project**
https://www.occrp.org
twitter: @drewOCCRP
+387 61 139 403 (mob)

**Join the Fight! Hold Power to Account.**

On Thu, Aug 12, 2021 at 10:57 PM David Gitman <david@monarchairgroup.com> wrote:

Mr. Sullivan, Members of the Board,
I see that some changes were made, thank you. I again want to remind you that Florida law (F.S. 836.08) requires that the changes made are published "in as conspicuous place and type as was said original article", which in this case would be the front page, while the changes in fact are published at the end of the article, noticeable by none. Also, none of your affiliate websites have made the changes.

Regardless, I also want to please understand your position. The last communication I received from you was an apology and a promise to correct some of the errors, which I believe is an act of a true leader. At the same time, there was no clear timeline nor explanation of what will be corrected. As some corrections in fact were made, I would like to know if more are coming or are you satisfied with the results.

In my opinion, the article is full of incorrect statements, misrepresentation of facts and general bias, that I strongly believe do not represent professional journalism.

Here is one example, there are plenty more. As the article goes:

*"...Then in 2011, according to a submission from prosecutors at Golubchik's bail hearing two years later, Florida customs agents discovered 16 kilograms of cocaine hidden in one of its planes. A former Monarch pilot, who was not on the flight, told OCCRP the plane was searched by customs agents when it returned to Fort Lauderdale International Airport from Haiti. They found a duffle bag full of cocaine inside. The crew was detained for several hours, he said, along with the person who had chartered the flight, a frequent customer whose name he did not recall. The pilot thought it was strange that the aircraft was then released. "I've seen in previous years, when the airplane was involved with drugs and it was in a hanger and it was not to be moved," he said. "It was under the control of customs. "The U.S. Customs and Border Protection Agency refused to release any information about the discovery of the cocaine, or explain why no one was arrested..."*

Using an unnamed source is a true privilege of a journalist in a developed country, which should be protected as part of the journalist's duty of being the watchdog of democracy. This also places the responsibility of verifying the information received from the source on the publisher, more so than when using a source that is willing to put his/her name on paper.

In this case, the OCCRP used a source that admits that he was not on the flight, i.e. not present

when the events of which he is reporting occurred, therefore does not have first-hand knowledge. You are reporting on a story told by an _unknown person_ to an unnamed source. Have you checked who this person is? Do you know if this person even exists?

Furthermore, your source clearly states that he is not an expert on the subject and speaks from some vague personal knowledge, without specifying what airport his experience relates to, whether it was a private flight or commercial charter and whether it was the crew or passenger that was in possession of the substance, all critical factors that affect the way Customs should handle the situation. Yet, you still use his statements, that the airplane should have been placed in a hangar.

The OCCRP has not checked what procedures the US Customs had in place in 2011 for handling with such incidents on a commercial aircraft. The OCCRP does not provide examples of other private charters or major airlines that had similar incidents.

The OCCRP simply casts a shadow on our operation, because according to an unnamed person, that heard something from someone, the airplane was not towed to a "hanger" (which is spelled "hangar".

In fact, the US Customs does not have a hangar at the Fort Lauderdale International airport, nor at the Fort Lauderdale executive airport. The OCCRP is publishing a rant of a person that is repeating some else's rant, that is clearly not related to reality, and you don't even bother checking basic facts.

Furthermore, sir, you state that "no one was arrested". Does that mean that according to the OCCRP the passenger that brought the illicit substance was not arrested? If thats the case, are you accusing the US Customs of corruption?

Sir, we do not have to agree and reach the same opinion, but I would appreciate if you could please give me a clear and concise response, so that I can act accordingly.

My question is simple: Does this article, as it is published today, meet your personal standards and those of the OCCRP?

Greatly appreciate your time.

Respectfully,


David Gitman

https://www.occrp.org/en/investigations/flight-of-the-monarch-us-govt-contracted-airline-once-owned-by-russian-criminals




On Jun 16, 2021, at 4:05 PM, David Gitman <david@monarchairgroup.com> wrote:

Mr. Sullivan,
Thank you for your response sir. For your reference, provided below is F.S. 836.08, which is the basis of my request to open a criminal investigation against your organization.

I trust that the corrections that you promise to make will be made in _"as conspicuous_

*place and type as was said original article" and that the "full and fair correction,*
*apology, or retraction"* shall state that the prosecutor has apologized for making the
statement that you have quoted, that Monarch was not part of the criminal
proceeding that you have mentioned in the article. I trust that you would reach out
to Jacob Gitman for his comment about the accusations that Mr. Paul Slavin has
made and that you have published without giving him the opportunity to respond
and that you would reach out to Monarch for a full response regarding the
people that (falsely) claim that they were not paid. I am also
attaching hereby the answers that we have provided to your initial request, please
make sure that our answer is published **in full.** We have the legal right to respond to
your accusations.

<Monarch Response .pdf>

   **836.08   Correction, apology, or retraction by newspaper.—**
   (1)   If it appears upon the trial that said article was published in good faith; that its
falsity was due to an honest mistake of the facts; that there were reasonable grounds
for believing that the statements in said article were true; and that, within the period
of time specified in subsection (2), a full and fair correction, apology, and retraction
was published in the same editions or corresponding issues of the newspaper or
periodical in which said article appeared, *and in as conspicuous place and type as*
*was said original article,* then any criminal proceeding charging libel based on an
article so retracted shall be discontinued and barred.
   (2)   Full and fair correction, apology, or retraction shall be made:
   (a)   In the case of a broadcast or a daily or weekly newspaper or periodical, within
10 days after service of notice;
   (b)   In the case of a newspaper or periodical published semimonthly, within 20 days
after service of notice;
   (c)   In the case of a newspaper or periodical published monthly, within 45 days
after service of notice; and
   (d)   In the case of a newspaper or periodical published less frequently than
monthly, in the next issue, provided that notice is served no later than 45 days prior to
such publication.
   History.—s. 2, ch. 16070, 1933; CGL 1940 Supp. 7064(2); s. 993, ch. 71-136; s. 2, ch. 80-34.


On Jun 16, 2021, at 2:25 PM, Drew Sullivan <drew@occrp.org> wrote:

Hi Mr. Gitman,

We just got your latest email.  I do apologize.  I ordered changes made in the article after your suggestion that the article be taken down.  I have just become aware that they were not made. I have ordered that they be added immediately.  There is still an outstanding issue that is not resolved that the fact checker is working on.  I will follow up on that.


Drew Sullivan - Editor
Organized Crime and Corruption Reporting Project
https://www.occrp.org
twitter: @drewOCCRP
+387 61 139 403 (mob)

**Join the Fight!** Hold Power to Account.

NOT AN OFFICIAL COPY - CCIS - ATTORNEY OF RECORD

**From:** Drew Sullivan <drew@occrp.org>
**Sent:** Wednesday, May 12, 2021 10:04 PM
**To:** David Gitman <david@monarchairgroup.com>
**Subject:** Re: correction

Mr Gitman.  I agree with you and we are trying to resolve this but everyone has a very full schedule. In addition, our delay is caused by you bringing up new issues. We take things quite seriously and each issue requires a re-examination.  I also have to deal with staff vacations and the normal emergencies we face that are unpredictable.  I apologize for the delay and when I can get staff together we will sort out the remaining issues

which are few.

**Drew Sullivan - Editor**
**Organized Crime and Corruption Reporting Project**
https://www.occrp.org
**twitter: @drewOCCRP**
**+387 61 139 403 (mob)**

**Join the Fight! Hold Power to Account.**

On Tue, May 11, 2021 at 5:33 PM David Gitman <david@monarchairgroup.com> wrote:

Mr. Sullivan,

Respectfully sir, nearly two months have passed since March 16th, after you have advised me that this will take approximately 2 weeks to fact check. Nearly 6 weeks have passed since March 31st, when you have advised that you will get back with me in 48 hours.

I understand that sometimes things take longer than projected but I would greatly appreciate a realistic timeline.
1.When should I expect a resolution?
2. We all know that there are many flaws with this article. Why is it not taken down, until you resolve the flaws?

Also I cordially request you to comment on my questions brought up in my May 5th email, provided here again for your convenience:

The OCCRP article quotes the Federal prosecutor, Mr. Naftalis, stating that: "We do not believe this business is legitimate." This statement was made during a bail hearing in 2013. Yet, the article at no point stated that Monarch Air Group, nor any of its officers/directors, were not a party to the case. Furthermore, the company was never mentioned in any proceedings outside the bail hearing, yet this again was never mentioned.
Here is what the defense attorney, Mr. Lichtman, told the Court, referring to the how the government presented its case (I provided the transcript to your team in my first correspondence and reattaching hereto):

MR. LICHTMAN: "If you notice, during the last hearing before Judge Freeman, obviously your Honor read that we learned about the plane company that he owned. Last time he owned the plane company. A few days later, well, now he doesn't own it anymore, but he has contacts with the plane company. And then the next day, a few days later, well, it seems like we might have made a little mistake. We might have pushed the envelope too far."

Later on in the hearing, the Prosecutor, Mr. Naftalis, whos quote you've provided, responded that:

"THE COURT: Mr. Naftalis briefly, if you have any response?
MR. NAFTALIS: Yes, your Honor, very briefly. Defense counsel likes to accuse the government of misstating things. We have been completely candid. We may have -- the airplane company I guess it went bankrupt because of this cocaine issue. I fall on my sword, your Honor."

When confronted by the defense infront of the Judge, Mr. Naftalis admitted that he has made a mistake by even presenting Monarch in the hearing.

Question 1:
In your opinion as the editor and co-founder of the OCCRP - sir, was this situation presented correctly in the November 2020 article?

The article presents the opinion of Mr. Paul Slavin, an honest man that clearly stated that he is angry at my father, Jacob Gitman. Mr. Slavin accuses Jacob Gitman of many things including compromising on safety while running an airline, a very serious and troubling accusation.
The OCCRP, while it has requested Jacob Gitman to comment on many things, and received a response to the questions it presented, never asked Jacob Gitman about his position when it comes to Mr. Slavin or Mr. Slavins accusations.

Question 2:
In your opinion as the editor and co-founder of the OCCRP - sir, is it OK to accuse a man, based on a statement from a man that is telling you he is biased against the accused, and never *request* a response?

Question 3:
The OCCRP is quoting unknown sources stating that Monarch did not pay its employee. Monarch has never had the opportunity to respond to this allegation (which, by the way is factually).
In your opinion as the editor and co-founder of the OCCRP- is it OK to accuse a company of not paying its employees based on a statement from a "confidential source" and not even provide the company an opportunity to comment?
Does the fact that the allegation is false make this even worst?

Question 4:
I have provided Ms. Brauer with literally dozens of inconsistencies, biases and factually incorrect statements. You have plenty of time to review them.
At this stage, after reviewing all the information with the OCCRP fact checker, as the editor and co-founder of the OCCRP, are you satisfied with the quality of the article?

Regards

David

On May 5, 2021, at 9:36 PM, Drew Sullivan <drew@occrp.org> wrote:

Thank you.
You've raised a lot of issues that all need to be checked but when I get a chance to schedule everyone will will try to get final resolution on this.

Drew Sullivan - Editor
Organized Crime and Corruption Reporting Project
https://www.occrp.org
twitter: @drewOCCRP
+387 61 139 403 (mob)

**Join the Fight!** Hold Power to Account.

On Wed, May 5, 2021 at 7:02 AM David Gitman <david@monarchairgroup.com> wrote:

Greetings Mr. Sullivan,

I hope all is well. Please advise per the below.

Regards,

David

On Apr 29, 2021, at 3:52 PM, David Gitman <david@monarchairgroup.com> wrote:

The hearing transcript is now attached

On Apr 29, 2021, at 3:52 PM, David Gitman
<david@monarchairgroup.com> wrote:

Mr. Sullivan,

If you would like me to clarify the amount of the
contracts you reference below-please let me know, I
will provide the contract numbers to your or anyone
from your team. Its two contracts- one for the fuel and
one for aviation services under the GSA. There were
several work orders issued under the GSA contract.
If you could- please provide a breakdown of the $6m:
that means we are significantly short and collections
are in order.

I would like your help to please clarify the following:

The OCCRP article quotes the Federal prosecutor, Mr.
Naftalis, stating that: "We do not believe this business
is legitimate." This statement was made during a bail
hearing in 2013. Yet, the article at no point stated that
Monarch Air Group, nor any of its officers/directors,
were not a party to the case. Furthermore, the
company was never mentioned in any proceedings
outside the bail hearing, yet this again was never
mentioned.
Here is what the defense attorney, Mr. Lichtman, told
the Court, referring to the how the government
presented its case (I provided the transcript to your
team in my first correspondence and reattaching
hereto):

MR. LICHTMAN: "If you notice, during the last
hearing before Judge Freeman, obviously your
Honor read that we learned about the plane
company that he owned. Last time he owned the
plane company. A few days later, well, now he
doesn't own it anymore, but he has contacts with the
plane company. And then the next day, a few days
later, well, it seems like we might have made a little
mistake. We might have pushed the envelope too

_far."_

Later on in the hearing, the Prosecutor, Mr. Naftalis, whos quote you've provided, responded that:

_"THE COURT: Mr. Naftalis briefly, if you have any response?_

_MR. NAFTALIS: Yes, your Honor, very briefly. Defense counsel likes to accuse the government of misstating things. We have been completely candid. We may have -- the airplane company I guess it went bankrupt because of this cocaine issue. I fall on my sword, your Honor."_

When confronted by the defense infront of the Judge, Mr. Naftalis admitted that he has made a mistake by even presenting Monarch in the hearing.

Question 1:
In your opinion as the editor and co-founder of the OCCRP - sir, was this situation presented correctly in the November 2020 article?

The article presents the opinion of Mr. Paul Slavin, an honest man that clearly stated that he is angry at my father, Jacob Gitman. Mr. Slavin accuses Jacob Gitman of many things including compromising on safety while running an airline, a very serious and troubling accusation.
The OCCRP, while it has requested Jacob Gitman to comment on many things, and received a response to the questions it presented, never asked Jacob Gitman about his position when it comes to Mr. Slavin or Mr. Slavins accusations.

Question 2:
In your opinion as the editor and co-founder of the OCCRP - sir, is it OK to accuse a man, based on a statement from a man that is telling you he is biased against the accused, and never receive a response?

Question 3:
The OCCRP is quoting unknown sources stating that

Monarch did not pay its employee. Monarch has never
had the opportunity to respond to this allegation
(which, by the way is factually).
In your opinion as the editor and co-founder of the
OCCRP- is it OK to accuse a company of not paying
its employees based on a statement from
a "confidential source" and not even provide the
company an opportunity to comment?
Does the fact that the allegation is false make this even
worst?

Question 4:
I have provided Ms. Brauer with literally dozens
of inconsistencies, biases and factually
incorrect statements. You have plenty of time to review
them.
At this stage, after reviewing all the information with
the OCCRP fact checker, as the editor and co-founder of
the OCCRP, are you satisfied with the quality of the
article?

Mr. Sullivan,
I did not bother you during the last few weeks as I saw
that one of your colleagues was detained by the
Russian government. It is very sad to witness a judicial
system that is being used to put pressure on journalists
and political opponents. I understand that it probably
put your organization under significant stress and
shifted priorities away from the article in
question. Having said that, I believe that enough time
has elapsed and I would like to receive an answer
whether you will correct the mistakes made or if you
will chose a different route.

I would like to understand your position- whether you
will try to cover this up, which I will take to your
sponsors and the Court, or if you will correct
the mistakes. Once I understand your position, it will
clarify to me if the OCCRP is an independent
news organization or just another website using false
and loud headlines as click bait.

If you are a real news organization you should
know that a former subject of the same reporter has

approached me 2 years ago offering to "try and solve the problem" of the upcoming article, though it was supposed to be published in another publication (which they declined to do, perhaps because the fact checked the story). Perhaps this is why she went on a Twitter rage publishing lies about our website being hosted by a Russian bank, Mercury Jets not being registered in Florida and some wild rant about a Canadian company being used for some unspecified illegal activity. Separately, there is also a story that could be rather large, which I would like to discuss with a real investigative reporter, but it has to be a real non biased outlet.

I look forward to your decision sir.
When can I expect an answer to my questions?

Respectfully,

David Gitman

On Apr 14, 2021, at 10:43 PM, Drew Sullivan <drew@occrp.org> wrote:

**Mr. Gitman - there are some discrepancies we are trying to resolve.
You indicate Monarch has six contracts. We find one. We find a total of $6 million as opposed to your $3 million.**

**We will issue corrections or clarifications on the nationalities, the WAB subcontracts and the airlines/charter status as soon as we settle these other issues.**

**Drew Sullivan - Editor
Organized Crime and Corruption Reporting Project
https://www.occrp.org
twitter: @drewOCCRP
+387 61 139 403 (mob)**

**Join the Fight! Hold Power to Account.**

<April 29, 2013 Hearing Transcript.pdf>

NOT AN OFFICIAL COPY – CCIS – ATTORNEY OF RECORD

NOT AN OFFICIAL COPY – CCIS – ATTORNEY OF RECORD

**From:** Drew Sullivan <drew@occrp.org>
**Sent:** Saturday, April 10, 2021 1:46 AM
**To:** David Gitman <david@monarchairgroup.com>
**Subject:** Re: response

Yes. We want to get it right and there are some things we are checking. It's taking longer than I thought.

On Fri, 9 Apr 2021 at 11:18, David Gitman <david@monarchairgroup.com> wrote:

Mr. Sullivan,

On March 31st I received your email stating that you will update me within 48 hours. I sincerely hope that all is well and I am standing by for your update sir.

Regards

David Gitman

> On Apr 7, 2021, at 1:35 PM, David Gitman <david@monarchairgroup.com> wrote:
>
> Mr. Sullivan,
> Please update when practical.
>
> Regards
> David Gitman
>
>> On Mar 31, 2021, at 2:58 PM, David Gitman <david@monarchairgroup.com> wrote:
>>
>> Thank you for the update
>>
>>> On Mar 31, 2021, at 8:49 AM, Drew Sullivan <drew@occrp.org> wrote:
>>>
>>> Hi David.
>>>
>>> I got the information back from the fact checkers and am working out some details.  There were some mistakes made and we will correct them.  There are also some more complex clarifications.  I will get back to you in the next 48 hours.  Thank you for your patience.
>>>
>>> Drew Sullivan - Editor
>>> Organized Crime and Corruption Reporting Project
>>> https://www.occrp.org
>>> twitter: @drewOCCRP
>>> +387 61 139 403 (mob)
>>>
>>> **Join the Fight! Hold Power to Account.**

--
—————————
Drew Sullivan
Editor and Publisher OCCRP
@drewOCCRP
+387 61 139-403

Join the Fight! Hold Power to Account.

Inline images

NOT AN OFFICIAL COPY – CCIS – ATTORNEY OF RECORD

**From:** Drew Sullivan <drew@occrp.org>
**Sent:** Thursday, March 18, 2021 3:26 PM
**To:** David Gitman <david@monarchairgroup.com>
**Subject:** Re: Your comments

Our fact checkers, on all our stories, have no editorial stake in our work. They only care about the level and degree of proof which they assess. She independently gives her assessment of all facts which goes to the editors who then determine how they are handled. She is the lead fact checker and is one of the most ethical and strictest fact checkers in the business. Her reputation is outstanding. There is nobody better. She is fluent or near fluent in about 8 languages including Russian so often she is reading the original source documents herself.

If the original fact checking or the reporter was not balanced or accurate we will fix it. We always have. To me this is my trade and my business and it's not personal. I don't know you and have no need to take sides. I just want a fair and accurate story. If the facts are correct we will not change it. We go through this process regularly.

As far as the sources, we are under no obligation to put you in contact with them. We will assess whether we accurately and faithfully reflected their words and intent. I suggest you wait until that process is finished before contacting them.  I ask you to be patient.

On Thu, 18 Mar 2021 at 14:23, David Gitman <david@monarchairgroup.com> wrote:
   Greetings Mr. Sullivan,

   I was contacted by your colleague, Ms. Birgit Brauer, the OCCRP fact checker. Thank you for passing along my contact information to her.

   My understanding was that you will assign an *independent* fact checker, yet it seems that Ms. Brauer is the OCCRP staff fact checker.
   In a way, won't she be checking her own work? Or am I missing something?

I again cordially request that you provide me with the official US government spoke persons that the OCCRP has contacted regarding this matter and the statements/questions that were sent to them.
I would like to send our reply to them directly. I am not sure why you refuse to provide me with their contact information.

Respectfully,

David Gitman

> On Mar 17, 2021, at 2:52 PM, David Gitman <david@monarchairgroup.com> wrote:
>
> Mr. Sullivan,
>
> For your convenience I have attached the full response as it was sent by my colleague to Ms. Caroline. I am not sure where it was published and why parts of it were omitted.
> Having said that, I do think that your suggestion of an independent fact checker is appropriate and the two weeks timeline is reasonable. I will be standing by.
>
> However, I would like to contact the official government spokespeople that the OCCRP has contacted about this matter and provide them with our side of the story. For this purpose, I cordially request that you provide me their contact information and the statements that were sent to them.
>
> Is there an issue with this request, sir?
>
> Regards
>
> David Gitman

> On Mar 16, 2021, at 8:31 PM, Drew Sullivan <drew@occrp.org> wrote:
>
> They will look at all issues. It is incorrect to say your response was not included. There was a response included. We will look to see if it was appropriate and sufficient. Thank you for your patience.

On Tue, 16 Mar 2021 at 18:53, David Gitman
<david@monarchairgroup.com> wrote:
  Mr. Sullivan,

  Thank you sir for your prompt response.
  As I have stated in my letter, I am confident that the OCCRP
  holds itself to a higher standard, and an independent fact checker
  seems like the way to go. I am looking forward for this person to
  contact me, as I have left the majority of the incorrect facts out of
  the letter, to keep it short.
  I am confident that the fact checker will also address the bias
  presented in the article, as well as our lack of opportunity to
  respond to allegations.

  I will be standing by for two weeks (by March 30th) as requested.

  In the meanwhile, as I have also mentioned in the letter, I
  cordially request that your team provides me with the contact
  information for all the official Government media personnel that
  the OCCRP has been in touch with regarding this matter, as well
  as the statements that were made to them by the OCCRP.

  As our response was never published by the OCCRP, I would
  greatly appreciate the opportunity to respond to the allegation
  made against my family and my company.

  Regards,

  David Gitman


  > On Mar 16, 2021, at 7:11 AM, Drew Sullivan
  <drew@occrp.org> wrote:
  >
  > Hello David,
  >
  > We have received your comments. Thank you for pointing out
  what you consider factual errors. All our stories are fact checked.
  In cases where people allege errors, our procedure is to have an
  independent fact checker verify the origin fact checking and
  competing information. They may get back to you requesting
  proof of your comments.
  >
  > OCCRP takes accuracy and fairness very seriously. This
  process can take one to two weeks so please be patient.
  >
  > Drew Sullivan
  > Editor
  > --

> _____
> Drew Sullivan
> Editor and Publisher OCCRP
> @drewOCCRP
> +387 61 139-403
>
> Join the Fight! Hold Power to Account.
>
> Inline images
>
>

--
_____
Drew Sullivan
Editor and Publisher OCCRP
@drewOCCRP
+387 61 139-403

Join the Fight! Hold Power to Account.

Inline images


<Monarch Response .pdf>


--
_____
Drew Sullivan
Editor and Publisher OCCRP
@drewOCCRP
+387 61 139-403

Join the Fight! Hold Power to Account.

Inline images

<u>**Exhibit C**</u>
OOCRP Website "About" page

11/23/22, 4:03 PM                                                                         About

Our network is battling 41 frivolous lawsuits. Help OCCRP SLAPP Back.          **Donate (/en/aboutus/occrp-**
                              **slapps-back)**

- Featured: (/en/projects)
- The Panama Papers (/en/panamapapers/)
- Laundromats (/en/laundromats/)
- The Pegasus Project (/en/the-pegasus-project/)
- The Pandora Papers (/en/the-pandora-papers/)

-  (http://www
- (http://www
- (https://ww
  organized-
  reporting-p
- (http://www
  6WQOxml
-
  (https://me
  unreported

# Desktop menu



(/en/)

# Mobile menu

- Navigation
- Search

| Investigations | Daily | Features | Announcements | Resources | Contact | Donate (https://checkout.fundj org_id=occrp&campai |
| (/en/investigations) | (/en/daily) | (/en/blog) | (/en/announcements) | (/#resources) | (/en/conta |

**DONATE
(HTTPS://CHECKOUT.FUNDJOURNALISM.ORG/MEMBERFORM?
ORG_ID=OCCRP&CAMPAIGN=7011U000000ECJRQA0)**

# About Us



- Published: 24 August 2007
  - ○
- ○ Written by OCCRP



The last five decades have seen the dramatic globalization of organized crime and corruption, now totaling trillions of dollars every year. With the help of a "criminal services industry" — corrupt banks, law firms, registration agents, and lobbyists — criminal networks have steadily grown their markets, and the world's most corrupt officials and tycoons easily loot, launder, and hide stolen money for future use. The result is an unprecedented transfer of wealth and global web of high-level corruption and organized crime that has fueled global inequality, the rise of extremist groups, and the decline of democratic institutions all over the world.

**OCCRP believes it takes a network to fight a network.**

**MISSION**: By developing and equipping a global network of investigative journalists and publishing their stories, OCCRP exposes crime and corruption so the public can hold power to account.

**VISION**: A world where lives, livelihoods, and democracy are not threatened by crime and corruption.

As an investigative reporting platform for a worldwide network of independent media centers (https://www.occrp.org/en/members) and journalists, OCCRP is reinventing investigative journalism as a public good. In the face of rising costs and growing threats to independent media, OCCRP provides media outlets and journalists with a range of critical resources and tools including digital and physical security and allows those covering the most sensitive topics to work in teams with trusted editors.

While upholding the highest journalistic ethics and editorial standards, OCCRP develops and deploys cutting-edge tech tools to enable collaborative, secure data-driven investigations. With OCCRP Aleph (https://aleph.occrp.org/), an investigative data platform powered by software we developed, journalists can search and cross-reference more than three billion records to trace criminal connections and patterns and efficiently collaborate across borders.

OCCRP also partners with advocacy groups (https://www.occrp.org/en/gacc/), arming civil society with information

11/23/22, 4:03 PM                                                                                  About

to meaningfully press for justice and change, and unearths evidence that enables law enforcement to act.

We see a future where corruption and organized crime are drastically reduced and democracy is strengthened as a result of a more informed citizenry, increased accountability, and sharply higher costs for criminal activity.

# OUR THEORY OF CHANGE:

OCCRP exposes and explains the relationship between money and power and serves as a catalyst that arms others with the information needed to drive positive change. As **investigative journalists**, we expose crime and corruption at the highest levels. Using these revelations, **advocates** can press for policy reform and package information for **law enforcement**, which has the authority to act on evidence and deliver justice. **Policymakers** can point to investigative findings to pass legislation and advance reforms. **Citizens** who read our work get the information they need to act and organize on their own behalf.



About OCCRP - Skoll Awardee

11/23/22, 4:03 PM

About

## Join the fight.
## Hold power to account.

Support from readers like you helps OCCRP expose organized crime and corruption around the world.

**By donating, you'll be directly supporting investigative journalism as a public good. You'll also gain access to exclusive insights and benefits.**

DONATE TODAY

(https://checkout.fundjournalism.org/memberform?org_id=occrp&campaign=7011U000000yly8QAA)

- ABOUT (/en/about-us)
- TEAM (/en/aboutus/staff)
- Global Network (/en/members)
- IMPACT (/en/impact-to-date)
- GLOBAL ANTI-CORRUPTION CONSORTIUM (/en/gacc/)
- ACCOMPLICE PROGRAM (/en/aboutus/join-the-fight-become-an-occrp-accomplice)
- ANNUAL REPORTS (/en/annual-reports)
- AWARDS (/en/awards)
- HISTORY (/en/history-of-occrp)
- Work With Us (/en/jobs)
- BOARD OF DIRECTORS (/en/aboutus/board-of-directors)
- SUPPORTERS (/en/aboutus/who-supports-our-work)

# Most recent

NOT AN OFFICIAL COPY – PLUS – ATTORNEY OF RECORD



(/en/investigations/17071-faq-what-is-correspondent-banking)
FAQ: What is Correspondent Banking? (/en/investigations/17071-faq-what-is-correspondent-banking)

# FAQ: What is Correspondent Banking? (/en/investigations/17071-faq-what-is-correspondent-banking)

11/23/22, 4:03 PM                                              About



(/en/investigations/16985-rwanda-fed-false-intelligence-to-us-and-interpol-as-it-pursued-political-dissidents-abroad)
Rwanda Fed False Intelligence to U.S. and Interpol As It Pursued Political Dissidents Abroad
(/en/investigations/16985-rwanda-fed-false-intelligence-to-us-and-interpol-as-it-pursued-political-dissidents-abroad)

# Rwanda Fed False Intelligence to U.S. and Interpol As It Pursued Political Dissidents Abroad (/en/investigations/16985-rwanda-fed-false-intelligence-to-us-and-

About

# interpol-as-it-pursued-political-dissidents-abroad),



([/en/investigations/16973-documents-reveal-wagners-golden-ties-to-sudanese-military-companies](/en/investigations/16973-documents-reveal-wagners-golden-ties-to-sudanese-military-companies))
Documents Reveal Wagner's Golden Ties to Sudanese Military Companies ([/en/investigations/16973-documents-reveal-wagners-golden-ties-to-sudanese-military-companies](/en/investigations/16973-documents-reveal-wagners-golden-ties-to-sudanese-military-companies))

# Documents Reveal Wagner's Golden Ties to Sudanese Military Companies

# (/en/investigations/16973-documents-reveal-wagners-golden-ties-to-sudanese-military-companies)

Subscribe to our weekly newsletter! (https://mailchi.mp/occrp/subscribe-newsletter?campaign=joomla_right_column)

Contact (/en/aboutus/contact-us)

Privacy Policy (/en/aboutus/privacy-policy)

Bypassing Censorship (/en/aboutus/bypassing-censorship)

About (/en/about-us)    Member Centers (/en/members)

History of OCCRP (/en/history-of-occrp)    Team (/en/aboutus/staff)

Board of Directors (/en/aboutus/board-of-directors)

Awards (/en/awards)

Our Supporters (/en/aboutus/who-supports-our-work)



(http://www.facebo

(https://www.twitter

(https://www.linked
and-
corruption-
reporting-
project/)

(http://www.youtub
5AYQ9amDHK3sa
feature=watch)

## Exhibit D

Current Article

# Flight of the Monarch: US Gov't Contracted Airline Once Owned by Criminals with Ties to Russian Mob

📷 Credit: Facebook

by **Lily Dobrovolskaya**

27 November 2020

🐦 [(http://twitter.com/intent/tweet?text=U.S. authorities awarded Monarch Air Group over 100 contracts, including transporting protected witnesses](

f [(http://www.facebook.com/share.php?u=https://www.occrp.org/en/investigations/flight-of-the-monarch-us-govt-contracted-airline-once-owned-by](

❤ DONATE (https://www.occrp.org/en/donate)

An American aviation company that has transported protected witnesses for the U.S. government was once part-owned by two men who worked with a major Russian-American organized crime group.

These men, Anatoly Golubchik and Vadim Trincher, were jailed in 2014 for operating an illegal gambling and extortion ring (https://www.fbi.gov/contact-us/field-offices/newyork/news/press-releases/two-defendants-sentenced-for-participating-in-racketeering-conspiracy-with-russian-american-organized-crime-enterprise-operating-international-sportsbook-that-laundered-more-than-100-million) out of an apartment in Trump Tower in New York City. U.S. prosecutors said they were part of a "far-reaching Russian-American organized crime ring" known as the Taiwanchik-Trincher Organization, under the protection of notorious Russian crime boss Alimzhan "Taiwanchik" Tokhtakhounov.



Flight of the Monarch: US Gov't Contracted Airline Once Owned by Criminals with Ties to Russian Mob - OCCRP

## Пролетая над Америкой

Read a version of this story in Russian from our partner IStories.

**Read more** ▶

(https://istories.media/investigations/2020/11/27/proletaya-nad-amerikoi/)

Read OCCRP's coverage of how the Taiwanchik-Trincher Organization was busted wide open (https://www.occrp.org/en/investigations/1953-international-russian-organized-crime-ring-does-old-school-gambling-in-a-new-way).

Two other investors who ran the company afterwards also had legal troubles, and one fled a warrant for his arrest in the U.S. and remains on the lam.

Nonetheless, an OCCRP investigation shows Monarch Air Group has won U.S. government contracts worth over $6 million, and was making government flights as recently as September.

Monarch has carried out various tasks for U.S. authorities, including carrying protected witnesses for the Marshals Service and transporting fuel in Israel for the Department of Defense (DoD). (The witness-protection contracts were first reported by (https://thesternfacts.com/under-trump-witness-protection-has-been-infiltrated-by-the-russian-mafia-f6e4825f10a5) blogger Patrick Simpson last year.) One of its affiliates, WAB International, also subcontracted jobs transporting passengers and cargo for the DoD in Afghanistan.

"The negligence is startling," said Gary Kalman, director of the U.S. chapter of Transparency International. "Airlines with a history of criminal affiliation contracted by the government to transport protected witnesses is something we'd expect to see in a spy novel, not in a news report."





Credit: Twitter
Vadim Trincher, on the left, was sentenced to five years in prison in 2014 for operating an illegal gambling, money laundering, and extortion ring.

In a 2013 court document, prosecutors claimed Golubchik acted as Tokhtakhounov's "enforcer," and accused the men of laundering about $100 million on behalf of "high-level criminals" — some of it through Monarch and another airline company Golubchik and Trincher owned in the U.S. called Skyway International.

On one occasion, customs agents in Miami discovered 16 kilograms of cocaine on one of Monarch's planes. Prosecutors noted the seizure at Golubchik's bail hearing in 2013, adding of the airline: "We do not believe this business is legitimate."

The U.S. Marshals Service told reporters that it placed protected witnesses on Monarch planes through contracts overseen by the General Services Administration (GSA), which provides leasing, management, and other professional services to U.S. government agencies. The GSA did not respond to a request for comment.

Golubchik and Trincher both left Monarch in 2012, before the airline won the DoD and the GSA contracts. Monarch was audited by the GSA in 2013, the same year Golubchik and Trincher's arrest was widely reported, and the agency awarded the airline a 10-year contract in 2014 under which the U.S. Marshals service employed them to transport protected witnesses. The company is currently owned by the son of Golubchik and Trincher's former business partner.



Case 0:23-cv-61256-XXXX   Document 1-2   Entered on FLSD Docket 06/30/2023   Page 69 of 374

11/23/22, 4:33 PM                    Flight of the Monarch: US Gov't Contracted Airline Once Owned by Criminals with Ties to Russian Mob - OCCRP

A spokesperson for the Defense Logistics Agency, which manages the U.S. military's supply chains, said the agency followed the proper procedures when vetting Monarch for a contract awarded in 2012 to deliver fuel to a military base in Israel. Neither Golubchik nor Trincher were "involved in the bidding or performance of the contract," he added in an email.

Federal Acquisition Regulations require contractors like Monarch to provide details of any criminal offenses by its employees, even if they don't relate directly to the contract, according to Jessica Tillipman, a professor at George Washington University Law School with expertise in anti-corruption and government contracting. The agency is then required to make further enquiries, and it is at their discretion to decide whether to work with the company.

Alina Gavrushenko, Monarch's director of marketing and public relations, said the company has not been affiliated with Golubchik or Trincher since 2012.

"Like many startups, especially in aviation, the company has changed ownership and evolved its business model over the years," she said, adding: "Our business operations are conducted with full integrity and transparency."

The current owner of Monarch, David Gitman, did not respond to a request for comment.

Credit: Facebook
A promotional image used by Monarch.

## The Takeover

With the 2008 financial crisis threatening to ground Monarch Air, then a small Florida-based air cargo company, its owner, career pilot Paul Slavin needed an injection of funds.

Slavin, who had worked in the aviation industry for 35 years, started looking around for backers. A "trusted aircraft broker" he knew introduced him to Jacob Gitman and Anatoly Golubchick, who agreed to invest while staying out of the airline's day-to-day operations. For a while, it seemed an ideal solution.

But they soon invited more investors on board, and within three years the clique had taken control of the company. According to Slavin, they started withholding funds and making "operational decisions that conflicted with my standards." He says he sold his shares in 2011 for a token amount. The new group began aggressively expanding the business, opening new offices and bidding for U.S. government contracts.

Slavin says he didn't know that two of his investors had ties to Russian organized crime. "If they were involved in any illegal activity outside of the airline it was never revealed to me," he said in an email to OCCRP.

David Gitman's father, Jacob Gitman, was among the first investors to join Monarch Air after it hit financial turbulence in 2008.

The elder Gitman was born in the Soviet Union, where he worked as an engineer before immigrating to the U.S. in the early 1990s. He has been linked to dozens of U.S. businesses (https://www.azcentral.com/story/money/business/jobs/2019/08/16/la-paz-county-residents-fighting-plans-aluminum-smelter-alliance-metals/1928485001/) in everything from logistics and healthcare to aluminium smelting.

In 2017, Gitman was found liable in a civil lawsuit of misleading investors about technology, expertise, and potential profits from an operation to supposedly convert used tires into fuel. The plaintiff, Blizzard Energy, was awarded $3.8 million in





Credit: Twitter

Anatoly Golubchik was convicted of operating what New York prosecutors described as an illegal "large-scale sports book."

damages, and the case is now under appeal. Gitman declined to comment as the case is still ongoing.

Golubchik also joined as an investor in 2008, while Trincher, his criminal partner in the gambling, money laundering, and extortion ring, came aboard in 2011. Another immigrant from the former Soviet Union, Trincher was a professional card player who has reportedly made more than $1.2 million in live tournament earnings during his career, including winning the 2009 World Poker Tour Foxwoods Poker Classic.

Along with Tokhtakhounov, the Russian crime boss who is still on the run, the two men operated what New York prosecutors described as an illegal "large-scale sports book" that was used to launder approximately $100 million from former Soviet Union countries through Cyprus-registered shell companies. Prosecutors said around $50 million of that sum found its way to the U.S.

"Their clients were multi-millionaires and billionaires, oligarchs in Russia," the prosecutors noted in court documents.

Their group also ran a high-stakes poker game that attracted not only clients from Russia, but also major American actors



11/23/22, 4:33 PM                Flight of the Monarch: US Gov't Contracted Airline Once Owned by Criminals with Ties to Russian Mob - OCCRP



Credit: Evan Agostini/Invision/AP

**Molly Bloom, left, was among 34 people indicted for being part of the illegal gambling rings. Here she poses with actress Jessica Chastain, who played her in the film chronicling her experiences, "Molly's Game."**

like Ben Affleck, Leonardo DiCaprio, and Matt Damon, according to the industry publication Poker News. The rise and fall of the star-studded poker game was later made into the film "Molly's Game," featuring Jessica Chastain and Idris Elba.



The Taiwanchik-Trincher Organization and its sister crime ring, co-run by Trincher's son Illya, were broken up in 2013, reportedly (https://abcnews.go.com/US/story-fbi-wiretap-russians-trump-tower/story?id=46266198) after the FBI spent two years collecting information on the Russian money-laundering network using a wiretap hidden inside unit 63A in Trump Tower.

Jacob Gitman told OCCRP he had met Golubchik in 2006, but declined to explain how. He said he had never met or spoken with Trincher. "I don't have any business relations with them since 2013," he said in an email.

However, public records show that Gitman partnered with Golubchik and Trincher in at least four aviation companies. Panama-based SkyWay International Holding still lists all three men as corporate officers. Gitman said the Panamanian company was never active, and had never facilitated any transactions or opened bank accounts.

An important addition to Monarch's team was businessman Boruch "Bob" Freedman, who joined the company in April 2011. Freedman was already involved in air transport in Afghanistan, but he did not have the certificate or experience to procure direct government contracts. Monarch did. The two decided to join forces and, along with Gitman's son, David, they formed WAB International, which signed a profit-sharing and reimbursement arrangement with Monarch.

Freedman was well-known in the aviation world as the nephew of Alexander Mashkevich, a Kazakh business titan with links to the Eurasian Natural Resources Corporation (see box below (https://www.occrp.org/en/investigations/flight-of-the-monarch-us-govt-contracted-airline-once-owned-by-russian-criminals#occrp-inset-box-burundaiavia-s-controversial-owners)), according to John Dawkins, the head of a logistics company that worked with Freedman on a government contract in Afghanistan.

"Boruch was a middleman," Dawkins said. "He was plugged into everyone using his uncle's reputation to gain entry and relevance."

Freedman, who fled the U.S. after a warrant was issued for his arrest for not paying a court-mandated fine, did not respond to a request for comment.

## A Kyrgyz Investor With a Troubled Airline of His Own                                          —

In 2011, Gennady Gryaznov, a former director of Kyrgyzstan's Department of Civil Aviation, also bought into Monarch. Gryaznov already owned Sky KG Airlines, a Kyrgyz airline that is banned from operating in the European Union due to safety concerns.

Sky KG caught the attention of the United Nations Security Council the following year when it began leasing the aircraft that reportedly served as the former presidential plane of Romanian dictator Nicolae Ceaușescu to the powerful Somali pirate boss Mohamed Abdi Hassan. A U.N. report alleged that Hassan added Gryaznov's plane to his own small airline — which he used, along with other businesses, for the "laundering of piracy proceeds" — before he was arrested in Belgium.

Gryaznov did not respond to a request for comment.

Golubchik and Trincher appeared in Monarch's paperwork until 2012, the year the airline won its first contract with the DoD. They are last mentioned as investors in a report from April that year, and records show they were gradually replaced as managers by Freedman-controlled entities.

By 2015, corporate records show that Jacob Gitman owned 90 percent of Monarch, but he said he sold his majority shareholder position the following year. His 37-year-old son, David — who did not respond to a request for comment — is now listed as the CEO and sole owner of the airline.



Case 0:23-cv-61256-XXXX   Document 1-2   Entered on FLSD Docket 06/30/2023   Page 73 of 374

11/23/22, 4:33 PM                        Flight of the Monarch: US Gov't Contracted Airline Once Owned by Criminals with Ties to Russian Mob - OCCRP



Credit: Edin Pasovic/OCCRP

While Slavin had initially welcomed his new investors, the partnership turned sour.

"Unfortunately for me it became obvious that Boruch Freedman wanted control of the airline and used withholding of funds to affect the daily operation of the airline," said Slavin. "I was then double-crossed by Jacob Gitman, who gave his and Golubchik's voting shares to Freedman."

Slavin said he was voted out as CEO in 2011. At first he stayed on as director of operations, but left when he felt the new owners started cutting corners on safety.

Credit: Facebook

Monarch posted this image on the company's Facebook account last year, accompanied by a quote attributed to Henry Ford: "When everything seems to be going against you, remember that aircraft take off against the wind, not with it."



## Federal Contracts

When Slavin first launched Monarch Air Group in 2005, his cargo planes flew to just one destination: the Bahamas, a Caribbean island chain beginning 80 kilometers off the southeast Florida coast, and known as an easy-access playground for American tourists, celebrities, and global elites.



Credit: Facebook

This Monarch brochure from 2009 says the company flew cargo mainly to the Bahamas, Puerto Rico and the Dominican Republic.

Monarch expanded its flight routes when the new investors came on board, and began carrying passengers as well as cargo. Then in 2011, according to a submission from prosecutors at Golubchik's bail hearing two years later, Florida customs agents discovered 16 kilograms of cocaine hidden in one of its planes.

A former Monarch pilot, who was not on the flight, told OCCRP the plane was searched by customs agents when it returned to Fort Lauderdale International Airport from Haiti. They found a duffle bag full of cocaine inside. The crew was detained for several hours, he said, along with the person who had chartered the flight, a frequent customer whose name he did not recall. The pilot thought it was strange that the aircraft was then released.

"I've seen in previous years, when the airplane was involved with drugs and it was in a hanger and it was not to be moved," he said. "It was under the control of customs."

The U.S. Customs and Border Protection Agency refused to release any information about the discovery of the cocaine, or explain why no one was arrested.



Gavrushenko, Monarch's spokesperson, said the cocaine belonged to a passenger. "We have worked with the relevant authorities to develop and enhance existing procedures, to prevent this from happening again," she said. "In our 15 years of operations, this was the only occurrence."

In the two years following the bust, U.S. government agencies continued contracting Monarch. WAB also received subcontracts to provide helicopter transport for passengers and cargo in Afghanistan for the DoD. Court records show WAB subcontracted the jobs to a small Kazakhstan-based aviation company, JSC Airline Burundaiavia.

The DoD contracts ceased after a helicopter crash in Afghanistan, according to court documents. In early May 2013, two Burundaiavia choppers took off from a U.S. military forward operating base about 40 miles outside Kandahar, in southern Afghanistan. A short time later, the engines failed in one of the helicopters and it went down over a populated area, "causing much damage and destruction to the village."

The court documents say Burundaiavia failed to investigate the incident, as was required under international, Afghan, and U.S. law. The crash "tarnished" the company's reputation, according to a court submission made by Burundaiavia, and it was never awarded another U.S. government contract.

The incident appears to have led to a falling out between the business partners, culminating in a lawsuit in Florida. Burundaiavia successfully sued WAB in 2015 for failing to pay almost $8 million in fees it owed. A warrant was issued for Freedman's arrest the following year after he was held in contempt of court for not paying the fine. U.S. Marshals were unable to track him down, and he now lives in Israel, according to a court document.



Credit: burundaiavia.kz (https://burundaiavia.kz/)

Two Burundaiavia choppers crashed in southern Afghanistan in 2013.

### Burundaiavia's Controversial Owners                                   —

The Florida case involving WAB revealed who owns JSC Airline Burundaiavia: three oligarchs from Kazakhstan who have faced corruption allegations in various places.

▼ MORE

In 2017, the Marshals Service twice hired Monarch to transport people in the witness protection program and the Justice Prisoner and Alien Transportation System, which moves prisoners around the country.



Gary Kalman of Transparency International said the fact that Monarch was able to transport protected witnesses, despite the dubious backgrounds of its former owners, shows the need for more thorough checks on companies that are awarded public contracts.

"Common sense says that contracts should be clearly vetted before going to entities with a history of criminal affiliation, but there is no legal mandate that we check," he said. "That is a significant gap in the law, and this story is a prime example of how such a gap might be dangerously exploited."

The Marshals declined to comment, saying the GSA was responsible for vetting the company. Monarch's spokesperson said the company was audited by the GSA as a vendor in 2013 and won its contracts "with full transparency and open competition."

The GSA did not reply to a request for comment.



Credit: Facebook

Monarch's air carrier license was revoked in 2016, though it is still able to broker charter flights with other FAA certified airlines.

## No-Fly Zone

Between January and April 2016, Monarch's director of operations, chief pilot, and maintenance director all quit. A pilot who spoke to OCCRP anonymously said employees resigned after Monarch stopped paying them, and the airline struggled to find replacements.

In May that year, the airline requested the FAA remove its only aircraft from its "Operation Specifications," a legal designation that allowed it to run commercial operations like private chartered flights. Without any planes that met FAA requirements, or key staff members to run them, its air carrier certificate was revoked in February 2018.

But Monarch is still authorized to broker charter flights with other FAA-certified air carriers.



Analysis of public documents found U.S. authorities have awarded Monarch contracts worth more than $6 million. The company is still brokering flights under an open-ended 10-year contract awarded in 2014.

The bulk of Monarch's contracts were with the DoD and involved transporting fuel to Har Keren in Israel, where the U.S. military has a mountaintop radar facility known as Site 512. Those gigs took place between 2012 — the last year Golubchik and Trincher were known to be involved in the company — and 2015.

Seto Bagdoyan, director for audit services at the U.S. Government Accountability Office's (GAO) Forensic Audits & Investigative Service, said the lack of transparency in contracting structures presents a risk to the government.

"A recent GAO report ... flagged a number of fraud and national-security risks to DoD acquisition posed by contractor ownership structures that may not be fully transparent," he said. "While GAO didn't specifically focus on background checks, this could be an important aspect of DoD's assessment of its various controls."

In addition to U.S. federal contracts, the Monarch Air Group lists international clients including the United Nations World Food Program, and Canada's Department of National Defence. Most recently, David Gitman boasted (https://www.traveldailynews.com/post/repatriation-flights-and-the-key-role-of-private-aviation-during-pandemic) in a travel publication of Monarch's "great synergy" with U.S. embassies to bring home citizens stranded in Latin America due to the COVID-19 crisis.

In the 12 years since Slavin welcomed new investors, his small air cargo company has grown from a struggling start up, with just one route to the Bahamas, into a global operation. But even though he has not been able to "share in the prosperity," he said he is not bitter.

"I am done reliving this chapter of my life that I closed 10 years ago," Slavin said.

*This story has been updated with the following corrections and clarifications:*

- The story has been clarified to better explain that Monarch says it won six government contracts. These included more than 120 awards, or transactions, to carry out those jobs. U.S. government records show these totaled more than $6 million.
- The story incorrectly identified the nationality of two former part-owners of Monarch, Anatoly Golubchik and Vadim Trincher. They are naturalized U.S. citizens who emigrated from the former Soviet Union.
- The story incorrectly stated the manner in which WAB International, a Monarch affiliate, received funds. WAB reported it received $70 million in subcontracts for work on behalf of the U.S. military from one or more companies that received contracts directly from the U.S. military.
- The story has been clarified to correctly reflect Monarch's status during its years of operation. Monarch was designated as an airline until February 2018 when the Federal Aviation Administration (FAA) revoked its air carrier certificate. Monarch was then registered as an on-demand charter broker.

🐦 (http://twitter.com/intent/tweet?text=U.S. authorities awarded Monarch Air Group over 100 contracts, including transporting protected witnesses a

f (http://www.facebook.com/share.php?u=https://www.occrp.org/en/investigations/flight-of-the-monarch-us-govt-contracted-airline-once-owned-by

**Join the fight.**
**Hold power to account.**

Support from readers like you helps OCCRP expose organized crime and corruption around the world.

By donating, you'll be directly supporting investigative journalism as a public good. You'll also gain access to exclusive insights and benefits.

DONATE TODAY

(https://checkout.fundjournalism.org/memberform?org_id=occrp&campaign=7011U000000yMyDOAO)



0 Comments                                                    Sort by  Oldest

Add a comment ..,

Facebook Comments Plugin

**RELATED STORIES**

**Rwanda Fed False Intelligence to U.S. and Interpol As It Pursued Political Dissidents Abroad**
(/en/investigations/rwanda-fed-false-intelligence-to-us-and-interpol-as-it-pursued-political-dissidents-abroad)

**Documents Reveal Wagner's Golden Ties to Sudanese Military Companies**
(/en/investigations/documents-reveal-wagners-golden-ties-to-sudanese-military-companies)

**Inside South Africa's Brutal Lion Bone Trade**
(/en/investigations/inside-south-africas-brutal-lion-bone-trade)

**Notorious Nigerien Weapons Broker Lands Secret Arms Deal in Senegal**
(/en/investigations/notorious-nigerien-weapons-broker-lands-secret-arms-deal-in-senegal)

**RECENT STORIES**

**Rwanda Fed False Intelligence to U.S. and Interpol As It Pursued Political Dissidents Abroad**

Rwandan dissidents have claimed that President Paul Kagame has used dirty tactics to go after

his critics abroad. Now, a classified FBI report obtained by OCCRP confirms that Rwanda has been conducting "poison pen" operations

**Documents Reveal Wagner's Golden Ties to Sudanese Military Companies**

Wagner, the Russian mercenary company owned by the infamous businessman Yevgeny Prigozhin, secured and maintained its position in Sudan's gold sector while

working closely with companies affiliated with Sudan's brutal military.

© 2 NOVEMBER 2022    → READ THE ARTICLE

**Inside South Africa's Brutal Lion Bone Trade**

In the world's only commercial lion-farming industry, centered in South Africa's Free State, animals are reared in terrible conditions so they can be slaughtered for their bones. Reporters tracked the lion bone supply chain all the way to Laos, where one of the world's most notorious wildlife trafficking groups has

© 25 OCTOBER 2022    → READ THE ARTICLE

**Notorious Nigerien Weapons Broker Lands Secret Arms Deal in Senegal**

A contract seen by OCCRP shows how Aboubakar Hima, who allegedly skimmed millions from $240 million in corrupt arms

deals in his native Niger, may be up to his old tricks further from home.

NOT AN OFFICIAL COPY - COURT ATTORNEY OF RECORD

on American soil for
years.

(/en/investigations/rwanda-fed-false-
intelligence-to-us-and-interpol-as-it-
pursued-political-dissidents-abroad)

(/en/investigations/documents-reveal-
wagners-golden-ties-to-sudanese-
military-companies)

⊘ 4 NOVEMBER 2022    ➡ READ THE
                        ARTICLE

been buying up big cat
skeletons for years.

⊘ 26 OCTOBER 2022    ➡ READ THE
                        ARTICLE

(/en/investigations/inside-south-africas-
brutal-lion-bone-trade)

(/en/investigations/notorious-nigerien-
weapons-broker-lands-secret-arms-
deal-in-senegal)

Contact (/en/aboutus/contact-us)

Bypassing Censorship
(/en/aboutus/bypassing-censorship)

Member Centers (/en/members)

Team (/en/aboutus/staff)

Awards (/en/awards)

Privacy Policy (/en/aboutus/privacy-policy)

About (/en/about-us)

History of OCCRP (/en/history-of-occrp)

Board of Directors (/en/aboutus/board-of-
directors)

Our Supporters (/en/aboutus/who-
supports-our-work)

Subscribe to our weekly report
(https://mailchi.mp/occrp/occrp-
newsletter?campaign=footer)

(http://www.youtube.com
6WQOxmDHK3saMD8A?
feature=watch)

NOT AN OFFICIAL COPY – CCIS – ATTORNEY OF RECORDS

## Exhibit E
Statement from Author dated November 28, 2020

8:39     .ull LTE ▪

🔒 mobile.twitter.com — Private

←    Q   Search Twitter     ◦◦◦

| Log in | Sign up |
|---|---|

in the story in case any of it can be can be useful for researchers and reporters out there. Please read carefully and don't jump into conclusion.

💬 1     ↻     ♡ 1     ↑

**Lily Dobrovolskaya** ... · Nov 28, 2020   ◦◦◦
Monarch has a division called Mercury Jets which has no legal presence in the US. Mercury's website domain info shows it was registered by an eponymous company in Moscow and lists a contact email address of a Moscow-based commercial bank Sibcontact bank.

💬 3     ↻     ♡     ↑

**Lily Dobrovolskaya** ... · Nov 28, 2020   ◦◦◦
The bank lost more than 2 Billion RUR and came under criminal investigation after the bankruptcy. The banker owned his aviation business in partnership with a Russian public official arrested for bribes.

💬     ↻     ♡     ↑

**Eric Levai** @ericlevai · Nov 27, 2020   ◦◦◦
Replying to @BunchOfPhonies and @OCCRP
great work

💬     ↻     ♡ 1     ↑

NOT AN OFFICIAL COPY BLC - A COPY OF RECORD

**** FILED: BROWARD COUNTY, FL Brenda D. Forman, CLERK 11/28/2022 4:30:00 PM.****

## IN THE CIRCUIT COURT OF THE 17ᵀᴴ JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

Monarch Air Group LLC

Plaintiff

Case No: 22-17416

Judge Division: 09

VS

Journalism Development Network Inc

Defendant

Lily Dobrovolskaya

FILED
NOV 28 2022
By

### CLERK'S CERTIFICATE OF COMPLIANCE

I hereby certify that pursuant to Administrative Order, No. 2020–73Civ/2020–74–UFC: **"ADMINISTRATIVE ORDER DIRECTING CLERK OF COURTS WITH REGARD TO DISMISSED CIVIL OR FAMILY CASES",**

**The Clerk has conducted a search for all previous existing civil cases related to these two parties.**

**Listed below are all the aforementioned related cases:** NONE

Brenda D. Forman
Circuit and County Courts

By:

Deputy Clerk

Filing # 162009246 E-Filed 11/29/2022 01:57:48 PM

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

MONARCH AIR GROUP, LLC
a Florida Limited Liability Company,

      Plaintiff,                       CASE NO.: CACE-22-017416

v.

JOURNALISM DEVELOPMENT
NETWORK INC., A Maryland Corporation,
and LILY DOBROVOLSKAYA

      Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:

To Each Sheriff of the State:

      You are commanded to serve this summons and a copy of the complaint filed in this action,
on Defendant, JOURNALISM DEVELOPMENT NETWORK INC., by serving:

**Journalism Development Network, Inc.**
**Registered Agent: CSC-Lawyers Incorporating Service Company**
**7 St. Paul Street, Suite 820**
**Baltimore, Maryland 21202**

      Defendant is required to serve written defenses to the Complaint on, Joshua R. Kon, Esq.,
Plaintiff's attorneys, whose address is: STOK KON + BRAVERMAN, One East Broward Boulevard, Suite
915, Fort Lauderdale, Florida 33301 within twenty (20) days after service of this Summons on that Defendant,
exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before
service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered
against that Defendant for the relief demanded in the Complaint.

Dated:     NOV 29 2022

                              Clerk of the Court

                              BY: _____
                              As Deputy Clerk

                              **BRENDA D. FORMAN**

{00706877}

      *** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN,  CLERK 11/29/2022 01:57:46 PM.****

## IMPORTANT

A lawsuit has been filed against you. You have twenty (20) calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book). If you choose to file a written response yourself, at the same time you file your written response to the court you may also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named above.

## IMPORTANTE

Usted ha sido demandado legalmente. Tiene veinte (20) días, contados a partir de la recepción de esta notificación, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefónica no lo protegerá. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el número del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podría ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Se no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guía telefónica. Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, deberá usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous.   Vous avez vingt (20) jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de téléphone est insuffisant pour vous protéger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entede votre cause. Se vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocat, ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones). Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme cidessous.

{00706877}

Filing # 162678321 E-Filed 12/08/2022 03:42:24 PM

**IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT FOR BROWARD COUNTY, FLORIDA**

Monarch Air Group, LLC

        Plaintiff

    v.

Journalism Development Network Inc., et al.

        Defendant

Case No.:CACE-22-017416

**AFFIDAVIT OF PERSONAL SERVICE**

That I, Rodney Getlan hereby solemnly affirm under penalties of perjury and upon personal knowledge that the contents of the following document are true and do affirm I am a competent person over 18 years of age, not a party to this action and that I am certified and in good standing and/or authorized to serve process in the Judicial Circuit in which the process was served.

That on 12/2/2022 at 9:08 AM at 7 Saint Paul St Ste 820, Baltimore, MD 21202-1681 I served Journalism Development Network Inc. with the following list of documents: Summnos; Complaint; Civil Case Cover Sheet by then and there personally delivering a true and correct copy of the documents into the hands of and leaving with Jessica Slbright - Intake Specialist who is authorized to accept service on behalf of Journalism Development Network Inc..

That the description of the person actually served is as follows: Gender: Female Race: Caucasian Age: 31-35 Height: 5'7 - 6'0 Weight: 141-160 Lbs Hair: Black Eyes:Brown Marks:

That I asked the person spoken to whether the Servee was in the active duty military service of the United States or in the state in which this service was made and was told [ ] No they were not [ ] Yes they are [ ] No answer was given.

*Rod S G*

Rodney Getlan
**L&L Process**
13876 SW 56 Street Suite 200
Miami, FL 33175
(305) 772-8804

12/2/2022
Executed On:



Order #:33735
Their File 2022004440

NOT AN OFFICIAL COPY - CLERK - PORTAL OF RECORD

*** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN,  CLERK 12/08/2022 03:42:24 PM.****

Filing # 162876135 E-Filed 12/12/2022 05:18:43 PM

CACE-22-017416

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

MONARCH AIR GROUP, LLC
a Florida Limited Liability Company,

      Plaintiff,

CASE NO.: CACE-22-017416

v.

JOURNALISM DEVELOPMENT
NETWORK INC., A Maryland Corporation,
and LILY DOBROVOLSKAYA

      Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:

To Each Sheriff of the State:

    You are commanded to serve this summons and a copy of the complaint filed in this action, on Defendant, LILY DOBROVOLSKAYA, by serving:

**Lily Dobrovolskaya**
**89 E 2nd Street, Apt 1**
**New York, New York 10009-7962**

    Defendant is required to serve written defenses to the Complaint on, Joshua R. Kon, Esq., Plaintiff's attorneys, whose address is: STOK KON + BRAVERMAN, One East Broward Boulevard, Suite 915, Fort Lauderdale, Florida 33301 within twenty (20) days after service of this Summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint.

Dated:    DEC 13 2022

                          Clerk of the Court

                          BY: _____
                             As Deputy Clerk

**BRENDA D. FORMAN**

{00706879}

## IMPORTANT

A lawsuit has been filed against you. You have twenty (20) calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book). If you choose to file a written response yourself, at the same time you file your written response to the court you may also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named above.

## IMPORTANTE

Usted ha sido demandado legalmente. Tiene veinte (20) días, contados a partir de la recepción de esta notificación, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefónica no lo protegerá. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el número del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podría ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Se no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guía telefónica. Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, deberá usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous.   Vous avez vingt (20) jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de téléphone est insuffisant pour vous protéger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entede votre cause. Se vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocat, ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones). Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme cidessous.

{00706879}

Filing # 163856058 E-Filed 12/29/2022 07:01:01 PM

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO. CACE22017416   DIVISION: 09   JUDGE: Levenson, Jeffrey R. (09)

Monarch Air Group, LLC

Plaintiff(s) / Petitioner(s)

v.

JOURNALISM DEVELOPMENT NETWORK, INC., et al

Defendant(s) / Respondent(s)

_____/

### AGREED ORDER ENLARGING THE TIME PERIOD WITHIN WHICH DEFENDANT JOURNALISM DEVELOPMENT NETWORK, INC. MUST RESPOND TO PLAINTIFF'S COMPLAINT AND ORDER TO SET CASE MANAGMENT CONFERENCE

This cause came before the Court upon the parties' stipulation that Defendant, JOURNALISM DEVELOPMENT NETWORK, INC. ("JDN"), shall have a 30-day enlargement of the time period within which JDN must respond to Plaintiff's Complaint, up to and including January 26, 2023.  It is hereby:

ORDERED AND ADJUDGED:

Defendant JDN shall respond to Plaintiff's Complaint in the above-captioned matter on or before January 26, 2023.

**The Plaintiff shall set a case management conference to be conducted within twenty (20) days of the filing of the Response to address scheduling. *Failure to do so may result in sanctions. However, the case management conference may be canceled upon notifying the Court after Plaintiff files a notice of trial after the filing of the answer.***

DONE AND ORDERED in Chambers at Broward County, Florida on 29th day of December, 2022.

CACE22017416 12-29-2022 6:34 PM
Hon. Jeffrey Levenson
**CIRCUIT COURT JUDGE**
Electronically Signed by Jeffrey Levenson

*** FILED: BROWARD COUNTY, FL BRENDA D. FORMAN, CLERK 12/29/2022 07:01:00 PM.****

Case Number: CACE22017416

**Copies Furnished To:**
Dana J. McElroy , E-mail : DMcElroy@tlolawfirm.com
Daniela Abratt , E-mail : dabratt@tlolawfirm.com
Joshua Kon , E-mail : jkon@stoklaw.com
Joshua Kon , E-mail : gortiz@stoklaw.com
Peretz Laine , E-mail : plaine@stoklaw.com
Peretz Laine , E-mail : gortiz@stoklaw.com
Robert A. Stok , E-mail : service@stoklaw.com
Robert A. Stok , E-mail : ssolis@stoklaw.com
Yosef Kudan , E-mail : ykudan@stoklaw.com

NOT AN OFFICIAL COPY - CCIS - ATTORNEY OF RECORD

Filing # 165517223 E-Filed 01/26/2023 11:41:08 AM

**IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA**

MONARCH AIR GROUP, LLC,
a Florida Limited Liability Company,

      Plaintiff,

                                    CASE NO.: CACE-22-017416
                                    DIVISION 09

v.

JOURNALISM DEVELOPMENT
NETWORK INC., a Maryland Corporation,
And LILY DOBROVOLSDKAYA,

      Defendants.

_____/

**NOTICE OF APPEARANCE AND EMAIL DESIGNATION**

      NOTICE IS HEREBY GIVEN that Dana J. McElroy, James J. McGuire, and Linda R.

Norbut of the law firm of Thomas & LoCicero PL hereby enter their appearances as counsel on

behalf of Defendant JOURNALISM DEVELOPMENT NETWORK, INC. Copies of all future

pleadings, papers, and correspondence should be sent to the undersigned attorneys at the

addresses and email addresses listed below.

| | |
|---|---|
| Dana J. McElroy<br>Thomas & LoCicero PL<br>915 Middle River Drive, Suite 309<br>Fort Lauderdale, FL 33304 | James J. McGuire<br>Linda R. Norbut<br>Thomas & LoCicero PL<br>601 South Boulevard<br>Tampa, FL 33606 |
| Primary E-Mail Address:<br>dmcelroy@tlolawfirm.com | Primary E-Mail Address:<br>jmcguire@tlolawfirm.com<br>lnorbut@tlolawfirm.com |
| Secondary E-Mail Address:<br>cbenson@tlolawfirm.com<br>bbrennan@tlolawfirm.com | Secondary E-Mail Address:<br>tgilley@tlolawfirm.com |

Dated:  January 26, 2023

Respectfully submitted,

THOMAS & LOCICERO PL

By: /s/ Dana J. McElroy
    Dana J. McElroy, Esq.
    Florida Bar No. 845906
    dmcelroy@tlolawfirm.com
    915 Middle River Drive Suite 309
    Fort Lauderdale, FL 33304
    Phone: (954) 703-3416

    - and -

    James J. McGuire
    Florida Bar No. 0187798
    jmcguire@tlolawfirm.com
    Linda R. Norbut
    Florida Bar No. 1011401
    lnorbut@tlolawfirm.com
    601 South Boulevard
    Tampa, FL 33606
    Telephone: (813) 984-3060

    *Attorneys for Journalism*
    *Development Network*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this **26th** day of **January, 2023** the foregoing document was electronically with the Clerk of the Court via the E-Portal, and was served this same day on all counsel of record, either via transmission of Notices of Electronic Filing generated by the E-Portal or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

    By:    /s/ Dana J. McElroy
            Attorney

2

Filing # 165568355 E-Filed 01/26/2023 05:43:47 PM

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

MONARCH AIR GROUP, LLC,
a Florida Limited Liability Company,

      Plaintiff,

                                    CASE NO.: CACE-22-017416
                                    DIVISION 09

v.

JOURNALISM DEVELOPMENT
NETWORK INC., a Maryland Corporation,
And LILY DOBROVOLSDKAYA,

      Defendants.

_____/

**DEFENDANT JOURNALISM DEVELOPMENT NETWORK, INC.'S
COMBINED MOTION TO DISMISS COMPLAINT AND TO
STRIKE DEMANDS FOR ATTORNEY'S FEES**

      Pursuant to Fla. R. Civ. P. 1.140, Defendant JOURNALISM DEVELOPMENT

NETWORK, INC. ("JDN") moves to dismiss Counts I and II of the Complaint[1] filed by Plaintiff

MONARCH AIR GROUP, LLC ("Monarch"). The Complaint purports to assert counts for

defamation per se and defamation by implication against Monarch, but in fact fails to do so. As

is evident from the Complaint itself, the alleged false and defamatory statements are substantially

true and privileged or constitute non-actionable opinions. As a result, Monarch's defamation

claims necessarily fail as a matter of law and should be dismissed.[2] To the extent any portion of

the Complaint remains, Plaintiff's requests for attorney's fees should be stricken.

_____

[1] Pursuant to Procedures for Civil Division 09 Section 2(d), a true and correct copy of the Complaint is attached as **Exhibit 1**.

[2] The Complaint includes a third count for defamation per se against co-Defendant Lily Dobrovolskaya. That count is *not* brought against JDN.

1

**INTRODUCTION**

1.      Monarch is a Florida company that provides on-demand air charter and long-term aircraft leases, among other things.

2.      JDN operates a website under the name Organized Crime and Corruption Reporting Project ("OCCRP"), through which it assists in creating and disseminating investigative reports related to organized crime and corruption and their impact on the public good. *See* Compl. Ex. C ("About" webpage from occrp.org).

3.      In November of 2020, OCCRP published an investigative news article titled "Flight of the Monarch:  US Gov't Contracted Airline Once Owned by Russian Criminals" (the "Article"). *Id*. at Ex. A.

4.      The Article reports truthfully on the history of a company that was once intimately intertwined with Russian Mafia criminals but suffered little apparent government scrutiny and continued to be engaged in U.S. government contracts – matters that are of undeniable public concern. *See id*. On its face, the Article relies on several sources, including documents from official judicial proceedings and other official government statements, witness statements, and comments directly from a Monarch spokesperson. *Id*.

5.      Monarch claims that the Article defames it in a variety of ways.  Most critically, Monarch asserts that the Article falsely claims that Monarch is *currently* involved in criminal activity.  *See id*. at ¶ 18 ("The Article falsely paints Plaintiff to be involved in criminal activity.").  But this assertion is belied by the Article itself, which truthfully and accurately reports that, *in the past*, Monarch was owned by individuals connected to the Russia Mafia.

6.      As noted above, the Article's headline makes perfectly clear that the criminal ownership of Monarch was in the past:  it states that Monarch was "Once Owned" by these

2

criminals.  Similarly, the Article's first sentence clearly states: "An American aviation company that has transported protected witnesses for the U.S. government *was once part-owned by two men who worked with a major Russian-American organized crime group*." *Id.* at Ex. A (emphasis added).   The Article then provides more details on the timing of this ownership interest by the two criminals, named Golubchik and Trincher, explaining that "both left Monarch in 2012." *Id.*  The Article even quotes Monarch's director of marketing and public relations, who "said the company has not been affiliated with Golubchik or Trincher since 2012." *Id.*

7.       Monarch might be unhappy that two of its former owners are criminals, but their criminal status is not in dispute.  Nor is it disputed that they were once owners of Monarch.  But the Article makes perfectly clear that the criminal ownership ceased in 2012.  In other words, the Article manifestly does not make the statement about current criminal activity that Monarch claims it makes.

8.       Likewise, Monarch asserts that Article falsely accuses it of "drug smuggling," *see id.* at ¶ 37, but that plainly is not what the Article actually says.  Rather, the Article sets forth facts relating to the 2011 discovery by U.S. Customs Agents of 16 kilograms of cocaine on a Monarch flight – facts that are *not* contested by Monarch.   It also provides Monarch's explanation of the event:

> On one occasion, customs agents in Miami discovered 16 kilograms of cocaine on one of Monarch's planes. . . .
> . . . .
>
> The U.S. Customs and Border Protection Agency refused to release any information about the discovery of the cocaine, or explain why no one was arrested.
>
> Gavrushenko, Monarch's spokesperson, said the cocaine belonged to a passenger. "We have worked with the relevant authorities to develop and enhance existing procedures, to prevent this from happening again," she said. "In our 15 years of operations, this was the only occurrence."

3

*Id.* at Ex. A.

9.     Thus, the Article does not accuse Monarch of drug smuggling.  Instead, it truthfully reports that, ten years ago, U.S. Customs Agents discovered a large quantity of cocaine on a Monarch flight, no one was arrested, and Monarch says the cocaine belonged to a passenger.  These statements are true and privileged and, as a result, cannot support Monarch's defamation claims.

10.     Many of Monarch's other allegations of defamation suffer from the same defect – the Article actually and expressly says the opposite of what Monarch claims it says.

11.     With regard to a few other allegations of defamation – including, for example, the claim that the Article implies the U.S. Government should not have utilized Monarch to transport individuals in the witness protection program – they are based on opinions expressed in the Article, which are protected by Florida law and the First Amendment.

12.     As explained in greater detail below, Monarch's Complaint is far from clear on what statements Monarch actually contends are false and defamatory.  But regardless of Monarch's intent, the Article is not false and defamatory with regard to Monarch, and therefore Monarch's claims fail.

## ARGUMENT

### I.     Motion to Dismiss Standard and Application to Defamation Lawsuits.

13.     In considering a motion to dismiss, this Court must take the facts alleged in the Complaint as true and draw reasonable factual inferences in favor of Plaintiff.  *See Palm Beach-Broward Med. Imaging Center, Inc. v. Continental Grain Co.*, 715 So. 2d 343 (Fla. 4th DCA 1998). However, where, as here, the Complaint is deficient as a matter of law it should be dismissed. *See* Fla. R. Civ. P. 1.140(b)(6).

14.     Florida requires fact pleading, so Plaintiff must set forth ultimate facts in support of each claim alleged in its complaint. *See* Fla. R. Civ. P. 1.110(b). The complaint "must set forth factual assertions that can be supported by evidence which gives rise to legal liability." *Barrett v. City of Margate*, 743 So. 2d 1160, 1162-63 (Fla. 4th DCA 1999). "It is insufficient to plead opinions, theories, legal conclusions or argument." *Id.* at 1163.

15.     Therefore, to the extent Plaintiff has failed to allege ultimate facts sufficient to support each element of a claim for defamation or defamation by implication in the Complaint, Plaintiff has not pled a viable cause of action.

16.     The Court must also treat exhibits attached to a complaint as part of the pleadings. *See* Fla. R. Civ. P. 1.130(b) ("Any exhibit attached to a pleading shall be considered part thereof for all purposes."). "If an exhibit [attached to a complaint] facially negates the cause of action asserted, the document attached as an exhibit controls and must be considered in determining a motion to dismiss." *Fladell v. Palm Beach Cty. Canvassing Bd.*, 772 So. 2d 1240, 1242 (Fla. 2000). Here, as explained below, the Article itself negates most of Monarch's allegations.

17.     Moreover, this Court may consider material outside the four corners of the complaint on a motion to dismiss when the plaintiff's allegations necessarily incorporate it by reference. *One Call Prop. Servs. Inc. v. Sec. First Ins. Co.*, 165 So. 3d 749, 752 (Fla. 4th DCA 2015); *U.S. Fire Ins. Co. v. ADT Sec. Servs.*, 134 So. 3d 477 (Fla. 2d DCA 2013); *Posigian v. Am. Reliance Ins. Co. of N.J.*, 549 So. 2d 751, 753 (Fla. 3d DCA 1989). Because Monarch's entire claim is based upon the Article, the Court may consider key sources of information referenced or cited to in the Article.

18.     The Florida Evidence Code also permits this Court to take judicial notice of court records. *See* Fla. Stat. § 90.202 (5)-(6) (2021); *Seminole Tribe of Fla. v. Fla. Dep't of Revenue,*

202 So. 3d 971, 972 (Fla. 1st DCA 2016) (trial court permitted to take judicial notice of court records of different court).  Accordingly, this Court may take judicial notice of the court records attached to this Motion.

19.    More generally, when analyzing a defamation claim, "a publication must be considered in its *totality*.  The court must consider *all the words used*, not merely a particular phrase or sentence. . . .  Articles are to be considered with their illustrations; pictures are to be viewed with their captions; stories are to be read with their headlines." *Byrd v. Hustler Mag., Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983) (internal quotation omitted) (emphasis added); *Smith v. Cuban Am. Nat. Found.*, 731 So. 2d 702, 705 (Fla. 3d DCA 1999) (same).

20.    Finally, cases involving First Amendment rights are particularly suited for motions to dismiss. Florida courts have long favored dismissal of legally untenable defamation claims at the earliest possible juncture. *See, e.g., Skupin v. Hemisphere Media Grp., Inc.*, 314 So. 3d 353, 357 (Fla. 3d DCA 2020); *Byrd*, 433 So. 2d at 595. Pretrial disposition is especially appropriate in defamation cases because of "the chilling effect" these cases have on First Amendment rights.  *See Stewart v. Sun-Sentinel Co.*, 695 So. 2d 360, 363 (Fla. 4th DCA 1997).

21.    Here, among other deficiencies, the Complaint is unclear as to what statements Plaintiff is suing upon. Indeed, Paragraphs 45-52 of the Complaint's "General Allegations," which purport to identify various allegedly defamatory statements, are not even incorporated into any of the defamation counts. *See* Compl. ¶¶ 53, 59 (Counts I and II incorporating only paragraphs 1-44), ¶ 63 (Count III incorporating only paragraphs 12-44). Further, to the extent Count I claims that paragraphs 11-28 describe the "numerous statements that were false and defamatory and/or defamatory *per se*," the reference is perplexing, as paragraphs 20-27 set forth nothing more than jurisdictional and venue allegations, and the remaining paragraphs do not

identify any specific allegedly defamatory statements. Remarkably, Plaintiff also admits that the Complaint does *not* include an "exhaustive list of all the false and defamatory statements contained in the Article," *id.* at ¶ 51, which makes it impossible for JDN to intelligently discern the issues to be litigated. This, alone, is grounds for dismissal. *See Hawke v. Broward Nat. Bank of Ft. Lauderdale*, 220 So. D 678, 679 (Fla. 4th DCA 1969) (affirming dismissal of complaint for failure to allege with precision the "disputed words used").

22.     As discussed below, the Counts I and II should be dismissed as a matter of law.

**II.     The Defamation *Per Se* Claim (Count I) Fails to State a Claim for Relief.**

23.     To state a claim for defamation, Plaintiff must plead and prove that JDN, in the Article, made a false, defamatory and unprivileged statement of fact about Monarch, with the required level of fault and resulting harm. *See Valencia v. Citibank Int'l*, 728 So. 2d 330 (Fla. 3d DCA 1999); *see also Mile Marker, Inc. v. Peterson Publ'g, LLC*, 811 So. 2d 841, 845 (Fla. 4th DCA 2002). Count I fails to state a claim for relief because Plaintiff is unable to allege ultimate facts establishing that the Article in fact contains such statements.

**A.     Statements that are fairly reported from official government sources are not actionable as a matter of law.**

24.     A claim of defamation must be dismissed where the publication is true, or where the publication is privileged. *See Woodard v. Sunbeam Television Corp.*, 616 So. 2d 501, 502-03 (Fla. 3d DCA 1993).

25.     "[T]he heart and soul of all defamation actions still rests at the core question: are the defamatory statements true or false?" Rodney A. Smolla, *Law of Defamation*, § 5.2, at 5-3 (2d ed.). Thus, under the First Amendment, truth defeats a defamation claim. *See Garrison v. Louisiana*, 379 U.S. 64, 74 (1964) ("Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned."); *Turner v. Wells*, 879 F.3d 1254,

7

1262 (11th Cir. 2018) ("True statements . . . are protected from defamation actions by the First Amendment.").

26.     Truth is so highly protected that if a statement is just "substantially" true, it is not actionable.  Under the substantial truth doctrine, inaccuracies do not necessarily equate to falsity, and a statement is considered true if its "gist" or "sting" is accurate.  *See, e.g., Air Wis. Airlines Corp., v. Hoeper*, 571 U.S. 237, 255 (2014) (finding that an airline's statements made to federal authorities about pilot's mental instability, terminated status, and fact that he was armed were substantially true and need not be further qualified or worded in the precise manner the pilot preferred); *Nelson v. Associated Press, Inc.*, 667 F. Supp. 1468, 1477–80 (S.D. Fla. 1987) (finding statement that person "saw" two individuals having sex substantially true because person unquestionably knew it occurred, even though it was not witnessed firsthand); *Woodard*, 616 So. 2d at 502–03 (news story was substantially true when it reported four-year prison sentence for homicide, rather than actual two-year term served for attempted murder); *Smith*, 731 So. 2d at 706 (failing to disclose that grants received by organization were passed along to other entities did not render substantially untrue statement that the original grant recipient's affiliated political action committee had donated to congressman who created grants); *McCormick v. Miami Herald Publ'g Co.*, 139 So. 2d 197, 200 (Fla. 2d DCA 1962) (defamation defendants "are not to be held to the exact facts or to the most minute details of the transactions they publish, that what the law requires is that the publication shall be substantially true, and that mere inaccuracies, not affecting materially the purport of the [publication], are immaterial") (citation omitted).

27.     Adding another layer of protection to truthful speech, the news media have a qualified privilege to report on the contents of an official document so long as the report is fair

8

and accurate; in other words, so long as it "conveyed to [the audience] a substantially correct account of" the document. *Woodard*, 616 So. 2d at 502-03. "Because the fair report privilege is broad and because 'its fair and accurate bar is a low standard,'" courts have held that there are "several practical ramifications arising from its applicability," including:

> (1) the protection is not lost by "colorful language or a failure to look beyond the government documents for verification"; (2) "editorial style is expected, and news media can phrase their coverage to catch ... the reader's attention"; (3) the media can also "select the focus of a piece and have no duty to further investigate or verify government-produced information"; (4) a "publication's language does not have to be technically precise in discussing legal proceedings"; (5) media defendants "can add color"; (6) media defendants are "not required to regurgitate the exact, precise language of their government sources"; (6) media defendants can also "summarize and focus publications as they choose"; (7) media defendants are "under no obligation to include additional information that would portray the Plaintiff in a more favorable light"; and (8) the press can "select the focus of their own publications, without regard to presenting both sides of every issue."

*Larreal v. Telemundo of Fla., LLC*, 489 F. Supp. 3d 1309, 1319-20 (S.D. Fla. 2020) (quoting *Folta v. New York Times Co.*, No. 1:17cv246-MW/GRJ, 2019 WL 1486776, at *4, *7-8 (N.D. Fla. Feb. 27, 2019)).

28.     Here, because the Article is both true and a fair and accurate report of official government documents, Count I should be dismissed.

> 1.     Former Monarch Owners' Ties to Criminal Activity.

29.     Plaintiff primarily takes issue with the fact that the Article truthfully reports on the blemished history of Monarch's former owners. Whether Monarch likes it or not, the company was once owned, in part, by two now-convicted felons, named Golubchik and Trincher. Plaintiff does not dispute that Monarch was once owned by Golubchik and Trincher nor that the two men were criminally convicted. Plaintiff also does not dispute the truth of the allegedly defamatory statement that Monarch "is currently owned by the son of Golubchik and

9

Trincher's former business partner." Compl. ¶ 45.b. Further, contrary to Plaintiff's assertions that the Article implies that Monarch is *currently* involved in criminal activity, the Article makes clear that this is not the case. *See id.* at Ex. A (headline stating Monarch was "Once Owned" by these criminals; describing Monarch as a company that "*was once part-owned by two men who worked with a major Russian-American organized crime group*"; explaining Golubchik and Trincher "both left Monarch in 2012"; quoting Monarch's director of marketing and public relations, who "said the company has *not* been affiliated with Golubchik or Trincher since 2012.") (emphasis added). In other words, many of the statements Plaintiff complains of are demonstrably and admittedly true. Thus, they are not actionable as a matter of law. *See Garrison*, 379 U.S. at 74.

30.     The Article further provides sources for the facts surrounding Golubchik's and Trincher's criminal history by citing, for example, to an official FBI press release[3] detailing Golubchik's and Trincher's crimes and punishment. *See* Compl. Ex. A.

31.     Thus, Plaintiff's claims, which rely on a mischaracterization of the Article's discussion of Monarch's historical criminal ties, necessarily fail because statements about Golubchik's and Trincher's criminal backgrounds are fair and accurate accounts of an official government press release and are therefore wholly privileged and not actionable. *See Stewart*, 695 So. 2d at 362 (affirming dismissal of defamation claims pursuant to fair report privilege because "there were no material differences" between the subject publications and the quoted sheriff's office press releases).

---

[3] According to the Article as attached to the Complaint, this press release is available at https://web.archive.org/web/20201127190413/https://www.fbi.gov/contact-us/field-offices/newyork/news/press-releases/two-defendants-sentenced-for-participating-in-racketeering-conspiracy-with-russian-american-organized-crime-enterprise-operating-international-sportsbook-that-laundered-more-than-100-million.

2.      Golubchik's 2013 Bail Hearings.

32.      Likewise, the Article's account of an April 24, 2013, bail hearing for Golubchik (the "First Bail Hearing") is a fair and accurate report of a court proceeding. The Article quotes a prosecutor from that hearing who stated: "We do not believe this business [Monarch] is legitimate." *Compare* Compl. Ex. A *with* Ex. 2, 10:16–10:17.[4]  Plaintiff takes issue with this quotation, but not because it disputes the fact that the prosecutor actually made the statement. Instead, Monarch claims (falsely) that "[t]he Article deliberately omitted the other part of the story – that the prosecutor subsequently, in the same proceeding, apologized for misspeaking and calling Monarch an illegitimate business." *Id*. at ¶ 35. But, as the First Bail Hearing transcript makes perfectly clear, the prosecutor never "retracted" or "apologized" for his statement during that hearing.

33.      The First Bail Hearing raised the issue of Golubchik being a flight risk and the prosecution's concern that he might use Monarch's airplane to escape. *See id*. at 10:13–10:18 ("Owning an airplane company allows you obviously to leave quite easily. . . . [I]t provides him the opportunity to flee."). However, during a subsequent bail hearing five days after the First Bail Hearing (the "Second Bail Hearing"), the prosecutor realized that Monarch was, at that time, bankrupt.  As a result, the prosecutor stated: "Defense counsel likes to accuse the government of misstating things. We have been completely candid. We may have – the airplane company I guess it went bankrupt because of this cocaine issue. I fall on my sword, your Honor."

---

[4] Attached as **Exhibit 2** is a true and correct copy of relevant excerpts from the First Bail Hearing transcript. The prosecutor's statements at the First Bail Hearing are integral to Plaintiff's defamation claims and are incorporated by reference in the Complaint. *See* Compl. ¶¶ 35-36. The hearing transcript is also an official court document. As such, the Court may consider it on a motion to dismiss without converting it to a summary judgment motion. *See* Fla. Stat. § 90.202 (5)-(6); *Seminole Tribe of Fla.*, 202 So. 3d at 972; *One Call Prop. Servs. Inc.*, 165 So. 3d at 752; *U.S. Fire Ins. Co.*, 134 So. 3d at 477; *Posigian*, 549 So. 2d at 753.

11

*See* **Exhibit 3** at 45:18–45:21 (a true and correct copy of relevant excerpts from the April 29, 2013 Second Bail Hearing transcript).[5] As is evident from the transcript, the prosecutor "fell on his sword" in conceding that Golubchik's relationship to Monarch no longer factored into *his flight risk analysis*, since the company had gone bankrupt and apparently was no longer in operation. But the prosecutor never retracted or apologized for his statement that the government does "not believe this business is legitimate." Plaintiff's assertion that the Article omits key facts about the prosecutor's statement is simply and demonstrably false.

34.     Moreover, Florida law and the First Amendment recognize the right of journalists to exercise editorial discretion about what they report. *See Turner*, 879 F.3d at 1270 ("the law of defamation is concerned with whether a publisher reports a story truthfully, not generously"); *Larreal*, 489 F. Supp. 3d at 1319-20 (holding that media defendants can "summarize and focus publications as they choose" and are "under no obligation to include additional information that would portray the Plaintiff in a more favorable light"); *Jamason v. Palm Beach Newspapers, Inc.*, 450 So.2d 1130 (Fla. 4th DCA 1984) ("The newspaper, had it wished, could have devoted the entire issue to the statement without any effort to neutralize the accusation . . . ."). Thus, JDN had no obligation to report on the Second Bail Hearing or to further investigate or verify the statements made in the First Bail Hearing.

    3.     Drug Smuggling.

35.     For similar reasons, Plaintiff's allegation that the Article falsely accuses Monarch of drug smuggling, *see* Compl. ¶¶ 37-41, also fails as a matter of law. The Article, relying on the

---

[5] The prosecutor's statements at the Second Bail Hearing are also integral to Plaintiff's defamation claims and are incorporated by reference in the Complaint. *See* Compl. ¶¶ 35-36. The Court may therefore consider the official court transcript of the hearing on a motion to dismiss. *See supra* note 4.

First Bail Hearing transcript (*see id.* at Ex. A, noting the information comes from "Golubchik's bail hearing in 2013"), accurately reports that "[o]n one occasion, customs agents in Miami discovered 16 kilograms of cocaine on one of Monarch's planes." *Compare id. with* Ex. 2, 10:15–10:16. Contrary to Plaintiff's assertion that the statement insinuates that Monarch was involved in drug smuggling, the Article never states that the drugs belonged to or were knowingly transported by Monarch. In fact, the opposite is true. The Article includes a statement *from Monarch* saying, "the cocaine belonged to a passenger." Compl. Ex. A. It further quotes Monarch's spokesperson as stating, "We have worked with the relevant authorities to develop and enhance existing procedures, to prevent this from happening again. . . . In our 15 years of operations, this was the only occurrence." *Id.* Plaintiff complains that this quotation does not include the spokesperson's *entire* statement, but, of course, a defamation claim cannot lie on that basis. *See Larreal*, 489 F. Supp. 3d at 1320 ("media defendants are under no obligation to include additional information that would portray the Plaintiff in a more favorable light") (internal quotation omitted).

36.      The Article's statements in this regard are, at a minimum, true and undeniably privileged accounts of public records. *See Smith*, 731 So. 2d at 706 (no defamation claim permitted where "sting or "gist" of published statements are substantially true); *Woodard*, 616 So. 2d at 502 (Fla. 3d DCA 1993) (official reports privilege protects substantially true reports based on information provided by government officials); *Stewart*, 695 So. 2d at 363 (same). And any negative perceptions allegedly flowing from official records do not change the analysis. *See Alan v. Palm Beach Newspapers*, 973 So. 2d 1177, 1180 (Fla. 4th DCA 2008) (privilege is not defeated by "negative light" in which statements depict plaintiff).

37.      Here, because the "gist" or "sting" of the Article – that U.S. Customs agents

13

discovered 16 kilograms of cocaine on a Monarch flight, that no one was arrested, and that Monarch says the drugs belonged to a passenger – is true or substantially true and based upon privileged statements, Plaintiff's defamation claims based on those statements necessary fail, and must be dismissed.

    4.    <u>Monarch Is Not Paying Its Employees.</u>

    38.    Monarch claims that the Article falsely accuses Monarch of not currently paying its employees. Compl. ¶ 45.a. But this is not what the Article actually says. Instead, the Article reports on important transformations in Monarch's business *in the past*, between January 2016 and February 2018, when Monarch lost employees, gave up its right to fly commercial operations, and had its air carrier certificate revoked:

> Between January and April 2016, Monarch's director of operations, chief pilot, and maintenance director all quit. A pilot who spoke to OCCRP anonymously said employees resigned after Monarch stopped paying them, and the airline struggled to find replacements.
>
> In May that year, the airline requested the FAA remove its only aircraft from its "Operation Specifications," a legal designation that allowed it to run commercial operations like private chartered flights. Without any planes that met FAA requirements, or key staff members to run them, its air carrier certificate was revoked in February 2018.

*Id.* at Ex. A.

    39.    Monarch does *not* dispute these facts because they are true. Just as critically, the Article never states that Monarch is currently unable to pay its employees. Rather, the Article expressly recognizes that, as of today, Monarch is an ongoing and thriving business enterprise. According to the Article, Monarch's owner recently commented in a travel publication about "Monarch's 'great synergy' with U.S. embassies to bring home citizens stranded in Latin America due to the COVID-19 crisis." *Id.* The Article likewise notes that Monarch "has grown from a struggling start up, with just one route to the Bahamas, into a global operation." *Id.*

14

40.     Taken together, the Article's statements about Monarch today – and Monarch's numerous issues in the past – are true and therefore cannot support a defamation claim. *Turner*, 879 F.3d at 1262 ("True statements . . . are protected from defamation actions by the First Amendment.").

**B.     Opinion statements are also not actionable as a matter of law.**

41.     A statement constituting an opinion (rather than a fact) is not actionable because it is not capable of being proven true or false. *See Byrd*, 433 So. 2d at 595 ("A false statement of fact is the *sine qua non* for recovery in a defamation action."). Whether a statement constitutes opinion is a matter of law and therefore proper for this Court to decide on a motion to dismiss. *See Sullivan v. Barrett*, 510 So. 2d 982, 983 (Fla. 4th DCA 1987).

42.     Opinions that are expressed based on facts set forth in the same publication, or otherwise known by or available to the audience as members of the public, are protected from defamation liability. *Id.*; *Rasmussen v. Collier Cnty. Publ'g Co.*, 946 So. 2d 567, 571 (Fla. 2d DCA 2006). "In determining whether an alleged libelous statement is pure opinion, the court must construe the statement in its totality, examining not merely a particular phrase or sentence, but all of the words used in the publication." *Hay v. Indep. Newspapers, Inc.*, 450 So. 2d 293, 295 (Fla. 2d DCA 1984).

43.     Several of the alleged defamatory statements described in the Complaint constitute protected pure opinion and are therefore not actionable as a matter of law.

44.     For instance, Plaintiff takes issue with the Article's alleged "assert[ions] that the Government should not have allowed Monarch to transport people in the witness protection program in 2017, given the reputation of Monarch's former owners" and that Monarch "should . . . not be awarded Government contracts." Compl. ¶¶ 33-34, 42. In fact, the Article does *not*

15

actually make these statements. Instead, the closest it comes to making such assertions is a quotation from Gary Kalman, director of the U.S. chapter of Transparency International. *See id.* at Ex. A. Kalman suggests that "[a]irlines with a history of criminal affiliation contracted by the government to transport protected witnesses is something we'd expect to see in a spy novel, not in a news report." *Id.* Apparently referring to the fact that the government has awarded multiple contracts to Monarch despite its spotted history, Kalman opines that "[t]he negligence is startling."[6] *Id.* Obviously, any "negligence" identified by Kalman is the apparent negligence of the U.S. government, not Monarch.

45.     Moreover, Kalman's statements are clearly expressions of his opinion about those with whom the government *"should"* or *"should not"* do business – an opinion that, as discussed above, is expressly based on true facts set forth in the Article regarding the Russian mob ties of Monarch's former owners. Accordingly, the statements are protected pure opinion that cannot form the basis of Plaintiff's defamation claims. *See Sullivan*, 510 So. 2d at 983. In addition, the Article expressly reports the opposite opinion, as well. The Article quotes a Defense Logistics Agency spokesperson who said the Agency, "which manages the U.S. military's supply chains, . . . followed the proper procedures when vetting Monarch for a contract awarded in 2012." Compl. Ex. A.

46.     Similarly, Plaintiff's claim premised on the statement that one of Monarch's former owners and career pilot, Paul Slavin, "stayed on as [Monarch's] director of operations,

---

[6] To the extent that Plaintiffs claims are based on this comment or on an alleged assertion in the Article that the government "is corrupt or engaged in corruption" (*see* Compl. ¶ 33), these claims fail for the additional reason that they are not "of and concerning" plaintiff, but rather the government. The rule that a statement is not actionable unless it is "of and concerning" the plaintiff is of constitutional magnitude. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 288 (1964). Consequently, a plaintiff is "required to show specific reference" to himself in an allegedly defamatory statement. *Rosenblatt v. Baer*, 383 U.S. 75, 83 (1966).

16

but he left when *he felt* that the new owners started cutting corners on safety," is not actionable. *See* Compl. ¶ 45.a. (emphasis added). Again, this statement is a clear expression of Slavin's opinion and also an expression of rhetorical hyperbole, which cannot provide the basis for a defamation claim.

47.      "Rhetorical hyperbole" is "imaginative expression" or "loose, figurative language." *Forston v. Colangelo*, 434 F. Supp. 2d 1369, 1378 (S. D. Fla. 2006). Thus, the expression "to cut corners," which is an expression of figurative or imaginative language, is a typical statement of rhetorical hyperbole since it plainly does not mean that Monarch literally "cut" any "corners." Rather, the phrase is understood to suggest "perform[ing] some action in the quickest, easiest or cheapest way." *See* https://www.merriam-webster.com/dictionary/cut%20corners. But whether Monarch addressed safety issues in an "easy" or "quick" way simply is not a not a question that can be determined as a matter of fact. What one person views as "easy" or "quick" another may view as "difficult" or "time-consuming," and neither view represents objective truth. Because the expression "cut corners" is rhetorical hyperbole, it is not actionable in defamation. *See Forston*, 434 F. Supp. 2d at 1378.

48.      Moreover, as a career pilot, Slavin is entitled to form and express his own opinions about suitable safety procedures. Whether he believed Monarch's procedures to be satisfactory or unsatisfactory is a pure matter of opinion, not fact. The expression of such protected opinions is shielded from defamation liability.

**III.      The Defamation by Implication Claim (Count II) Fails to State a Claim for Relief**

49.      In addition to the claim of defamation, Plaintiff also brings a claim for defamation by implication, arguing that "by juxtaposing and/or conveying incomplete information and/or omitting facts," the Article "impl[ies] a defamatory connection between Monarch, criminals,

17

and/or criminal activity." Compl. ¶ 60. Within the Complaint's "General Allegations," Plaintiff seems to identify three alleged implications as the basis of this claim: (1) that the Article "implie[s] that Monarch is involved in criminal activity"; (2) that the Article's omission of a prosecutor's so-called "retraction" of his statement that the government does "not believe [Monarch] is legitimate" is impliedly defamatory; and (3) that the Article's failure to quote in full a Monarch spokesperson's statement about the cocaine incident described above "obfuscate[s] that the cocaine was in the passenger's personal possession" and "insinuate[es] that Monarch was involved in drug smuggling." *See id.* at ¶¶ 31-32, 35-36, 38-40. Plaintiff's defamation by implication claim fails as a matter of law with regard to each of these alleged implications.

50.     A defamation by implication claim arises "in circumstances where *literally true statements* are conveyed in such a way as to create a *false impression.*" *Jews for Jesus, Inc.*, 997 So. 2d 1098, 1108 (Fla. 2008) (emphasis added). Florida courts recognize a claim for defamation by implication in two circumstances: (1) where a defendant "juxtaposes a series of facts so as to imply a defamatory connection between them" or (2) where a defendant "creates a defamatory implication by omitting facts." *Id.* at 1106. As distinguished from a traditional claim for defamation, a claim for defamation by implication "arises, not from what is stated, but from what is implied" and "is premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements." *Id.* at 1106-07.

51.     Whether the Article's statements constitute defamation by implication is a question of law. *Turner*, 879 F.3d at 1269. "The inquiry turns on whether the 'gist' of the publication is false." *Id.* To decide whether a statement is capable of a defamatory meaning, courts must take an objective approach and "evaluate the publication, not by extremes, but as the

18

common mind would naturally understand it." *Byrd*, 433 So. 2d at 595 (finding that re-touched photograph resulting in subject giving obscene gesture could not, in light of caption making clear photograph was altered, be viewed as implying subject posed making the gesture) (citation omitted). *See also Valentine v. C.B.S., Inc.*, 698 F.2d 430, 431–32 (11th Cir. 1983) (finding plaintiff's claim that Bob Dylan song lyrics implied she was part of conspiracy to convict Rubin "Hurricane" Carter was not reasonable because none of the lyrics mentioning her related to the conspiracy and noting "[a] review of the entire song makes it clear this interpretation is not reasonably possible . . . plaintiff's interpretation does not construe the words as the common mind would understand them but is tortured and extreme."). Further, "[a]ll of the protections of defamation law that are afforded to the media and private defendants are [] extended to the tort of defamation by implication." *Jews for Jesus, Inc.*, 997 So. 2d at 1108.

52.     Here, Plaintiff alleges that the Article "deliberately implied that Monarch is involved in criminal activity," but such an allegation does not support a claim for defamation by implication because, as explained above, the Article directly refutes this allegation by *expressly* stating, for instance, that the two individuals involved in a Russian-American criminal enterprise "both left Monarch in 2012," and by quoting Monarch's spokesperson *expressly* saying that "the airline has not been affiliated with Golubchik or Trincher since 2012." Compl. Ex. A. Monarch's contention that the Article *implies* the opposite of what it *expressly says* is wholly irrational and cannot provide the basis of a defamation by implication claim.

53.     Plaintiff next contends that the Article's omission of the prosecutor's statement from the Second Bail Hearing, which allegedly "retracted" and "apologized" for his statement from the First Bail Hearing that the State "do[es] not believe this business is legitimate," implies a connection between Monarch and criminal activity. But this theory of defamation by

implication again fails for three key reasons. First, as explained above, the Article directly quotes from statements made during a court proceeding. *See id.*; Ex. 2. Thus, the Article is privileged under Florida's fair report privilege. *Woodard*, 616 So. 2d at 502-03. Second, JDN was under no obligation to report on the Second Bail Hearing or to further investigate or verify the statements made in the First Bail Hearing. *Larreal*, 489 F. Supp. 3d at 1319-20; *Jamason*, 450 So. 2d 1130. Finally, even if such an obligation existed, the prosecutor never "retracted" or "apologized" for his original comment. The Second Bail Hearing transcript instead made clear that the prosecutor merely withdrew the State's position that Golubchik's relationship to Monarch (and presumed access to airplanes) should factor into the flight risk analysis since Monarch was already bankrupt and out of business. *See* Ex. 3 at 45:18–45:21. This is a far cry from a retraction or apology for the statement by the prosecutor that Monarch is not a legitimate business. Thus, inclusion of the prosecutor's statements from the Second Bail Hearing would not have changed the gist or sting of the prosecutor's original comment.

54.     Finally, Plaintiff argues that the Article fails to fully quote a Monarch spokesperson's statement related to the 2011 cocaine incident, thus allegedly "obfuscate[ing] that the cocaine was in a passenger's personal possession," and "accus[ing] Monarch of drug smuggling." Compl. ¶¶ 37-41. Specifically, Plaintiff complains that the Article does not directly quote Monarch's comment that "[i]n 2011, a charter passenger was apprehended by the U.S. Customs and Boarder Protection for items in his personal possession . . ." and instead summarizes that comment by noting that "Monarch's spokesperson said that the cocaine belonged to a passenger." *Id.* But this allegation also cannot support a defamation by implication claim for several reasons. First, the Article accurately cites from the First Bail Hearing to describe how "customs agents in Miami discovered 16 kilograms of cocaine on one of

Monarch's planes." *Compare id.* at Ex. A *with* Ex. 2 at 10:15-10:16. Therefore, this too is protected by Florida's fair report privilege. Finally, once again, publishers are required to report truthfully, not generously, and are free to make editorial decisions. Thus, whether a publication summarizes a source's statement or quotes that statement in its entirety is irrelevant to the analysis, so long as the summary is fair and accurate. Such is the case here. Therefore, Plaintiff's defamation by implication claim fails as a matter of law.

## MOTION TO STRIKE

1.      To the extent any of the claims against JDN survive, Plaintiff's requests for an award of attorney's fees are impermissible and must be stricken. *See* Compl., Count I and II Wherefore Clauses at 9, 10 (seeking "attorney's fees").

2.      It is fundamental under Florida law that attorney's fees are not recoverable unless a statute or contractual provision provides for them. *See Price v. Tyler*, 890 So. 2d 246, 250 (Fla. 2004); *Pepper's Steel & Alloys, Inc. v. United States*, 850 So. 2d 462 (Fla. 2003) ("Under Florida law, each party generally bears its own attorneys' fees unless a contract or statute provides otherwise.").

3.      Here, Plaintiff has not and cannot allege the existence of any contract or statutory basis for the recovery of attorney's fees. Plaintiff's demands must therefore be stricken.

## CONCLUSION

WHEREFORE, JDN respectfully requests that the Court grant this Motion, and dismiss Counts I and II of the Complaint with prejudice. Should any portion of those counts remain pending, JDN moves the Court for an order striking Plaintiff's requests for attorney's fees.

THOMAS & LOCICERO PL

By: */s/ Dana J. McElroy*
    Dana McElroy
    Florida Bar No. 845906
    dmcelroy@tlolawfirm.com
    915 Middle River Drive
    Suite 309
    Fort Lauderdale, FL 33304
    Phone: (954)703-3416

    and

    James J. McGuire
    Florida Bar No. 187798
    jmcguire@tlolawfirm.com
    Linda R. Norbut
    Florida Bar No. 1011401
    lnorbut@tlolawfirm.com
    601 South Boulevard
    Tampa, FL 33606
    Phone: (813) 984-3060

    *Attorneys for JDN*

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on this **26th** day of **January, 2023** the foregoing document was electronically with the Clerk of the Court via the E-Portal, and was served this same day on all counsel of record, either via transmission of Notices of Electronic Filing generated by the E-Portal or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

        By: */s/ Dana J. McElroy*
        Attorney

22

# EXHIBIT 1

Case Number: CACE-22-017416 Division: 09

Filing # 161836731 E-Filed 11/23/2022 05:09:14 PM

|  |  |
|---|---|
| **MONARCH AIR GROUP, LLC**<br>a Florida Limited Liability Company,<br><br>        Plaintiff,<br><br>v.<br><br>**JOURNALISM DEVELOPMENT**<br>**NETWORK INC.**, A Maryland Corporation,<br>and **LILY DOBROVOLSKAYA**<br><br>        Defendants.<br>_____/ | **IN THE CIRCUIT COURT OF THE 17ᵀᴴ**<br>**JUDICIAL CIRCUIT IN AND FOR**<br>**BROWARD COUNTY, FLORIDA**<br><br>**CASE NO.:** |

## COMPLAINT

Plaintiff MONARCH AIR GROUP, LLC ("Monarch") sues Defendants, JOURNALISM

DEVELOPMENT NETWORK, INC. ("JDN"), a Maryland corporation, and LILY

DOBROVOLSKAYA ("Author"), an individual and allege the following:

### Introduction

1.      On November 27, 2020, Defendants, via Organized Crime and Corruption Report Project

("OCCRP"), knowingly/maliciously/negligently published a defamatory article (the "Article")

about Plaintiff. The original November 27, 2020 Article is attached hereto as **Exhibit A**.

2.      The Article contained multiple factually false statements, misleading innuendos, and

unsupported claims about criminal activity and corruption.

3.      Defendants admittedly used statements from disgruntled employees who did not have

firsthand knowledge of the reported events.

4.      Defendants did not provide Plaintiff an opportunity to respond on many of the claims in

the Article, and even on the matters that Defendants did request Plaintiff's comment, Defendants

altered and misrepresented Plaintiff's response.

5.       When confronted by Plaintiff during March 2021, Mr. Andrew ("Drew") Sullivan, JDN's

principal officer and OCCRP's co-founder and editor, confirmed that the Article contained

multiple inaccuracies and promised to amend them within 48 hours.

6.       Yet, Sullivan had not made any changes until June of 2021, after Plaintiff submitted a

formal complaint with the relevant authorities.

7.       In fact, on June 16, Sullivan wrote the following in an email to Plaintiff:

> I do apologize. I ordered changes made in the [A]rticle after your suggestion that
> the [A]rticle be taken down. I have just become aware that **they were not
> made** . . . . There is still an outstanding issue that is not resolved that the fact
> checker is working on.

Andrew Sullivan's June 16, 2021 email (emphasis added) attached hereto as **Composite
Exhibit B.**

8.       Thus, from at least March of 2021 until June of 2021 Defendants knowingly and

admittingly maintained false and defamatory information on OCCRP's website.

9.       Even after Defendants made some changes to the Article, that Article remains defamatory.

10.      Despite JDN being aware of false and defamatory statements in the generally defamatory

Article, and despite Plaintiff requesting that the Article be temporarily taken down until the agreed

upon changes could be made, JDN/OCCRP chose to keep those false statements on the World

Wide Web—causing Plaintiff harm and damage as a result.

11.      To illustrate, on May 11, 2021, David Gitman, Plaintiff's manager, wrote the following

email to JDN/OCCRP regarding the Article.

> Mr. Sullivan, nearly two months have passed since March 16, after you have
> advised me that this will take approximately 2 weeks to fact check. Nearly 6 weeks
> have passed since March 31st, when you have advised that you will get back [to]
> me in 48 hours . . . . **We all know that there are many flaws with this article,
> why is it not taken down until you resolve these flaws?**

David Gitman's May 11, 2021 email (emphasis added) attached hereto as **Composite
Exhibit B.**

12.    On May 12, 2021, Sullivan responded as follows:

> Mr. Gitman. **I agree with you** and we are trying to resolve this but everyone has a very full schedule . . . . **I also have to deal with staff vacations** and the normal emergencies we face that are unpredictable. I apologize for the delay and when I get staff together we will sort out the remaining issues which are few.

Andrew Sullivan's May 12, 2021 email (emphasis added) attached hereto as **Composite Exhibit B.**

13.    Gitman's reply to this email is attached hereto as **Composite Exhibit B.**

14.    The rest of the email chains between Gitman and Sullivan is attached hereto as **Composite Exhibit B.**

15.    Sullivan told Plaintiff that OCCRP procedure is to have an **independent fact checker** look into disputed matters. Instead, OCCRP had **a member of its own staff** serve as "the independent fact checker," when Plaintiff confronted Sullivan on this issue, Sullivan explained that while indeed on OCCRP's staff, this person is an "independent fact checker" because she has "no editorial stake in [the] work." See **Composite Exhibit B.**

16.    The Article was republished on Defendants' social media thus spreading the false and defamatory statements to a wider audience.

17.    As a result of JDN/OCCRP's malice, negligence and/or incompetence in first publishing the defamatory Article and then failing to timely rectify the situation, Plaintiff's business was harmed and damaged, and is continuing to suffer harm and damage.

18.    The Article falsely paints Plaintiff to be involved in criminal activity.

19.    Accordingly, the Article constitutes defamation *per se*.

## Jurisdiction and Venue

20.    This is an action to recover damages in excess of $30,000 for the reputational damage that Monarch suffered because of the defamatory Article, based on innuendo and false information,

*Complaint*
*Page 4 of 12*

that Defendants published.

21.    Plaintiff, Monarch is a Florida limited liability company with its principal place of business in Fort Lauderdale, Florida.

22.    Defendant, JDN is a Maryland corporation that owns and controls OCCRP.

23.    Defendant, Author, is a freelance investigative journalist operating, conducting, engaging or carrying on a business in Florida, she is believed to be a Florida resident, and is otherwise *sui juris*.

24.    Author and OCCRP published the Article about Monarch and Gitman on the World Wide Web. The Article was accessible in Florida, was accessed in Florida, and caused harm in Florida. Accordingly, jurisdiction is proper under § 48.193(1)(a)(2) *Fla. Stat.* and the Florida Supreme Court's interpretation thereof.

25.    The About page on OCCRP's website explains that its purpose is to expose the subject(s) of its articles and to promote action by advocates, law enforcement, policy makers, and citizens, based on OCCRP's exposés. Accordingly, both Author and JDN via OCCRP purposely directed their defamatory Article to Florida and Defendant thus has sufficient minimum contacts with the State of Florida to satisfy personal jurisdiction. *See* **Exhibit C.**

26.    Venue is proper in Broward County pursuant to §§ 47.011 and 47.051 *Fla. Stat.* because the cause of action accrued in Broward County.

27.    All conditions precedent to the institution of this action have been satisfied or otherwise excused, including the service of statutory notice on JDN and OCCRP pursuant to § 770.01 *Fla. Stat.*

## General Allegations

28.    David Gitman has been Monarch's sole manager since 2016.

29.    On or around June of 2021, Defendants republished the Article on OCCRP's website

currently titled *The Flight of the Monarch: US Gov't Contracted Airline Once Owned by Criminals with Ties to Russian Mob*. A copy of The Article in its current form is attached hereto as **Exhibit D.**

30.     The Article contained numerous false and defamatory statements about Monarch most of which are defamatory *per se*.

31.     For example, Defendants published the Article via OCCRP, which reports on crime and corruption. Therefore, by publishing the Article about Monarch on OCCRP's website, Defendants are insinuating that Monarch is involved in criminal activity.

32.     Neither Gitman nor Monarch have been charged with any crime. Yet, Defendants concealed this fact from its readers and deliberately implied that Monarch is involved in criminal activity. To do so, is defamation *per se*.

33.     The Article's premise is that Monarch and Gitman are connected with the Russian Mafia and the Government should thus not award them contracts, and the Government, by awarding Monarch and Gitman with government contracts, is corrupt or engaged in corruption.

34.     The Article was published in 2020. At that time, Gitman had been the sole owner and CEO for four years. By publishing the Article in 2020, Defendants insinuate that Monarch, under the control of Gitman, is connected with criminal activity, and should thus not be awarded Government contracts.

35.     The Article claims that a prosecutor in 2013 stated that "We do not believe this business [Monarch] is legitimate." The Article deliberately omitted the other part of the story—that the prosecutor subsequently, in the same proceeding, apologized for misspeaking and calling Monarch an illegitimate business.

36.     By omitting the prosecutor's retraction and deliberately concealing the full context of those

**STOK KON + BRAVERMAN**
1 E. Broward Boulevard, Suite 915 • Fort Lauderdale, FL 33301 • P.954.237.1777 • F.954.237.1737 • E-mail: service@stoklaw.com

remarks and retraction, Defendants published a defamatory statement.

37.    The Article also accuses Monarch of drug smuggling and that the border control turned a blind eye to it.

38.    The Article states that Florida customs agents discovered 16 kilograms of cocaine hidden in one of [Monarch's] planes"—insinuating that Monarch was involved in drug smuggling.

39.    When OCCRP reached out to Monarch for comment, Monarch sent the following: "[i]n 2011, a charter passenger was apprehended by the U.S. Customs and Boarder Protection for items in his personal possession . . . ." Monarch's statement explains that the drug smuggling had nothing to do with Monarch, and was entirely the responsibility of a passenger.

40.    Despite Monarch's statement, OCCRP changed Monarch's response to obfuscate that the cocaine was in a passenger's personal possession and instead wrote that "Monarch's spokesperson said that the cocaine belonged to a passenger."

41.    OCCRP's statement still connotes that Monarch was involved in the drug smuggling, and that the cocaine happened to belong to a passenger. Thus, not only is OCCRP's narrative of event defamatory; their misquoting Monarch's spokesperson is defamatory, and it shows a continuing pattern of deliberately hiding the truth from their readers to defame Monarch.

42.    The Article asserted that the Government should not have allowed Monarch to transport people in the witness protection program in 2017, given the reputation of Monarch's former owners. To publish this claim in 2020, is to insinuate that in 2017, Gitman and Monarch were still associated with Monarch's former owners—some who were criminals—and should not have been trusted with transporting people in the witness protection program.

43.    Trincher and Golubchik were part owners of Monarch up until 2012. In 2013, a year after they were no longer associated with Monarch, Trincher and Golubchik were charged for crimes

unrelated to Monarch, and Monarch was not at all implicated in the charges. As a matter of fact, as stated above, the prosecutor apologized for implying any association between Monarch and Trincher/Golubchik—a fact that Defendants chose to omit.

44.    Despite this, in 2020—eight years after Trincher and Golubchik were no longer associated with the company—Defendants insinuated that just three years prior, and five years since Trincher/Golubchik had been involved in the company, Monarch was presently associated with criminals. In doing so, Defendants painted Monarch as guilty-by-association.

45.    The Article also contained the following are false and disparaging statements that defame Plaintiffs:

   a.  "At first [Slavin] stayed on as [Monarch's] director of operations, but he left when he felt that the new owners started cutting corners on safety." Despite OCCRP requesting Monarch's comment/response on other issues, OCCRP did not give Monarch an opportunity to respond to this allegation. Defendants are thus publishing a biased defamatory narrative and leading its readers to believe that Monarch does not care about the safety of its passengers.

   b.  "the company is currently owned by the son of Golubchik and Trincher's former business partner." By specifically juxtaposing Gitman to these convicted criminals—who were charged after they left Monarch, and were not partners in Monarch for over seven years—insinuates these criminals were connected to Monarch and Gitman when the Article was published.

   c.  "Employees resigned after Monarch stopped paying them." This falsely accuses Monarch of not paying its employees. Despite OCCRP requesting Monarch's comment/response on other issues, OCCRP did not give Monarch an opportunity to

respond to this allegation. Defendants are thus publishing a biased defamatory narrative and leading its readers to believe that Monarch does not pay its employees.

46.    As indicated above on March 16, 2021, Gitman reached out to Andrew Sullivan—JDN's principal officer and director, and the editor for OCCRP—informing him of defamatory statements in the Article.

47.    On March 31, 2021, Sullivan admitted to Gitman that there were indeed mistakes in the Article, and that they would correct them.

48.    Despite this, no corrections were made until June of 2021—more than the 10 days afforded to media publicists to retract defamatory statements. § 836.08 *Fla. Stat.* In addition, the corrections that were made in June, were insufficient to cure the defamatory statements, and were not sufficiently "as conspicuous" as it was when the Article was originally published. *See id.*

49.    Accordingly, even the false statements that were corrected were done too late, and not in the proper method to comply with Florida Statutes Section 836.08, and still constitute actionable defamation.

50.    The Article, as a whole, is defamatory, and even the true statements contained therein are defamatory because of the context and the light in which they are published.

51.    The defamatory statements contained in this Complaint is not an exhaustive list of all the false and defamatory statements contained in the Article and/or published by defendants.

52.    The publication of the Article caused Plaintiff financial harm and damage as a direct result of its publication.

## COUNT I–DEFAMATION *PER SE*

53.    Plaintiff realleges and incorporates by reference the allegations in paragraphs 1–44, and all subparts.

54.    On or about November 27, 2020 Defendants published the Article which contained

numerous statements that were false and defamatory and/or defamatory *per se*, as more fully described in paragraphs 11–28, including all subparts.

55.   The aforementioned false and defamatory statements were of and concerning Monarch, and were published to third parties when they accessed the Article in Florida.

56.   The false and defamatory statements were defamatory per se because they charged Monarch committed a crime and/or tended to subject Monarch to hatred, distrust, ridicule, contempt, or disgrace, and/or tended to injure Monarch in its profession.

57.   Defendants published the Article and the statements contained therein while they knew/should have reasonably known they were false; with reckless disregard for their truth; or, at least, with a negligent disregard of its truth.

58.   As a direct and proximate cause of the aforementioned defamatory statements, Monarch has suffered and will continue to suffer damage to its reputation, as well as loss of income, diminution in value of its shares, loss of goodwill, and other economic losses.

**WHEREFORE**, Monarch respectfully demands judgment against Defendants for (a) compensatory and consequential damages, (b) court costs, (c) pre- and post-judgment interest, (d) attorney's fees and (e) any such other and further relief as this Court deems just and proper. Monarch reserves its right to amend its complaint to seek punitive damages upon the making of an evidentiary proffer.

## COUNT II – DEFAMATION BY IMPLICATION

59.   Plaintiff realleges and reincorporates the allegations in paragraphs 1 through 44 as if fully set forth herein.

60.   Defendants published information about Monarch, as set out in the general allegations, by juxtaposing and/or conveying incomplete information and/or omitting facts to imply a defamatory

connection between Monarch, criminals, and/or criminal activity.

61.     Defendants published the Article and the statements contained therein while they knew/should have reasonably known they were false; with reckless disregard for their truth; or, at least, with a negligent disregard for its truth.

62.     As a direct and proximate result of Defendants' defamatory statements, Monarch suffered substantial damages.

        **WHEREFORE**, Monarch respectfully demands judgment against Defendants for (a) compensatory and consequential damages, (b) court costs, (c) pre- and post-judgment interest, (d) attorney's fees and (e) any such other and further relief as this Court deems just and proper. Monarch reserves its right to amend its complaint to seek punitive damages upon the making of an evidentiary proffer.

## COUNT III–DEFAMATION *PER SE* AGAINST AUTHOR

63.     Plaintiff realleges and reincorporates the allegations in paragraphs 12 through 44 as if fully set forth herein.

64.     On November 28, 2020, Author published the following false and defamatory statement: "Monarch has a division called Mercury Jets which has no legal presence in the U.S. Mercury's website domain info shows it was registered by an eponymous company in Moscow and lists a contact email address of a Moscow-based commercial bank Sibcontact bank." Statement is attached hereto as **Exhibit E.**

65.     The aforementioned false and defamatory statement was of, and concerned Monarch, and were published to third parties when they accessed the defamatory statement in Florida.

66.     The false and defamatory statement constituted defamation per se because it charged that Monarch committed a crime and/or tended to subject Monarch to hatred, distrust, ridicule, contempt, or disgrace, and/or tended to injure Monarch in its profession.

*Complaint*
*Page 11 of 12*

67.     Author published the defamatory statement while she knew/should have reasonably known they were false; with reckless disregard for their truth; or, at least, with a negligent disregard of its truth.

68.     As a direct and proximate cause of the aforementioned defamatory statement, Monarch suffered and will continue to suffer damage to its reputation, as well as loss of income, diminution in value of its shares, loss of goodwill, and other economic losses.

**WHEREFORE**, Monarch respectfully demands judgment against Author for (a) compensatory and consequential damages, (b) court costs, (c) pre- and post-judgment interest, (d) attorney's fees and (e) any such other and further relief as this Court deems just and proper. Monarch reserves its right to amend its complaint to seek punitive damages upon the making of an evidentiary proffer.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all issues so triable.

Dated: November 23, 2022.

Respectfully submitted,

**STOK KON+ BRAVERMAN**
Attorneys for Plaintiff
One East Broward Boulevard, Suite 915
Fort Lauderdale, Florida 33301
Tel.: (954) 237-1777
Fax: (954) 237-1737
Email: service@stoklaw.com

*/s/ Peretz Laine*
ROBERT A. STOK, ESQ.
Florida Bar No. 857051
rstok@stoklaw.com
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
jkon@stoklaw.com

*Complaint*
*Page 12 of 12*

YOSEF Y. KUDAN, ESQ.
Florida Bar No. 1010261
ykudan@stoklaw.com
PERETZ LAINE, ESQ.
Florida Bar No. 1038556
plaine@stoklaw.com

**Exhibit A**
Original November 27, 2020 Article

NOT AN OFFICIAL COPY – CCIS – ATTORNEY OF RECORD

# Flight of the Monarch: US Gov't Contracted Airline Once Owned by Russian Criminals

🖼 Credit: Facebook

by Lily Dobrovolskaya

27 November 2020

🐦 (https://web.archive.org/web/20201127190413/http://twitter.com/intent/tweet?text=U.S. authorities awarded Monarch Air Group over 100 contract

f (https://web.archive.org/web/20201127190413/http://www.facebook.com/share.php?u=https://www.occrp.org/en/investigations/flight-of-the-mona

♥ DONATE (https://web.archive.org/web/20201127190413/https://www.occrp.org/en/donate)

An American airline that has been transporting protected witnesses for the U.S. government was once part-owned by two Russian organized crime figures, and is still owned by the son of their business partner, an OCCRP investigation has found.

These men, Anatoly Golubchik and Vadim Trincher, were jailed in 2014 for operating an illegal gambling and extortion ring (https://web.archive.org/web/20201127190413/https://www.fbi.gov/contact-us/field-offices/newyork/news/press-releases/two-defendants-sentenced-for-participating-in-racketeering-conspiracy-with-russian-american-organized-crime-enterprise-operating-international-sportsbook-that-laundered-more-than-100-million) out of an apartment in Trump Tower in New York City. U.S. prosecutors said they were part of a "far-reaching Russian-American organized crime ring" known as the Taiwanchik-Trincher Organization, under the protection of notorious Russian crime boss Alimzhan "Taiwanchik" Tokhtakhounov.

We use cookies to improve your experience on our website. Find out more or opt-out. (/web/20201127190413/http://www.occrp.org/en/aboutus/privacy-policy#optout).     Accept

## Пролетая над Америкой

Read a version of this story in Russian from our partner IStories.

**Read more** ⊙

(https://web.archive.org/web/20201127190413/https://istories.media/investigations/2020/11/27/proletaya-nad-amerikoi/)

Read OCCRP's coverage of how the Taiwanchik-Trincher Organization was busted wide open (https://web.archive.org/web/20201127190413/https://www.occrp.org/en/investigations/1953-international-russian-organized-crime-ring-does-old-school-gambling-in-a-new-way).

Two other investors who ran the airline afterwards also had legal troubles, and one fled a warrant for his arrest in the U.S. and remains on the lam.

Nonetheless, an OCCRP investigation shows Monarch Air Group has won more than 120 U.S. government contracts worth over $6 million, and was making government flights as recently as September.

The airline and its affiliate, WAB International, have been awarded contracts for sensitive jobs such as moving fuel in Israel for the Department of Defense (DoD), flying people around Afghanistan, and transporting protected witnesses in the U.S. for the Marshals Service. WAB International reported earning some $70 million from work for the U.S. military in 2013 alone.

"The negligence is startling," said Gary Kalman, director of the U.S. chapter of Transparency International. "Airlines with a history of criminal affiliation contracted by the government to transport protected witnesses is something we'd expect to see in a spy novel, not in a news report."





Credit: Twitter

Vadim Trincher, on the left, was sentenced to five years in prison in 2014 for operating an illegal gambling, money laundering, and extortion ring.

In a 2013 court document, prosecutors claimed Golubchik acted as Tokhtakhounov's "enforcer," and accused the men of laundering about $100 million on behalf of "high-level criminals" — some of it through Monarch and another airline company Golubchik and Trincher owned in the U.S. called Skyway International.

On one occasion, customs agents in Miami discovered 16 kilograms of cocaine on one of Monarch's planes. Prosecutors noted the seizure at Golubchik's bail hearing in 2013, adding of the airline: "We do not believe this business is legitimate."

The U.S. Marshals Service told reporters that it placed protected witnesses on Monarch planes through contracts overseen by the General Services Administration (GSA), which provides leasing, management, and other professional services to U.S. government agencies. The GSA did not respond to a request for comment.

Golubchik and Trincher both left Monarch in 2012, before the airline won the DoD and the GSA contracts. Monarch was audited by the GSA in 2013, the same year Golubchik and Trincher's arrest was widely reported, and the agency awarded the airline a 10-year contract in 2014 under which the U.S. Marshals service employed them to transport protected witnesses. The company is currentlyuseneoktasthesupreistgolubekjietinicfrinchureforsivefindsiesregertaxept-out.

(/web/20201127190413/http://www.occrp.org/en/aboutus/privacy-policy#optout).     Accept

A spokesperson for the Defense Logistics Agency, which manages the U.S. military's supply chains, said the agency followed the proper procedures when vetting Monarch for a contract awarded in 2012 to deliver fuel to a military base in Israel. Neither Golubchik nor Trincher were "involved in the bidding or performance of the contract," he added in an email.

Federal Acquisition Regulations require contractors like Monarch to provide details of any criminal offenses by its employees, even if they don't relate directly to the contract, according to Jessica Tillipman, a professor at George Washington University Law School with expertise in anti-corruption and government contracting. The agency is then required to make further enquiries, and it is at their discretion to decide whether to work with the company.

Alina Gavrushenko, Monarch's director of marketing and public relations, said the airline has not been affiliated with Golubchik or Trincher since 2012.

"Like many startups, especially in aviation, the company has changed ownership and evolved its business model over the years," she said, adding: "Our business operations are conducted with full integrity and transparency."

The current owner of Monarch, David Gitman, did not respond to a request for comment.

Credit: Facebook

U.S. authorities have awarded Monarch more than 120 contracts over the past eight years.

## A Russian Takeover

With the 2008 financial crisis threatening to ground Monarch Air, then a small Florida-based air cargo company, its owner, career pilot Paul Slavin needed an injection of funds.

Slavin, who had worked in the aviation industry for 35 years, started looking around for backers. A "trusted aircraft broker" he knew introduced him to two Russians, who agreed to invest while staying out of the airline's day-to-day operations. For a while, it seemed an ideal solution.

But they soon invited more investors on board, and within three years the clique had taken control of the company. According to Slavin, they started withholding funds and making "operational decisions that conflicted with my standards." He says he sold his shares in 2011 for a token amount. The new group began aggressively expanding the business, opening new offices and bidding for U.S. government contracts.

Slavin says he didn't know that two of his investors had ties to Russian organized crime. "If they were involved in any illegal activity outside of the airline it was never revealed to me," he said in an email to OCCRP.

David Gitman's father, Jacob Gitman, was among the first investors to join Monarch Air after it hit financial turbulence in 2008.

The elder Gitman was born in the Soviet Union, where he worked as an engineer before immigrating to the U.S. in the early 1990s. He has been linked to dozens of U.S. businesses (https://web.archive.org/web/20201127190413/https://www.azcentral.com/story/money/business/jobs/2019/08/16/la-paz-county-residents-fighting-plans-aluminum-smelter-alliance-metals/1928485001/) in everything from logistics and healthcare to aluminium smelting.

We use cookies to improve your experience on our website. Find out more or opt-out.

In 2017, Gitman joined forces with another aging investor seeking to leverage his expertise and potential profits

11/22/22, 1:50 PM                    Flight of the Monarch: US Gov't Contracted Airline Once Owned by Russian Criminals - OCCRP



Credit: Twitter

Antoly Golubchik was convicted of operating what New York prosecutors described as an illegal "large-scale sports book."

from an operation to supposedly convert used tires into fuel. The plaintiff, Blizzard Energy, was awarded $3.8 million in damages, and the case is now under appeal. Gitman declined to comment as the case is still ongoing.

Golubchik also joined as an investor in 2008, while Trincher, his criminal partner in the gambling, money laundering, and extortion ring, came aboard in 2011. Another immigrant from the former Soviet Union, Trincher was a professional card player who has reportedly made more than $1.2 million in live tournament earnings during his career, including winning the 2009 World Poker Tour Foxwoods Poker Classic.

Along with Tokhtakhounov, the Russian crime boss who is still on the run, the two men operated what New York prosecutors described as an illegal "large-scale sports book" that was used to launder approximately $100 million from former Soviet Union countries through Cyprus-registered shell companies. Prosecutors said around $50 million of that sum found its way to the U.S.

We use cookies to improve your experience on our website. Find out more or opt-out.
"Their clients were multi-millionaires and billionaires, oligarchs in Russia," the prosecutors noted in court documents.



Credit: Evan Agostini/Invision/AP

Molly Bloom, left, was among 34 people indicted for being part of the illegal gambling rings. Here she poses with actress Jessica Chastain, who played her in the film chronicling her experiences, "Molly's Game."

We use cookies to improve your experience on our website. Find out more or opt-out.
(/web/20201127190413/http://www.occrp.org/en/aboutus/privacy-policy#optout).    Accept

Their group also ran a high-stakes poker game that attracted not only clients from Russia, but also major American actors like Ben Affleck, Leonardo DiCaprio, and Matt Damon, according to the industry publication Poker News. The rise and fall of the star-studded poker game was later made into the film "Molly's Game," featuring Jessica Chastain and Idris Elba.

The Taiwanchik-Trincher Organization and its sister crime ring, co-run by Trincher's son Illya, were broken up in 2013, reportedly (https://web.archive.org/web/20201127190413/https://abcnews.go.com/US/story-fbi-wiretap-russians-trump-tower/story?id=46266198) after the FBI spent two years collecting information on the Russian money-laundering network using a wiretap hidden inside unit 63A in Trump Tower.

Jacob Gitman told OCCRP he had met Golubchik in 2006, but declined to explain how. He said he had never met or spoken with Trincher. "I don't have any business relations with them since 2013," he said in an email.

However, public records show that Gitman partnered with Golubchik and Trincher in at least four aviation companies. Panama-based SkyWay International Holding still lists all three men as corporate officers. Gitman said the Panamanian company was never active, and had never facilitated any transactions or opened bank accounts.

An important addition to Monarch's team was businessman Boruch "Bob" Freedman, who joined the company in April 2011. Freedman was already involved in air transport in Afghanistan, but he did not have the certificate or experience to procure direct government contracts. Monarch did. The two decided to join forces and, along with Gitman's son, David, they formed WAB International, which signed a profit-sharing and reimbursement arrangement with Monarch.

Freedman was well-known in the aviation world as the nephew of Alexander Mashkevich, a Kazakh business titan with links to the Eurasian Natural Resources Corporation (see box below (https://web.archive.org/web/20201127190413/https://new.occrp.org/en/investigations/flight-of-the-monarch-us-govt-contracted-airline-once-owned-by-russian-criminals#occrp-inset-box-burundaiavia-s-controversial-owners)), according to John Dawkins, the head of a logistics company that worked with Freedman on a government contract in Afghanistan.

"Boruch was a middleman," Dawkins said. "He was plugged into everyone using his uncle's reputation to gain entry and relevance."

Freedman, who fled the U.S. after a warrant was issued for his arrest for not paying a court-mandated fine, did not respond to a request for comment.

## A Kyrgyz Investor With a Troubled Airline of His Own

In 2011, Gennady Gryaznov, a former director of Kyrgyzstan's Department of Civil Aviation, also bought into Monarch. Gryaznov already owned Sky KG Airlines, a Kyrgyz airline that is banned from operating in the European Union due to safety concerns.

Sky KG caught the attention of the United Nations Security Council the following year when it began leasing the aircraft that reportedly served as the former presidential plane of Romanian dictator Nicolae Ceaușescu to the powerful Somali pirate boss Mohamed Abdi Hassan. A U.N. report alleged that Hassan added Gryaznov's plane to his own small airline — which he used, along with other businesses, for the "laundering of piracy proceeds" — before he was arrested in Belgium.

Gryaznov did not respond to a request for comment.

Golubchik and Trincher appeared in Monarch's paperwork until 2012, the year the airline won its first contract with the DoD. They are last mentioned as investors in a report from April that year, and records show they were gradually replaced as managers by Freedman-controlled entities.

By 2015, corporate records show that Jacob Gitman owned 90 percent of Monarch, but he said he sold his majority shareholder position the following year. His 37-year-old son, David — who did not respond to a request for comment — is now listed as the CEO and sole owner of the airline.

We use cookies to improve your experience on our website. Find out more or opt-out.
(/web/20201127190413/http://www.occrp.org/en/aboutus/privacy-policy#optout).     Accept

11/22/22, 1:50 PM                    Flight of the Monarch: US Gov't Contracted Airline Once Owned by Russian Criminals - OCCRP



Credit: Edin Pasovic/OCCRP

While Slavin had initially welcomed his new investors, the partnership turned sour.

"Unfortunately for me it became obvious that Boruch Freedman wanted control of the airline and used withholding of funds to affect the daily operation of the airline," said Slavin. "I was then double-crossed by Jacob Gitman, who gave his and Golubchick's voting shares to Freedman."

Slavin said he was voted out as CEO in 2011. At first he stayed on as director of operations, but left when he felt the new owners started cutting corners on safety.

Credit: Facebook

We use cookies to improve your experience on our website. Find out more or opt-out.

Monarch posted this image on the company's Facebook account in 2014. Accompanied by a quote attributed to Henry Ford: "When everything seems to be going against you, remember that aircraft take off against the wind, not with it."

## Federal Contracts

When Slavin first launched Monarch Air Group in 2005, his cargo planes flew to just one destination: the Bahamas, a Caribbean island chain beginning 80 kilometers off the southeast Florida coast, and known as an easy-access playground for American tourists, celebrities, and global elites.



Credit: Facebook

This Monarch brochure from 2009 says the company flew cargo mainly to the Bahamas, Puerto Rico and the Dominican Republic.

Monarch expanded its flight routes when the new investors came on board, and began carrying passengers as well as cargo. Then in 2011, according to a submission from prosecutors at Golubchick's bail hearing two years later, Florida customs agents discovered 16 kilograms of cocaine hidden in one of its planes.

A former Monarch pilot, who was not on the flight, told OCCRP the plane was searched by customs agents when it returned to Fort Lauderdale International Airport from Haiti. They found a duffle bag full of cocaine inside. The crew was detained for several hours, he said, along with the person who had chartered the flight, a frequent customer whose name he did not recall. The pilot thought it was strange that the aircraft was then released.

"I've seen in previous years, when the airplane was involved with drugs and it was in a hanger and it was not to be moved," he said. "It was under the control of customs."

The U.S. Customs and Border Protection agency never responded to any information about the discovery of the cocaine, or explain why no one was arrested.

11/22/22, 1:50 PM                    Flight of the Monarch: US Gov't Contracted Airline Once Owned by Russian Criminals - OCCRP

Gavrushenko, Monarch's spokesperson, said the cocaine belonged to a passenger. "We have worked with the relevant authorities to develop and enhance existing procedures, to prevent this from happening again," she said, "In our 15 years of operations, this was the only occurrence."

In the two years following the bust, U.S. government agencies continued contracting Monarch. The DoD kept up its subcontracts with WAB to provide helicopter transport for passengers and cargo in Afghanistan. Court records show WAB subcontracted the jobs to a small Kazakhstan-based aviation company, JSC Airline Burundaiavia.

The DoD contracts ceased after a helicopter crash in Afghanistan, according to court documents. In early May 2013, two Burundaiavia choppers took off from a U.S. military forward operating base about 40 miles outside Kandahar, in southern Afghanistan. A short time later, the engines failed in one of the helicopters and it went down over a populated area, "causing much damage and destruction to the village."

The court documents say Burundaiavia failed to investigate the incident, as was required under international, Afghan, and U.S. law. The crash "tarnished" the company's reputation, according to a court submission made by Burundaiavia, and it was never awarded another U.S. government contract.

The incident appears to have led to a falling out between the business partners, culminating in a lawsuit in Florida. Burundaiavia successfully sued WAB in 2015 for failing to pay almost $8 million in fees it owed. A warrant was issued for Freedman's arrest the following year after he was held in contempt of court for not paying the fine. U.S. Marshals were unable to track him down, and he now lives in Israel, according to a court document.





Credit: burundaiavia.kz (https://web.archive.org/web/20201127190413/https://burundaiavia.kz/)
Two Burundaiavia choppers crashed in southern Afghanistan in 2013.

## Burundaiavia's Controversial Owners

The Florida case involving WAB revealed who owns JSC Airline Burundaiavia: three oligarchs from Kazakhstan who have faced corruption allegations in various places.

▼ SHOW

In 2017, the Marshals Service twice hired Monarch to transport people in the witness protection program and the Justice Prisoner and Alien Transportation System, which moves prisoners around the country.

We use cookies to improve your experience on our website. Find out more or opt-out.
(/web/20201127190413/http://www.occrp.org/en/aboutus/privacy-policy#optout).     Accept

Gary Kalman of Transparency International said the fact that Monarch was able to transport protected witnesses, despite the dubious backgrounds of its former owners, shows the need for more thorough checks on companies that are awarded public contracts.

"Common sense says that contracts should be clearly vetted before going to entities with a history of criminal affiliation, but there is no legal mandate that we check," he said. "That is a significant gap in the law, and this story is a prime example of how such a gap might be dangerously exploited."

The Marshals declined to comment, saying the GSA was responsible for vetting the company. Monarch's spokesperson said the company was audited by the GSA as a vendor in 2013 and won its contracts "with full transparency and open competition."

The GSA did not reply to a request for comment.



Credit: Facebook

Monarch's air carrier license was revoked in 2016, though it is still able to broker charter flights with other FAA certified airlines.

## No-Fly Zone

Between January and April 2016, Monarch's director of operations, chief pilot, and maintenance director all quit. A pilot who spoke to OCCRP anonymously said employees resigned after Monarch stopped paying them, and the airline struggled to find replacements.

In May that year, the airline requested the FAA remove its only aircraft from its "Operation Specifications," a legal designation that allowed it to run commercial operations like private chartered flights. Without any planes that met FAA requirements, or key staff members to run them, its air carrier certificate was revoked in February 2018.

We use cookies to improve your experience on our website. Find out more or opt-out.

But Monarch is still authorized to broker charter flights with other FAA-certified airlines.      Accept

11/22/22, 1:50 PM                    Flight of the Monarch: US Gov't Contracted Airline Once Owned by Russian Criminals - OCCRP

Analysis of public documents found U.S. authorities have awarded Monarch more than 120 contracts over the past eight years, totalling more than $6 million. The airline is still making flights under an open-ended 10-year contract awarded in 2014.

The bulk of Monarch's contracts were with the DoD and involved transporting fuel to Har Keren in Israel, where the U.S. military has a mountaintop radar facility known as Site 512. Those gigs took place between 2012 — the last year Golubchik and Trincher were known to be involved in the company — and 2015.

Seto Bagdoyan, director for audit services at the U.S. Government Accountability Office's (GAO) Forensic Audits & Investigative Service, said the lack of transparency in contracting structures presents a risk to the government.

"A recent GAO report ... flagged a number of fraud and national-security risks to DoD acquisition posed by contractor ownership structures that may not be fully transparent," he said. "While GAO didn't specifically focus on background checks, this could be an important aspect of DoD's assessment of its various controls."

In addition to U.S. federal contracts, the Monarch Air Group lists international clients including the United Nations World Food Program, and Canada's Department of National Defence. Most recently, David Gitman boasted (https://web.archive.org/web/20201127190413/https://www.traveldailynews.com/post/repatriation-flights-and-the-key-role-of-private-aviation-during-pandemic) in a travel publication of Monarch's "great synergy" with U.S. embassies to bring home citizens stranded in Latin America due to the COVID-19 crisis.

In the 12 years since Slavin welcomed new investors, his small air cargo company has grown from a struggling start up, with just one route to the Bahamas, into a global operation. But even though he has not been able to "share in the prosperity," he said he is not bitter.

"I am done reliving this chapter of my life that I closed 10 years ago," Slavin said.

🐦 (https://web.archive.org/web/20201127190413/http://twitter.com/intent/tweet?text=U.S. authorities awarded Monarch Air Group over 100 contract
f (https://web.archive.org/web/20201127190413/http://www.facebook.com/share.php?u=https://www.occrp.org/en/investigations/flight-of-the-mona

Join the fight.
Hold power to account.

Support from readers like you helps OCCRP expose organized crime and corruption around the world.

By donating, you'll be directly supporting investigative journalism as a public good. You'll also gain access to exclusive insights and benefits.

DONATE TODAY

(https://web.archive.org/web/20201127190413/https://checkout.fundjournalism.org/memberform?org_id=occrp&campaign=7011U000000AyOQAQ)

RELATED STORIES

'I Already Knew Who Was Behind Her': A Mysterious Woman, a Top Russian Official, and Contracts Worth Millions

Gaben's First Family Stashed Cash In DC

Luxury London Resid Official's Son Purchas Mysterious Payment

RECENT STORIES

## Flight of the Monarch: US Gov't Contracted Airline Once Owned by Russian Criminals

U.S. authorities awarded Monarch Air Group over 100 contracts, including transporting protected witnesses and fuel for the military.

© 27 NOVEMBER 2020   → READ THE ARTICLE

(/web/20201127190413/http://www.occr of-the-monarch-us-govt-contracted-airline-once-owned-by-russian-criminals)

## 'I Already Knew Who Was Behind Her': A Mysterious Woman, a Top Russian Official, and Contracts Worth Millions

A mysterious woman negotiates state contracts for a major security company and owns firms that do lucrative business with the help of Russia's Interior Ministry. Sources say she was once the romantic partner of Viktor Zolotov, Putin's former top bodyguard and now the head of Russia's National Guard.

© 24 NOVEMBER 2020   → READ THE ARTICLE

(/web/20201127190413/http://www.occr already-knew-who-was-behind-her)

## Gabon's First Family Stashed Cash in DC Property

Gabon's ruling Bongo family and their inner circle have bought at least seven properties worth over US$4.2 million in and near the U.S. capital, a destination whose real estate has long attracted African dictators.

© 23 NOVEMBER 2020   → READ THE ARTICLE

(/web/20201127190413/http://www.occr first-family-stashed-cash-in-dc-property)

## Prevezon Holdings: The Black Money Collector

A small Russian-owned real estate investment company based in Cyprus leaves an unusually large footprint in stories about global crime and politics.

© 17 NOVEMBER 2020   → READ THE ARTICLE

(/web/20201127190413/http://www.occr fincen-files/prevezon-holdings-the-black-money-collector)

Contact (/web/20201127190413/http://www.occrp.org/en/aboutus/contact-us)
Privacy Policy (/web/20201127190413/http://www.occrp.org/en/aboutus/privacy-policy)
Bypassing Censorship (/web/20201127190413/http://www.occrp.org/en/aboutus/bypassing-censorship)
About (/web/20201127190413/http://www.occrp.org/en/about-us)
Member Centers (/web/20201127190413/http://www.occrp.org/en/members)
History of OCCRP (/web/20201127190413/http://www.occrp.org/en/history-of-occrp)
Team (/web/20201127190413/http://www.occrp.org/en/aboutus/staff)
Board of Directors (/web/20201127190413/http://www.occrp.org/en/aboutus/board-of-directors)
Awards (/web/20201127190413/http://www.occrp.org/en/aboutus/awards)
Our Supporters (/web/20201127190413/http://www.occrp.org/en/aboutus/who-supports-

Subscribe to our weekly report (https://web.archive.org/web/20201127190413/h newsletter?campaign=foo (https://web.archive.org/

(https://web.archive.org/ 6WQQxmDHK3saMD8A? feature=watch)

We use cookies to improve your experience on our website. Find out more or opt-out.
(http://www.occrp.org/en/aboutus/privacy-policy#optout).   Accept

Flight of the Monarch: US Gov't Contracted Airline Once Owned by Russian Criminals - OCCRP

NOT AN OFFICIAL COPY – CCIS – ATTORNEY OF RECORD

We use cookies to improve your experience on our website. Find out more or opt-out.
(/web/20201127190413/http://www.occrp.org/en/aboutus/privacy-policy#optout).     Accept

**Composite Exhibit B**
E-mail Thread

NOT AN OFFICIAL COPY – CCIS – ATTORNEY OF RECORD

**From:** Drew Sullivan <drew@occrp.org>
**Sent:** Saturday, August 21, 2021 7:45 PM
**To:** David Gitman <david@monarchairgroup.com>
**Subject:** Re: issues

Dear Mr. Gitman:

I am in receipt of your email from August 12, 2021. We see no reason to consider further revisions to the story, having dealt with many concerns that you have expressed.  If you wish to raise further

concerns about the story, you may have your lawyer contact OCCRP's attorneys directly: Alex Papachristou (apapachristou@nycbar.org) and Carla Pierini (cpierini@nycbar.org).

Regards,

**Drew Sullivan - Editor**
**Organized Crime and Corruption Reporting Project**
https://www.occrp.org
twitter: @drewOCCRP
+387 61 139 403 (mob)

**Join the Fight!** Hold Power to Account.

On Thu, Aug 12, 2021 at 10:57 PM David Gitman <david@monarchairgroup.com> wrote:

Mr. Sullivan, Members of the Board,

I see that some changes were made, thank you. I again want to remind you that Florida law (F.S. 836.08) requires that the changes made are published "in as conspicuous place and type as was said original article", which in this case would be the front page, while the changes in fact are published at the end of the article, noticeable by none. Also, none of your affiliate websites have made the changes.

Regardless, I also want to please understand your position. The last communication I received from you was an apology and a promise to correct some of the errors, which I believe is an act of a true leader. At the same time, there was no clear timeline nor explanation of what will be corrected. As some corrections in fact were made, I would like to know if more are coming or are you satisfied with the results.

In my opinion, the article is full of incorrect statements, misrepresentation of facts and general bias, that I strongly believe do not represent professional journalism.

Here is one example, there are plenty more. As the article goes:

"...Then in 2011, according to a submission from prosecutors at Golubchik's bail hearing two years later, Florida customs agents discovered 16 kilograms of cocaine hidden in one of its planes. A former Monarch pilot, who was not on the flight, told OCCRP the plane was searched by customs agents when it returned to Fort Lauderdale International Airport from Haiti. They found a duffle bag full of cocaine inside. The crew was detained for several hours, he said, along with the person who had chartered the flight, a frequent customer whose name he did not recall. The pilot thought it was strange that the aircraft was then released. "I've seen in previous years, when the airplane was involved with drugs and it was in a hanger and it was not to be moved," he said. "It was under the control of customs. "The U.S. Customs and Border Protection Agency refused to release any information about the discovery of the cocaine, or explain why no one was arrested..."

Using an unnamed source is a true privilege of a journalist in a developed country, which should be protected as part of the journalist's duty of being the watchdog of democracy. This also places the responsibility of verifying the information received from the source on the publisher, more so than when using a source that is willing to put his/her name on paper.

In this case, the OCCRP used a source that admits that he was not on the flight, i.e. not present

when the events of which he is reporting occurred, therefore does not have first-hand knowledge. You are reporting on a story told by an *unknown person* to an unnamed source. Have you checked who this person is? Do you know if this person even exists?

Furthermore, your source clearly states that he is not an expert on the subject and speaks from some vague personal knowledge, without specifying what airport his experience relates to, whether it was a private fight or commercial charter and whether it was the crew or passenger that was in possession of the substance, all critical factors that affect the way Customs should handle the situation. Yet, you still use his statements, that the airplane should have been placed in a hangar.

The OCCRP has not checked what procedures the US Customs had in place in 2011 for handling with such incidents on a commercial aircraft. The OCCRP does not provide examples of other private charters or major airlines that had similar incidents.

The OCCRP simply casts a shadow on our operation, because according to an unnamed person, that heard something from someone, the airplane was not towed to a "hanger" (which is spelled "hangar".

In fact, the US Customs does not have a hangar at the Fort Lauderdale International airport, nor at the Fort Lauderdale executive airport. The OCCRP is publishing a rant of a person that is repeating someone else's rant, that is clearly not related to reality, and you don't even bother checking basic facts.

Furthermore, sir, you state that "no one was arrested". Does that mean that according to the OCCRP the passenger that brought the illicit substance was not arrested? If thats the case, are you accusing the US Customs of corruption?

Sir, we do not have to agree and reach the same opinion, but I would appreciate if you could please give me a clear and concise response, so that I can act accordingly.

My question is simple: Does this article, as it is published today, meet your personal standards and those of the OCCRP?

Greatly appreciate your time.

Respectfully,

David Gitman

https://www.occrp.org/en/investigations/flight-of-the-monarch-us-govt-contracted-airline-once-owned-by-russian-criminals

On Jun 16, 2021, at 4:05 PM, David Gitman <david@monarchairgroup.com> wrote:

Mr. Sullivan,
Thank you for your response sir. For your reference, provided below is F.S. 836.08, which is the basis of my request to open a criminal investigation against your organization.

I trust that the corrections that you promise to make will be made in *"as conspicuous*

*place and type as was said original article"* and that the *"full and fair correction, apology, or retraction"* shall state that the prosecutor has apologized for making the statement that you have quoted, that Monarch was not part of the criminal proceeding that you have mentioned in the article. I trust that you would reach out to Jacob Gitman for his comment about the accusations that Mr. Paul Slavin has made and that you have published without giving him the opportunity to respond and that you would reach out to Monarch for a full response regarding the people that (falsely) claim that they were not paid. I am also attaching hereby the answers that we have provided to your initial request, please make sure that our answer is published **in full.** We have the legal right to respond to your accusations.


<Monarch Response .pdf>

**836.08   Correction, apology, or retraction by newspaper.—**

(1)   If it appears upon the trial that said article was published in good faith; that its falsity was due to an honest mistake of the facts; that there were reasonable grounds for believing that the statements in said article were true; and that, within the period of time specified in subsection (2), a full and fair correction, apology, and retraction was published in the same editions or corresponding issues of the newspaper or periodical in which said article appeared, *and in as conspicuous place and type as was said original article,* then any criminal proceeding charging libel based on an article so retracted shall be discontinued and barred.

(2)   Full and fair correction, apology, or retraction shall be made:

(a)   In the case of a broadcast or a daily or weekly newspaper or periodical, within 10 days after service of notice;

(b)   In the case of a newspaper or periodical published semimonthly, within 20 days after service of notice;

(c)   In the case of a newspaper or periodical published monthly, within 45 days after service of notice; and

(d)   In the case of a newspaper or periodical published less frequently than monthly, in the next issue, provided that notice is served no later than 45 days prior to such publication.

History.—s. 2, ch. 16070, 1933; CGL 1940 Supp. 7064(2); s. 993, ch. 71-136; s. 2, ch. 80-34.


On Jun 16, 2021, at 2:25 PM, Drew Sullivan <drew@occrp.org> wrote:

Hi Mr. Gitman,

We just got your latest email.  I do apologize.  I ordered changes made in the article after your suggestion that the article be taken down.  I have just become aware that they were not made. I have ordered that they be added immediately.  There is still an outstanding issue that is not resolved that the fact checker is working on.  I will follow up on that.

Drew Sullivan - Editor
Organized Crime and Corruption Reporting Project
https://www.occrp.org
twitter: @drewOCCRP
+387 61 139 403 (mob)

**Join the Fight!** Hold Power to Account.

NOT AN OFFICIAL COPY – CCIS – ATTORNEY OF RECORD

**From:** Drew Sullivan <drew@occrp.org>
**Sent:** Wednesday, May 12, 2021 10:04 PM
**To:** David Gitman <david@monarchairgroup.com>
**Subject:** Re: correction

Mr Gitman.  I agree with you and we are trying to resolve this but everyone has a very full schedule. In addition, our delay is caused by you bringing up new issues. We take things quite seriously and each issue requires a re-examination.  I also have to deal with staff vacations and the normal emergencies we face that are unpredictable.  I apologize for the delay and when I can get staff together we will sort out the remaining issues

which are few.

Drew Sullivan - Editor
Organized Crime and Corruption Reporting Project
https://www.occrp.org
twitter: @drewOCCRP
+387 61 139 403 (mob)

**Join the Fight!** Hold Power to Account.

On Tue, May 11, 2021 at 5:33 PM David Gitman <david@monarchairgroup.com> wrote:

Mr. Sullivan,

Respectfully sir, nearly two months have passed since March 16th, after you have advised me that this will take approximately 2 weeks to fact check. Nearly 6 weeks have passed since March 31st, when you have advised that you will get back with me in 48 hours.

I understand that sometimes things take longer than projected but I would greatly appreciate a realistic timeline.
1. When should I expect a resolution?
2. We all know that there are many flaws with this article. Why is it not taken down, until you resolve the flaws?

Also I cordially request you to comment on my questions brought up in my May 5th email, provided here again for your convenience:

The OCCRP article quotes the Federal prosecutor, Mr. Naftalis, stating that: "We do not believe this business is legitimate." This statement was made during a bail hearing in 2013. Yet, the article at no point stated that Monarch Air Group, nor any of its officers/directors, were not a party to the case. Furthermore, the company was never mentioned in any proceedings outside the bail hearing, yet this again was never mentioned.
Here is what the defense attorney, Mr. Lichtman, told the Court, referring to the how the government presented its case (I provided the transcript to your team in my first correspondence and reattaching hereto):

MR. LICHTMAN: "If you notice, during the last hearing before Judge Freeman, obviously your Honor read that we learned about the plane company that he owned. Last time he owned the plane company. A few days later, well, now he doesn't own it anymore, but he has contacts with the plane company. And then the next day, a few days later, well, it seems like we might have made a little mistake. We might have pushed the envelope too far."

Later on in the hearing, the Prosecutor, Mr. Naftalis, whos quote you've provided, responded that:

"THE COURT: Mr. Naftalis briefly, if you have any response?
MR. NAFTALIS: Yes, your Honor, very briefly. Defense counsel likes to accuse the government of misstating things. We have been completely candid. We may have -- the airplane company I guess it went bankrupt because of this cocaine issue. I fall on my sword, your Honor. "

When confronted by the defense infront of the Judge, Mr. Naftalis admitted that he has made a mistake by even presenting Monarch in the hearing.

Question 1:
In your opinion as the editor and co-founder of the OCCRP - sir, was this situation presented correctly in the November 2020 article?

The article presents the opinion of Mr. Paul Slavin, an honest man that clearly stated that he is angry at my father, Jacob Gitman. Mr. Slavin accuses Jacob Gitman of many things including compromising on safety while running an airline, a very serious and troubling accusation.
The OCCRP, while it has requested Jacob Gitman to comment on many things, and received a response to the questions it presented, never asked Jacob Gitman about his position when it comes to Mr. Slavin or Mr. Slavins accusations.

Question 2:
In your opinion as the editor and co-founder of the OCCRP - sir, is it OK to accuse a man, based on a statement from a man that is telling you he is biased against the accused, and never request a response?

Question 3:
The OCCRP is quoting unknown sources stating that Monarch did not pay its employee. Monarch has never had the opportunity to respond to this allegation (which, by the way is factually).
In your opinion as the editor and co-founder of the OCCRP- is it OK to accuse a company of not paying its employees based on a statement from a "confidential source" and not even provide the company an opportunity to comment?
Does the fact that the allegation is false make this even worst?

Question 4:
I have provided Ms. Brauer with literally dozens of inconsistencies, biases and factually incorrect statements. You have plenty of time to review them.
At this stage, after reviewing all the information with the OCCRP fact checker, as the editor and co-founder of the OCCRP, are you satisfied with the quality of the article?

Regards

David

On May 5, 2021, at 9:36 PM, Drew Sullivan <drew@occrp.org> wrote:

Thank you.
You've raised a lot of issues that all need to be checked but when I get a chance to schedule everyone will will try to get final resolution on this.

Drew Sullivan - Editor
Organized Crime and Corruption Reporting Project
https://www.occrp.org
twitter: @drewOCCRP
+387 61 139 403 (mob)

**Join the Fight!** Hold Power to Account.

On Wed, May 5, 2021 at 7:02 AM David Gitman <david@monarchairgroup.com> wrote:

Greetings Mr. Sullivan,

I hope all is well. Please advise per the below.

Regards,

David

On Apr 29, 2021, at 3:52 PM, David Gitman <david@monarchairgroup.com> wrote:

The hearing transcript is now attached

On Apr 29, 2021, at 3:52 PM, David Gitman <david@monarchairgroup.com> wrote:

Mr. Sullivan,

If you would like me to clarify the amount of the contracts you reference below-please let me know, I will provide the contract numbers to your or anyone from your team. Its two contracts- one for the fuel and one for aviation services under the GSA. There were several work orders issued under the GSA contract. If you could- please provide a breakdown of the $6m: that means we are significantly short and collections are in order.

I would like your help to please clarify the following:

The OCCRP article quotes the Federal prosecutor, Mr. Naftalis, stating that: "We do not believe this business is legitimate." This statement was made during a bail hearing in 2013. Yet, the article at no point stated that Monarch Air Group, nor any of its officers/directors, were not a party to the case. Furthermore, the company was never mentioned in any proceedings outside the bail hearing, yet this again was never mentioned.
Here is what the defense attorney, Mr. Lichtman, told the Court, referring to the how the government presented its case (I provided the transcript to your team in my first correspondence and reattaching hereto):

MR. LICHTMAN: "If you notice, during the last hearing before Judge Freeman, obviously your Honor read that we learned about the plane company that he owned. Last time he owned the plane company. A few days later, well, now he doesn't own it anymore, but he has contacts with the plane company. And then the next day, a few days later, well, it seems like we might have made a little mistake. We might have pushed the envelope too

*far."*

Later on in the hearing, the Prosecutor, Mr. Naftalis, whos quote you've provided, responded that:

*"THE COURT: Mr. Naftalis briefly, if you have any response?*

*MR. NAFTALIS: Yes, your Honor, very briefly. Defense counsel likes to accuse the government of misstating things. We have been completely candid. We may have -- the airplane company I guess it went bankrupt because of this cocaine issue. I fall on my sword, your Honor. "*

When confronted by the defense infront of the Judge, Mr. Naftalis admitted that he has made a mistake by even presenting Monarch in the hearing.

Question 1:
In your opinion as the editor and co-founder of the OCCRP - sir, was this situation presented correctly in the November 2020 article?

The article presents the opinion of Mr. Paul Slavin, an honest man that clearly stated that he is angry at my father, Jacob Gitman. Mr. Slavin accuses Jacob Gitman of many things including compromising on safety while running an airline, a very serious and troubling accusation.
The OCCRP, while it has requested Jacob Gitman to comment on many things, and received a response to the questions it presented, never asked Jacob Gitman about his position when it comes to Mr. Slavin or Mr. Slavins accusations.

Question 2:
In your opinion as the editor and co-founder of the OCCRP - sir, is it OK to accuse a man, based on a statement from a man that is telling you he is biased against the accused, and never receive a response?

Question 3:
The OCCRP is quoting unknown sources stating that

Monarch did not pay its employee. Monarch has never had the opportunity to respond to this allegation (which, by the way is factually).

In your opinion as the editor and co-founder of the OCCRP- is it OK to accuse a company of not paying its employees based on a statement from a "confidential source" and not even provide the company an opportunity to comment?

Does the fact that the allegation is false make this even worst?

Question 4:

I have provided Ms. Brauer with literally dozens of inconsistencies, biases and factually incorrect statements. You have plenty of time to review them.

At this stage, after reviewing all the information with the OCCRP fact checker, as the editor and co-founder of the OCCRP, are you satisfied with the quality of the article?

Mr. Sullivan,

I did not bother you during the last few weeks as I saw that one of your colleagues was detained by the Russian government. It is very sad to witness a judicial system that is being used to put pressure on journalists and political opponents. I understand that it probably put your organization under significant stress and shifted priorities away from the article in question. Having said that, I believe that enough time has elapsed and I would like to receive an answer whether you will correct the mistakes made or if you will chose a different route.

I would like to understand your position- whether you will try to cover this up, which I will take to your sponsors and the Court, or if you will correct the mistakes. Once I understand your position, it will clarify to me if the OCCRP is an independent news organization or just another website using false and loud headlines as click bait.

If you are a real news organization you should know that a former subject of the same reporter has

approached me 2 years ago offering to "try and solve the problem" of the upcoming article, though it was supposed to be published in another publication (which they declined to do, perhaps because the fact checked the story). Perhaps this is why she went on a Twitter rage publishing lies about our website being hosted by a Russian bank, Mercury Jets not being registered in Florida and some wild rant about a Canadian company being used for some unspecified illegal activity. Separately, there is also a story that could be rather large, which I would like to discuss with a real investigative reporter, but it has to be a real non biased outlet.

I look forward to your decision sir.
When can I expect an answer to my questions?

Respectfully,

David Gitman

On Apr 14, 2021, at 10:43 PM, Drew Sullivan <drew@occrp.org> wrote:

Mr. Gitman – there are some discrepancies we are trying to resolve.
You indicate Monarch has six contracts. We find one. We find a total of $6 million as opposed to your $3 million.

We will issue corrections or clarifications on the nationalities, the WAB subcontracts and the airlines/charter status as soon as we settle these other issues.

Drew Sullivan - Editor
Organized Crime and Corruption
Reporting Project
https://www.occrp.org
twitter: @drewOCCRP
+387 61 139 403 (mob)

**Join the Fight!** Hold Power to Account.

<April 29, 2013 Hearing Transcript.pdf>

NOT AN OFFICIAL COPY – CCIS – ATTORNEY OF RECORD

NOT AN OFFICIAL COPY – CCIS – ATTORNEY OF RECORD

**From:** Drew Sullivan <drew@occrp.org>
**Sent:** Saturday, April 10, 2021 1:46 AM
**To:** David Gitman <david@monarchairgroup.com>
**Subject:** Re: response

Yes. We want to get it right and there are some things we are checking. It's taking longer than I thought.

On Fri, 9 Apr 2021 at 11:18, David Gitman <david@monarchairgroup.com> wrote:

Mr. Sullivan,

On March 31st I received your email stating that you will update me within 48 hours. I sincerely hope that all is well and I am standing by for your update sir.

Regards

David Gitman

> On Apr 7, 2021, at 1:35 PM, David Gitman <david@monarchairgroup.com> wrote:
>
> Mr. Sullivan,
> Please update when practical.
>
> Regards
> David Gitman

>> On Mar 31, 2021, at 2:58 PM, David Gitman <david@monarchairgroup.com> wrote:
>>
>> Thank you for the update

>>> On Mar 31, 2021, at 8:49 AM, Drew Sullivan <drew@occrp.org> wrote:
>>>
>>> Hi David.
>>>
>>> I got the information back from the fact checkers and am working out some details. There were some mistakes made and we will correct them. There are also some more complex clarifications. I will get back to you in the next 48 hours. Thank you for your patience.
>>>
>>> Drew Sullivan - Editor
>>> Organized Crime and Corruption Reporting Project
>>> https://www.occrp.org
>>> twitter: @drewOCCRP
>>> +387 61 139 403 (mob)
>>>
>>> **Join the Fight!** Hold Power to Account.

--

Drew Sullivan
Editor and Publisher OCCRP
@drewOCCRP
+387 61 139-403

Join the Fight! Hold Power to Account.

Inline images

NOT AN OFFICIAL COPY – CCIS – ATTORNEY OF RECORD

**From:** Drew Sullivan <drew@occrp.org>
**Sent:** Thursday, March 18, 2021 3:26 PM
**To:** David Gitman <david@monarchairgroup.com>
**Subject:** Re: Your comments

Our fact checkers, on all our stories, have no editorial stake in our work. They only care about the level and degree of proof which they assess. She independently gives her assessment of all facts which goes to the editors who then determine how they are handled. She is the lead fact checker and is one of the most ethical and strictest fact checkers in the business. Her reputation is outstanding. There is nobody better. She is fluent or near fluent in about 8 languages including Russian so often she is reading the original source documents herself.

If the original fact checking or the reporter was not balanced or accurate we will fix it. We always have. To me this is my trade and my business and it's not personal. I don't know you and have no need to take sides. I just want a fair and accurate story. If the facts are correct we will not change it. We go through this process regularly.

As far as the sources, we are under no obligation to put you in contact with them. We will assess whether we accurately and faithfully reflected their words and intent. I suggest you wait until that process is finished before contacting them. I ask you to be patient.

On Thu, 18 Mar 2021 at 14:23, David Gitman <david@monarchairgroup.com> wrote:
  Greetings Mr. Sullivan,

  I was contacted by your colleague, Ms. Birgit Brauer, the OCCRP fact checker. Thank you for passing along my contact information to her.

  My understanding was that you will assign an *independent* fact checker, yet it seems that Ms. Brauer is the OCCRP staff fact checker.
  In a way, won't she be checking her own work? Or am I missing something?

I again cordially request that you provide me with the official US government spoke persons that the OCCRP has contacted regarding this matter and the statements/questions that were sent to them.

I would like to send our reply to them directly. I am not sure why you refuse to provide me with their contact information.

Respectfully,

David Gitman

On Mar 17, 2021, at 2:52 PM, David Gitman <david@monarchairgroup.com> wrote:

Mr. Sullivan,

For your convenience I have attached the full response as it was sent by my colleague to Ms. Caroline. I am not sure where it was published and why parts of it were omitted.

Having said that, I do think that your suggestion of an independent fact checker is appropriate and the two weeks timeline is reasonable. I will be standing by.

However, I would like to contact the official government spokespeople that the OCCRP has contacted about this matter and provide them with our side of the story. For this purpose, I cordially request that you provide me their contact information and the statements that were sent to them.

Is there an issue with this request, sir?

Regards

David Gitman

On Mar 16, 2021, at 8:31 PM, Drew Sullivan <drew@occrp.org> wrote:

They will look at all issues. It is incorrect to say your response was not included. There was a response included. We will look to see if it was appropriate and sufficient. Thank you for your patience.

On Tue, 16 Mar 2021 at 18:53, David Gitman
<david@monarchairgroup.com> wrote:
  Mr. Sullivan,

  Thank you sir for your prompt response.
  As I have stated in my letter, I am confident that the OCCRP
  holds itself to a higher standard, and an independent fact checker
  seems like the way to go. I am looking forward for this person to
  contact me, as I have left the majority of the incorrect facts out of
  the letter, to keep it short.
  I am confident that the fact checker will also address the bias
  presented in the article, as well as our lack of opportunity to
  respond to allegations.

  I will be standing by for two weeks (by March 30th) as requested.

  In the meanwhile, as I have also mentioned in the letter, I
  cordially request that your team provides me with the contact
  information for all the official Government media personnel that
  the OCCRP has been in touch with regarding this matter, as well
  as the statements that were made to them by the OCCRP.

  As our response was never published by the OCCRP, I would
  greatly appreciate the opportunity to respond to the allegation
  made against my family and my company.

  Regards,

  David Gitman


  > On Mar 16, 2021, at 7:11 AM, Drew Sullivan
  <drew@occrp.org> wrote:
  >
  > Hello David,
  >
  > We have received your comments. Thank you for pointing out
  what you consider factual errors. All our stories are fact checked.
  In cases where people allege errors, our procedure is to have an
  independent fact checker verify the origin fact checking and
  competing information. They may get back to you requesting
  proof of your comments.
  >
  > OCCRP takes accuracy and fairness very seriously. This
  process can take one to two weeks so please be patient.
  >
  > Drew Sullivan
  > Editor
  > --

> _____
> Drew Sullivan
> Editor and Publisher OCCRP
> @drewOCCRP
> +387 61 139-403
>
> Join the Fight! Hold Power to Account.
>
> Inline images
>
>

--
_____
Drew Sullivan
Editor and Publisher OCCRP
@drewOCCRP
+387 61 139-403

Join the Fight! Hold Power to Account.

Inline images


<Monarch Response .pdf>


--
_____
Drew Sullivan
Editor and Publisher OCCRP
@drewOCCRP
+387 61 139-403

Join the Fight! Hold Power to Account.

Inline images

**Exhibit C**
OOCRP Website "About" page

11/23/22, 4:03 PM                                    About

**Our network is battling 41 frivolous lawsuits. Help OCCRP SLAPP Back.**            **Donate (/en/aboutus/occrp-slapps-back)**

- Featured: (/en/projects)
- The Panama Papers (/en/panamapapers/)
- Laundromats (/en/laundromats/)
- The Pegasus Project (/en/the-pegasus-project/)
- The Pandora Papers (/en/the-pandora-papers/)

- (http://ww
- (http://ww
- (https://ww
  organized-
  reporting-p
- (http://ww
  6WQOxml
- (https://me
  unreported

# Desktop menu



OCCRP   ORGANIZED CRIME AND CORRUPTION REPORTING PROJECT

(/en/)

# Mobile menu

- Navigation
- Search

- Investigations (/en/investigations)
- Daily (/en/daily)
- Features (/en/blog)
- Announcements (/en/announcements)
- Resources (/#resources)
- Donate (https://checkout.fundj org_id=occrp&campaign)
- Contact (/en/conta

**DONATE (HTTPS://CHECKOUT.FUNDJOURNALISM.ORG/MEMBERFORM? ORG_ID=OCCRP&CAMPAIGN=7011U000000ECJRQA0)**

About

# About Us



- Published: 24 August 2007
  - 
  - Written by OCCRP



The last five decades have seen the dramatic globalization of organized crime and corruption, now totaling trillions of dollars every year. With the help of a "criminal services industry" — corrupt banks, law firms, registration agents, and lobbyists — criminal networks have steadily grown their markets, and the world's most corrupt officials and tycoons easily loot, launder, and hide stolen money for future use. The result is an unprecedented transfer of wealth and global web of high-level corruption and organized crime that has fueled global inequality, the rise of extremist groups, and the decline of democratic institutions all over the world.

**OCCRP believes it takes a network to fight a network.**

**MISSION:** By developing and equipping a global network of investigative journalists and publishing their stories, OCCRP exposes crime and corruption so the public can hold power to account.

**VISION:** A world where lives, livelihoods, and democracy are not threatened by crime and corruption.

As an investigative reporting platform for a worldwide network of independent media centers (https://www.occrp.org/en/members) and journalists, OCCRP is reinventing investigative journalism as a public good. In the face of rising costs and growing threats to independent media, OCCRP provides media outlets and journalists with a range of critical resources and tools including digital and physical security and allows those covering the most sensitive topics to work in teams with trusted editors.

While upholding the highest journalistic ethics and editorial standards, OCCRP develops and deploys cutting-edge tech tools to enable collaborative, secure data-driven investigations. With OCCRP Aleph (https://aleph.occrp.org/), an investigative data platform powered by software we developed, journalists can search and cross-reference more than three billion records to trace criminal connections and patterns and efficiently collaborate across borders.

OCCRP also partners with advocacy groups (https://www.occrp.org/en/gacc/), arming civil society with information

to meaningfully press for justice and change, and unearths evidence that enables law enforcement to act.

We see a future where corruption and organized crime are drastically reduced and democracy is strengthened as a result of a more informed citizenry, increased accountability, and sharply higher costs for criminal activity.

# OUR THEORY OF CHANGE:

OCCRP exposes and explains the relationship between money and power and serves as a catalyst that arms others with the information needed to drive positive change. As **investigative journalists**, we expose crime and corruption at the highest levels. Using these revelations, **advocates** can press for policy reform and package information for **law enforcement**, which has the authority to act on evidence and deliver justice. **Policymakers** can point to investigative findings to pass legislation and advance reforms. **Citizens** who read our work get the information they need to act and organize on their own behalf.



About OCCRP - Skoll Awardee

11/23/22, 4:03 PM                                                About

**Join the fight.**
**Hold power to account.**

Support from readers like you helps OCCRP expose organized crime and corruption around the world.

By donating, you'll be directly supporting investigative journalism as a public good. You'll also gain access to exclusive insights and benefits.

DONATE TODAY

(https://checkout.fundjournalism.org/memberform?org_id=occrp&campaign=7011U000000yly8QAA)

- ABOUT (/en/about-us)
- TEAM (/en/aboutus/staff)
- Global Network (/en/members)
- IMPACT (/en/impact-to-date)
- GLOBAL ANTI-CORRUPTION CONSORTIUM (/en/gacc/)
- ACCOMPLICE PROGRAM (/en/aboutus/join-the-fight-become-an-occrp-accomplice)
- ANNUAL REPORTS (/en/annual-reports)
- AWARDS (/en/awards)
- HISTORY (/en/history-of-occrp)
- Work With Us (/en/jobs)
- BOARD OF DIRECTORS (/en/aboutus/board-of-directors)
- SUPPORTERS (/en/aboutus/who-supports-our-work)

# Most recent

About



(/en/investigations/17071-faq-what-is-correspondent-banking)
FAQ: What is Correspondent Banking? (/en/investigations/17071-faq-what-is-correspondent-banking)

# FAQ: What is Correspondent Banking? (/en/investigations/17071-faq-what-is-correspondent-banking)

11/23/22, 4:03 PM                                    About



(/en/investigations/16985-rwanda-fed-false-intelligence-to-us-and-interpol-as-it-pursued-political-dissidents-abroad)
Rwanda Fed False Intelligence to U.S. and Interpol As It Pursued Political Dissidents Abroad
(/en/investigations/16985-rwanda-fed-false-intelligence-to-us-and-interpol-as-it-pursued-political-dissidents-abroad)

# Rwanda Fed False Intelligence to U.S. and Interpol As It Pursued Political Dissidents Abroad (/en/investigations/16985-rwanda-fed-false-intelligence-to-us-and-

11/23/22, 4:03 PM                                                About

# interpol-as-it-pursued-political-dissidents-abroad)



(/en/investigations/16973-documents-reveal-wagners-golden-ties-to-sudanese-military-companies)
Documents Reveal Wagner's Golden Ties to Sudanese Military Companies (/en/investigations/16973-documents-reveal-wagners-golden-ties-to-sudanese-military-companies)

# Documents Reveal Wagner's Golden Ties to Sudanese Military Companies

11/23/22, 4:03 PM

**About**

# (/en/investigations/16973-documents-reveal-wagners-golden-ties-to-sudanese-military-companies)

Subscribe to our weekly newsletter! (https://mailchi.mp/occrp/subscribe-newsletter?campaign=joomla_right_column)

Contact (/en/aboutus/contact-us)

Privacy Policy (/en/aboutus/privacy-policy)

Bypassing Censorship (/en/aboutus/bypassing-censorship)

About (/en/about-us)    Member Centers (/en/members)

History of OCCRP (/en/history-of-occrp)    Team (/en/aboutus/staff)

Board of Directors (/en/aboutus/board-of-directors)

Awards (/en/awards)

Our Supporters (/en/aboutus/who-supports-our-work)



(http://www.facebo

(http://www.twitter

(https://www.linke ed-
and-
corruption
(http://www.youtub
EWQqZ1HDHK3sa
reporting-watch)
project/)

## Exhibit D
Current Article

NOT AN OFFICIAL COPY – CCIS – ATTORNEY OF RECORD

# Flight of the Monarch: US Gov't Contracted Airline Once Owned by Criminals with Ties to Russian Mob

Credit: Facebook.

by Lily Dobrovolskaya

27 November 2020
 (https://twitter.com/intent/tweet?text=U.S. authorities awarded Monarch Air Group over 100 contracts, including transporting protected witnesses
f (https://www.facebook.com/share.php?u=https://www.occrp.org/en/investigations/flight-of-the-monarch-us-govt-contracted-airline-once-owned-by-

♥ DONATE (https://www.occrp.org/en/donate)

An American aviation company that has transported protected witnesses for the U.S. government was once part-owned by two men who worked with a major Russian-American organized crime group.

These men, Anatoly Golubchik and Vadim Trincher, were jailed in 2014 for operating an illegal gambling and extortion ring (https://www.fbi.gov/contact-us/field-offices/newyork/news/press-releases/two-defendants-sentenced-for-participating-in-racketeering-conspiracy-with-russian-american-organized-crime-enterprise-operating-international-sportsbook-that-laundered-more-than-100-million) out of an apartment in Trump Tower in New York City. U.S. prosecutors said they were part of a "far-reaching Russian-American organized crime ring" known as the Taiwanchik-Trincher Organization, under the protection of notorious Russian crime boss Alimzhan "Taiwanchik" Tokhtakhounov.



## Пролетая над Америкой

**Read a version of this story in Russian from our partner IStories.**

**Read more** ❯

(https://istories.media/investigations/2020/11/27/proletaya-nad-amerikoi/)

Read OCCRP's coverage of how the Taiwanchik-Trincher Organization was busted wide open (https://www.occrp.org/en/investigations/1953-international-russian-organized-crime-ring-does-old-school-gambling-in-a-new-way).

Two other investors who ran the company afterwards also had legal troubles, and one fled a warrant for his arrest in the U.S. and remains on the lam.

Nonetheless, an OCCRP investigation shows Monarch Air Group has won U.S. government contracts worth over $6 million, and was making government flights as recently as September.

Monarch has carried out various tasks for U.S. authorities, including carrying protected witnesses for the Marshals Service and transporting fuel in Israel for the Department of Defense (DoD). (The witness-protection contracts were first reported by (https://thesternfacts.com/under-trump-witness-protection-has-been-infiltrated-by-the-russian-mafia-f6e4825f10a5) blogger Patrick Simpson last year.) One of its affiliates, WAB International, also subcontracted jobs transporting passengers and cargo for the DoD in Afghanistan.

"The negligence is startling," said Gary Kalman, director of the U.S. chapter of Transparency International. "Airlines with a history of criminal affiliation contracted by the government to transport protected witnesses is something we'd expect to see in a spy novel, not in a news report."





Credit: Twitter

Vadim Trincher, on the left, was sentenced to five years in prison in 2014 for operating an illegal gambling, money laundering, and extortion ring.

In a 2013 court document, prosecutors claimed Golubchik acted as Tokhtakhounov's "enforcer," and accused the men of laundering about $100 million on behalf of "high-level criminals" — some of it through Monarch and another airline company Golubchik and Trincher owned in the U.S. called Skyway International.

On one occasion, customs agents in Miami discovered 16 kilograms of cocaine on one of Monarch's planes. Prosecutors noted the seizure at Golubchik's bail hearing in 2013, adding of the airline: "We do not believe this business is legitimate."

The U.S. Marshals Service told reporters that it placed protected witnesses on Monarch planes through contracts overseen by the General Services Administration (GSA), which provides leasing, management, and other professional services to U.S. government agencies. The GSA did not respond to a request for comment.

Golubchik and Trincher both left Monarch in 2012, before the airline won the DoD and the GSA contracts. Monarch was audited by the GSA in 2013, the same year Golubchik and Trincher's arrest was widely reported, and the agency awarded the airline a 10-year contract in 2014 under which the U.S. Marshals service employed them to transport protected witnesses. The company is currently owned by the son of Golubchik and Trincher's former business partner.



11/23/22, 4:33 PM                    Flight of the Monarch: US Gov't Contracted Airline Once Owned by Criminals with Ties to Russian Mob – OCCRP

A spokesperson for the Defense Logistics Agency, which manages the U.S. military's supply chains, said the agency followed the proper procedures when vetting Monarch for a contract awarded in 2012 to deliver fuel to a military base in Israel. Neither Golubchik nor Trincher were "involved in the bidding or performance of the contract," he added in an email.

Federal Acquisition Regulations require contractors like Monarch to provide details of any criminal offenses by its employees, even if they don't relate directly to the contract, according to Jessica Tillipman, a professor at George Washington University Law School with expertise in anti-corruption and government contracting. The agency is then required to make further enquiries, and it is at their discretion to decide whether to work with the company.

Alina Gavrushenko, Monarch's director of marketing and public relations, said the company has not been affiliated with Golubchik or Trincher since 2012.

"Like many startups, especially in aviation, the company has changed ownership and evolved its business model over the years," she said, adding: "Our business operations are conducted with full integrity and transparency."

The current owner of Monarch, David Gitman, did not respond to a request for comment.

Credit: Facebook
A promotional image used by Monarch.

## The Takeover

With the 2008 financial crisis threatening to ground Monarch Air, then a small Florida-based air cargo company, its owner, career pilot Paul Slavin needed an injection of funds.

Slavin, who had worked in the aviation industry for 35 years, started looking around for backers. A "trusted aircraft broker" he knew introduced him to Jacob Gitman and Anatoly Golubchick, who agreed to invest while staying out of the airline's day-to-day operations. For a while, it seemed an ideal solution.

But they soon invited more investors on board, and within three years the clique had taken control of the company. According to Slavin, they started withholding funds and making "operational decisions that conflicted with my standards." He says he sold his shares in 2011 for a token amount. The new group began aggressively expanding the business, opening new offices and bidding for U.S. government contracts.

Slavin says he didn't know that two of his investors had ties to Russian organized crime. "If they were involved in any illegal activity outside of the airline it was never revealed to me," he said in an email to OCCRP.

David Gitman's father, Jacob Gitman, was among the first investors to join Monarch Air after it hit financial turbulence in 2008.

The elder Gitman was born in the Soviet Union, where he worked as an engineer before immigrating to the U.S. in the early 1990s. He has been linked to dozens of U.S. businesses (https://www.azcentral.com/story/money/business/jobs/2019/08/16/la-paz-county-residents-fighting-plans-aluminum-smelter-alliance-metals/1928485001/) in everything from logistics and healthcare to aluminium smelting.

In 2017, Gitman was found liable in a civil lawsuit of misleading investors about technology, expertise, and potential profits from an operation to supposedly convert used tires into fuel. The plaintiff, Blizzard Energy, was awarded $3.8 million in 



Credit: Twitter

Anatoly Golubchik was convicted of operating what New York prosecutors described as an illegal "large-scale sports book."

damages, and the case is now under appeal. Gitman declined to comment as the case is still ongoing.

Golubchik also joined as an investor in 2008, while Trincher, his criminal partner in the gambling, money laundering, and extortion ring, came aboard in 2011. Another immigrant from the former Soviet Union, Trincher was a professional card player who has reportedly made more than $1.2 million in live tournament earnings during his career, including winning the 2009 World Poker Tour Foxwoods Poker Classic.

Along with Tokhtakhounov, the Russian crime boss who is still on the run, the two men operated what New York prosecutors described as an illegal "large-scale sports book" that was used to launder approximately $100 million from former Soviet Union countries through Cyprus-registered shell companies. Prosecutors said around $50 million of that sum found its way to the U.S.

"Their clients were multi-millionaires and billionaires, oligarchs in Russia," the prosecutors noted in court documents.

Their group also ran a high-stakes poker game that attracted not only clients from Russia, but also major American actors



11/23/22, 4:33 PM                    Flight of the Monarch: US Gov't Contracted Airline Once Owned by Criminals with Ties to Russian Mob – OCCRP



Credit: Evan Agostini/Invision/AP

Molly Bloom, left, was among 34 people indicted for being part of the illegal gambling rings. Here she poses with actress Jessica Chastain, who played her in the film chronicling her experiences, "Molly's Game."

like Ben Affleck, Leonardo DiCaprio, and Matt Damon, according to the industry publication Poker News. The rise and fall of the star-studded poker game was later made into the film "Molly's Game," featuring Jessica Chastain and Idris Elba.



https://www.occrp.org/en/investigations/flight-of-the-monarch-us-govt-contracted-airline-once-owned-by-russian-criminals#:~:text=to Russian Mob-,Fli...   6/14

The Taiwanchik-Trincher Organization and its sister crime ring, co-run by Trincher's son Ilya, were broken up in 2013, reportedly (https://abcnews.go.com/US/story-fbi-wiretap-russians-trump-tower/story?id=46266198) after the FBI spent two years collecting information on the Russian money-laundering network using a wiretap hidden inside unit 63A in Trump Tower.

Jacob Gitman told OCCRP he had met Golubchik in 2006, but declined to explain how. He said he had never met or spoken with Trincher. "I don't have any business relations with them since 2013," he said in an email.

However, public records show that Gitman partnered with Golubchik and Trincher in at least four aviation companies. Panama-based SkyWay International Holding still lists all three men as corporate officers. Gitman said the Panamanian company was never active, and had never facilitated any transactions or opened bank accounts.

An important addition to Monarch's team was businessman Boruch "Bob" Freedman, who joined the company in April 2011. Freedman was already involved in air transport in Afghanistan, but he did not have the certificate or experience to procure direct government contracts. Monarch did. The two decided to join forces and, along with Gitman's son, David, they formed WAB International, which signed a profit-sharing and reimbursement arrangement with Monarch.

Freedman was well-known in the aviation world as the nephew of Alexander Mashkevich, a Kazakh business titan with links to the Eurasian Natural Resources Corporation (see box below (https://www.occrp.org/en/investigations/flight-of-the-monarch-us-govt-contracted-airline-once-owned-by-russian-criminals#occrp-inset-box-burundaiavia-s-controversial-owners)), according to John Dawkins, the head of a logistics company that worked with Freedman on a government contract in Afghanistan.

"Boruch was a middleman," Dawkins said. "He was plugged into everyone using his uncle's reputation to gain entry and relevance."

Freedman, who fled the U.S. after a warrant was issued for his arrest for not paying a court-mandated fine, did not respond to a request for comment.

### A Kyrgyz Investor With a Troubled Airline of His Own

In 2011, Gennady Gryaznov, a former director of Kyrgyzstan's Department of Civil Aviation, also bought into Monarch. Gryaznov already owned Sky KG Airlines, a Kyrgyz airline that is banned from operating in the European Union due to safety concerns.

Sky KG caught the attention of the United Nations Security Council the following year when it began leasing the aircraft that reportedly served as the former presidential plane of Romanian dictator Nicolae Ceausescu to the powerful Somali pirate boss Mohamed Abdi Hassan. A U.N. report alleged that Hassan added Gryaznov's plane to his own small airline — which he used, along with other businesses, for the "laundering of piracy proceeds" — before he was arrested in Belgium.

Gryaznov did not respond to a request for comment.

Golubchik and Trincher appeared in Monarch's paperwork until 2012, the year the airline won its first contract with the DoD. They are last mentioned as investors in a report from April that year, and records show they were gradually replaced as managers by Freedman-controlled entities.

By 2015, corporate records show that Jacob Gitman owned 90 percent of Monarch, but he said he sold his majority shareholder position the following year. His 37-year-old son, David — who did not respond to a request for comment — is now listed as the CEO and sole owner of the airline.



11/23/22, 4:33 PM                    Flight of the Monarch: US Gov't Contracted Airline Once Owned by Criminals with Ties to Russian Mob - OCCRP



Credit: Edin Pasovic/OCCRP

While Slavin had initially welcomed his new investors, the partnership turned sour.

"Unfortunately for me it became obvious that Boruch Freedman wanted control of the airline and used withholding of funds to affect the daily operation of the airline," said Slavin. "I was then double-crossed by Jacob Gitman, who gave his and Golubchik's voting shares to Freedman."

Slavin said he was voted out as CEO in 2011. At first he stayed on as director of operations, but left when he felt the new owners started cutting corners on safety.

Credit: Facebook

Monarch posted this image on the company's Facebook account last year, accompanied by a quote attributed to Henry Ford: "When everything seems to be going against you, remember that aircraft take off against the wind, not with it."



## Federal Contracts

When Slavin first launched Monarch Air Group in 2005, his cargo planes flew to just one destination: the Bahamas, a Caribbean island chain beginning 80 kilometers off the southeast Florida coast, and known as an easy-access playground for American tourists, celebrities, and global elites.



Credit: Facebook
This Monarch brochure from 2009 says the company flew cargo mainly to the Bahamas, Puerto Rico and the Dominican Republic.

Monarch expanded its flight routes when the new investors came on board, and began carrying passengers as well as cargo. Then in 2011, according to a submission from prosecutors at Golubchik's bail hearing two years later, Florida customs agents discovered 16 kilograms of cocaine hidden in one of its planes.

A former Monarch pilot, who was not on the flight, told OCCRP the plane was searched by customs agents when it returned to Fort Lauderdale International Airport from Haiti. They found a duffle bag full of cocaine inside. The crew was detained for several hours, he said, along with the person who had chartered the flight, a frequent customer whose name he did not recall. The pilot thought it was strange that the aircraft was then released.

"I've seen in previous years, when the airplane was involved with drugs and it was in a hanger and it was not to be moved," he said. "It was under the control of customs."

The U.S. Customs and Border Protection Agency refused to release any information about the discovery of the cocaine, or explain why no one was arrested.



11/23/22, 4:33 PM

Flight of the Monarch: US Gov't Contracted Airline Once Owned by Criminals with Ties to Russian Mob - OCCRP

Gavrushenko, Monarch's spokesperson, said the cocaine belonged to a passenger. "We have worked with the relevant authorities to develop and enhance existing procedures, to prevent this from happening again," she said. "In our 15 years of operations, this was the only occurrence."

In the two years following the bust, U.S. government agencies continued contracting Monarch. WAB also received subcontracts to provide helicopter transport for passengers and cargo in Afghanistan for the DoD. Court records show WAB subcontracted the jobs to a small Kazakhstan-based aviation company, JSC Airline Burundaiavia.

The DoD contracts ceased after a helicopter crash in Afghanistan, according to court documents. In early May 2013, two Burundaiavia choppers took off from a U.S. military forward operating base about 40 miles outside Kandahar, in southern Afghanistan. A short time later, the engines failed in one of the helicopters and it went down over a populated area, "causing much damage and destruction to the village."

The court documents say Burundaiavia failed to investigate the incident, as was required under international, Afghan, and U.S. law. The crash "tarnished" the company's reputation, according to a court submission made by Burundaiavia, and it was never awarded another U.S. government contract.

The incident appears to have led to a falling out between the business partners, culminating in a lawsuit in Florida. Burundaiavia successfully sued WAB in 2015 for failing to pay almost $8 million in fees it owed. A warrant was issued for Freedman's arrest the following year after he was held in contempt of court for not paying the fine. U.S. Marshals were unable to track him down, and he now lives in Israel, according to a court document.



Credit: burundaiavia.kz (https://burundaiavia.kz/)

Two Burundaiavia choppers crashed in southern Afghanistan in 2013.

## Burundaiavia's Controversial Owners

The Florida case involving WAB revealed who owns JSC Airline Burundaiavia: three oligarchs from Kazakhstan who have faced corruption allegations in various places.

▼ MORE

In 2017, the Marshals Service twice hired Monarch to transport people in the witness protection program and the Justice Prisoner and Alien Transportation System, which moves prisoners around the country.



11/23/22, 4:33 PM                    Flight of the Monarch: US Gov't Contracted Airline Once Owned by Criminals with Ties to Russian Mob - OCCRP

Gary Kalman of Transparency International said the fact that Monarch was able to transport protected witnesses, despite the dubious backgrounds of its former owners, shows the need for more thorough checks on companies that are awarded public contracts.

"Common sense says that contracts should be clearly vetted before going to entities with a history of criminal affiliation, but there is no legal mandate that we check," he said. "That is a significant gap in the law, and this story is a prime example of how such a gap might be dangerously exploited."

The Marshals declined to comment, saying the GSA was responsible for vetting the company. Monarch's spokesperson said the company was audited by the GSA as a vendor in 2013 and won its contracts "with full transparency and open competition."

The GSA did not reply to a request for comment.



Credit: Facebook

Monarch's air carrier license was revoked in 2016, though it is still able to broker charter flights with other FAA certified airlines.

## No-Fly Zone

Between January and April 2016, Monarch's director of operations, chief pilot, and maintenance director all quit. A pilot who spoke to OCCRP anonymously said employees resigned after Monarch stopped paying them, and the airline struggled to find replacements.

In May that year, the airline requested the FAA remove its only aircraft from its "Operation Specifications," a legal designation that allowed it to run commercial operations like private chartered flights. Without any planes that met FAA requirements, or key staff members to run them, its air carrier certificate was revoked in February 2018.

But Monarch is still authorized to broker charter flights with other FAA-certified air carriers.



11/23/22, 4:33 PM                        Flight of the Monarch: US Gov't Contracted Airline Once Owned by Criminals with Ties to Russian Mob - OCCRP

Analysis of public documents found U.S. authorities have awarded Monarch contracts worth more than $6 million. The company is still brokering flights under an open-ended 10-year contract awarded in 2014.

The bulk of Monarch's contracts were with the DoD and involved transporting fuel to Har Keren in Israel, where the U.S. military has a mountaintop radar facility known as Site 512. Those gigs took place between 2012 — the last year Golubchik and Trincher were known to be involved in the company — and 2015.

Seto Bagdoyan, director for audit services at the U.S. Government Accountability Office's (GAO) Forensic Audits & Investigative Service, said the lack of transparency in contracting structures presents a risk to the government.

"A recent GAO report ... flagged a number of fraud and national-security risks to DoD acquisition posed by contractor ownership structures that may not be fully transparent," he said. "While GAO didn't specifically focus on background checks, this could be an important aspect of DoD's assessment of its various controls."

In addition to U.S. federal contracts, the Monarch Air Group lists international clients including the United Nations World Food Program, and Canada's Department of National Defence. Most recently, David Gitman boasted (https://www.traveldailynews.com/post/repatriation-flights-and-the-key-role-of-private-aviation-during-pandemic) in a travel publication of Monarch's "great synergy" with U.S. embassies to bring home citizens stranded in Latin America due to the COVID-19 crisis.

In the 12 years since Slavin welcomed new investors, his small air cargo company has grown from a struggling start up, with just one route to the Bahamas, into a global operation. But even though he has not been able to "share in the prosperity," he said he is not bitter.

"I am done reliving this chapter of my life that I closed 10 years ago," Slavin said.

*This story has been updated with the following corrections and clarifications:*

- The story has been clarified to better explain that Monarch says it won six government contracts. These included more than 120 awards, or transactions, to carry out different jobs. U.S. government records show these totaled more than $6 million.
- The story incorrectly identified the nationality of two former part-owners of Monarch, Anatoly Golubchik and Vadim Trincher. They are naturalized U.S. citizens who emigrated from the former Soviet Union.
- The story incorrectly stated the manner in which WAB International, a Monarch affiliate, received funds. WAB reported it received $70 million in subcontracts for work on behalf of the U.S. military from one or more companies that received contracts directly from the U.S. military.
- The story has been clarified to correctly reflect Monarch's status during its years of operation. Monarch was designated as an airline until February 2018 when the Federal Aviation Administration (FAA) revoked its air carrier certificate. Monarch was then registered as an on-demand charter broker.

🐦 (http://twitter.com/intent/tweet?text=U.S. authorities awarded Monarch Air Group over 100 contracts, including transporting protected witnesses
f (http://www.facebook.com/share.php?u=https://www.occrp.org/en/investigations/flight-of-the-monarch-us-govt-contracted-airline-once-owned-by

**Join the fight.**
**Hold power to account.**

Support from readers like you helps OCCRP expose organized crime and corruption around the world.

By donating, you'll be directly supporting investigative journalism as a public good. You'll also gain access to exclusive insights and benefits.

DONATE TODAY

(https://checkout.fundjournalism.org/memberform?org_id=occrp&campaign=7011U000000MyDOAQ)



11/23/22, 4:33 PM                    Flight of the Monarch: US Gov't Contracted Airline Once Owned by Criminals with Ties to Russian Mob - OCCRP

0 Comments

Sort by   Oldest

Add a comment...

Facebook Comments Plugin

RELATED STORIES

**Rwanda Fed False Intelligence to U.S. and Interpol As It Pursued Political Dissidents Abroad**

**Documents Reveal Wagner's Golden Ties to Sudanese Military Companies**

**Inside South Africa's Brutal Lion Bone Trade**

**Notorious Nigerien Weapons Broker Lands Secret Arms Deal in Senegal**

RECENT STORIES

**Rwanda Fed False Intelligence to U.S. and Interpol As It Pursued Political Dissidents Abroad**

Rwandan dissidents have claimed that President Paul Kagame has used dirty tactics to go after

his critics abroad. Now, a classified FBI report obtained by OCCRP confirms that Rwanda has been conducting "poison pen" operations

**Documents Reveal Wagner's Golden Ties to Sudanese Military Companies**

Wagner, the Russian mercenary company owned by the infamous businessman Yevgeny Prigozhin, secured and maintained its position in Sudan's gold sector while

working closely with companies affiliated with Sudan's brutal military.

© 2 NOVEMBER 2022   → READ THE ARTICLE

**Inside South Africa's Brutal Lion Bone Trade**

In the world's only commercial lion-farming industry, centered in South Africa's Free State, animals are reared in terrible conditions so they can be slaughtered for their bones. Reporters tracked the lion bone supply chain all the way to Laos, where one of the world's most notorious wildlife trafficking groups has

**Notorious Nigerien Weapons Broker Lands Secret Arms Deal in Senegal**

A contract seen by OCCRP shows how Aboubakar Hima, who allegedly skimmed millions from $240 million in corrupt arms

deals in his native Niger, may be up to his old tricks further from home.

© 25 OCTOBER 2022   → READ THE ARTICLE



https://www.occrp.org/en/investigations/flight-of-the-monarch-us-govt-contracted-airline-once-owned-by-russian-criminals#:~:text=to Russian Mob-,...      13/14

11/23/22, 4:33 PM    Flight of the Monarch: US Gov't Contracted Airline Once Owned by Criminals with Ties to Russian Mob - OCCRP

on American soil for
years.

4 NOVEMBER 2022    → READ THE
ARTICLE

(/en/investigations/rwanda-fed-false-
intelligence-to-us-and-interpol-as-it-
pursued-political-dissidents-abroad)

(/en/investigations/documents-reveal-
wagners-golden-ties-to-sudanese-
military-companies)

been buying up big cat
skeletons for years.

26 OCTOBER 2022    → READ THE
ARTICLE

(/en/investigations/inside-south-africas-
brutal-lion-bone-trade)

(/en/investigations/notorious-nigerien-
weapons-broker-lands-secret-arms-
deal-in-senegal)

Contact (/en/aboutus/contact-us)

Bypassing Censorship
(/en/aboutus/bypassing-censorship)

Member Centers (/en/members)

Team (/en/aboutus/staff)

Awards (/en/awards)

Privacy Policy (/en/aboutus/privacy-policy)

About (/en/about-us)

History of OCCRP (/en/history-of-occrp)

Board of Directors (/en/aboutus/board-of-
directors)

Our Supporters (/en/aboutus/who-
supports-our-work)

Subscribe to our weekly newsletter
(https://mailchi.mp/occrp/electronic-
newsletter?campaign=fo...) (http://twitter.com/occrp

(https://www.youtube.com
6WQOxmDHKRsaMDSA?
feature=watch)

## Exhibit E

Statement from Author dated November 28, 2020

NOT AN OFFICIAL COPY – CCIS – ATTORNEY OF RECORD

8:39                                                    .ll LTE 🔋

🔒 mobile.twitter.com — Private

← 🔍 Search Twitter                               ∘∘∘

( Log in )                  ( Sign up )

in the story in case any of it can be useful for researchers and reporters out there. Please read carefully and don't jump into conclusion.

💬 1          ↻          ♡ 1          ⬆

**Lily Dobrovolskaya ...** · Nov 28, 2020   ∘∘∘
Monarch has a division called Mercury Jets which has no legal presence in the US. Mercury's website domain info shows it was registered by an eponymous company in Moscow and lists a contact email address of a Moscow-based commercial bank Sibcontact bank.

💬 3          ↻          ♡          ⬆

**Lily Dobrovolskaya ...** · Nov 28, 2020   ∘∘∘
The bank lost more than 2 Billion RUR and came under criminal investigation after the bankruptcy. The banker owned his aviation business in partnership with a Russian public official arrested for bribes.

💬          ↻          ♡          ⬆

**Eric Levai** @ericlevai · Nov 27, 2020   ∘∘∘
Replying to @BunchOfPhonies and @OCCRP
great work

💬          ↻          ♡ 1          ⬆

# EXHIBIT 2

```
                    UNITED  STATES  DISTRICT  COURT
                  SOUTHERN  DISTRICT  OF  NEW  YORK

In re:                                 :
                                           Docket #13cr268
UNITED STATES OF AMERICA,               : 1:13-cr-00268-JMF

                         Plaintiff,     :

   - against -                          :

ALIMZHAN TOKHTAKHOUNOV, ANATOLY         :
GOLUBCHIK, et al.,                        New York, New York
                                        : April 24, 2013
                         Defendants.
---------------------------------------- :

                          PROCEEDINGS BEFORE
                    THE HONORABLE DEBRA FREEMAN,
           UNITED  STATES  DISTRICT  COURT  MAGISTRATE  JUDGE

APPEARANCES:

For the United States      U.S. ATTORNEY'S OFFICE
      of America:          SOUTHERN DISTRICT OF NEW YORK
                           BY:  JOSHUA NAFTALIS, ESQ.
                           One Saint Andrew's Plaza
                           New York, New York 10007
                           (212) 637-2310


For the Defendant          LAW OFFICES OF JEFFREY LICHTMAN
Golubchik:                 BY:   JEFFREY HARRIS LICHTMAN, ESQ.
                           750 Lexington Ave, 15th floor
                           New York, New York 10022
                           (212) 581-1001




Transcription Service:     Carole Ludwig, Transcription Services
                           141 East Third Street #3E
                           New York, New York 10009
                           Phone:  (212) 420-0771
                           Fax:  (212) 420-6007

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

**INDEX**

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None    |        |       |           |          |

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None           |             |    |    |           |

7

1              MR. NAFTALIS:   I will, yes.

2              THE COURT:   Okay.

3              MR. NAFTALIS:   Mr. Golubchik, Mr. Tokhtakhounov,

4    and Mr. Trincher are the three leaders of this RICO

5    conspiracy.  They're all charged with extortion, money

6    laundering, RICO, illegal gambling.

7              THE COURT:   And all I'm saying is you're talking

8    about one, I'll give you leave to be saying he this, he that,

9    he the other thing, as long as I know you're still talking

10   about that person.

11             MR. NAFTALIS:   Yes, Your Honor.

12             THE COURT:   Then if you shift gears and you're

13   talking about someone else and saying he, make sure I get it.

14             MR. NAFTALIS:   I will, Your Honor.

15             THE COURT:   Okay.

16             MR. NAFTALIS:   The defendants are charged with

17   extortion.  Part of the extortion relates to working with Mr.

18   Tokhtakhounov to extort money in fear of force and use of

19   force.  As Your Honor is aware, the Second Circuit has made

20   clear that being a leader of a criminal enterprise satisfies

21   the dangerousness prong as well.

22             As I mentioned, the defendant is caught on numerous

23   intercepts with Mr. Tokhtakhounov, including discussions about

24   extorting money through the threat of force.  We believe

25   that's dangerousness.  This is an international conspiracy

8

1  that uses fear from this very high level person to get people

2  to pay.

3          With respect to risk of flight, the defendant

4  himself has set forth in the Pre-Trial Services report has

5  extensive connections to the Ukraine, Russia, France, and

6  Israel.  He's a dual citizen I believe of Israel and the

7  United States.  If he were bailed, we believe he would run.

8          He has close connections, as I mentioned to Mr.

9  Tokhtakhounov who is a man of immense wealth and power in the

10  former Soviet Union who can easily help him hide.  Mr.

11  Tokhtakhounov has been under indictment publicly since 2002

12  and living freely.  He is also an Israeli citizen, meaning Mr.

13  Golubchik, and Mr. Golubchik owns property in France.  He was

14  arrested soon after coming back from a long international trip

15  from France and Israel, and he spends substantial amounts of

16  time, for example, in Monaco as well.

17          We believe that if he is bailed, he will leave and

18  go, use the protections and money afforded to him by the other

19  members of this conspiracy to leave the United States.

20          As I mentioned, this is a large-scale money

21  laundering operation.  As you can see, just from what he's

22  revealed to the Court, has a large amount of assets.  He

23  personally has been involved in laundering tens of millions of

24  dollars from Russia to shell accounts in Cyprus into the

25  United States.  We believe that there is money, we've already

9

1   seized money in Cyprus that belonged to this organization, and

2   there is much more over there we believe.

3          His access to funds is so great that, for example,

4   he and Mr. Trincher provided payment to Mr. Tokhtakhounov, the

5   vor, of $10 to $12 million in a few-month period simply for

6   Mr. Tokhtakhounov providing his services which are effectively

7   to extort payments from people.

8          The defendant lists as his employment on the Pre-

9   Trial Services report Haggert Realty.  This company is a

10  complete fraud.  It is used to launder money.  It is the shell

11  company where the money that is laundered lands in the United

12  States.  As I mentioned, the money starts in Russia.  They

13  move it here for safekeeping we believe.  It goes through

14  shell accounts in Cyprus.  Sometimes it goes directly to Mr.

15  Golubchik, sometimes it goes into Haggert Realty, and that

16  money is washed through this real estate company so it comes

17  out, for example, as rental (inaudible).  It used to be

18  illegal gambling money.  It now comes out as rental payments,

19  hedge fund dividends, for example.

20         Another example to access to cash overseas, during

21  our investigation we've learned of Mr. Golubchik being

22  involved in picking up cash in Kiev.  This is an international

23  organization with close ties overseas and large amounts of

24  money at his disposal.

25         As Your Honor noted, he's charged in many counts.

10

1   He faces up to 90 years of prison.  We have unbelievably

2   strong evidence again the defendant.  As I mentioned, there

3   are Title III wiretaps, there are search warrants of email

4   accounts, massive bank record discovery; over 360 bank

5   accounts we've been through.  We believe that we have more

6   than a solid case against the defendant.

7           Finally, and this relates to both the money

8   laundering and risk of flight.  The defendant has an ownership

9   interest in two companies, one called Skyway, one called

10  Monarch.  These are airplane companies.  They have a

11  legitimate purpose in that they are airline companies.  They

12  were also used to wash money in the United States.

13          Owning an airplane company allows you obviously to

14  leave quite easily.  The airplane company not only was used

15  for laundering money; in 2011 Miami customs discovered 16

16  kilos of cocaine on one of these planes.  We do not believe

17  this business is legitimate.  Realistically it is used to

18  launder money and it provides him the opportunity to flee.

19          And, finally, just in terms of – to come back to

20  where the defendant's codefendant Mr. Trincher stands, he was

21  detained on these exact same arguments by Judge Francis.  We

22  see no reason why he should be treated differently, and we're

23  obviously happy to answer any questions about the facts.  I

24  know this is all coming to you.  Poor Judge Francis had the

25  privilege of presenting 20 defendants, he got pretty familiar

```
 1                                                     48
 2                C E R T I F I C A T E
 3
 4          I, Carole Ludwig, certify that the foregoing
 5  transcript of proceedings in the United States District
 6  Court, Southern District of New York, United States of
 7  America v. Tokhtakhounov, et al., Docket #13cr268, was
 8  prepared using digital electronic transcription equipment
 9  and is a true and accurate record of the proceedings.
10
11
12
13
14  Signature_____
15
16  Date:   April 25, 2013
17
18
19
20
21
22
23
24
25
```

# EXHIBIT 3

D4tngolc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        13 Cr. 268 (JMF)

5   ANATOLY GOLUBCHIK,

6              Defendant.

7   ------------------------------x

8                                      New York, New York
                                       April 29, 2013
9                                      11:15 a.m.

10
    Before:
11
                      HON. JESSE M. FURMAN,
12
                                       District Judge
13

14                      APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    BY:  JOSHUA NAFTALIS
17       Assistant United States Attorney

18  JEFFREY LICHTMAN
    JEFFREY EINHORN
19       Attorneys for Defendant

20  ALSO PRESENT:

21  Pretrial Services Officer Jeff Steimel
    FBI Special Agent Robert Hanratty
22

23

24

25

                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

D4tngolc

1    claimed legitimate job as Haggard Realty on the pretrial

2    services report. It is a fraud. That is a money laundering

3    vehicle.

4              The defendants take their money from overseas, they

5    put it into real estate here, and it comes out as rental

6    payments, hedge fund dividends, to try to hide it from the

7    government.

8              As another example of lying to the Court, when the

9    defendant came into the United States from his trip overseas,

10   he said he owned a gas station, that was his employment.

11             I don't see anything about a gas station in the

12   pretrial services report in terms of his employment.  He says

13   he does Haggard Realty.

14             THE COURT:  He told whom that he --

15             MR. NAFTALIS:  U.S. customs.  When you fill out the

16   card when you come in, what do you do here.  He said he owned a

17   gas station.  He does own a gas station, but he doesn't tell

18   the Court about it, and he doesn't say that is his employment

19   history.

20             In terms of assets overseas and payments, we mentioned

21   he and Mr. Trincher and the other members of the

22   Taiwanchik-Trincher organization paid Mr. Tokhtakhounov between

23   ten and twelve million dollars in one period of time, simply

24   for his protection, for his ability to extort money.  If you

25   have that kind of money, you have the ability to run.

D4tngolc

1          Just in terms of background, I think that my colleague

2    mentioned it to you at the arraignment, this is a huge sports

3    book betting operation.

4          The settle point, or the amount when a bettor would

5    have to settle up with the defendants was $500,000.  It wasn't

6    like you lost $50,000 you have to pay.  If you have swings of

7    $500,000, that's when you owe money.  It shows just how much

8    money is moving through this organization.

9          The defendant faces 90 years in prison.  That is a lot

10   of time.  He has a lot of money.  We mentioned before Judge

11   Freeman the defendant has or did have an ownership interest in

12   two airline companies, which were money laundering vehicles.

13         One of them is called Skyway.  One of them was called

14   Monarch.  We believe he still has contacts.  To the extent I

15   suspect that defense counsel will say he's somehow gotten rid

16   of these investments, he has contacts with an airline company,

17   another indicia of flight.

18         One of these airplanes was found with 16 kilograms of

19   cocaine on it.  I am not saying it was his.  But it is a

20   company he used, and that is a lot of cocaine to find.

21         Defense counsel's other argument is this is not a man

22   who has a fake ID.  He's not a man who's lied.  As I've gone

23   over it, he's lied to the Court, he's lied to customs, he's

24   hidden money.  The MO of this operation is to hide money from

25   the government.

D4tngolc

1    submit to your Honor that a bail package involving some much

2    less restrictive methods, such as home where the client is

3    monitoring, and a certain amount of cash alternative in

4    addition to a personal recognizance bond signed by another

5    financially sound (inaudible) should be more than sufficient to

6    require my client to appear in court as necessary."

7              Does that sound likes the conditions that we put

8    forth?

9              It is not even close.

10             THE COURT:  Mr. Lichtman, I understand you are just

11   responding to an argument, fairly responding to an argument

12   that the government has made regarding Mr. Trincher and his

13   similarity or lack therefore and your view.  Whether I detain

14   Mr. Golubchik or grant him bail will be on the basis of factors

15   and considerations that are specific to him.

16             MR. LICHTMAN:  Fair enough.

17             THE COURT:  Why don't we move off Mr. Trincher.

18             MR. LICHTMAN:  Fair enough.

19             THE COURT:  I think that has limited probative value

20   at the end of the day.

21             MR. LICHTMAN:  I do as well.

22             Your Honor, at bottom what we have here is actually,

23   you know, Judge, before I get into an introduction, I want to

24   talk about one other problem that relates to this defendant.

25             If you notice, during the last hearing before Judge

D4tngolc

1    Freeman, obviously your Honor read that we learned about the

2    plane company that he owned.  Last time he owned the plane

3    company.  A few days later, well, now he doesn't own it

4    anymore, but he has contacts with the plane company.

5          Pretty shocking difference when one man supposedly

6    owns a plane company that's waiting outside his apartment in

7    Fort Lee, if you would listen to them.

8          And then the next day, a few days later, well, it

9    seems like we might have made a little mistake.  We might have

10    pushed the envelope too far.

11          Well, let me tell you what I did.  About 15 minutes

12    after I got back from Court last week, I went on the Florida

13    Division of Corporation website, and I looked up these

14    companies.

15          What did it show?  2009, 2010, 2011 he is an owner.

16    He's listed as one of the principals.  Then he disappears

17    because he sold his interest in the company.  That took me 15

18    seconds to figure out.

19          But when you are trying to get detention by any means

20    necessary, you may slide the facts a little bit.  The fact is

21    it took me a second to figure out that he has no ownership

22    interest.

23          I was in Court with him, and I asked him because that

24    is the first I heard about the plane company.  I didn't know

25    that this existed until they brought it up.

D4tngolc

1              I said to him, What's with the plane company?

2              I misunderstood what he said, and I think I actually

3    said that the company doesn't exist anymore.  There is an issue

4    of communication here.  I am not saying that he requires an

5    interpreter, but it would have been just as easy for me to say,

6    well, he sold his interest the last couple of years in both

7    companies, and I had difficulty communicating with him a little

8    bit so I learned, at least what I gleaned from him was that the

9    company didn't exist anymore.

10             It wasn't until I got back and looked at it myself to

11   see that it didn't, and I also spoke to one of the people that

12   work in the company right now and confirmed it.

13             These are things that they could have done, but they

14   didn't want to because why not just say it to a Court and

15   figure maybe we can get away from it.

16             I think we can expect a little bit of backup before

17   such things are said.  It is such an important issue of flight

18   if someone owns a plane company.

19             But at bottom, this is a very large gambling case.  We

20   are told about the Colombo case and the Gotti case.  I'm

21   familiar with both.  The Colombo case had murder.  The Gotti

22   case the entire case was violence.  Every single thing in that

23   case was permeated with violence.  I know the case.  Violence,

24   violence, violence.

25             What we have here is a very large gambling case with

D4tngolc

```
 1    a waiver of the privilege because you are not taking steps to

 2    protect the confidentiality of the communications.

 3            If he calls his lawyer or makes a spouse call that

 4    would otherwise fall within the privilege, knowing that the

 5    government may be listening in, I don't know why a similar

 6    argument wouldn't apply.

 7            MR. LICHTMAN:  I think that's fair and I agree.  I

 8    can't deny that is a fair argument, and if he's he out on bail

 9    and has the ability to come to my office, which is probably

10    half an hour away tops, I don't see any reason why the only

11    conversations we would have over the phone is I would like to

12    come see on you this date at this time.

13            THE COURT:  All right.  Anything further?

14            MR. LICHTMAN:  I think that is all, your Honor.

15            THE COURT:  Mr. Naftalis briefly, if you have any

16    response?

17            MR. NAFTALIS:  Yes, your Honor, very briefly.

18            Defense counsel likes to accuse the government of

19    misstating things.  We have been completely candid.  We may

20    have -- the airplane company I guess it went bankrupt because

21    of this cocaine issue.  I fall on my sword, your Honor.

22            This case is about money being hidden.  This is not

23    just a gambling case.  I think that the defense attorney is

24    blowing smoke honestly.  This is not a gambling case.  This is

25    an organized crime RICO extortion case.  That's like saying the
```

Filing # 166019365 E-Filed 02/02/2023 02:59:33 PM

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

MONARCH AIR GROUP, LLC
a Florida Limited Liability Company,

      Plaintiff,

           CASE NO.: CACE-22-017416

v.

JOURNALISM DEVELOPMENT
NETWORK INC., A Maryland Corporation,
and LILY DOBROVOLSKAYA

      Defendants.

_____/

## NOTICE OF HEARING
*(Uniform Motion Calendar)*

    **PLEASE TAKE NOTICE** that the following matter will be heard before the Honorable

Jeffrey R. Levenson, via Zoom Video Conference, on **Tuesday, February 14, 2023 at 8:45 a.m.**,

or as soon thereafter may be heard:

### CASE MANAGEMENT CONFERENCE

**JUDGE JEFFREY LEVENSON is inviting you to a scheduled Zoom meeting.**
**Topic: Judge Levenson Docket**
**Join Zoom Meeting**
**https://17thflcourts.zoom.us/j/109129436**
**Meeting ID: 109 129 436**
**One tap mobile**
**+13126266799, 109 129 436# US (Chicago)**
**+16468769923,,109 129 436# US (New York)**
**Dial by your location or Toll Free Below**
**+1 312 626 6799 US (Chicago)**
**+1 646 876 9923 US (New York)**
**+1 669 900 6833 US (San Jose)**
**+1 253 215 8782 US**
**(888)475-4499 US Toll-free,**
**(833)548-0276 US Toll-free,**
**(833)548-0282 US Toll-free,**
**(877)853-5257 US Toll-free**
**+1 301 715 8592 US**

{00714897}        STOK KON + BRAVERMAN
1 E. Broward Boulevard, Suite 915 • Fort Lauderdale, FL 33301 • P.954.237.1777 • F.954.237.1737 • E-mail: service@stoklaw.com

*** FILED: BROWARD COUNTY, FL BRENDA D. FORMAN, CLERK 02/02/2023 02:59:33 PM.****

**+1 346 248 7799 US (Houston)**
**+1 408 638 0968 US (San Jose)**
**Meeting ID: 109 129 436**
**Find your local number: https://17thflcourts.zoom.us/u/adcKOluwtS**

> **"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the ADA Coordinator, Room 470, 201 S.E. Sixth Street, Fort Lauderdale, Florida 33301, 954-831-7721 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.".**

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed and served via the Florida Courts E-Filing Portal on this 2nd day of February 2023 to: Dana J. McElroy, dmcelroy@tlolawfirm.com; Thomas & LoCicero PL 915 Middle River Drive, Suite 309 Fort Lauderdale, FL 33304; James J. McGuire, Esq., jmcguire@tlolawfirm.com; Linda R. Norbut, Esq., lnorbut@tlolawfirm.com; Thomas & LoCicero PL 601 South Boulevard Tampa, FL 33606.

Respectfully Submitted,

*/s/ Peretz Laine*
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
jkon@stoklaw.com
PERETZ LAINE, ESQ.
Florida Bar No. 1038556
plaine@stoklaw.com

Filing # 166904636 E-Filed 02/15/2023 07:25:34 PM

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO. <u>CACE22017416</u>   DIVISION: <u>09</u>   JUDGE: <u>Levenson, Jeffrey R. (09)</u>

**Monarch Air Group, LLC**

Plaintiff(s) / Petitioner(s)

v.

**JOURNALISM DEVELOPMENT NETWORK, INC., et al**

Defendant(s) / Respondent(s)

_____/

<u>ORDER ON CASE STATUS CONFERENCE</u>

This cause came before on February 14, 2023 for a case management conference at which counsel for Plaintiff Monarch Air Group, LLC ("Plaintiff") and Defendant Journalism Development Network, Inc. ("Defendant") appeared. The Court, having reviewed the file and otherwise being fully advised in the premises, orders as follows:

**ORDERED AND ADJUDGED:**

1. Plaintiff shall file a response to Defendant's combined motion to dismiss Plaintiff's complaint and to strike demands for attorney's fees ("Defendant's Motion") on or before March 16, 2023. Defendant shall thereafter have until March 30, 2023 to file a reply.
2. Defendant's Motion shall be set for a 30-minute hearing on April 25, 2023, beginning at 1:30 p.m.

*** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN,  CLERK 02/15/2023 07:25:33 PM.****

**DONE AND ORDERED** in Chambers at Broward County, Florida on <u>15th day of February, 2023</u>.

<u>CACE22017416 02-15-2023 1:35 PM</u>
Hon. Jeffrey Levenson
**CIRCUIT COURT JUDGE**
Electronically Signed by Jeffrey Levenson

**Copies Furnished To:**
Dana J McElroy , E-mail : dmcelroy@tlolawfirm.com
Dana J McElroy , E-mail : bbrennan@tlolawfirm.com
Dana J McElroy , E-mail : cbenson@tlolawfirm.com
James J. McGuire , E-mail : jmcguire@tlolawfirm.com
James J. McGuire , E-mail : tgilley@tlolawfirm.com
Joshua Kon , E-mail : jkon@stoklaw.com
Joshua Kon , E-mail : gortiz@stoklaw.com
Linda Riedemann Norbut , E-mail : lnorbut@tlolawfirm.com
Linda Riedemann Norbut , E-mail : dlake@tlolawfirm.com
Peretz Laine , E-mail : plaine@stoklaw.com
Peretz Laine , E-mail : gortiz@stoklaw.com
Robert A. Stok , E-mail : ssolis@stoklaw.com
Robert A. Stok , E-mail : service@stoklaw.com
Yosef Kudan , E-mail : ykudan@stoklaw.com

Filing # 167682189 E-Filed 02/28/2023 10:43:39 AM

### IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
### IN AND FOR BROWARD COUNTY, FLORIDA

MONARCH AIR GROUP, LLC,
a Florida Limited Liability Company,

      Plaintiff,

                              CASE NO.: CACE-22-017416
                              DIVISION 09

v.

JOURNALISM DEVELOPMENT
NETWORK INC., a Maryland Corporation,
And LILY DOBROVOLSDKAYA,

      Defendants.

_____/

### NOTICE OF HEARING
*(Special Set – 30 minutes)*

      **YOU ARE HEREBY NOTIFIED** that the undersigned has called up for hearing the

following to be heard:

| | | |
|---|---|---|
| **DATE**: | Tuesday, April 25, 2023 | |
| **TIME**: | 1:30 p.m. | |
| **JUDGE**: | The Honorable Jeffrey R. Levenson | |
| **LOCATION:** | 201 SE 6th Street, Fort Lauderdale, FL 33301 Courtroom 16-150 | |
| **MATTER**: | Defendant Journalism Development Network, Inc.'s Combined Motion to Dismiss Complaint and to Strike Demand for Attorney's Fees | |

                                Respectfully submitted,

                                THOMAS & LOCICERO PL

                                By: */s/ Dana J. McElroy*
                                    Dana J. McElroy, Esq.
                                    Florida Bar No. 845906
                                    dmcelroy@tlolawfirm.com
                                    915 Middle River Drive Suite 309

Fort Lauderdale, FL 33304
Phone: (954) 703-3416

- and -

James J. McGuire
Florida Bar No. 0187798
jmcguire@tlolawfirm.com
Linda R. Norbut
Florida Bar No. 1011401
lnorbut@tlolawfirm.com
601 South Boulevard
Tampa, FL 33606
Telephone: (813) 984-3060

*Attorneys for Journalism
Development Network, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this **28th** day of **February, 2023** the foregoing document was electronically with the Clerk of the Court via the E-Portal, and was served this same day on all counsel of record, either via transmission of Notices of Electronic Filing generated by the E-Portal or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

By:   */s/ Dana J. McElroy*
      Attorney

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the ADA Coordinator, Room 470, 201 S.E. Sixth Street, Fort Lauderdale, Florida 33301, 954-831-7721 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.

2

Filing # 167842305 E-Filed 03/01/2023 05:05:20 PM

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

MONARCH AIR GROUP, LLC
a Florida Limited Liability Company,

        Plaintiff,

v.

JOURNALISM DEVELOPMENT
NETWORK INC., A Maryland Corporation,
and LILY DOBROVOLSKAYA

        Defendants.

_____/

CASE NO.: CACE-22-017416

DIVISION 09

### PLAINTIFF'S UNOPPOSED MOTION FOR ENLARGEMENT OF TIME

Plaintiff, MONARCH AIR GROUP, LLC ("Monarch") moves this Court to enter an Agreed Order enlarging the time for Monarch to respond to Defendant, JOURNALISM DEVELOPMENT NETWORK INC. ("JDN")'s combined motion to dismiss Plaintiff's complaint and to strike demands for attorneys' fees ("Defendant's Motion"), and for Defendant to reply to Monarch's response.

1.    This cause came before the Court for a case management conference on February 14, 2023.

2.    The Court ordered that Plaintiff's response will be due on March 16, 2023, Defendant's reply will be due on March 30, 2023, and Defendant's Motion shall be set for a 30-minute hearing on April 25, 2023, beginning at 1:30 p.m.

3.    The hearing on Defendant's Motion subsequently was noticed for a special-set hearing as ordered.

4.    Plaintiff's counsel is traveling abroad for a family matter and this trip will interfere with Plaintiff's ability to respond by March 16, 2023.

5.    In light of this and that the hearing is not set to take place until April 25, 2023, Plaintiff's

{00718227}

counsel contacted Defendant's counsel asking if it was agreeable to Defendant that the due dates for the response and reply be postponed to April 4, and April 18, 2023, respectively.

6.      In response, counsel for Defendant advised that Defendant did not oppose the requested enlargement of the time in which Plaintiff's response and Defendant's reply will be due.

7.      Thus, Plaintiff respectfully requests this Honorable Court to enter the agreed order that Plaintiff respond to Defendant's Motion on or before April 4, 2023, and that Defendant shall have until April 18, 2023 to file a reply to Plaintiff's response.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed and served via the Florida Courts E-Filing Portal on this **1st day of March 2023** to all counsels of record.

Respectfully submitted,

**STOK KON+ BRAVERMAN**
Attorneys for Plaintiff
One East Broward Boulevard, Suite 915
Fort Lauderdale, Florida 33301
Tel.: (954) 237-1777
Fax: (954) 237-1737
Email: service@stoklaw.com

*/s/ Peretz Laine*
PERETZ LAINE, ESQ.
Florida Bar No. 1038556
plaine@stoklaw.com
ROBERT A. STOK, ESQ.
Florida Bar No. 857051
rstok@stoklaw.com
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
jkon@stoklaw.com
YOSEF Y. KUDAN, ESQ.
Florida Bar No. 1010261
ykudan@stoklaw.com

{00718227}

Filing # 167848124 E-Filed 03/01/2023 07:01:34 PM

### IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
### IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO. <u>CACE22017416</u>   DIVISION: <u>09</u>   JUDGE: <u>Levenson, Jeffrey R. (09)</u>

**Monarch Air Group, LLC**

Plaintiff(s) / Petitioner(s)

v.

**JOURNALISM DEVELOPMENT NETWORK, INC., et al**

Defendant(s) / Respondent(s)

_____/

### AGREED ORDER ENLARGING THE TIME PERIOD FOR PLAINTIFF'S RESPONSE AND DEFENDANT'S REPLY

This cause came before the Court upon Plaintiff's unopposed motion for an enlargement of the time for Plaintiff Monarch Air Group, LLC ("Plaintiff") to respond to Defendant Journalism Development Network, Inc. ("Defendant")'s combined motion to dismiss Plaintiff's complaint and to strike demands for attorneys' fees ("Defendant's Motion"), and for Defendant to reply to Plaintiff's response. It is hereby

### ORDERED AND ADJUDGED:

Plaintiff shall file a response to Defendant's Motion on or before April 4, 2023. Defendant shall thereafter have until **April 14, 2023** to file a reply (*not April 18, 2023*). Counsel shall upload the motions and responses and deliver hard copies of same to the Court's chambers.

*** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN,  CLERK 03/01/2023 07:01:33 PM.****

Case Number: CACE22017416

**DONE AND ORDERED** in Chambers at Broward County, Florida on <u>1st day of March, 2023</u>.

<u>CACE22017416 03-01-2023 5:56 PM</u>
Hon. Jeffrey Levenson
**CIRCUIT COURT JUDGE**
Electronically Signed by Jeffrey Levenson

**Copies Furnished To:**
Dana J McElroy , E-mail : dmcelroy@tlolawfirm.com
Dana J McElroy , E-mail : bbrennan@tlolawfirm.com
Dana J McElroy , E-mail : cbenson@tlolawfirm.com
James J. McGuire , E-mail : jmcguire@tlolawfirm.com
James J. McGuire , E-mail : tgilley@tlolawfirm.com
Joshua Kon , E-mail : jkon@stoklaw.com
Joshua Kon , E-mail : gortiz@stoklaw.com
Linda Riedemann Norbut , E-mail : lnorbut@tlolawfirm.com
Linda Riedemann Norbut , E-mail : dlake@tlolawfirm.com
Peretz Laine , E-mail : plaine@stoklaw.com
Peretz Laine , E-mail : gortiz@stoklaw.com
Robert A. Stok , E-mail : ssolis@stoklaw.com
Robert A. Stok , E-mail : service@stoklaw.com
Yosef Kudan , E-mail : ykudan@stoklaw.com

Filing # 169143234 E-Filed 03/20/2023 04:12:32 PM

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

MONARCH AIR GROUP, LLC
a Florida Limited Liability Company,

        Plaintiff,

CASE NO.: CACE-22-017416

v.

JOURNALISM DEVELOPMENT
NETWORK INC., A Maryland Corporation,
and LILY DOBROVOLSKAYA

        Defendants.

_____/

## MOTION FOR COURT TO RECOGNIZE SERVICE BY OTHER MEANS UNDER SECTION 48.102, FLORIDA STATUTES

Plaintiff, MONARCH AIR GROUP, LLC, under section 48.102, *Florida Statutes*, respectfully moves this Honorable Court to enter an order that Defendant, Lily Dobrovolskaya ("Author") has been served with process in this case via text message, Messenger, and LinkedIn.

1.    Plaintiff filed this lawsuit on November 23, 2022.

2.    On December 2, 2022, Plaintiff's process server effectively served Defendant, Journalism Development Network Inc.("JDN").

3.    Plaintiff also attempted to locate Author via Skiptrace and Westlaw's Public Record search. These searches yielded two addresses in New York City and Author's cellphone number.

4.    On December 13, 2022, the Clerk of Court issued a summons for Author.

5.    On December 21, 2022, Plaintiff's process server tried serving Author at each of the two addresses. *See* **Exhibit A**.

6.    Plaintiff's process server made several more attempts at each of the two addresses but was unable to serve Author. *See* **Exhibit B**, affidavit from process server.

STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 • Fort Lauderdale, FL 33301 • P.954.237.1777 • F.954.237.1737 • E-mail: service@stoklaw.com

*** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN,  CLERK 03/20/2023 04:12:31 PM.****

7.      The undersigned contacted JDN's counsel inquiring whether JDN or its counsel are either authorized to accept service on behalf of Author or know Author's whereabouts and/or her email address. JDN's counsel, however stated that neither she nor JDN were authorized to accept service on behalf of Author, nor did they have authority to provide Author's information.

8.      Accordingly, on Monday, March 20, 2023, the undersigned called Author's cell to confirm that it was Author's number. The undersigned confirmed that it was Author's number by asking if her name is Lily Dobrovolskaya and if she is a freelance reporter for the Miami-Herald. Author confirmed both. She refused, however, to provide her address or email address.

9.      Upon confirming that the cellphone belongs to Author, the undersigned's office sent Author the summons and complaint via text message. *See* Exhibit C screenshot of text message.

10.     In addition, the undersigned sent Author messages both via LinkedIn and Messenger. *See* Composite Exhibit D, screenshots of same.

11.     The undersigned then contacted JDN's counsel (OC) who told the undersigned that she is now also representing Author, and that all further communications to Author should be sent to OC. The undersigned asked OC whether she would accept service for Author and/or share information on Author's whereabouts so that Plaintiff can serve her in person, but OC said that she is unauthorized to do so.

12.     Based on the above, Author knows about the suit pending against her and has retained counsel to defend her in same.

        WHEREFORE, Plaintiff moves this Honorable Court to enter an order that Author has been properly served under section 48. 102, *Florida Statutes* on March 20, 2023, via text message and other technology, or that Plaintiff shall have an additional 120 days to serve Author, together with such and further relief this Honorable Court deems just and proper.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed and served via the Florida Courts E-Filing Portal on this **20th day of March 2023** to all counsel of record.

Respectfully submitted,

**STOK KON+ BRAVERMAN**
Attorneys for Plaintiff
One East Broward Boulevard, Suite 915
Fort Lauderdale, Florida 33301
Tel.: (954) 237-1777
Fax: (954) 237-1737
Email: service@stoklaw.com

*/s/ Peretz Laine*
PERETZ LAINE, ESQ.
Florida Bar No. 1038556
plaine@stoklaw.com
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
jkon@stoklaw.com
YOSEF Y. KUDAN, ESQ.
Florida Bar No. 1010261
ykudan@stoklaw.com

# EXHIBIT A

---------- Forwarded message ---------
From: **Steven Mitchell** <keatingandwalker@gmail.com>
Date: Fri, Dec 23, 2022 at 8:42 AM
Subject: Monarch Air v. Lily Dobrovolskaya (Stok Kon & Braverman)
To: <michael@rubilegalservices.com>, Keating & Walker <service@keatingandwalker.com>

We sent a server out to both addresses on the 21st
at 89 East Second Street there are bells/intercoms, but no names on them - server rang bell
for Apt. 1 a few times, no one answered - there's no way to get into the building unless
someone rings you in after you've established contact by using the intercom system at the
front door.

At 245 East 10th Street server reports a heavily gated front entrance with what appears to
be a video intercom system - press a button and you get an option to ring in to any of 3
floors - server rang all 3, no one answered -

Both these attempts were in the afternoon - we had no one available to make evening
attempts and won't have anyone for that until Mike Keating gets back from vacation (Dec.
29)

# PLEASE NOTE - Do not respond directly to this email. Send ALL replies/questions & requests to "service@keatingandwalker.com".

Thank you!

Steven Mitchell
Keating & Walker Attorney Service, Inc.
116 Nassau Street, Suite 816
New York, NY 10038
(212) 964-6444

# EXHIBIT B

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA
---------------------------------------------------X

MONARCH AIR GROUP, LLC,
a Florida Limited Liability Company,

               Plaintiff(s),

    -against-

Case No. CACE-22-017416

JOURNALISM DEVELOPMENT
NETWORK, INC., a Maryland Corporation,
and LILY DOBROVOLSKAYA,

               Defendant(s).

**AFFIDAVIT OF
ATTEMPTED SERVICE**

---------------------------------------------------X

STATE OF NEW YORK   )
                s.s :
COUNTY OF NEW YORK  )

      MICHAEL KEATING, being duly sworn, deposes and says that deponent is an agent of
RUBI SERVICES at 8004 NW 154TH Street, Suite 671, Miami Lakes, FL 33016-5814, is over
the age of eighteen years and is not a party to the action.

      That on the 4th day of January, 2023, from approximately 7:40 to 7:55 p.m., deponent
attempted to serve a true copy of the **Summons and Complaint (with Exhibits) and Civil Cover
Sheet** upon Lily Dobrovolskaya at 89 East 2nd Street, Apt. #1, New York, New York 10009. I rang
the bell for apartment 1 but received no answer (I rang the bells for several other apartments but
did not receive an answer - the bells do not appear to work.) There are no names on the bells. I
waited outside the premises to see if the defendant entered or left but did not see her.

      That on the 4th day of January, 2023, at approximately 8:10 p.m., deponent attempted to
serve a true copy of the **Summons and Complaint (with Exhibits) and Civil Cover Sheet** upon
Lily Dobrovolskaya at 245 East 10th Street, Apt. #3, New York, New York 10009. I rang the
intercom for apartment 3 but received no answer. I was able to access the listings of the four
apartments in the building. Per the intercom apartment 1 and 3 are vacant. Apartments 2 and 4 have
tenants listed but the defendant is not listed.

That on the 14th day of January, 2023, from approximately 7:55 to 8:15 a.m., deponent attempted to serve a true copy of the **Summons and Complaint (with Exhibits) and Civil Cover Sheet** upon Lily Dobrovolskaya at 89 East 2nd Street, Apt. #1, New York, New York 10009. I rang the bell for apartment 1 but received no answer. I waited outside the premises to see if the defendant entered or left but did not see her.

That on the 17th day of January, 2023, from approximately 7:40 to 8:05 p.m., deponent attempted to serve a true copy of the **Summons and Complaint (with Exhibits) and Civil Cover Sheet** upon Lily Dobrovolskaya at 89 East 2nd Street, Apt. #1, New York, New York 10009. I rang the bell for apartment 1 but received no answer. I waited outside the premises to see if the defendant entered or left but did not see her.

Sworn to before me this
20th day of March, 2023

MICHAEL KEATING #848345

_____
**NOTARY PUBLIC, STATE OF NEW YORK**
STEVEN MITCHELL
**Reg. No. 01-MI-6326046**
**Qualified in New York County**
**Commission expires June 08, 2023**

(2)

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA
-----------------------------------------------------X
MONARCH AIR GROUP, LLC,
a Florida Limited Liability Company,

                         Case No. CACE-22-017416

                Plaintiff(s),

  -against-

JOURNALISM DEVELOPMENT
NETWORK, INC., a Maryland Corporation,
and LILY DOBROVOLSKAYA,

                **AFFIDAVIT OF**
                **ATTEMPTED SERVICE**

                Defendant(s).
-----------------------------------------------------X
STATE OF NEW YORK   )
               s.s :
COUNTY OF NEW YORK  )

      BOBBY ALI, being duly sworn, deposes and says that deponent is an agent of RUBI SERVICES at 8004 NW 154TH Street, Suite 671, Miami Lakes, FL 33016-5814, is over the age of eighteen years and is not a party to the action.

      That on the 21st day of December, 2022, at approximately 12:30 p.m., deponent attempted to serve a true copy of the **Summons and Complaint (with Exhibits) and Civil Cover Sheet** upon Lily Dobrovolskaya at 89 East 2nd Street, Apt. #1, New York, New York 10009. I rang the bell for apartment 1 but received no answer. (There are no names on the bells.)

      That on the 21st day of December, 2022, at approximately 12:52 p.m., deponent attempted to serve a true copy of the **Summons and Complaint (with Exhibits) and Civil Cover Sheet** upon Lily Dobrovolskaya at 245 East 10th Street, Apt. #3, New York, New York 10009. I rang the intercom for apartment 3 but received no answer.

Sworn to before me this
20th day of March, 2023

                    BOBBY ALI #871612

_____
NOTARY PUBLIC, STATE OF NEW YORK
STEVEN MITCHELL
Reg. No. 01-MI-6326046
Qualified in New York County
Commission expires June 08, 2023

# EXHIBIT C



• New SMS

**(929) 523-5234**

Unknown

**Chat**   Media   Files

Today

**GO** **Gabriela Ortiz**

SERVICE OF COURT DOCUMENT(S): COURT. IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA CASE NUMBER: CACE-22-017416 CASE STYLE: Monarch v. Journalism Development Network and Dobrovolskaya TITLE OF DOCUMENT SERVED: "Summons and Complaint- Lily Dobrovolskaya.pdf  https://acrobat.adobe.com/link/review?uri=urn:aaid:scds:US:d547d18d-b62b-4045-8898-a1c54b5ca91 SENDER'S NAME AND TELEPHONE NUMBER: Joshua R. Kon. Esq. (954) 257-1777

Feedback

+      

# COMPOSITE
# EXHIBIT D

 

← **Lily Dobrovolskaya**   ⋮   ☆



## Lily Dobrovolskaya
Freelance investigative journalist

TODAY

 **Peretz Laine** · 11:51 AM

**Service of Process**

Please see below link to Monarch's summons and complaint against you.

**https://acrobat.adobe.com /link/review?uri=urn:aaid:scds: US:d547d18d-b62b-4043-8898 -a1db41d3ea91**

You haven't received a response to your message yet. Learn more

||| ◯ ‹



2:22 UE



# Lily Dobrovolskaya

**Facebook**
You're not friends on Facebook

**VIEW PROFILE**

Please accept as service of process in Monarch's lawsuit against you.

https://stoklaw-my.sharepoint.com/:f:/p/gortiz/Erx7oSlGtNJLhgdbUTc3QgkB1yjEZhzD8WYP193giLhmlA?e=hwjLxA

   Message  

  

NOT AN OFFICIAL COPY – CCIS – ATTORNEY OF RECORD

Filing # 169342005 E-Filed 03/22/2023 10:34:03 AM

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

MONARCH AIR GROUP, LLC
a Florida Limited Liability Company,

      Plaintiff,                    CASE NO.: CACE-22-017416

v.

JOURNALISM DEVELOPMENT
NETWORK INC., A Maryland Corporation,
and LILY DOBROVOLSKAYA

      Defendants.

_____/

## NOTICE OF HEARING
*(Uniform Motion Calendar)*

**PLEASE TAKE NOTICE** that the following matter will be heard before the Honorable

Jeffrey R. Levenson, via Zoom Video Conference, on **Tuesday, April 4, 2023 at 8:45 a.m.**, or as

soon thereafter may be heard:

### MOTION FOR COURT TO RECOGNIZE SERVICE
### BY OTHER MEANS UNDER SECTION 48.102, FLORIDA STATUTES

**Judge Jeffrey Levenson is inviting you to a scheduled Zoom meeting.**
**Topic: Judge Levenson Docket**
**Join Zoom Meeting**
**https://17thflcourts.zoom.us/j/109129436**
**Meeting ID: 109 129 436**
**One tap mobile**
**+13126266799, 109 129 436# US (Chicago)**
**+16468769923,,109 129 436# US (New York)**
**Dial by your location or Toll Free Below**
**+1 312 626 6799 US (Chicago)**
**+1 646 876 9923 US (New York)**
**+1 669 900 6833 US (San Jose)**
**+1 253 215 8782 US**
**(888)475-4499 US Toll-free,**
**(833)548-0276 US Toll-free,**
**(833)548-0282 US Toll-free,**
**(877)853-5257 US Toll-free**

{00721545}      STOK KON + BRAVERMAN
1 E. Broward Boulevard, Suite 915 • Fort Lauderdale, FL 33301 • P.954.237.1777 • F.954.237.1737 • E-mail: service@stoklaw.com

*** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN,  CLERK 03/22/2023 10:34:03 AM.****

+1 301 715 8592 US
+1 346 248 7799 US (Houston)
+1 408 638 0968 US (San Jose)
**Meeting ID: 109 129 436**
**Find your local number:** https://17thflcourts.zoom.us/u/adcKOluwtS

---

"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the ADA Coordinator, Room 470, 201 S.E. Sixth Street, Fort Lauderdale, Florida 33301, 954-831-7721 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.".

---

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been filed and served via the Florida Courts E-Filing Portal on this **22nd day of March 2023** to: Dana J. McElroy, dmcelroy@tlolawfirm.com; Thomas & LoCicero PL 915 Middle River Drive, Suite 309 Fort Lauderdale, FL 33304; James J. McGuire, Esq., jmcguire@tlolawfirm.com; Linda R. Norbut, Esq., lnorbut@tlolawfirm.com; Thomas & LoCicero PL 601 South Boulevard Tampa, FL 33606.

Respectfully submitted,

**STOK KON+ BRAVERMAN**
Attorneys for Plaintiff
One East Broward Boulevard, Suite 915
Fort Lauderdale, Florida 33301
Tel.: (954) 237-1777
Fax: (954) 237-1737
Email: service@stoklaw.com

*/s/ Peretz Laine*
PERETZ LAINE, ESQ.
Florida Bar No. 1038556
plaine@stoklaw.com
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
jkon@stoklaw.com

Filing # 170031783 E-Filed 03/30/2023 04:15:39 PM

## IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

MONARCH AIR GROUP, LLC,
a Florida Limited Liability Company,

        Plaintiff,

                                   CASE NO.: CACE-22-017416
                                   DIVISION 09

v.

JOURNALISM DEVELOPMENT
NETWORK INC., A Maryland Corporation,
And LILY DOBROVOLSKAYA,

        Defendants.

_____/

### DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR COURT TO RECOGNIZE SERVICE BY OTHER MEANS UNDER SECTION 48.102, FLORIDA STATUTES

        Without waiving her rights to proper service of process and to challenge exercise by this Court of personal jurisdiction, Defendant Lily Dobrovolskaya ("Defendant") hereby appears for the limited purpose of opposing Plaintiff Monarch Air Group, LLC's ("Plaintiff") motion requesting that this Court deem her served with process (of a summons and complaint) by text message and/or messages on LinkedIn and Messenger. In support of its motion, Plaintiff cites to newly-enacted Fla. Stat. § 48.102 -- which by its express terms -- applies *only to service on corporations, partnerships and limited liability companies.* In so doing, Plaintiff inexplicably ignores the plain meaning and wording of the statute. Because Defendant has not been properly served, Plaintiff's motion must be denied. In support, Defendant states:

        1.    Plaintiff filed its complaint on November 23, 2022. Despite alleging that Defendant was "believed to be a Florida resident," a summons was issued by the Clerk less than three weeks later to Defendant *at a New York address*. *See* Compl. ¶ 23; copy of summons attached as **Exhibit 1** to this opposition.

2.      According to its motion, Plaintiff subsequently attempted service upon Defendant at the address listed in late December of 2022 and on several dates in January of 2023 (the last of which was on January 17).  *See* Plaintiff's motion at Exh. B.  After that time, Plaintiff made no further attempts to serve Defendant.  Instead, three days prior to the expiration of the 120-day period mandated by Fla. R. Civ. P. 1.170(j), Plaintiff's counsel allegedly attempted to serve Defendant via text message, as well as the social media platforms LinkedIn and Messenger.  *Id.* at ¶¶ 9, 10.

3.      Plaintiff now asks this Court to apply Fla. Stat. § 48.102 (2023) to find that Defendant has been properly served with process based on text and social media messages. Plaintiff's reading of the statute, however, is entirely meritless.

4.      Section 48. 102 provides in relevant part:

> If, after due diligence, a party seeking to effectuate service is *unable to effectuate personal service of process* on a *domestic or foreign corporation*; a *domestic or foreign general partnership*, including a limited liability partnership; a *domestic or foreign limited liability partnership*, including a limited liability limited partnership; or a *domestic or foreign limited liability company*; the court, upon motion and showing of such inability, may authorize service in any other manner that the party seeking to effectuate service shows will be reasonably effective to give *the entity* on which service is sought to be effectuated actual notice of the suit.

*Id.* (emphasis added).  The statute further provides that "other manners of service" may include service by e-mail or other technology, or "other methods" consistent with due process. *Id.*

5.      Accordingly, by its clear and unmistakable terms, the statute applies only to service upon corporate entities -- not individuals.  Under such circumstances, Plaintiff's attempts at substituted service must necessarily fail.  *See generally Rodriguez v. HSBC Bank USA, N.A., et al.*, 362 So. 3d 8, 12 (Fla. 4th DCA 2022) (due process requires that statutes governing service be "strictly construed and enforced") (citations omitted).

2

WHEREFORE, Defendant Lily Dobrovolskaya, appearing in a limited capacity and without waiving proper service of process and personal jurisdiction, requests that this Court deny Plaintiff's motion to the extent it seeks an order that she has been served.

THOMAS & LOCICERO PL

By: */s/ Dana J. McElroy*
    Dana J. McElroy, Esq.
    Florida Bar No. 845906
    dmcelroy@tlolawfirm.com
    915 Middle River Drive Suite 309
    Fort Lauderdale, FL 33304
    Phone: (954) 703-3416

    - and -

    James J. McGuire
    Florida Bar No. 0187798
    jmcguire@tlolawfirm.com
    Linda R. Norbut
    Florida Bar No. 1011401
    lnorbut@tlolawfirm.com
    601 South Boulevard
    Tampa, FL 33606
    Telephone: (813) 984-3060

    *Attorneys for Lily Dobrovolskaya*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this **30th** day of **March, 2023** the foregoing document was electronically with the Clerk of the Court via the E-Portal, and was served this same day on all counsel of record, either via transmission of Notices of Electronic Filing generated by the E-Portal or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

By:   */s/ Dana J. McElroy*
       Attorney

3

# EXHIBIT 1

NOT AN OFFICIAL COPY – CCIS – ATTORNEY OF RECORD

Filing # 162876135 E-Filed 12/12/2022 05:18:43 PM

CACE-22-017416

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

MONARCH AIR GROUP, LLC
a Florida Limited Liability Company,

      Plaintiff,

CASE NO.: CACE-22-017416

v.

JOURNALISM DEVELOPMENT
NETWORK INC., A Maryland Corporation,
and LILY DOBROVOLSKAYA

      Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:

To Each Sheriff of the State:

      You are commanded to serve this summons and a copy of the complaint filed in this action,
on Defendant, LILY DOBROVOLSKAYA, by serving:

**Lily Dobrovolskaya
89 E 2nd Street, Apt 1
New York, New York 10009-7962**

      Defendant is required to serve written defenses to the Complaint on, Joshua R. Kon, Esq.,
Plaintiff's attorneys, whose address is: STOK KON + BRAVERMAN, One East Broward Boulevard, Suite
915, Fort Lauderdale, Florida 33301 within twenty (20) days after service of this Summons on that Defendant,
exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before
service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered
against that Defendant for the relief demanded in the Complaint.

Dated:    DEC 13 2022

Clerk of the Court

BY: _____
As Deputy Clerk

BRENDA D. FORMAN

{00706879}

## IMPORTANT

A lawsuit has been filed against you. You have twenty (20) calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book). If you choose to file a written response yourself, at the same time you file your written response to the court you may also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named above.

## IMPORTANTE

Usted ha sido demandado legalmente. Tiene veinte (20) días, contados a partir de la recepción de esta notificación, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefónica no lo protegerá. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el número del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podría ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Se no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guía telefónica. Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, deberá usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous.   Vous avez vingt (20) jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de téléphone est insuffisant pour vous protéger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entede votre cause. Se vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocat, ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones). Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme cidessous.

{00706879}

Filing # 170028385 E-Filed 03/30/2023 03:57:04 PM

**IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA**

MONARCH AIR GROUP, LLC,
a Florida Limited Liability Company,

      Plaintiff,

                                  CASE NO.: CACE-22-017416
                                  DIVISION 09

v.

JOURNALISM DEVELOPMENT
NETWORK INC., A Maryland Corporation,
And LILY DOBROVOLSKAYA,

      Defendants.

_____/

## <u>LIMITED AND SPECIAL NOTICE OF APPEARANCE</u>

      NOTICE IS HEREBY GIVEN that Dana J. McElroy, James J. McGuire, and Linda R.

Norbut of the law firm of Thomas & LoCicero PL hereby enter their limited appearances as

counsel on behalf of Defendant, LILY DOBROVOLSKAYA, for the limited purpose of

challenging service of process and personal jurisdiction. Copies of all future pleadings, papers,

and correspondence should be sent to the undersigned attorneys at the addresses and email

addresses listed below.

| | |
|---|---|
| Dana J. McElroy<br>Thomas & LoCicero PL<br>915 Middle River Drive, Suite 309<br>Fort Lauderdale, FL 33304 | James J. McGuire<br>Linda R. Norbut<br>Thomas & LoCicero PL<br>601 South Boulevard<br>Tampa, FL 33606 |
| Primary E-Mail Address:<br>dmcelroy@tlolawfirm.com | Primary E-Mail Address:<br>jmcguire@tlolawfirm.com<br>lnorbut@tlolawfirm.com |
| Secondary E-Mail Address:<br>cbenson@tlolawfirm.com<br>bbrennan@tlolawfirm.com | Secondary E-Mail Address:<br>tgilley@tlolawfirm.com |

THOMAS & LOCICERO PL

By: /s/ Dana J. McElroy
    Dana J. McElroy, Esq.
    Florida Bar No. 845906
    dmcelroy@tlolawfirm.com
    915 Middle River Drive Suite 309
    Fort Lauderdale, FL 33304
    Phone: (954) 703-3416

    - and -

    James J. McGuire
    Florida Bar No. 0187798
    jmcguire@tlolawfirm.com
    Linda R. Norbut
    Florida Bar No. 1011401
    lnorbut@tlolawfirm.com
    601 South Boulevard
    Tampa, FL 33606
    Telephone: (813) 984-3060

    *Attorneys for Lily Dobrovolskaya*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this **30th** day of **March, 2023** the foregoing document was electronically with the Clerk of the Court via the E-Portal, and was served this same day on all counsel of record, either via transmission of Notices of Electronic Filing generated by the E-Portal or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

By:    /s/ Dana J. McElroy
        Attorney

Filing # 170118374 E-Filed 03/31/2023 03:30:43 PM

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

MONARCH AIR GROUP, LLC
a Florida Limited Liability Company,

      Plaintiff,

CASE NO.: CACE-22-017416
DIVISION 09

v.

JOURNALISM DEVELOPMENT
NETWORK INC., A Maryland Corporation,
and LILY DOBROVOLSKAYA,

      Defendants.

_____/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT, JOURNALISM
DEVELOPMENT NETWORK INC.'S COMBINED MOTION TO DISMISS
COMPLAINT AND TO STRIKE DEMANDS FOR ATTORNEYS' FEES**

      Plaintiff, MONARCH AIR GROUP, LLC ("Monarch") files this response in opposition

to Defendant, JOURNALISM DEVELOPMENT NETWORK INC. ("JDN")'s motion to dismiss

Monarch's Complaint.

      **1.  This Court should deny Defendant's motion to dismiss.**

      "A motion to dismiss is designed to test the legal sufficiency of the complaint, not to

determine factual issues." *The Florida Bar v. Greene*, 926 So. 2d 1195, 1199 (Fla. 2006). "For

the purposes of a motion to dismiss . . . allegations of the complaint are assumed to be true and

all reasonable inferences arising therefrom are allowed in favor of the plaintiff." *Ralph v. City of

Daytona Beach*, 471 So.2d 1, 2 (Fla.1983).

      Here, Defendant's motion to dismiss ("MTD") should be denied because Monarch stated

valid causes of action in its Complaint.

{00716980}      STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33301 | Tel: (954) 237-1777 | Fax: (954) 237-1737

*** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN,  CLERK 03/31/2023 03:30:42 PM.****

**2. Florida law provides exceptional protection for its citizens' reputations, mental anguish, and financial losses incident to defamation per se.**

Although our Country generally takes the harms of humiliation seriously, Florida—perhaps singularly in the Nation—takes its citizens' reputations very seriously. Florida reserves the utmost contempt and disdain for the needless destruction of one's good name. For example, Florida's Fourth District Court of Appeal recounted:

> Florida's unusually high protection of personal reputation derives from the common consent of humankind and has ancient roots. It is highly valued by civilized people. Our state constitution and common law powerfully support it. This is a value as old as the Pentateuch and the Book of Exodus, and its command as clear as the Decalogue: "Thou shall not bear false witness against thy neighbor." The personal interest in one's own good name and reputation surpasses economics, business practices or money. It is a fundamental part of personhood, of individual standing and one's sense of worth. In short, the wrongdoing underlying the punitive damages in this case has Florida law's most severe condemnation, its highest blameworthiness, its most deserving culpability. For slander per se, reprehensibility is at its highest.

*Lawnwood Med. Ctr., Inc. v. Sadow*, 43 So. 3d 710, 729 (Fla. 4th DCA 2010).

A statement is defamatory under Florida law, if it "tends to harm the reputation of another by lowering him or her in the estimation of the community or, more broadly stated, one that exposes a plaintiff to hatred, ridicule, or contempt or injures his business or reputation or occupation." *Rapp*, 997 So.2d at 1109.

A defamatory statement cannot be given a tortured or strained interpretation; instead, courts must construe the statement in the way the common mind and the reader to whom it was addressed would ordinarily understand it. *McCormick v. Miami Herald Pub. Co.*, 139 So. 2d 197, 200 (Fla. 2d DCA 1962). "[C]ustomary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Time, Inc. v Firestone*, 424 U.S. 448, 460 (1976).

Yet statements of criminal misconduct or that tend to injure one's trade or business are

"so obviously defamatory" and "damaging to reputation" that they "give rise to an absolute presumption both of malice and damage." *Wolfson v. Kirk*, 273 So. 2d 774, 776 (Fla. 4th DCA 1973).

"In the case of words actionable per se, their injurious character is a fact of common notoriety, established by the general consent of men, and the court consequently takes judicial notice of it. They necessarily import damage, and therefore in such cases general damages need not be pleaded or proved but are conclusively presumed to result; nor need special damage be shown in order to sustain the action." *Campbell*, 66 So. 2d at 497.

"A false and unprivileged publication which injures a corporation, prejudices its ability to conduct its trade or business, deters third persons from dealing with it, assails its management, or impugns its method of doing business is actionable per se." *McIver v. Tallahassee Democrat, Inc.*, 489 So. 2d 793, 794 (Fla. 1st DCA 1986).

Because Defendants committed their defamation of the Plaintiff in writing, it is also important to note that "the permanency of written defamation" makes the presumed harm more "invariably" suffered. *See* Libel and slander per se, 1 Stein on Personal Injury Damages Treatise § 5:40 (3d ed.); *Belli v. Orlando Daily Newspapers, Inc.*, 389 F.2d 579, 581–82 (5th Cir. 1967) ("[a] libel per se is one that is defamatory on its face, including a publication that is susceptible of several meanings, one of which is defamatory; it is actionable without proof of special harm.")

Florida also "decided to permit recovery for other injuries without regard to measuring the effect the falsehood may have had upon a plaintiff's reputation." *Time, Inc. v Firestone*, 424 U.S. at 460. Instead, in Florida damages are presumed and "[s]uch a presumption is not an ordinary presumption of fact, but is a presumption of law and is not, therefore, dispelled by the production of evidence." *Wolfson*, 273 So. 2d at 777.

*Response to Motion to Dismiss*
*Case No. CACE-22-017416*
*Page 4 of 16*

### 3.  Monarch's Complaint properly alleges that Defendant's Article is defamation per se.

Defamation has five elements: (1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory. *Jews For Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008).

As mentioned above, a statement is defamatory if it "tends to harm the reputation of another by lowering him or her in the estimation of the community or, more broadly stated, one that exposes a plaintiff to hatred, ridicule, or contempt or injures his business or reputation or occupation." *Id.* at 1109.

A defendant's statements constitute defamation per se when they either accuse the plaintiff of criminal activity or accuse plaintiff of improper business practices. *Campbell v. Jacksonville Kennel Club*, 66 So. 2d 495, 497 (Fla. 1953). When a defendant's defamatory statement is considered defamation per se, damages are presumed. *Id.*

Here, based on the facts below which must be taken as true, and all reasonable inferences from these allegations must be construed in Monarch's favor, Monarch's Complaint meets all the required elements for bringing a defamation per se suit against the Defendant.

(1)    On November 27, 2020, Defendant, JOURNALISM DEVELOPMENT NETWORK, INC. ("JDN") via Organized Crime and Corruption Report Project ("OCCRP"), knowingly/maliciously/negligently published a defamatory article ("Article") about Plaintiff. *See* Compl. ¶ 1.

(2)    OCCRP's purpose is to expose the subjects of its articles and to promote action by advocates, law enforcement, policy makers, and citizens, based on OCCRP's exposés. In other words, Defendant's articles are not historical or informational pieces, but are aimed to promote

its readers to act against the subjects of its articles—whom the articles describe to be criminals or corrupt government officials. *Id.* ¶ 25.

(3)      The Article contained multiple factually false statements, misleading innuendos, and unsupported claims of criminal activity by Plaintiffs and corruption by the government. *E.g. id.* ¶ 2.

(4)      Defendant published the Article on the World Wide Web and republished it on its social media to further disseminate its false and defamatory statements about Plaintiff. This caused Plaintiff to suffer financial harm. *Id.* ¶¶ 10, 16, 24, 52.

(5)      In March 2021, Plaintiff confronted Defendant about the false and defamatory statements in the Article. Defendant admitted that the Article contained false information and promised to remove it from the Article within 48 hours. *Id.* ¶ 5.

(6)      Despite knowing about the Article's false and defamatory information, Defendant did not remove any of it from the Article until June 2021—three months later. Even after making some corrections, the Article still contains false and defamatory information about Plaintiff. *Id.* ¶¶ 6–12, 47–48.

(7)      The Article falsely claims that Plaintiff is involved in criminal activity and such claims thus constitute defamation per se. *Id.* ¶¶ 30–44. For example, the Article accuses Monarch of being connected to the Russian Mafia and accuses Monarch of smuggling drugs. Also, OCCRP's stated purpose is to write about organized crime. Making Monarch the primary subject of the Article, accuses Monarch of being a criminal.

(8)      Even the Article's true statements about Plaintiff is presented to paint Plaintiff as a participant in criminal activity. This constitutes defamation by implication, at the very least. *Id.* ¶¶ 31–44, 50.

(9)   Even the false statements corrected in June 2021 were corrected too late and such corrections were not "sufficiently conspicuous" under § 836.08 *Fla. Stat.* Thus, these statements until corrected, and even after corrected, constitute actionable defamation. *Id.* ¶¶ 48–49.

Thus, Monarch properly alleged that Defendant knowingly, recklessly, or at least negligently published false information about Monarch, which damaged Monarch. Monarch properly alleged that Defendant's false and defamatory statements constituted defamation per se because they concerned its business and accused it of criminal activity.

### 4.  Monarch' Complaint properly alleges that Defendant's Article is defamation by implication.

"[D]efamation by implication applies in circumstances where literally true statements are conveyed in such a way as to create a false impression." *Rapp*, 997 So. 2d at 1108. In other words, "[d]efamation by implication arises, not from what is stated, but from what is implied when a defendant (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts." *Id.*

Here, upon looking at Monarch's Complaint, this Court can see that Monarch's Complaint properly alleges that Defendant's Article constitutes defamation by implication.

Because Monarch properly alleges that the Article contains false and defamatory information about Monarch constituting defamation per se, and because Monarch properly alleges that even the true statements in the Article constitute defamation by implication, this Court should thus deny Defendant's MTD.

### 5.  The Court should not consider Defendant's affirmative defenses raised in its MTD

"Privilege is a matter of affirmative defense or avoidance and should be raised by the answer where it does not clearly appear from the averments of the complaint." *Wolfson*, 273 So.

at 779.

Here, Defendant's privilege defense does not appear on the face of Monarch's Complaint. Defendant thus has no business raising it in a motion to dismiss.

Similarly, for motion to dismiss purposes, this Court must accept Plaintiff's allegations as true. Plaintiff alleges that Defendant's Article contains false and defamatory statements about Plaintiff. These allegations must be taken as true. Accordingly, Defendant's assertion in its MTD that the statements in the Article are true and are therefore not legally defamatory is inappropriate in a motion to dismiss. *See, e.g., Rolle v. Cold Stone Creamery, Inc.*, 212 So. 3d 1073, 1076 (Fla. 3d DCA 2017).

### 6.   The Article being published by OCCRP is itself defamatory.

The above sections, on their own, are reason enough for this Court to deny Defendant's MTD. This is because Defendant's MTD is a smoke and mirrors attempt to cover up OCCRP's admission about publishing false and defamatory statements and failing to timely remove any of them. For thoroughness' sake, however, this response will address other shortcomings of Defendant's MTD.

For instance, Defendant's argument is duplicitous: On the one hand Defendant states that "the Article . . . truthfully and accurately reports that, *in the past*, Monarch was owned by individuals connected to the Russian Mafia and is thus claiming that it is not trying to defame Monarch's *current* ownership." Def.'s Mot. Dismiss ¶ 5. On the other hand, Defendant states "[t]he Article reports truthfully on . . . matters that are *undeniable public concern*, implying the Article's relevance even under Monarch's *current* ownership." *Id.* at ¶ 4 (emphasis added).

"[I]n arriving at the sense in which defamatory language is employed, it is necessary and proper to consider the *circumstances* of its publication." *Cooper v. Miami Herald Pub. Co.*, 31

So. 2d 382, 384 (Fla. 1947) (emphasis added) (holding that the court should consider the nature of the publication and its purpose in determining whether the publication's statements were defamatory).

For instance, is the purpose of History Channel's article about Volkswagen's being founded by the Nazis to expose *current wrongdoing* by Volkswagen and to encourage its readers to act against it? *See Volkswagen is founded*, History (last updated November 16, 2021), http://www.history.com/this-day-in-history/volkswagen-is-founded; *About Us*, OCCRP (Aug. 24, 2007), http://www.occrp.org/en/about-us. (OCCRP's purpose is to "expose crime and corruption at the *highest levels*" and to encourage its readers to hold the subjects of its articles accountable).

Put another way, does an article discussing Volkswagen's founding by Nazis belong on OCCRP—an alleged news reporting website touting itself to be on the forefront of implementing change—or is it only suited for a History Channel piece as it is in fact so published? *See Volkswagen is founded*, History (last updated November 16, 2021), http://www.history.com/this-day-in-history/volkswagen-is-founded; Libby Haight O'Connell, *Noteworthy: The History Channel and History Education*, The Newsmagazine of the American Historical Ass'n: Perspectives on History (Oct. 1, 1995), http://www.historians.org/research-and-publications/perspectives-on-history/october-1995/the-history-channel-and-history-education ("[p]art of the History Channel's mission is to raise awareness about the vitality of history, promote history education, and encourage the preservation of historic archives and sites").

History Channel and similar historical and educational news outlets would likely not write a piece about Monarch's "history," because unlike Volkswagen, Monarch is a relatively small company that most people have not heard about. The only way to make Monarch's

"history" relevant to the average reader is by implying that its past partial minority ownership by criminals plays a *current* role in the company. Otherwise, why write about Monarch at all?

Monarch's previous part owners were indeed convicted of crimes. But (1) they were convicted *years after* they left Monarch, (2) they were convicted for crimes *unrelated* to Monarch, and (3) the crimes and the resulting convictions occurred *before* Monarch's current manager took over the company. Yet OCCRP's 2020 Article connects Monarch—as it is *currently* owned and managed—to these convicted criminals.

Does a company's having former passive investments from criminals make it "intimately intwined with such criminals"? *See* Def.'s Mot. Dismiss ¶ 4 (stating that "[Monarch] was once *intimately intertwined* with Russian Mafia criminals") (emphasis added).

"All of the circumstances surrounding the publication must be considered, including the medium by which it was disseminated and the audience to which it was published." *Hay v. Indep. Newspapers, Inc.*, 450 So. 2d 293, 295 (Fla. 2d DCA 1984). "[W]hether a statement is defamatory . . . must be considered in the context of the publication." *Smith v. Cuban Am. Nat. Found.*, 731 So. 2d 702, 705 (Fla. 3d DCA 1999).

Given OCCRP's mission statement: "expos[ing] crime and corruption at the *highest levels*" and encouraging its readers to act against the subject of its articles, Defendant's making Monarch—a business which had absolutely no affiliation with criminals at least as of 2012—the subject of its 2020 OCCRP Article, is at least defamation by implication. So OCCRP's alleged C.Y.A. statements imbedded in the Article does not repair the harm caused under OCCRP's stated mission—exposing the subjects of its articles to harm.

### 7. Defendant's MTD tries to misdirect this Court.

Defendant's MTD is not only a smoke and mirrors attempt to hide the relevant facts but

is also a smoke and mirrors attempt to hide the relevant and binding law. For example, Defendant's MTD cites *Seminole tribe of Fla. v. Fla. Dep't of Revenue*, 202 So. 3d 971, 972 (Fla 1st DCA 2016) for the proposition that this Court may take judicial notice of another court's records when considering its MTD. *See* Def.'s Mot. Dismiss ¶ 18. But *Seminole tribe* and similar cases specifically state that a court may only look at records of prior litigation from another court's records for *res judicata* or collateral estoppel when the prior litigation is clear on the face of the complaint, and only when the defendant properly makes a request for judicial notice. *See Seminole tribe of Fla.*, 202 So. 3d at 973. Here, Defendant asks this Court to look at another court's record for purposes not related to *res judicata* or collateral estoppel. *See* Def.'s Mot. Dismiss ¶ 18.

Also, Plaintiff's Complaint only incorporates the Article and alleges that the Article only stated a prosecutor's disparaging statement about Monarch, and purposely omitted the prosecutor's admission that his disparaging statement was misplaced. *See* Compl. ¶ 35–36, 43. This does not mean, however, that the Complaint incorporates the other court's record. The other court's record is thus beyond the four corners of the Complaint and cannot be considered for Defendant's MTD. *See id.; U.S. Servs. Auto. Ass'n v. Robinson*, 4D21-2518, 2023 WL 380337, at *1 (Fla. 4th DCA Jan. 25, 2023) (holding that the court erred by looking at another court's record to consider *res judicata* because facts giving rise to such defense were not properly incorporated on the face of the complaint); *Seminole tribe of Fla.* 202 So. 3d at 973 (holding that the court properly looked at another court's record to determine whether *res judicata* applied, but only because the facts giving rise to such defense were properly incorporated).

Here, however, (1) Defendant's MTD does not raise *res judicata* or collateral estoppel, and (2) only the Article, and not the other court's record, was incorporated into the Complaint.

Thus, to the extent Defendant requests this Court to take judicial notice of another court's record under section 90.203, *Florida Statutes*, Plaintiff respectfully asks this Court to deny Defendant's request.

**8. Defendant changes and misstates the Complaint's allegations trying to dissuade this Court from accepting Plaintiff's allegations as true on a motion to dismiss.**

Paragraph 13 of Defendant's MTD correctly states that "this Court must take the facts alleged in the Complaint as true and draw reasonable factual inferences in [Plaintiff's] favor." Yet paragraph 32 of Defendant's MTD states that "Monarch claims *falsely* that the Article deliberately omitted the other part of the story." Def.'s Mot. Dismiss ¶ 32 (emphasis added).

In the same paragraph, Defendant miscategorizes Plaintiff's allegation, and once again attempts to attack the *truth* of the allegation despite the Court's having to accept Plaintiff's allegations as true.

To illustrate: Defendant first correctly quotes paragraph 35 of the Complaint that "[t]he Article deliberately omitted the other part of the story—that the prosecutor subsequently, in the same *proceeding*, apologized for misspeaking and calling Monarch an illegitimate business." *Id.* (emphasis added); Compl. ¶ 35 (emphasis added). But after correctly quoting Plaintiff's allegation, Defendant then miscategorizes Plaintiff's allegation and states "[b]ut as the First Bail Hearing transcript makes perfectly clear, the prosecutor never "retracted" or "apologized" for his statement during that *hearing*. Def.'s Mot. Dismiss ¶ 32 (emphasis added).

First, as stated above, the transcript is beyond the four corners of the Complaint. Second, Plaintiff did not allege that the retraction/apology occurred in the same "hearing" but in the same "proceeding." *See id.*; Compl. ¶ 35. A court proceeding is broader than a hearing because proceeding       refers       to       the       entire       case.       *See       legal       proceeding,*

https://www.thesaurus.com/browse/legal%20proceeding;                     *legal                action*,

https://www.thesaurus.com/browse/legal%20proceeding.

Thus, first Defendant tries to attack the truth of Plaintiff's allegation on a motion to dismiss; second, it does so by miscategorizing Plaintiff's allegation; and third, it tries to enter a transcript, which is beyond the four corners of the Complaint, attempting to prove the falsity of its miscategorized version of Plaintiff's allegation.

Plaintiff also alleges that the Article specifically changed Monarch's spokesperson's language to insinuate that Monarch played a role in drug smuggling. Monarch's spokesperson explained that the drugs were in the passenger's personal possession. In other words, Monarch had nothing to do with it. The Article changed the spokesperson's statement to "*the drugs belonged to a passenger.*" The Article's statement changes Monarch's entirely exculpatory statement to an inculpative one. In other words, under the Article's miscategorization of Monarch's spokesperson's statement, Monarch could have been well aware of the drugs and was even acting as a courier, the drugs just happened not to belong to it. *See* Compl. ¶¶ 39–41.

In any event, why would OCCRP, in 2020, write about events that took place in 2011—when Monarch was under different ownership and management—if not to suggest that these past events reflect on Monarch's present? In other words, how is this story relevant to OCCRP's readers who are looking for current and relevant exposés of crime and corruption?

Defendant also wrongly states that Monarch does *not* dispute that Monarch did not pay its employees. Def.'s Mot. Dismiss ¶ 39. Monarch in paragraph 45(c) of its Complaint, however, does exactly that: "'Employees resigned after Monarch stopped paying them.' This *falsely* accuses Monarch of not paying its employees." *See* Compl. ¶ 45(c) (emphasis added).

**9.  Defendant's claim that it is unclear what Plaintiff is suing it on is disingenuous.**

A person of average intelligence can discern that Plaintiff is suing Defendant for defamation. To claim that a typo—failing to incorporate the last eight paragraphs of the General Allegations, 45–52—prevents Defendant from determining Plaintiff's allegations against it, is disingenuous. *See* Def.'s Mot. Dismiss ¶ 21. Had the Complaint alleged multiple causes of action and pleaded inconsistent facts in the alternative, Defendant would genuinely be able to claim bewilderment. Here, however, the claim is simple: Defendant defamed Plaintiff.

To the extent this Court finds the typo to be too confusing, Plaintiff asks this Court to allow it to amend by interlineation.

Despite Defendant's claimed bewilderment by the last eight General Allegations not specifically being reincorporated, Defendant then turns around and says that paragraph 51—one of the last eight paragraphs of the General Allegations—makes it difficult for Defendant to defend because the paragraph states that the previous allegations should not be construed as "an exhaustive list of all the false and defamatory statements contained in the Article." *Id.*; *See* Compl. ¶ 51. Defendant's claim is disingenuous, however, because, as Defendant correctly states in paragraph 19 of its MTD "when analyzing a defamation claim, 'a publication must be considered in its totality.'" Thus, Defendant must indeed consider the entire Article to defend against Plaintiff's Complaint. This is because the Complaint is indeed premised on the entire Article, including its publication by OCCRP whose proclaimed mission statement is to "expose crime and corruption at the *highest levels*" and encourage "the public to hold [the subjects of its articles] to account."

Defendant also claims that it is confused by Count I's statement that the Complaint's paragraphs 11–28 describe "numerous statements that were false and defamatory and/or defamatory *per se*" but paragraphs 20–27 are just allegations about jurisdiction and venue.

What about paragraphs 11–19 which point to Defendant's admission that it knew the Article contained false and defamatory statements and failed to remove them?

Why does Defendant's MTD not address those allegations at all? The reason is obvious: Those allegations, if taken as true, as they must be, topples Defendant's house-of-cards, and shows that its entire MTD is nothing but smoke and mirrors.

**10. The cases Defendant cites in its MTD are distinguishable from this case.**

Here are four examples of Defendant trying to misdirect this Court by citing cases distinguishable from this one: For example, Defendant cites *Woodard v. Sunbeam Television Corp.*, 616 So. 2d 501, 502–03 (Fla. 3d DCA 1993). That case is distinguishable for a few reasons: (1) that case involved a story that a then current bus driver was a convicted murderer in the past—which was of undeniable *current* public concern, and (2) the alleged defamation in that case came from matters published in the public records. *See id*. Here, on the other hand, (1) the Article's defamatory statements are not of public concern, and (2) the Article's defamatory statements are based not on public record but on unfounded hearsay.

Defendant also cites *Air Wisconsin Airlines Corp. v. Hoeper*, 571 U.S. 237 (2014) for the proposition that inaccuracies are ok. That case, however, concerned a report to the TSA and is therefore distinguishable. In that case, for example, the Court stated

> to encourage air carriers and their employees, often in fast-moving situations and with little time to fine-tune their diction, to provide the TSA immediately with information about potential threats. Baggage handlers, flight attendants, gate agents, and other airline employees who report suspicious behavior to the TSA should not face financial ruin if, in the heat of a potential threat, they fail to choose their words with exacting care.

*Air Wisconsin Airlines Corp.*, 571 U.S. at 253–54.

In this case, on the other hand, what right does Defendant have to purposely craft

inaccurate statements for a news publication?

Defendant also cites *McCormick*, 139 So. 2d 197, for the same proposition. In that case, however, the court held that if by taking out the false statements the article, would still have the same effect on the average reader, then the false statements would not be considered defamatory. *See id.* at 201 ("although the articles are not a model of objective journalism, when considered in the light of the small portions thereof alleged to be false, they were not libelous per se"). Here, however the Article's false statements were not just a few inconsistent statements here and there. Also, the Article as a whole and the fact that it was published by OCCRP makes the Article defamatory.

*Larreal v. Telemundo of Florida, LLC*, 489 F.Supp. 3d 1309 (2020), which Defendant heavily cites, is from a federal trial court's case that came up on summary judgement, not motion to dismiss. Thus, not only is the case not binding authority, it's not even persuasive. That case is also distinguishable from this one on its facts. For example, in that case, the plaintiff was not the focus of the story, and the reporter in that case accurately reported the information it received from the police. *Id.* at 1323. Here on the other hand, the standard of motion to dismiss requires this Court to accept Plaintiff's allegations as true and all inferences must be drawn in Plaintiff's favor. The Article is all about Plaintiff, and Defendant's false statements are not privileged.

**11. This Court should thus deny Defendant's motion to dismiss.**

As described and explained above, Defendant's motion to dismiss attempts to misdirect the Court with smoke and mirrors both on the facts and the law. But "[f]or the purposes of a motion to dismiss . . . allegations of the complaint are assumed to be true and all reasonable inferences arising therefrom are allowed in favor of the plaintiff." *Ralph*, 471 So.2d at 2). Because Monarch's Complaint properly alleges that Defendant's Article constitutes both

defamation per se and defamation by implication, this Court should deny Defendant's motion to dismiss.

Dated: March 31, 2023

Respectfully submitted,

**STOK, KON +
BRAVERMAN**
1 East Broward Boulevard
Suite 915
Fort Lauderdale, FL 33301
P.954.237.1777
F.954.237.1737
service@stoklaw.com

*/s/ Peretz Laine*
PERETZ LAINE, ESQ.
Florida Bar No. 1038556
plaine@stoklaw.com
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
jkon@stoklaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed and served via the Florida Courts E-Filing Portal this 31st day of March 2023 to all counsel of record.

*/s/ Peretz Laine*
PERETZ LAINE, ESQ.
Florida Bar No. 1038556
plaine@stoklaw.com
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
jkon@stoklaw.com

Filing # 170348313 E-Filed 04/04/2023 07:07:27 PM

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO. CACE22017416   DIVISION: 09   JUDGE: Levenson, Jeffrey R. (09)

Monarch Air Group, LLC

Plaintiff(s) / Petitioner(s)

v.

JOURNALISM DEVELOPMENT NETWORK, INC., et al

Defendant(s) / Respondent(s)

_____/

ORDER ON PLAINTIFF'S MOTION FOR COURT TO RECOGNIZE SERVICE BY OTHER
MEANS UNDER SECTION 48. 102, FLORIDA STATUTES

This cause came before the Court on April 4, 2023 upon Plaintiff's Motion for Court to Recognize Service by Other Means Under Section 48.102, Florida Statutes, filed March 20, 2023 (the "Motion"). This Court, having reviewed the Motion and the response in opposition by Defendant Lily Dobrovolskaya ("Defendant"), having heard argument of counsel, and otherwise being fully advised in the premises, it is hereby:

ORDERED AND ADJUDGED as follows:

1. Plaintiff's Motion is Denied in Part and Granted in Part.

2. To the extent Plaintiff seeks an order that Defendant has been properly served under Section 48.102, the Motion is denied because that section applies only to service of process on business entities.

3. As to Plaintiff's alternative request for a 120-day extension of the time period within which is must serve Defendant with process, Plaintiff's Motion is granted in part.  Plaintiff shall have until April 23, 2023 to serve Defendant with a summons and the complaint.

Case Number: CACE22017416

**DONE AND ORDERED** in Chambers at Broward County, Florida on <u>4th day of April, 2023</u>.

CACE22017416 04-04-2023 3:48 PM

<u>CACE22017416 04-04-2023 3:48 PM</u>
Hon. Jeffrey Levenson
**CIRCUIT COURT JUDGE**
Electronically Signed by Jeffrey Levenson

Copies Furnished To:
Dana J McElroy , E-mail : dlake@tlolawfirm.com
Dana J McElroy , E-mail : dmcelroy@tlolawfirm.com
Dana J McElroy , E-mail : bbrennan@tlolawfirm.com
James J. McGuire , E-mail : jmcguire@tlolawfirm.com
James J. McGuire , E-mail : tgilley@tlolawfirm.com
Joshua Kon , E-mail : jkon@stoklaw.com
Joshua Kon , E-mail : gortiz@stoklaw.com
Linda Riedemann Norbut , E-mail : lnorbut@tlolawfirm.com
Peretz Laine , E-mail : plaine@stoklaw.com
Peretz Laine , E-mail : gortiz@stoklaw.com
Robert A. Stok , E-mail : ssolis@stoklaw.com
Robert A. Stok , E-mail : service@stoklaw.com
Yosef Kudan , E-mail : ykudan@stoklaw.com

Filing # 170639607 E-Filed 04/10/2023 12:27:20 PM

IN THE CIRCUIT COURT OF THE 17th
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

MONARCH AIR GROUP, LLC.,
a Florida Limited Liability Company,

       Plaintiff,

CASE NO.:  CACE-22-017416

vs.

JOURNALISM DEVELOPMENT
NETWORK INC., a Maryland Corporation,
and LILY DOBROVOLSKAYA

       Defendants.

_____/

## ALIAS SUMMONS

THE STATE OF FLORIDA

To Each Sheriff of the State:

       YOU ARE COMMANDED to serve this summons and a copy of the complaint in this action on Defendant, LILY DOBROVOLSKAYA, by serving:

**LILY DOBROVOLSKAYA**
c/o Secretary of State
P.O. Box 6327
Tallahassee, FL 32314

       Defendant is required to serve written defenses to the complaint or petition on Joshua R. Kon, Esq., Plaintiff's attorney, whose address is: STOK KON + BRAVERMAN, One East Broward Boulevard, Suite 915, Fort Lauderdale, Florida 33301 within twenty (20) days after service of this summons on that Defendant, service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint.

Dated:     APR 21 2023

Clerk of the Court

By: _____

As Deputy Clerk of the Court

BRENDA D. FORMAN

{00724996}   1

## IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

## IMPORTANTE

Usted ha sido demandado legalmente. Tiene 20 días, contados a partir del recibo de esta notificación, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefónica no lo protegerá. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podría ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guía telefónica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

{00724996}      2

Filing # 171051458 E-Filed 04/14/2023 03:57:43 PM

**IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA**

MONARCH AIR GROUP, LLC,
a Florida Limited Liability Company,

Plaintiff,                                                    CASE NO.: CACE-22-017416
                                                              DIVISION 09
v.

JOURNALISM DEVELOPMENT
NETWORK INC., a Maryland Corporation,
And LILY DOBROVOLSDKAYA,

    Defendants.

_____/

**REPLY OF DEFENDANT JOURNALISM DEVELOPMENT NETWORK, INC.
IN SUPPORT OF ITS COMBINED MOTION TO DISMISS COMPLAINT
<u>AND TO STRIKE DEMAND FOR ATTORNEY'S FEES</u>**

    As Defendant Journalism Development Network ("JDN") demonstrated in its Motion to

Dismiss, Plaintiff has failed to plead a viable claim against JDN for defamation per se or

defamation by implication. Plaintiff's Response in Opposition to Defendant's Motion to Dismiss

(the "Opposition") does nothing to alter that conclusion.

    The Complaint asserts that an investigative news article published by JDN – titled "Flight

of the Monarch: US Gov't Contracted Airline Once Owned by Russian Criminals" (the

"Article") – contains numerous false and defamatory statements about Plaintiff. But both the

Complaint and the Opposition are wholly unable to identify any such allegedly false and

defamatory statements. Rather, as explained below, the Opposition repeatedly asserts that the

Article says one thing, when it in fact says the *opposite*, or *misstates* the relevant law, or simply

disregards key and undisputed matters that undermine Plaintiff's claims. With respect to the

claims asserted against JDN (Counts I and II of the Complaint), the Complaint should be

dismissed.

## Argument

As JDN noted in its Motion to Dismiss, the Complaint filed by Plaintiff Monarch Air Group, LLC ("Monarch") is enormously confusing. *See* Motion to Dismiss ¶ 21. Among other problems, it never clearly identifies the specific statements in the Article that Monarch claims are false and defamatory. Despite this pleading deficiency, JDN's Motion to Dismiss analyzed in detail each statement in the Complaint that Monarch might possibly be intending to rely upon. *See id.* ¶¶ 29-40, 44-48, 52-54. Unfortunately, in its Opposition, Monarch again fails to set forth with specificity the actual statements in the Article allegedly supporting its claims. Instead, the Opposition jumps between topics and also questions – in apparent disregard for the First Amendment – whether JDN should even be permitted to report on Monarch at all or argues illogically that the Court should deem the Article defamatory simply because it appears on JDN's occrp.org website.[1] Opposition at 7-9.

But as explained in the Motion to Dismiss – and as demonstrated again below – the Article does not defame Monarch, either directly or by implication, because each of the allegedly defamatory statements in the Article is either substantially true or privileged as a fair report of official records. As a result, the Motion to Dismiss should be granted.

## I.   The Article Truthfully States That Monarch's Past Owners Included Criminals.

On numerous occasions, the Complaint and the Opposition willfully misread the Article. The most glaring example is the repeated false assertion that the Article accuses Monarch of being engaged in criminal activity. *See* Opposition at 5, ¶ 7 ("The Article falsely claims that

---

[1]      Monarch also argues that Count I states a valid cause of action because "damages are presumed" under Florida law where a statement is considered "defamation per se." *See* Opposition at 4, ¶ 3. Monarch is simply wrong. The United States Supreme Court has in fact eliminated "presumed damages" in defamation *per se* actions against media defendants. *Edelstein v. WFTV, Inc.*, 798 So. 2d 797, 798 (Fla. 4th DCA 2001); *see also Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1120 (S.D. Fla. 2021).

2

Plaintiff is involved in criminal activity."); Complaint ¶ 18 ("The Article falsely paints Plaintiff to be involved in criminal activity.").  But as pointed out in JDN's Motion to Dismiss, the Article makes no such statement.  Instead, it repeatedly explains that Monarch was *owned in the past* by two individuals who were convicted of criminal conduct.  *See* Motion to Dismiss ¶ 6.

In particular, the Article's headline and its first sentence make absolutely clear that the criminal *ownership* of Monarch occurred *in the past*:



🖼 Credit: Facebook

An American aviation company that has transported protected witnesses for the U.S. government was once part-owned by two men who worked with a major Russian-American organized crime group.

by Lily Dobrovolskaya
27 November 2020

*See* Article at https://www.occrp.org/en/investigations/flight-of-the-monarch-us-govt-contracted-airline-once-owned-by-russian-criminals (red boxes added for emphasis); the Article also is attached to the Complaint as Exhibits A and D.

In addition to the headline and first sentence, the Article repeatedly expresses that Monarch's ownership by two criminals occurred *in the past*.  For instance, the Article explains that the two criminals, named Golubchik and Trincher, "both left Monarch in 2012." Complaint, Exh. A, at p. 3 of 14.  The Article then quotes Monarch's director of marketing and public relations, who "said the company has not been affiliated with Golubchik or Trincher since 2012."

3

*Id.* at p. 4 of 14.

Because the Article never explicitly states that Monarch is engaged in criminal activity, it appears that Monarch may be attempting to argue that the Article implies that it is engaged in criminal activity. But any such claim would necessarily fail. As noted in the Motion to Dismiss, a defamation by implication claim arises "in circumstances where literally true statements are conveyed in such a way as to create a *false impression*." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1108 (Fla. 2008) (emphasis added). A claim for defamation by implication arises in two circumstances: (1) where a defendant "juxtaposes a series of facts so as to imply a defamatory connection between them" or (2) where a defendant "creates a defamatory implication by omitting facts." *Id.* at 1106.

Here, of course, the fact that the criminals Golubchik and Trincher are *former* owners of Monarch was *not* omitted from the Article. To the contrary, the Article explicitly states that Golubchik and Trincher have "not been affiliated" with Monarch since 2012. Nor are any facts juxtaposed in the Article in such a way as to imply Golubchik and Trincher's ongoing connection to Monarch. The Article repeatedly and expressly notes that they have had no ownership interest in Monarch since 2012. As Monarch itself recognizes, an allegedly defamatory publication should not be subjected to a tortured or strained reading. *See* Opposition at 2. But that is precisely what Monarch invites this Court to do – to read the Article in a tortured manner as meaning the opposite of what it expressly says. The Court should reject that baseless invitation. *See, e.g., Turner v. Wells*, 198 F. Supp. 3d 1355, 1376 (S.D. Fla. 2016) (rejecting defamation by implication claim premised upon "tortured and extreme" interpretation of news report).

The Article truthfully reports on Monarch's past ownership. It never accuses Monarch of

engaging in criminal activity. Thus, to the extent Monarch's claim is based upon the alleged statement that Monarch is engaged in criminal activity, the claim should be dismissed.

**II.   The Article Accurately Reported A Federal Prosecutor's Statement About Monarch; The Prosecutor Never Withdrew That Statement.**

Monarch's defamation claims are premised in part upon the Complaint's demonstrably false allegation that a prosecutor referred to Monarch as not being a "legitimate" business, but later retracted that statement:

> 35.   The Article claims that a prosecutor in 2013 stated that "We do not believe this business [Monarch] is legitimate." The Article deliberately omitted the other part of the story – that the prosecutor subsequently, in the same proceeding, apologized for misspeaking and calling Monarch an illegitimate business.

*See* Complaint ¶ 35. Monarch is wrong. The prosecutor never "retracted" or "apologized" for questioning Monarch's legitimacy.

In reality, a bail hearing was held for Golubchik on April 24, 2013 (the "First Bail Hearing"), during which the federal prosecutor noted that Golubchik could be a flight risk because of his connection to Monarch and his resulting access to aircraft. *See* **Exhibit 2** to Motion to Dismiss at 10:13–10:18 ("Owning an airplane company allows you obviously to leave quite easily. . . . [I]t provides him the opportunity to flee."). But at a second bail hearing, five days later (the "Second Bail Hearing"), the prosecutor realized that Monarch was *bankrupt*. Accordingly, he stated: "Defense counsel likes to accuse the government of misstating things. We have been completely candid. We may have – the airplane company I guess it went bankrupt because of this cocaine issue. I fall on my sword, your Honor." *See* **Exhibit 3** to Motion to Dismiss at 45:18–45:21. The prosecutor withdrew his concern about Monarch's aircraft factoring into the flight risk analysis. But he never withdrew his assertion that Monarch was an illegitimate business. Thus, the Article fairly and accurately recounts the prosecutor's statement as reflected

in government records (the Bail Hearing transcripts).

Remarkably, in its Opposition, Monarch does *not* dispute these facts. Rather, it questions whether the Court should consider these facts on a motion to dismiss. *See* Opposition at 6-7. Under controlling Florida law, the Court can and should consider them.

The Florida Rules of Civil Procedure make clear that any exhibits attached to a complaint are part of the pleadings for all purposes. *See* Fla. R. Civ. P. 1.130(b) ("Any exhibit attached to a pleading must be considered part thereof for all purposes."). Thus, the Article, which is an Exhibit to the Complaint, is part of Monarch's Complaint for all purposes.

In addition, the Court may consider material technically outside the four corners of the complaint on a motion to dismiss when the pleadings necessarily incorporate them by reference. *One Call Prop. Servs. Inc. v. Sec. First Ins. Co.*, 165 So. 3d 749, 752 (Fla. 4th DCA 2015) (trial court properly considered documents referenced in complaint on motion to dismiss); *Posigian v. Am. Reliance Ins. Co. of N.J.*, 549 So. 2d 751, 753 (Fla. 3d DCA 1989) (affirming dismissal where trial court appropriately reviewed documents referenced in complaint). Here, the Complaint (including the Article) incorporates the Bail Hearing proceedings.

In particular, paragraphs 35 and 36 of the Complaint cite the Bail Hearing proceedings to support Monarch's defamation claims. *See* Complaint ¶ 35 ("The Article deliberately omitted the other part of the story – that the prosecutor subsequently, *in the same proceeding*, apologized for misspeaking and calling Monarch an illegitimate business.") (emphasis added); *id.* ¶ 36 ("By omitting the prosecutor's retraction and deliberately concealing the full context of those remarks and retraction, Defendants published a defamatory statement."). Likewise, the Article directly cites the Bail Hearings. *See* Complaint, Exh. A, at p. 3 of 14 ("Prosecutors noted the seizure [of cocaine] at Golubchik's bail hearing in 2013, adding of the airline: 'We do not believe this

6

business is legitimate.'"").   Since both the Complaint and the Article (which is part of the pleadings for all purposes) reference and rely upon the Bail Hearing proceedings, the Court is undoubtedly entitled to consider those incorporated federal judicial records while ruling on JDN's Motion to Dismiss.

Based upon a review of those records, it is evident that the Article provides a fair and accurate account of a statement made in an official judicial proceeding, meaning it is protected from potential defamation liability under Florida's fair report privilege.  *See, e.g., Alan v. Palm Beach Newspapers*, 973 So. 2d 1177, 1180 (Fla. 4th DCA 2008); *Stewart v. Sun-Sentinel Co.*, 695 So. 2d 360, 362 (Fla. 4th DCA 1997).

Monarch also argues that the Court should not consider the fair report privilege on a motion to dismiss because it is an affirmative defense not clearly raised by the pleadings. Monarch is wrong.  First, to state a defamation claim, Monarch must plead that the allegedly defamatory statements are *not privileged*, as Monarch's own Opposition acknowledges. *See* Opposition at 3 (citing *McIver v. Tallahassee Democrat, Inc.*, 489 So. 2d 793, 794 (Fla. 1st DCA 1986) for the proposition that defamation per se claim arises from a false and *unprivileged publication* which injures the plaintiff) (emphasis added); *see also Mile Marker, Inc. v. Peterson Publ'g, LLC*, 811 So. 2d 841, 845 (Fla. 4th DCA 2002) ("A common law claim for defamation requires the *unprivileged* publication (to a third party) of a false and defamatory statement concerning another, with fault amounting to at least negligence on behalf of the publisher, with damage ensuing.") (emphasis added).  Thus, because privilege is not an affirmative defense, Monarch must plead that the allegedly defamatory statements in the Article are not privileged, but it has failed to do so.

Second, the Complaint and the Article, on their faces, undoubtedly raise the privilege

issue because they both cite to statements allegedly made in a *judicial proceeding*, namely, the Bail Hearing proceeding. *See* Complaint ¶ 35 (alleging that the Article omitted the prosecutor's statement, "in the same proceeding, apologiz[ing] for misspeaking and calling Monarch an illegitimate business"); *id.* Exh. A, at p. 3 of 14 (explaining that prosecutors referred to Monarch as not being "legitimate" "at Golubchik's bail hearing in 2013"). Thus, to the extent Monarch's claim is based upon the Article allegedly misrepresenting the statement of a federal prosecutor, the claim fails because the Article quotes the prosecutor's statement accurately and is therefore a privileged fair report of official records. *See Folta v. New York Times Co.*, No. 1:17cv246-MW/GRJ, 2019 WL 1486776, at *1 (N.D. Fla. Feb. 27, 2019) (application of privilege is a question of law when facts and circumstances of the communication are undisputed).

**III.    The Article Accurately Reported That 16 Kilograms Of Cocaine Were Discovered On A Monarch Airplane.**

The Article accurately states that "[o]n one occasion, customs agents in Miami discovered 16 kilograms of cocaine on one of Monarch's planes." Complaint, Exh. A, at p. 3 of 14. Again, Monarch does not dispute the accuracy of this statement. Instead, Monarch claims that the Article *misquotes* a Monarch spokesperson's statement about the cocaine incident, thereby creating the false implication that "Monarch could have been well aware of the drugs and was even acting as a courier." *See* Opposition at 12. This is an extraordinarily convoluted and inaccurate reading of what the Article actually says. In relevant part, the Article reports:

> Monarch expanded its flight routes when the new investors came on board, and began carrying passengers as well as cargo. Then in 2011, according to a submission from prosecutors at Golubchik's bail hearing two years later, Florida customs agents discovered 16 kilograms of cocaine hidden in one of its planes.
>
> A former Monarch pilot, who was not on the flight, told OCCRP the plane was searched by customs agents when it returned to Fort Lauderdale International Airport from Haiti. They found a duffle bag full of cocaine inside. The crew was detained for several hours, he said, along with the person who had chartered the

flight, a frequent customer whose name he did not recall. The pilot thought it was strange that the aircraft was then released.

"I've seen in previous years, when the airplane was involved with drugs and it was in a hanger and it was not to be moved," he said. "It was under the control of customs."

The U.S. Customs and Border Protection Agency refused to release any information about the discovery of the cocaine, or explain why no one was arrested.

Gavrushenko, Monarch's spokesperson, said *the cocaine belonged to a passenger. "We have worked with the relevant authorities to develop and enhance existing procedures, to prevent this from happening again,"* she said. *"In our 15 years of operations, this was the only occurrence."*

In the two years following the bust, U.S. government agencies continued contracting Monarch. . . .

Complaint, Exh. A. at pp. 9-10 of 14 (emphasis added).

The Article does not state or suggest that Monarch was aware that cocaine was on its airplane or that Monarch was a courier for the cocaine, and it simply would not be reasonable to read the Article in that manner.  Rather, the Article provides a fair report of federal records (the submission by prosecutors at Golubchik's Bail Hearing) and a direct response from Monarch denying any involvement with the matter or any additional drug-related incidents.  Thus, the statements about the drugs are not false, are not defamatory of Monarch, and are privileged under the fair report privilege, meaning they cannot support Monarch's defamation claims.

**IV.    The Article Is Not False With Regard to Monarch's Payment of Employees.**

The Article states that, in early 2016, Monarch was not able to pay employees. Complaint, Exh. A, at p. 11 of 14.  It does not state that Monarch is presently unable to do so. Thus, Monarch's allegation in its Complaint – that the Article "falsely accuses Monarch of not paying employees" – is contradicted by the Article itself.

Nevertheless, if Monarch intended to allege that the Article accused Monarch of failing to

pay employees *in the past*, and to allege that such a statement is false, the Complaint still fails to state a defamation claim because the statement is substantially true.

As the U.S. Supreme Court has explained, in defamation cases, "minor inaccuracies" do not necessarily equate to falsity. *Air Wis. Airlines Corp., v. Hoeper*, 571 U.S. 237, 247 (2014) (internal quotation omitted). Rather, in the defamation context, a "statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.* (internal quotation omitted).

To determine whether an allegedly false statement would have a different effect on the mind of the reader from that which the pleaded truth would have produced, Florida courts eliminate the allegedly false statement from the story and compare that version to the original version. *Bishop v. Wometco Enters., Inc.*, 235 So. 2d 759, 763 (Fla. 3d DCA 1970). If the two versions would not have a different effect, "as the common mind would naturally understand it," then the statement in question is not materially false. *Id.*; *McCormick v. Miami Herald Publ'g Co.*, 139 So. 2d 197, 200 (Fla. 2d DCA 1962).

Thus, to assess whether the Article is materially false, the Court should read the entire Article, including those section excerpted below, both with and without the allegedly false statement about Monarch failing to pay employees (noted in italics/underline below):

> Between January and April 2016, Monarch's director of operations, chief pilot, and maintenance director all quit. A pilot who spoke to OCCRP anonymously said employees resigned *after Monarch stopped paying them*, and the airline struggled to find replacements.

> In May that year, the airline requested the FAA remove its only aircraft from its "Operation Specifications," a legal designation that allowed it to run commercial operations like private chartered flights. Without any planes that met FAA requirements, or key staff members to run them, its air carrier certificate was revoked in February 2018.

10

But Monarch is still authorized to broker charter flights with other FAA-certified air carriers.

Analysis of public documents found U.S. authorities have awarded Monarch contracts worth more than $6 million. The company is still brokering flights under an open-ended 10-year contract awarded in 2014.

. . . .

In addition to U.S. federal contracts, the Monarch Air Group lists international clients including the United Nations World Food Program, and Canada's Department of National Defence. Most recently, David Gitman boasted in a travel publication of Monarch's "great synergy" with U.S. embassies to bring home citizens stranded in Latin America due to the COVID-19 crisis.

In the 12 years since Slavin welcomed new investors, his small air cargo company has grown from a struggling start up, with just one route to the Bahamas, into a global operation. But even though he has not been able to "share in the prosperity," he said he is not bitter.

Complaint, Exh. A, at pp. 11-12 (italics added).

With or without the phrase "after Monarch stopped paying them," the gist of the Article is the same: Monarch faced several setbacks from 2016 to 2018, including employee resignations and losing its FAA authorization for commercial operators, but as of today Monarch is still permitted to broker charter flights, provides services to the U.S. government,  and has, over the past 12 years, grown from a small, single-route company to a global operation.  Because the Article with the allegedly false statement removed would not have a different effect on the mind of readers, the Article is not materially false and therefore cannot support Monarch's defamation claim.

**V.       As A Matter Of Law, JDN Is Permitted To Report On Past Events.**

Monarch makes an unusual argument about the subject matter upon which JDN should or should not report.  In particular, Monarch appears to argue that JDN should not be permitted to report on Monarch's history because Monarch is not a large company whose history might be of

11

interest to the general public, like Volkswagen.  *See* Opposition at 7-9.  Monarch cites no case law for this extraordinary proposition because there is no case law supporting it.  To the contrary, "[t]he privilege of enlightening the public is by no means limited to dissemination of news in the sense of current events but extends far beyond to include all types of factual, educational and historical data . . . concerning interesting phases of human activity in general."  *Paulsen v. Personality Posters, Inc.*, 299 N.Y.S.2d 501, 506 (N.Y. Sup. Ct. 1968).

Monarch also makes the strange argument that because the "About" page on JDN's website, occrp.org, states that OCCRP is interested in exposing crime and corruption, the website necessarily defamed Monarch by implication merely by publishing an article focused on Monarch.  *See* Opposition at 9.  Once again, Monarch cites no case law for this peculiar proposition.  Moreover, Monarch's argument fails in the face of the facts demonstrated above – namely, (1) that the statements about past criminal ownership of Monarch are true, (2) that the recitation of events relating to the discovery of 16 kilograms of cocaine on a Monarch airplane are true, and (3) that the report that a federal prosecutor referred to Monarch as not "legitimate" is true and privileged.  These statements do not become untrue or unprivileged simply because the occrp.org website purports to report on crime and corruption.

And, of course, the statements on the "About" page do not mention or concern Monarch. One of the key elements of any defamation claim is that the allegedly false and defamatory factual statements must be "of and concerning" the plaintiff.  *See, e.g.*, *Mile Marker*, 811 So. 2d at 845.  The "of and concerning" requirement is constitutionally mandated.  *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 288 (1964).  Thus, a plaintiff is "required to show specific reference" to himself in an allegedly defamatory publication.  *Rosenblatt v. Baer*, 383 U.S. 75, 82-83 (1966). Here, the "About" webpage makes no reference – directly or indirectly – to Monarch.

12

Thus, for this additional reason, Monarch's defamation and defamation by implication claims fail.

**VI.     The Court Should Strike Monarch's Request For Attorneys' Fees.**

Monarch's Opposition does not address JDN's argument that, if any portion of the Complaint survives, the Court should nonetheless strike Monarch's claim for attorneys' fees because it is not based upon any applicable contract or statute.  Having failed to argue the point, Monarch has, in effect, conceded that the request for fees should be stricken.

<u>CONCLUSION</u>

WHEREFORE, JDN respectfully requests that the Court grant its Motion to Dismiss and dismiss Counts I and II of the Complaint with prejudice. Should any portion of those counts remain pending, JDN requests that the Court strike Plaintiff's requests for attorney's fees.

THOMAS & LOCICERO PL

By: */s/ Dana J. McElroy*
    Dana McElroy
    Florida Bar No. 845906
    dmcelroy@tlolawfirm.com
    915 Middle River Drive
    Suite 309
    Fort Lauderdale, FL 33304
    Phone:  (954)703-3416

    and

    James J. McGuire
    Florida Bar No. 187798
    jmcguire@tlolawfirm.com
    Linda R. Norbut
    Florida Bar No. 1011401
    lnorbut@tlolawfirm.com
    601 South Boulevard
    Tampa, FL 33606
    Phone:  (813) 984-3060

    *Attorneys for JDN*

13

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this **14th** day of **April, 2023** the foregoing document was electronically with the Clerk of the Court via the E-Portal, and was served this same day on all counsel of record, either via transmission of Notices of Electronic Filing generated by the E-Portal or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

By: */s/ Dana J. McElroy*
    Attorney

14

Filing # 171329810 E-Filed 04/19/2023 12:21:36 PM
Filing # 162876135 E-Filed 12/12/2022 05:18:43 PM

CACE-22-017416

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

MONARCH AIR GROUP, LLC
a Florida Limited Liability Company,

Plaintiff,

CASE NO.: CACE-22-017416

v.

JOURNALISM DEVELOPMENT
NETWORK INC., A Maryland Corporation,
and LILY DOBROVOLSKAYA

Defendants.

_____/

*Returned unserved/ unexecuted* (handwritten)

**SUMMONS**

THE STATE OF FLORIDA:

To Each Sheriff of the State:

　　You are commanded to serve this summons and a copy of the complaint filed in this action, on Defendant, LILY DOBROVOLSKAYA, by serving:

**Lily Dobrovolskaya
89 E 2nd Street, Apt 1
New York, New York 10009-7962**

　　Defendant is required to serve written defenses to the Complaint on, Joshua R. Kon, Esq., Plaintiff's attorneys, whose address is: STOK KON + BRAVERMAN, One East Broward Boulevard, Suite 915, Fort Lauderdale, Florida 33301 within twenty (20) days after service of this Summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint.

Dated:　　DEC 13 2022

Clerk of the Court

BY: _____
As Deputy Clerk

**BRENDA D. FORMAN**

{00706879}

*** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN,  CLERK 12/12/2022 05:18:41 PM.****
*** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN,  CLERK 04/19/2023 12:21:36 PM.****

## IMPORTANT

A lawsuit has been filed against you. You have twenty (20) calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book). If you choose to file a written response yourself, at the same time you file your written response to the court you may also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named above.

## IMPORTANTE

Usted ha sido demandado legalmente. Tiene veinte (20) días, contados a partir de la recepción de esta notificación, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefónica no lo protegerá. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el número del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podría ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Se no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guía telefónica. Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, deberá usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous. Vous avez vingt (20) jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de téléphone est insuffisant pour vous protéger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entede votre cause. Se vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocat, ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones). Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme cidessous.

{00706879}

Filing # 171440350 E-Filed 04/20/2023 02:08:56 PM

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

MONARCH AIR GROUP, LLC
a Florida Limited Liability Company,

       Plaintiff,                                    CASE NO.: CACE-22-017416

v.

JOURNALISM DEVELOPMENT
NETWORK INC., A Maryland Corporation,
and LILY DOBROVOLSKAYA

       Defendants.

_____/

## PLAINTIFF'S MOTION FOR EXTENSION OF TIME TO SERVE DEFENDANT WITH PROCESS

      Plaintiff, MONARCH AIR GROUP, LLC, under rule 1.070(j) moves this Honorable Court

to enter an order extending the time in which Plaintiff can serve Defendant, Lily Dobrovolskaya

("Author") with service of process.

1.     Plaintiff filed this lawsuit on November 23, 2022, Plaintiff's 120 days to serve Author

expired on May 27, 2023.

2.     Plaintiff first attempted to locate Author under via Skiptrace and Westlaw's Public Record

Search under Author's name as it is spelled on her publications and social media.

3.     Plaintiff, however discovered that the way Author spells her name for legal purposes,

perhaps, is Lili Dobrovolskaia, and discovered that Author's last known address is in New York

City.

4.     Based on this, Plaintiff requested a summons for Author's address in New York, and the

Clerk of Court issued a summons for Author on December 13, 2022.

5.     On December 21, 2022, Plaintiff's process server tried serving Author at her last known

{00726536}                                    STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 • Fort Lauderdale, FL 33301 • P.954.237.1777 • F.954.237.1737 • E-mail: service@stoklaw.com

address. *See* ▮EXHIBIT A▮

6.    Plaintiff's process server made several more attempts at each of the two addresses but could not serve Author. *See* ▮EXHIBIT A▮ affidavit from process server.

7.    The undersigned contacted JDN's counsel asking whether JDN or its counsel are either authorized to accept service on behalf of Author or know Author's whereabouts and/or her email address. JDN's counsel, however stated that neither she nor JDN were allowed to accept service on behalf of Author, nor did they have authority to provide Author's information.

8.    Accordingly, on Monday, March 20, 2023, the undersigned called Author's cell number, discovered via Westlaw's Public Records, to confirm that it was Author's number. The undersigned confirmed that it was Author's number by asking if her name is Lili Dobrovolskaia and if she is a freelance reporter for the Miami-Herald. Author confirmed both. She refused, however, to provide her address or email address.

9.    Upon confirming that the cellphone belongs to Author, the undersigned's office sent Author the summons and complaint via text message.

10.   In addition, the undersigned sent Author messages both on LinkedIn and Messenger.

11.   The undersigned then contacted JDN's counsel (OC) who told the undersigned that she is now also representing Author, and that all further communications to Author should be sent to OC.

12.   The undersigned asked OC whether she would accept service for Author and/or share information on Author's whereabouts so that Plaintiff can serve her in person, but OC said that she cannot do so.

13.   Based on the above, Author knows about the suit pending against her and has retained counsel to defend her in it.

14.   On April 4, 2023, this Court denied Plaintiff's motion to recognize that Author was

properly served under section 48.102, *Florida Statutes*, "service by other means" because this Court found that the entire statute, including the last two sentences of the statute, only applies to service by other on <u>entities</u>, and Author is not an entity.

15.     The Court did, however, grant Plaintiff until April 23, 2023 to continue its attempt to serve Author.

16.     Plaintiff's process server made additional attempts on April 10, April 14, and April 15, 2023, to serve Author but did not succeed. *See* **EXHIBIT B**

17.     Plaintiff sought to get an Alias Summons from the Clerk of Court to serve Author via the Secretary of State, under sections 48.161 and 48.181, *Florida Statutes*, but because of the court closures and other reasons, the Clerk of Court has still not signed the summons.

18.     Rule 1.070(j) states:

> **(j) Summons; Time Limit.** If service of the initial process and initial pleading is not made upon a defendant within 120 days after filing of the initial pleading directed to that defendant the court, on its own initiative after notice or on motion, shall direct that service be effected within a specified time or shall dismiss the action without prejudice or drop that defendant as a party; <u>**provided that if the plaintiff shows good cause or excusable neglect for the failure, the court shall extend the time for service for an appropriate period**</u>.

Fla. R. Civ. P. 1.070 (emphasis added and emphasis in original).

19.     Rule 1.070 "is not intended to be a trap…nor a rule to impose a secondary statute of limitations based on time of service." *Sneed v. H.B. Daniel Const. Co., Inc.*, 674 So. 2d 158, 160 (Fla. 5th DCA 1996).

20.     Instead, the rule is an administrative tool to efficiently move cases through the courts, not decide cases on the merits of the timeframe. *Id.* When a plaintiff makes an initial effort to serve a defendant within the 120-day period, plaintiff has shown good cause even though the defendant

was not served within the 120-day period. *Onett v. Aloga*, 683 So. 2d 593, 595, (Fla. 3rd DCA 1996) (finding good cause were Plaintiff tried to make service on defective information within 120-day time frame); *Ludwig v. Schwagel*, 701 So. 2d 1256 (Fla. 5th DCA 1994) (finding good cause where initial effort to serve defendant, although ineffective, was made within 120-day period); *Crews v. Shadburne*, 637 So. 2d 979, 981 (Fla. 1st DCA 1994) (holding that the trial court's dismissal was too harsh when the Plaintiff made multiple attempts to serve the initial complaint thereby demonstrating good cause).

21.     Here, Plaintiff shows good cause by showing that it tried to serve Author with process at several locations, and on several times and dates, both within the initial 120-day period and during the additional 19-day period that this Court first granted Plaintiff.

22.     Plaintiff seeks more time to obtain alias and pluries summonses, and to conduct discovery in aid of service of process, which will require a minimum 60 days from when this Court enters an order extending Plaintiff's time to serve Author.

        **WHEREFORE**, Plaintiff moves this Honorable Court to enter an order granting Plaintiff until July 3, 2023 to serve the Author, together with such and further relief this Honorable Court deems just and proper.

**[CERTIFICATE OF SERVICE IS ON THE NEXT PAGE]**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed and served

via the Florida Courts E-Filing Portal on this **20th day of April 2023** to all counsel of record.

Respectfully submitted,

**STOK KON+ BRAVERMAN**
Attorneys for Plaintiff
One East Broward Boulevard, Suite 915
Fort Lauderdale, Florida 33301
Tel.: (954) 237-1777
Fax: (954) 237-1737
Email: service@stoklaw.com

*/s/ Peretz Laine*
PERETZ LAINE, ESQ.
Florida Bar No. 1038556
plaine@stoklaw.com
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
jkon@stoklaw.com
YOSEF Y. KUDAN, ESQ.
Florida Bar No. 1010261
ykudan@stoklaw.com

# EXHIBIT A

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA
------------------------------------------------------X

MONARCH AIR GROUP, LLC,
a Florida Limited Liability Company,

                        Plaintiff(s),

    -against-

JOURNALISM DEVELOPMENT
NETWORK, INC., a Maryland Corporation,
and LILY DOBROVOLSKAYA,

                      Defendant(s).
------------------------------------------------------X

STATE OF NEW YORK    )
                      s.s :
COUNTY OF NEW YORK  )

Case No. CACE-22-017416

**AFFIDAVIT OF**
**ATTEMPTED SERVICE**

      BOBBY ALI, being duly sworn, deposes and says that deponent is an agent of RUBI SERVICES at 8004 NW 154TH Street, Suite 671, Miami Lakes, FL 33016-5814, is over the age of eighteen years and is not a party to the action.

      That on the 21st day of December, 2022, at approximately 12:30 p.m., deponent attempted to serve a true copy of the **Summons and Complaint (with Exhibits) and Civil Cover Sheet** upon Lily Dobrovolskaya at 89 East 2nd Street, Apt. #1, New York, New York 10009. I rang the bell for apartment 1 but received no answer. (There are no names on the bells.)

      That on the 21st day of December, 2022, at approximately 12:52 p.m., deponent attempted to serve a true copy of the **Summons and Complaint (with Exhibits) and Civil Cover Sheet** upon Lily Dobrovolskaya at 245 East 10th Street, Apt. #3, New York, New York 10009. I rang the intercom for apartment 3 but received no answer.


Sworn to before me this
20th day of March, 2023

                                     BOBBY ALI #871612

_____
NOTARY PUBLIC, STATE OF NEW YORK
STEVEN MITCHELL
Reg. No. 01-MI-6326046
Qualified in New York County
Commission expires June 08, 2023

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA
---------------------------------------------------X

MONARCH AIR GROUP, LLC,
a Florida Limited Liability Company,

                              Plaintiff(s),

     -against-

JOURNALISM DEVELOPMENT
NETWORK, INC., a Maryland Corporation,
and LILY DOBROVOLSKAYA,

                            Defendant(s).
---------------------------------------------------X

Case No. CACE-22-017416

**AFFIDAVIT OF
ATTEMPTED SERVICE**

STATE OF NEW YORK    )
                      s.s :
COUNTY OF NEW YORK   )

      MICHAEL KEATING, being duly sworn, deposes and says that deponent is an agent of RUBI SERVICES at 8004 NW 154TH Street, Suite 671, Miami Lakes, FL 33016-5814, is over the age of eighteen years and is not a party to the action.

      That on the 4th day of January, 2023, from approximately 7:40 to 7:55 p.m., deponent attempted to serve a true copy of the **Summons and Complaint (with Exhibits) and Civil Cover Sheet** upon Lily Dobrovolskaya at 89 East 2nd Street, Apt. #1, New York, New York 10009. I rang the bell for apartment 1 but received no answer (I rang the bells for several other apartments but did not receive an answer - the bells do not appear to work.) There are no names on the bells. I waited outside the premises to see if the defendant entered or left but did not see her.

      That on the 4th day of January, 2023, at approximately 8:10 p.m., deponent attempted to serve a true copy of the **Summons and Complaint (with Exhibits) and Civil Cover Sheet** upon Lily Dobrovolskaya at 245 East 10th Street, Apt. #3, New York, New York 10009. I rang the intercom for apartment 3 but received no answer. I was able to access the listings of the four apartments in the building. Per the intercom apartment 1 and 3 are vacant. Apartments 2 and 4 have tenants listed but the defendant is not listed.

(1)

That on the 14th day of January, 2023, from approximately 7:55 to 8:15 a.m., deponent attempted to serve a true copy of the **Summons and Complaint (with Exhibits) and Civil Cover Sheet** upon Lily Dobrovolskaya at 89 East 2nd Street, Apt. #1, New York, New York 10009. I rang the bell for apartment 1 but received no answer. I waited outside the premises to see if the defendant entered or left but did not see her.

That on the 17th day of January, 2023, from approximately 7:40 to 8:05 p.m., deponent attempted to serve a true copy of the **Summons and Complaint (with Exhibits) and Civil Cover Sheet** upon Lily Dobrovolskaya at 89 East 2nd Street, Apt. #1, New York, New York 10009. I rang the bell for apartment 1 but received no answer. I waited outside the premises to see if the defendant entered or left but did not see her.

Sworn to before me this
20th day of March, 2023

MICHAEL KEATING #848345

_____
NOTARY PUBLIC, STATE OF NEW YORK
STEVEN MITCHELL
Reg. No. 01-MI-6326046
Qualified in New York County
Commission expires June 08, 2023

(2)

# EXHIBIT B

Filing # 170639607 E-Filed 04/20/2023 01:20:01 PM

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA
----------------------------------------------------X
MONARCH AIR GROUP, LLC,
a Florida Limited Liability Company,

                                         Case No. CACE-22-017416

                    Plaintiff(s),

    -against-

JOURNALISM DEVELOPMENT
NETWORK, INC., a Maryland Corporation,
and LILY DOBROVOLSKAYA,

                                 **RETURN OF NON-SERVICE**

                   Defendant(s).
----------------------------------------------------X
STATE OF NEW YORK    )
                         s.s :
COUNTY OF NEW YORK  )

      MICHAEL KEATING, being duly sworn, deposes and says that deponent is an agent of
RUBI SERVICES at 8004 NW 154TH Street, Suite 671, Miami Lakes, FL 33016-5814, is over
the age of eighteen years and is not a party to the action.

      That deponent has, despite repeated attempts, has been unable to effect service upon the
individual defendant Lily Dobrovolskaya.

      Attempts were made on the 4th day of January, 2023, from approximately 7:40 to 7:55 p.m.;
on the 14th day of January, 2023, from approximately 7:55 to 8:15 a.m.; on the 17th day of
January, 2023, from approximately 7:40 to 8:05 p.m.; on the 10th day of April at 7:00 p.m.; on the
15th day of April at 9:30 a.m. Each time I rang the bell for the defendant's apartment - Apartment
#1 at 89 East 2nd Street, New York, New York 10009. I rang the bell but received no answer. I
waited outside the premises to see if the defendant entered or left but did not see her.

Sworn to before me this
19th day of April, 2023

                                MICHAEL KEATING #848345

_____
NOTARY PUBLIC, STATE OF NEW YORK
STEVEN MITCHELL
Reg. No. 01-MI-6326046
Qualified in New York County
Commission expires June 08, 2023

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA
------------------------------------------------------X

MONARCH AIR GROUP, LLC,
a Florida Limited Liability Company,

                                        Case No. CACE-22-017416

                Plaintiff(s),

   -against-

JOURNALISM DEVELOPMENT
NETWORK, INC., a Maryland Corporation,
and LILY DOBROVOLSKAYA,

                                **RETURN OF NON-SERVICE**

                Defendant(s).
------------------------------------------------------X
STATE OF NEW YORK    )
                      s.s :
COUNTY OF NEW YORK  )

      BOBBY ALI, being duly sworn, deposes and says that deponent is an agent of RUBI
SERVICES at 8004 NW 154TH Street, Suite 671, Miami Lakes, FL 33016-5814, is over the age
of eighteen years and is not a party to the action.

      That deponent has, despite two attempts, has been unable to effect service upon the
individual defendant Lily Dobrovolskaya.

      Attempts were made on the 21st day of January, 2023 at 12:30 p.m. and again on the 14th
day of April, 2023 at 12:57 p.m. Each time I rang the bell for the defendant's apartment -
Apartment #1 at 89 East 2nd Street, New York, New York 10009. I rang the bell but received no
answer.

Sworn to before me this
19th day of April, 2023

                                   BOBBY ALI #871612

NOTARY PUBLIC, STATE OF NEW YORK
STEVEN MITCHELL
Reg. No. 01-MI-6326046
Qualified in New York County
Commission expires June 08, 2023

Filing # 170639607 E-Filed 04/20/2023 01:20:01 PM

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA
--------------------------------------------------X
MONARCH AIR GROUP, LLC,
a Florida Limited Liability Company,

               Plaintiff(s),

    -against-

JOURNALISM DEVELOPMENT
NETWORK, INC., a Maryland Corporation,
and LILY DOBROVOLSKAYA,

               Defendant(s).
--------------------------------------------------X

Case No. CACE-22-017416

**RETURN OF NON-SERVICE**

STATE OF NEW YORK   )
                 s.s :
COUNTY OF NEW YORK  )

    MICHAEL KEATING, being duly sworn, deposes and says that deponent is an agent of RUBI SERVICES at 8004 NW 154TH Street, Suite 671, Miami Lakes, FL 33016-5814, is over the age of eighteen years and is not a party to the action.

    That deponent has, despite repeated attempts, has been unable to effect service upon the individual defendant Lily Dobrovolskaya.

    Attempts were made on the 4th day of January, 2023, from approximately 7:40 to 7:55 p.m.; on the 14th day of January, 2023, from approximately 7:55 to 8:15 a.m.; on the 17th day of January, 2023, from approximately 7:40 to 8:05 p.m.; on the 10th day of April at 7:00 p.m.; on the 15th day of April at 9:30 a.m. Each time I rang the bell for the defendant's apartment - Apartment #1 at 89 East 2nd Street, New York, New York 10009. I rang the bell but received no answer. I waited outside the premises to see if the defendant entered or left but did not see her.

Sworn to before me this
19th day of April, 2023

MICHAEL KEATING #848345

NOTARY PUBLIC, STATE OF NEW YORK
STEVEN MITCHELL
Reg. No. 01-MI-6326046
Qualified in New York County
Commission expires June 08, 2023

*** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN,  CLERK 04/20/2023 01:19:59 PM.****

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA
-----------------------------------------------------X

MONARCH AIR GROUP, LLC,
a Florida Limited Liability Company,

                     Plaintiff(s),

    -against-

JOURNALISM DEVELOPMENT
NETWORK, INC., a Maryland Corporation,
and LILY DOBROVOLSKAYA,

                    Defendant(s).
-----------------------------------------------------X

STATE OF NEW YORK   )
                        s.s :
COUNTY OF NEW YORK  )

Case No. CACE-22-017416

**RETURN OF NON-SERVICE**

      BOBBY ALI, being duly sworn, deposes and says that deponent is an agent of RUBI SERVICES at 8004 NW 154TH Street, Suite 671, Miami Lakes, FL 33016-5814, is over the age of eighteen years and is not a party to the action.

      That deponent has, despite two attempts, has been unable to effect service upon the individual defendant Lily Dobrovolskaya.

      Attempts were made on the 21st day of January, 2023 at 12:30 p.m. and again on the 14th day of April, 2023 at 12:57 p.m. Each time I rang the bell for the defendant's apartment - Apartment #1 at 89 East 2nd Street, New York, New York 10009. I rang the bell but received no answer.

Sworn to before me this
19th day of April, 2023

BOBBY ALI #871612

NOTARY PUBLIC, STATE OF NEW YORK
STEVEN MITCHELL
Reg. No. 01-MI-6326046
Qualified in New York County
Commission expires June 08, 2023

Filing # 171892446 E-Filed 04/26/2023 07:01:04 PM

**IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA**

CASE NO. <u>CACE22017416</u>   DIVISION: <u>09</u>   JUDGE: <u>Levenson, Jeffrey R. (09)</u>

**Monarch Air Group, LLC**

Plaintiff(s) / Petitioner(s)

v.

**JOURNALISM DEVELOPMENT NETWORK, INC., et al**

Defendant(s) / Respondent(s)

_____/

<u>**ORDER ON DEFENDANT JOURNALISM DEVELOPMENT NETWORK'S COMBINED
MOTION TO DISMISS COMPLAINT AND TO STRIKE DEMANDS FOR ATTORNEY'S
FEES**</u>

This cause came before the Court on April 25, 2023 upon Defendant Journalism Development
Network's ("Defendant") Combined Motion to Dismiss Complaint and to Strike Demands for
Attorney's Fees ("Motion"). Both counsel for the Defendant and Plaintiff were present. This Court,
having reviewed Defendant's Motion, Plaintiff's Response, and Defendant's Reply, and having heard
argument of counsel, and otherwise being fully advised in the premises, it is hereby:

**ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion is Denied in Part and Granted in Part.

2. To the extent Defendant seeks to dismiss Counts I and II of Plaintiff's Complaint, the
   motion is denied for the reasons stated on the record.

3. To the extent Defendant seeks to strike Plaintiff's request for attorney's fees in Counts I
   and II, Defendant's motion is granted.

4. The Complaint shall be deemed amended by interlineation to incorporate paragraphs
   45–52 to Counts I and II listed in the Complaint.

*** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN,  CLERK 04/26/2023 07:01:04 PM.****

5. The Complaint shall be deemed amended by interlineation to have the Complaint's

   paragraph 54 state "as more fully described in paragraphs 1–19 including all subparts."

6. Defendant will have until May 17, 2023 to answer Plaintiff's Complaint.

7. This Court will conduct a case management conference on May 23, 2023 at 8:45 AM.

**DONE AND ORDERED** in Chambers at Broward County, Florida on 26th day of April, 2023.

CACE22017416 04-26-2023 5:29 PM

<u>CACE22017416 04-26-2023 5:29 PM</u>
Hon. Jeffrey Levenson
**CIRCUIT COURT JUDGE**
Electronically Signed by Jeffrey Levenson

**Copies Furnished To:**
Dana J McElroy , E-mail : dlake@tlolawfirm.com
Dana J McElroy , E-mail : dmcelroy@tlolawfirm.com
Dana J McElroy , E-mail : bbrennan@tlolawfirm.com
James J. McGuire , E-mail : jmcguire@tlolawfirm.com
James J. McGuire , E-mail : tgilley@tlolawfirm.com
Joshua Kon , E-mail : jkon@stoklaw.com
Joshua Kon , E-mail : gortiz@stoklaw.com
Linda Riedemann Norbut , E-mail : lnorbut@tlolawfirm.com
Linda Riedemann Norbut , E-mail : jvanderhorst@tlolawfirm.com
Peretz Laine , E-mail : plaine@stoklaw.com
Peretz Laine , E-mail : gortiz@stoklaw.com
Robert A. Stok , E-mail : ssolis@stoklaw.com
Robert A. Stok , E-mail : service@stoklaw.com
Yosef Kudan , E-mail : ykudan@stoklaw.com

Filing # 172535716 E-Filed 05/05/2023 12:48:00 PM

**IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA**

MONARCH AIR GROUP, LLC,
a Florida Limited Liability Company,

      Plaintiff,

v.

JOURNALISM DEVELOPMENT
NETWORK INC., a Maryland Corporation,
And LILY DOBROVOLSKAYA,

      Defendants.

_____/

CASE NO.: CACE-22-017416
DIVISION 09

**JOURNALISM DEVELOPMENT NETWORK, INC.'S FIRST REQUEST FOR
ADMISSION TO PLAINTIFF MONARCH AIR GROUP, LLC**

Defendant Journalism Development Network, Inc. ("JDN"), pursuant to Fla. R. Civ. P.

1.370, hereby propounds the following requests for admission to Plaintiff Monarch Air Group, LLC

("Plaintiff"), to be answered within 30 days of the date of service:

    1.      Admit that Plaintiff is seeking damages in this case that exceed $75,000.00.

    2.      Admit that Plaintiff is not seeking damages in this case that exceed $75,000.00.

            THOMAS & LOCICERO PL

            By: */s/ Dana J. McElroy*
                Dana McElroy
                Florida Bar No. 845906
                dmcelroy@tlolawfirm.com
                915 Middle River Drive, Suite 309
                Fort Lauderdale, FL 33304
                Phone:  (954)703-3416

                and

                James J. McGuire
                Florida Bar No. 187798
                jmcguire@tlolawfirm.com
                Linda R. Norbut

Florida Bar No. 1011401
lnorbut@tlolawfirm.com
601 South Boulevard
Tampa, FL 33606
Phone: (813) 984-3060

*Attorneys for JDN*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this **5th** day of **May, 2023** the foregoing document was electronically with the Clerk of the Court via the E-Portal, and was served this same day on all counsel of record, either via transmission of Notices of Electronic Filing generated by the E-Portal or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

By: */s/ Dana J. McElroy*
      Attorney

NOT AN OFFICIAL COPY – CCIS – ATTORNEY OF RECORD

Filing # 172535716 E-Filed 05/05/2023 12:48:00 PM

**IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT**
**IN AND FOR BROWARD COUNTY, FLORIDA**

MONARCH AIR GROUP, LLC,
a Florida Limited Liability Company,

        Plaintiff,

v.

JOURNALISM DEVELOPMENT
NETWORK INC., a Maryland Corporation,
And LILY DOBROVOLSKAYA,

        Defendants.

_____/

CASE NO.: CACE-22-017416
DIVISION 09

**DEFENDANT JOURNALISM DEVELOPMENT NETWORK, INC.'S NOTICE OF**
**SERVICE OF FIRST INTERROGATORIES TO**
**PLAINTIFF MONARCH AIR GROUP, LLC**

        Defendant Journalism Development Network, Inc. ("JDN"), pursuant to Fla. R. Civ. P.

1.340, hereby gives notice of serving its first interrogatories upon Plaintiff Monarch Air Group,

LLC, and requests that they be answered fully in writing and under oath, within thirty (30) days from

the date service of this notice.

**CERTIFICATE OF SERVICE**

        I HEREBY CERTIFY that on this **5th** day of **May, 2023** the foregoing document was

electronically with the Clerk of the Court via the E-Portal, and was served this same day on all

counsel of record, either via transmission of Notices of Electronic Filing generated by the E-Portal or

in some other authorized manner for those counsel or parties who are not authorized to receive

electronic Notices of Electronic Filing.

        THOMAS & LOCICERO PL

        By: */s/ Dana J. McElroy*
           Dana McElroy
           Florida Bar No. 845906

dmcelroy@tlolawfirm.com
915 Middle River Drive, Suite 309
Fort Lauderdale, FL 33304
Phone: (954)703-3416

and

James J. McGuire
Florida Bar No. 187798
jmcguire@tlolawfirm.com
Linda R. Norbut
Florida Bar No. 1011401
lnorbut@tlolawfirm.com
601 South Boulevard
Tampa, FL 33606
Phone: (813) 984-3060

*Attorneys for JDN*

## DEFINITION

As used herein, the words "you" and "your" shall refer to Plaintiff Monarch Air Group, LLC.

## INTERROGATORIES

1. Please describe in detail and with particularity all damages, expense, loss and/or injury that You claim to have incurred and for which You seek recovery under Count I for Defamation Per Se in this action (including but not limited to the "damages" You claim to have suffered to Your "reputation, as well as loss of income, diminution in value of [Your] shares, loss of goodwill, and other economic losses," as alleged in Paragraph 58 of the Complaint), and as to each please identify the amount, the date(s) incurred, and how each item was calculated.

2. Please describe in detail and with particularity all damages, expense, loss and/or injury that You claim to have incurred and for which You seek recovery under Count II for Defamation By Implication in this action (including but not limited to the "substantial damages" You allege You have suffered in Paragraph 62 of the Complaint), and as to each please identify the amount, the date(s) incurred, and how each item was calculated.

3. Please describe in detail and with particularity all damages, expense, loss and/or injury that You claim to have incurred and for which You seek recovery under Count III for Defamation Per Se Against Author in this action (including but not limited to the "actual damages" You claim to have suffered to Your "reputation, as well as loss of income, diminution in value of [Your] shares, loss of goodwill, and other economic losses," as alleged in Paragraph 68 of the Complaint), and as to each please identify the amount, the date(s) incurred, and how each item was calculated.

3

MONARCH AIR GROUP, LLC

By: _____

Title: _____


STATE OF FLORIDA    )
                      ) SS
COUNTY OF BROWARD   )

      The foregoing answers to interrogatories were sworn to and subscribed before me by means

of ☐ physical presence OR ☐ online notarization on this _____ day of _____, 2023, by

_____, as _____ for Monarch

Air Group, LLC, who is ☐ personally known to me or ☐ produced identification (*type of ID and ID*

*Number* _____), and who states that the answers are true and correct.


                      NOTARY PUBLIC, State of Florida

                      Sign: _____

                      Print: _____

NOT AN OFFICIAL COPY – CCR – ATTORNEY OF RECORD

Filing # 173034121 E-Filed 05/12/2023 12:12:24 PM

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

MONARCH AIR GROUP, LLC
a Florida Limited Liability Company,

     Plaintiff,

CASE NO.: CACE-22-017416

v.

JOURNALISM DEVELOPMENT
NETWORK INC., A Maryland Corporation,
and LILY DOBROVOLSKAYA

     Defendants.

_____/

## NOTICE OF HEARING
*(Uniform Motion Calendar)*

**PLEASE TAKE NOTICE** that the following matter will be heard before the Honorable

Jeffrey R. Levenson, via Zoom Video Conference, on **Wednesday, May 31, 2023 at 8:45 a.m.**,

or as soon thereafter may be heard:

### MOTION FOR EXTENSION OF TIME TO SERVE DEFENDANT WITH PROCESS

**Judge Jeffrey Levenson is inviting you to a scheduled Zoom meeting.**
**Topic: Judge Levenson Docket**
**Join Zoom Meeting**
**https://17thflcourts.zoom.us/j/109129436**
**Meeting ID: 109 129 436**
**One tap mobile**
**+13126266799, 109 129 436# US (Chicago)**
**+16468769923,,109 129 436# US (New York)**
**Dial by your location or Toll Free Below**
**+1 312 626 6799 US (Chicago)**
**+1 646 876 9923 US (New York)**
**+1 669 900 6833 US (San Jose)**
**+1 253 215 8782 US**
**(888)475-4499 US Toll-free,**
**(833)548-0276 US Toll-free,**
**(833)548-0282 US Toll-free,**
**(877)853-5257 US Toll-free**
**+1 301 715 8592 US**

{00721545}        STOK KON + BRAVERMAN
1 E. Broward Boulevard, Suite 915 • Fort Lauderdale, FL 33301 • P.954.237.1777 • F.954.237.1737 • E-mail: service@stoklaw.com

*** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN, CLERK 05/12/2023 12:12:24 PM.****

**+1 346 248 7799 US (Houston)**
**+1 408 638 0968 US (San Jose)**
**Meeting ID: 109 129 436**
**Find your local number: https://17thflcourts.zoom.us/u/adcKOluwtS**

"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the ADA Coordinator, Room 470, 201 S.E. Sixth Street, Fort Lauderdale, Florida 33301, 954-831-7721 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.".

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed and served via the Florida Courts E-Filing Portal on this 12th day of May 2023 to: Dana J. McElroy, dmcelroy@tlolawfirm.com; Thomas & LoCicero PL 915 Middle River Drive, Suite 309 Fort Lauderdale, FL 33304; James J. McGuire, Esq., jmcguire@tlolawfirm.com; Linda R. Norbut, Esq., lnorbut@tlolawfirm.com; Thomas & LoCicero PL 601 South Boulevard Tampa, FL 33606.

Respectfully submitted,

**STOK KON+ BRAVERMAN**
Attorneys for Plaintiff
One East Broward Boulevard, Suite 915
Fort Lauderdale, Florida 33301
Tel.: (954) 237-1777
Fax: (954) 237-1737
Email: service@stoklaw.com

*/s/ Peretz Laine*
PERETZ LAINE, ESQ.
Florida Bar No. 1038556
plaine@stoklaw.com
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
jkon@stoklaw.com

Filing # 173353786 E-Filed 05/17/2023 12:26:18 PM

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

MONARCH AIR GROUP, LLC
a Florida Limited Liability Company,

      Plaintiff,                  CASE NO.: CACE-22-017416

v.

JOURNALISM DEVELOPMENT
NETWORK INC., A Maryland Corporation,
and LILY DOBROVOLSKAYA

      Defendants.

_____/

## NOTICE OF CANCELLATION OF HEARING
### *(Uniform Motion Calendar)*

    **PLEASE TAKE NOTICE** that the undersigned has canceled[1] the hearing before the Honorable Jeffrey R. Levenson, via Zoom Video Conference, on **Wednesday, May 31, 2023, at 8:45 a.m.** on the following matter:

### MOTION FOR EXTENSION OF TIME TO SERVE DEFENDANT WITH PROCESS

---

[1] The parties have mutually agreed to reschedule the hearing due to a scheduling conflict.

{00730289}             STOK KON + BRAVERMAN
1 E. Broward Boulevard, Suite 915 • Fort Lauderdale, FL 33301 • P.954.237.1777 • F.954.237.1737 • E-mail: service@stoklaw.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been filed and served via the Florida Courts E-Filing Portal on this **17th day of May 2023** to: Dana J. McElroy, dmcelroy@tlolawfirm.com; Thomas & LoCicero PL 915 Middle River Drive, Suite 309 Fort Lauderdale, FL 33304; James J. McGuire, Esq., jmcguire@tlolawfirm.com; Linda R. Norbut, Esq., lnorbut@tlolawfirm.com; Thomas & LoCicero PL 601 South Boulevard Tampa, FL 33606.

Respectfully submitted,

**STOK KON+ BRAVERMAN**
Attorneys for Plaintiff
One East Broward Boulevard, Suite 915
Fort Lauderdale, Florida 33301
Tel.: (954) 237-1777
Fax: (954) 237-1737
Email: service@stoklaw.com

*/s/ Peretz Laine*
PERETZ LAINE, ESQ.
Florida Bar No. 1038556
plaine@stoklaw.com
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
jkon@stoklaw.com

Filing # 173354841 E-Filed 05/17/2023 12:34:34 PM

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

MONARCH AIR GROUP, LLC
a Florida Limited Liability Company,

       Plaintiff,

v.

JOURNALISM DEVELOPMENT
NETWORK INC., A Maryland Corporation,
and LILY DOBROVOLSKAYA

       Defendants.

_____/

CASE NO.: CACE-22-017416

## RE-NOTICE OF HEARING
### (Uniform Motion Calendar)

**PLEASE TAKE NOTICE** that the following matter will be heard before the Honorable

Jeffrey R. Levenson, via Zoom Video Conference, on **Thursday, June 8, 2023 at 8:45 a.m.**, or

as soon thereafter may be heard:

### MOTION FOR EXTENSION OF TIME TO SERVE DEFENDANT WITH PROCESS

**Judge Jeffrey Levenson is inviting you to a scheduled Zoom meeting.**
**Topic: Judge Levenson Docket**
**Join Zoom Meeting**
**https://17thflcourts.zoom.us/j/109129436**
**Meeting ID: 109 129 436**
**One tap mobile**
**+13126266799, 109 129 436# US (Chicago)**
**+16468769923,,109 129 436# US (New York)**
**Dial by your location or Toll Free Below**
**+1 312 626 6799 US (Chicago)**
**+1 646 876 9923 US (New York)**
**+1 669 900 6833 US (San Jose)**
**+1 253 215 8782 US**
**(888)475-4499 US Toll-free,**
**(833)548-0276 US Toll-free,**
**(833)548-0282 US Toll-free,**
**(877)853-5257 US Toll-free**
**+1 301 715 8592 US**

{00730295}
STOK KON + BRAVERMAN
1 E. Broward Boulevard, Suite 915 • Fort Lauderdale, FL 33301 • P.954.237.1777 • F.954.237.1737 • E-mail: service@stoklaw.com

*** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN,  CLERK 05/17/2023 12:34:34 PM.****

**+1 346 248 7799 US (Houston)**
**+1 408 638 0968 US (San Jose)**
**Meeting ID: 109 129 436**
**Find your local number: https://17thflcourts.zoom.us/u/adcKOluwtS**

---

"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the ADA Coordinator, Room 470, 201 S.E. Sixth Street, Fort Lauderdale, Florida 33301, 954-831-7721 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.".

---

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been filed and served via the Florida Courts E-Filing Portal on this **17th day of May 2023** to: Dana J. McElroy, dmcelroy@tlolawfirm.com; Thomas & LoCicero PL 915 Middle River Drive, Suite 309 Fort Lauderdale, FL 33304; James J. McGuire, Esq., jmcguire@tlolawfirm.com; Linda R. Norbut, Esq., lnorbut@tlolawfirm.com; Thomas & LoCicero PL 601 South Boulevard Tampa, FL 33606.

Respectfully submitted,

**STOK KON+ BRAVERMAN**
Attorneys for Plaintiff
One East Broward Boulevard, Suite 915
Fort Lauderdale, Florida 33301
Tel.: (954) 237-1777
Fax: (954) 237-1737
Email: service@stoklaw.com

*/s/ Peretz Laine*
PERETZ LAINE, ESQ.
Florida Bar No. 1038556
plaine@stoklaw.com
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
jkon@stoklaw.com

Filing # 173368378 E-Filed 05/17/2023 02:06:54 PM

### IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
### IN AND FOR BROWARD COUNTY, FLORIDA

MONARCH AIR GROUP, LLC,
a Florida Limited Liability Company,

Plaintiff,

CASE NO.: CACE-22-017416
DIVISION 09

v.

JOURNALISM DEVELOPMENT
NETWORK INC., a Maryland Corporation,
And LILY DOBROVOLSKAYA,

     Defendants.

_____/

### DEFENDANT JOURNALISM DEVELOPMENT NETWORK, INC.'S
### ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT

Defendant, JOURNALISM DEVELOPMENT NETWORK, INC. ("JDN"), hereby answers the allegations in the Complaint of Plaintiff, MONARCH AIR GROUP, LLC ("Plaintiff" or "Monarch"), against it,[1] in numbered paragraphs corresponding to the numbered paragraphs of the Complaint as follows:

### Introduction

1.    JDN admits that the Organized Crime and Corruption Reporting Project ("OCCRP") published a news article on November 27, 2020. JDN denies the remaining allegations in Paragraph 1 of the Complaint.

2.    Denied.

3.    Denied.

4.    Denied.

---

[1]    To the extent the Complaint contains allegations against co-defendant Lily Dobrovolskaya, JDN is not required to respond. Moreover, JDN has not responded to any of the Complaint's allegations in this Answer on her behalf, and has responded only on its behalf.

5.     JDN admits that Andrew Sullivan is OCCRP's co-founder, but denies the remaining allegations of Paragraph 5.

6.     Denied.

7.     Denied.

8.     Denied.

9.     Denied.

10.    Denied.

11.    Denied.

12.    Denied.

13.    Denied.

14.    Denied.

15.    Denied.

16.    Denied.

17.    Denied.

18.    Denied.

19.    Denied.

## Jurisdiction and Venue

20.    JDN admits that Plaintiff has filed its action seeking damages in excess of $30,000.00, but denies the remaining allegations of Paragraph 20 of the Complaint.

21.    JDN is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21 of the Complaint, and those allegations are therefore denied.

22.    JDN admits that it is a Maryland corporation which owns and operates OCCRP. JDN denies the remaining allegations of Paragraph 22 of the Complaint.

2

23.     Denied.

24.     Denied.

25.     Denied.

26.     Denied.

27.     Denied.

## General Allegations

28.     JDN is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28 of the Complaint, and those allegations are therefore denied.

29.     JDN admits that OCCRP published a news article entitled "Flight of the Monarch: US Gov't Contracted Airline Once Owned by Criminals with Ties to the Russian Mob" but denies the remaining allegations or Paragraph 29 of the Complaint.

30.     Denied.

31.     Denied.

32.     Denied.

33.     Denied.

34.     Denied.

35.     Denied.

36.     Denied.

37.     Denied.

38.     Denied.

39.     Denied.

40.     Denied.

41.     Denied.

3

42.   Denied.

43.   JDN admits that Trincher and Golubchik were owners of Monarch until 2012 and were charged with crimes a year later.  JDN denies the remaining allegations in Paragraph 43 of the Complaint.

44.   Denied.

45.   Denied.

    a.  Denied.

    b.  Denied.

    c.  Denied.

46.   Denied.

47.   Denied.

48.   Denied.

49.   Denied.

50.   Denied.

51.   Denied.

52.   Denied.

## COUNT I – DEFAMATION *PER SE*

53.   JDN realleges and incorporates its responses to Paragraphs 1-52, and all their subparts, in response to Paragraph 53 of the Complaint.[2]

54.   Denied.

55.   Denied.

56.   Denied.

---

[2]   Pursuant the Court's order dated April 26, 2023, Paragraphs 53 and 59 of the Complaint were amended by interlineation to incorporate paragraphs 45-52.

4

57.     Denied.

58.     Denied.

JDN denies the allegations contained in the "wherefore" paragraph following Paragraph

58 of the Complaint and further denies that Plaintiff is entitled to any relief in this action.

## COUNT II – DEFAMATION BY IMPLICATION

59.     JDN realleges and incorporates its responses to Paragraphs 1-52, and all of their

subparts, in response to Paragraph 59 of the Complaint.

60.     Denied.

61.     Denied.

62.     Denied.

JDN denies the allegations contained in the "wherefore" paragraph following Paragraph

62 of the Complaint and further denies that Plaintiff is entitled to any relief in this action.

## COUNT III – DEFAMATION *PER SE* AGAINST AUTHOR

63.     JDN realleges and incorporates its responses to Paragraphs 12-44, and all of their

subparts, in response to Paragraph 63 of the Complaint.

64.     As to the allegations of Paragraph 64 of the Complaint, JDN is not required to

respond to allegations directed solely to a co-defendant. To the extent any allegations in this

paragraph concern or relate to JDN, the allegations are denied.

65.     As to the allegations of Paragraph 65 of the Complaint, JDN is not required to

respond to allegations directed solely to a co-defendant. To the extent any allegations in this

paragraph concern or relate to JDN, the allegations are denied.

66.     As to the allegations of Paragraph 66 of the Complaint, JDN is not required to

respond to allegations directed solely to a co-defendant. To the extent any allegations in this

paragraph concern or relate to JDN, the allegations are denied.

67.     As to the allegations of Paragraph 67 of the Complaint, JDN is not required to respond to allegations directed solely to a co-defendant. To the extent any allegations in this paragraph concern or relate to JDN, the allegations are denied.

68.     As to the allegations of Paragraph 68 of the Complaint, JDN is not required to respond to allegations directed solely to a co-defendant. To the extent any allegations in this paragraph concern or relate to JDN, the allegations are denied.

## DEMAND FOR JURY TRIAL

JDN admits only that Plaintiff has requested a jury trial.

## GENERAL DENIAL

All allegations of the Complaint not specifically admitted are hereby denied.

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state claims against JDN upon which relief can be granted, for the reasons set forth in the defenses stated in this Answer and Affirmative Defenses.

## SECOND AFFIRMATIVE DEFENSE

The statements and publication about which Plaintiff complains are privileged and protected by the First Amendment to the United States Constitution, Article 1, Section 4 of the Florida Constitution, and Florida's common law privileges, including but not limited to official reports, opinion, fair comment, and neutral reports.

## THIRD AFFIRMATIVE DEFENSE

The statements and publication about which Plaintiff complains did not contain any false statements of fact concerning Plaintiff Monarch.  To the extent Plaintiff seeks recovery or damages for any alleged statements concerning and/or about other individuals or entities,

6

Plaintiff is not entitled to seek recovery or damages for those statements.

## FOURTH AFFIRMATIVE DEFENSE

The statements and publication about which Plaintiff complains, when considered in their entirety as required by applicable law, are not false and defamatory in any material or significant respect, and are substantially true.

## FIFTH AFFIRMATIVE DEFENSE

The statements and publication about which Plaintiff complains did not defame Plaintiff.

## SIXTH AFFIRMATIVE DEFENSE

The statements and publication about which Plaintiff complains, when considered in their entirety as required by applicable law, were not reasonably capable of the false and defamatory interpretations, effects and/or implications alleged by Plaintiff.

## SEVENTH AFFIRMATIVE DEFENSE

The statements and publication about which Plaintiff complains constituted fair and accurate reports of judicial and/or official records, proceedings and statements.

## EIGHTH AFFIRMATIVE DEFENSE

The statements and publication about which Plaintiff complains concerned matters of public interest, concern and importance.

## NINTH AFFIRMATIVE DEFENSE

The statements and publication about which Plaintiff complains concerned matters of public record.

## TENTH AFFIRMATIVE DEFENSE

The statements and publication about which Plaintiff complains constitute protected opinion, the basis of which was fully disclosed or otherwise known or available, and/or rhetorical

hyperbole.

### ELEVENTH AFFIRMATIVE DEFENSE

The statements and publication about which Plaintiff complains did not contain or create any false, defamatory or actionable implications about Plaintiff. To the extent Plaintiff alleges false and defamatory implications, JDN did not intend or endorse such implications.

### TWELFTH AFFIRMATIVE DEFENSE

Plaintiff is a public figure for purposes of the standard of fault applicable to the statements and publication at issue.

### THIRTEENTH AFFIRMATIVE DEFENSE

The statements and publication about which Plaintiff complains were prepared and published in good faith and without negligence, express malice, or actual malice. Plaintiff accordingly is not entitled to damages of any kind, including but not limited to actual, special, presumed, general, and/or punitive damages.

### FOURTEENTH AFFIRMATIVE DEFENSE

The statements and publication about which Plaintiff complains did not cause Plaintiff to suffer actual injury and damages for which JDN is liable.

### FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because they violate Section 768.295, Fla. Stat. (2022) (Florida's Anti-SLAPP law).

### SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by its failure to satisfy all conditions precedent.

### SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the applicable statute of limitations.

### EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by its failure to mitigate and/or prevent the damages about which it complains, and any recovery should be reduced in direct proportion to such failure.

WHEREFORE, Defendant Journalism Development Network, Inc. respectfully requests that Plaintiff's Complaint be dismissed with prejudice and that JDN be awarded its attorneys' fees and costs, pursuant to Sections 768.295 and 57.105, Florida Statutes (2022), and such other relief as necessary and appropriate.

THOMAS & LOCICERO PL

By: */s/ Dana J. McElroy*
    Dana McElroy
    Florida Bar No. 845906
    dmcelroy@tlolawfirm.com
    915 Middle River Drive
    Suite 309
    Fort Lauderdale, FL 33304
    Phone:  (954)703-3416

    and

    James J. McGuire
    Florida Bar No. 187798
    jmcguire@tlolawfirm.com
    Linda R. Norbut
    Florida Bar No. 1011401
    lnorbut@tlolawfirm.com
    601 South Boulevard
    Tampa, FL 33606
    Phone:  (813) 984-3060

    *Attorneys for JDN*

NOT AN OFFICIAL COPY – CCIS – ATTORNEY OF RECORD

9

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this **17th** day of **May, 2023** the foregoing document was electronically with the Clerk of the Court via the E-Portal, and was served this same day on all counsel of record, either via transmission of Notices of Electronic Filing generated by the E-Portal or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

By: */s/ Dana J. McElroy*
　　Attorney

10

Filing # 173588345 E-Filed 05/19/2023 04:40:38 PM

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

MONARCH AIR GROUP, LLC
a Florida Limited Liability Company,

       Plaintiff,

CASE NO.: CACE-22-017416

v.

JOURNALISM DEVELOPMENT
NETWORK INC., A Maryland Corporation,
and LILY DOBROVOLSKAYA

       Defendants.

_____/

## AFFIDAVIT OF COMPLIANCE UNDER SECTION 48.161 FLORIDA STATUTES

       Peretz Laine being dully sworn, deposes and says:

1.    My name is Peretz Laine; I am an Associate Attorney at the law offices of Stok Kon +
Braverman, counsel for Monarch Air Group LLC ("Plaintiff") in the above-captioned action.

2.    Plaintiff's counsel filed this lawsuit on November 23, 2022, Plaintiff's 120 days to serve
LILY DOBROVOLSKAYA ("Author") expired on May 27, 2023.

3.    Plaintiff's counsel first attempted to locate Author via Skiptrace and Westlaw's Public
Record Search under Author's name as it is spelled on her publications and social media (as spelled
in this action as well).

4.    Plaintiff's counsel, however, discovered that the way Author spells her name for legal
purposes, perhaps, is Lili Dobrovolskaia, and discovered that Author's last known address is in
New York City.

5.    Based on this, Plaintiff's counsel requested a summons for Author's address in New York,
and the Clerk of Court issued a summons for Author on December 13, 2022.

6.    On December 21, 2022, Plaintiff's process server tried serving Author at her last known

STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 • Fort Lauderdale, FL 33301 • P.954.237.1777 • F.954.237.1737 • E-mail: service@stoklaw.com

*** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN,  CLERK 05/19/2023 04:40:37 PM.****

address. *See* **Exhibit A**.

7.     Plaintiff's process server made several more attempts at each of the two addresses but could not serve Author. *See* **Exhibit A**, affidavit from process server.

8.     I contacted JDN's counsel asking whether JDN or its counsel are either authorized to accept service on behalf of Author or know Author's whereabouts and/or her email address. JDN's counsel, however stated that neither she nor JDN were allowed to accept service on behalf of Author, nor did they have authority to provide Author's information.

9.     Accordingly, on Monday, March 20, 2023, I called Author's cell number, discovered via Westlaw's Public Records, to confirm that it was Author's number. I confirmed that it was Author's number by asking if her name is Lili Dobrovolskaia and if she is a freelance reporter for the Miami-Herald. Author confirmed both. She refused, however, to provide her address or email address.

10.    Upon confirming that the cellphone belongs to Author, Plaintiff's counsel sent Author the summons and complaint via text message.

11.    In addition, I sent Author messages both on LinkedIn and Messenger.

12.    I then contacted JDN's counsel ("OC") who told the undersigned that she is now also representing Author, and that all further communications to Author should be sent to OC.

13.    I asked OC whether she would accept service for Author and/or share information on Author's whereabouts so that Plaintiff can serve her in person, but OC said that she cannot do so.

14.    Based on the above, Author knows about the suit pending against her and has retained counsel to defend her in it.

15.    On April 4, 2023, this Court denied Plaintiff's motion to recognize that Author was properly served under section 48.102, *Florida Statutes*, "service by other means" because this

Court found that the entire statute, including the last two sentences of the statute, only applies to service by other means on underlined entities, and Author is not an entity.

16.     The Court did, however, grant Plaintiff until April 23, 2023, to continue its attempt to serve Author.

17.     Plaintiff's process server made additional attempts on April 10, April 14, and April 15, 2023, to serve the Author but did not succeed. *See* **Exhibit B**.

18.     Plaintiff's counsel sought to get an Alias Summons from the Clerk of Court to serve Author via the Secretary of State, under sections 48.161 and 48.181, *Florida Statutes*, but because of the court closures and other reasons, the Clerk of Court only signed the summons on April 21, 2023, and Plaintiff's counsel sent the summons to the Secretary of State on April 21, 2023. *See* **Exhibit C**.

19.     On April 26, 2023, Plaintiff's counsel was notified that substitute service of process was accepted for Author by the Secretary of State. *See* **Exhibit D**.

20.     Therefore, Author was served on April 21, 2023 pursuant to section 48.161(2) *Florida Statutes*:

> "An affidavit of compliance of the party effectuating service or such party's attorney must be filed within 40 days after the date of service on the Secretary of State or within such additional time as the court allows. The affidavit of compliance must set forth the facts that justify substituted service under this section and that show due diligence was exercised in attempting to locate and effectuate personal service on the party before using substituted service under this section. The party effectuating service does not need to allege in its original or amended complaint the facts required to be set forth in the affidavit of compliance."

*FURTHER AFFIANT SAYETH NAUGHT.*

PERETZ LAINE, ESQ.

STATE OF FLORIDA        )
                        ) SS.:
COUNTY OF BROWARD       )

    SWORN TO AND SUBSCRIBED before me this 19ᵗʰ day of May 2023 by PERETZ LAINE, ESQ., who is personally known to me, who after being first duly sworn, deposes and states that he executed the foregoing and that it is true and correct.



Notary Public State of Florida
Gabriela Ortiz Vega
My Commission
HH 237059
Exp. 3/7/2026

(SEAL)

NOTARY PUBLIC, STATE OF FLORIDA

Print Name: Gabriela Ortiz Vega

NOT AN OFFICIAL COPY – CCIS – ATTORNEY OF RECORD

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed and served

via the Florida Courts E-Filing Portal on this **19th day of May 2023** to all counsel of record.

Respectfully submitted,

**STOK KON+ BRAVERMAN**
Attorneys for Plaintiff
One East Broward Boulevard, Suite 915
Fort Lauderdale, Florida 33301
Tel.: (954) 237-1777
Fax: (954) 237-1737
Email: service@stoklaw.com

*/s/ Peretz Laine*
PERETZ LAINE, ESQ.
Florida Bar No. 1038556
plaine@stoklaw.com
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
jkon@stoklaw.com
YOSEF Y. KUDAN, ESQ.
Florida Bar No. 1010261
ykudan@stoklaw.com

# EXHIBIT A

{00650852}

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA
------------------------------------------------X
MONARCH AIR GROUP, LLC,
a Florida Limited Liability Company,

                   Case No. CACE-22-017416

              Plaintiff(s),

    -against-

JOURNALISM DEVELOPMENT
NETWORK, INC., a Maryland Corporation,
and LILY DOBROVOLSKAYA,

              Defendant(s).       **AFFIDAVIT OF**
                                         **ATTEMPTED SERVICE**
------------------------------------------------X
STATE OF NEW YORK    )
                   s.s :
COUNTY OF NEW YORK  )

      BOBBY ALI, being duly sworn, deposes and says that deponent is an agent of RUBI
SERVICES at 8004 NW 154TH Street, Suite 671, Miami Lakes, FL 33016-5814, is over the age
of eighteen years and is not a party to the action.
      That on the 21st day of December, 2022, at approximately 12:30 p.m., deponent attempted
to serve a true copy of the **Summons and Complaint (with Exhibits) and Civil Cover Sheet**
upon Lily Dobrovolskaya at 89 East 2nd Street, Apt. #1, New York, New York 10009. I rang the
bell for apartment 1 but received no answer. (There are no names on the bells.)
      That on the 21st day of December, 2022, at approximately 12:52 p.m., deponent attempted
to serve a true copy of the **Summons and Complaint (with Exhibits) and Civil Cover Sheet**
upon Lily Dobrovolskaya at 245 East 10th Street, Apt. #3, New York, New York 10009. I rang the
intercom for apartment 3 but received no answer.

Sworn to before me this
20th day of March, 2023

                              BOBBY ALI #871612

**NOTARY PUBLIC, STATE OF NEW YORK**
STEVEN MITCHELL
Reg. No. 01-MI-6326046
Qualified in New York County
Commission expires June 08, 2023

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA
-------------------------------------------------X
MONARCH AIR GROUP, LLC,
a Florida Limited Liability Company,

                           Plaintiff(s),

    -against-

JOURNALISM DEVELOPMENT
NETWORK, INC., a Maryland Corporation,
and LILY DOBROVOLSKAYA,

                           Defendant(s).
-------------------------------------------------X

Case No. CACE-22-017416

**AFFIDAVIT OF**
**ATTEMPTED SERVICE**

STATE OF NEW YORK    )
                       s.s :
COUNTY OF NEW YORK  )

      MICHAEL KEATING, being duly sworn, deposes and says that deponent is an agent of RUBI SERVICES at 8004 NW 154TH Street, Suite 671, Miami Lakes, FL 33016-5814, is over the age of eighteen years and is not a party to the action.

      That on the 4th day of January, 2023, from approximately 7:40 to 7:55 p.m., deponent attempted to serve a true copy of the **Summons and Complaint (with Exhibits) and Civil Cover Sheet** upon Lily Dobrovolskaya at 89 East 2nd Street, Apt. #1, New York, New York 10009. I rang the bell for apartment 1 but received no answer (I rang the bells for several other apartments but did not receive an answer - the bells do not appear to work.) There are no names on the bells. I waited outside the premises to see if the defendant entered or left but did not see her.

      That on the 4th day of January, 2023, at approximately 8:10 p.m., deponent attempted to serve a true copy of the **Summons and Complaint (with Exhibits) and Civil Cover Sheet** upon Lily Dobrovolskaya at 245 East 10th Street, Apt. #3, New York, New York 10009. I rang the intercom for apartment 3 but received no answer. I was able to access the listings of the four apartments in the building. Per the intercom apartment 1 and 3 are vacant. Apartments 2 and 4 have tenants listed but the defendant is not listed.

NOT IN THE CASE - CURTIS - ATTORNEY OF RECORD

(1)

That on the 14th day of January, 2023, from approximately 7:55 to 8:15 a.m., deponent attempted to serve a true copy of the **Summons and Complaint (with Exhibits) and Civil Cover Sheet** upon Lily Dobrovolskaya at 89 East 2nd Street, Apt. #1, New York, New York 10009. I rang the bell for apartment 1 but received no answer. I waited outside the premises to see if the defendant entered or left but did not see her.

That on the 17th day of January, 2023, from approximately 7:40 to 8:05 p.m., deponent attempted to serve a true copy of the **Summons and Complaint (with Exhibits) and Civil Cover Sheet** upon Lily Dobrovolskaya at 89 East 2nd Street, Apt. #1, New York, New York 10009. I rang the bell for apartment 1 but received no answer. I waited outside the premises to see if the defendant entered or left but did not see her.

Sworn to before me this
20th day of March, 2023

MICHAEL KEATING #848345

_____
NOTARY PUBLIC, STATE OF NEW YORK
STEVEN MITCHELL
Reg. No. 01-MI-6326046
Qualified in New York County
Commission expires June 08, 2023

(2)

# EXHIBIT B

{00650852}

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA
-----------------------------------------------X
MONARCH AIR GROUP, LLC,
a Florida Limited Liability Company,

                          Plaintiff(s),

         -against-

JOURNALISM DEVELOPMENT
NETWORK, INC., a Maryland Corporation,
and LILY DOBROVOLSKAYA,

                          Defendant(s).
-----------------------------------------------X

Case No. CACE-22-017416

**RETURN OF NON-SERVICE**

STATE OF NEW YORK      )
                                  s.s :
COUNTY OF NEW YORK   )

MICHAEL KEATING, being duly sworn, deposes and says that deponent is an agent of
RUBI SERVICES at 8004 NW 154TH Street, Suite 671, Miami Lakes, FL 33016-5814, is over
the age of eighteen years and is not a party to the action.

That deponent has, despite repeated attempts, has been unable to effect service upon the
individual defendant Lily Dobrovolskaya.

Attempts were made on the 4th day of January, 2023, from approximately 7:40 to 7:55 p.m.;
on the 14th day of January, 2023, from approximately 7:55 to 8:15 a.m.; on the 17th day of
January, 2023, from approximately 7:40 to 8:05 p.m.; on the 10th day of April at 7:00 p.m.; on the
15th day of April at 9:30 a.m. Each time I rang the bell for the defendant's apartment - Apartment
#1 at 89 East 2nd Street, New York, New York 10009. I rang the bell but received no answer. I
waited outside the premises to see if the defendant entered or left but did not see her.

Sworn to before me this
19th day of April, 2023

MICHAEL KEATING #848345

NOTARY PUBLIC, STATE OF NEW YORK
STEVEN MITCHELL
Reg. No. 01-MI-6326046
Qualified in New York County
Commission expires June 08, 2023

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA
------------------------------------------------------X

MONARCH AIR GROUP, LLC,
a Florida Limited Liability Company,

                      Plaintiff(s),

   -against-

JOURNALISM DEVELOPMENT
NETWORK, INC., a Maryland Corporation,
and LILY DOBROVOLSKAYA,

                  Defendant(s).
------------------------------------------------------X

Case No. CACE-22-017416

**RETURN OF NON-SERVICE**

STATE OF NEW YORK   )
                s.s :
COUNTY OF NEW YORK  )

      BOBBY ALI, being duly sworn, deposes and says that deponent is an agent of RUBI SERVICES at 8004 NW 154TH Street, Suite 671, Miami Lakes, FL 33016-5814, is over the age of eighteen years and is not a party to the action.

      That deponent has, despite two attempts, has been unable to effect service upon the individual defendant Lily Dobrovolskaya.

      Attempts were made on the 21st day of January, 2023 at 12:30 p.m. and again on the 14th day of April, 2023 at 12:57 p.m. Each time I rang the bell for the defendant's apartment - Apartment #1 at 89 East 2nd Street, New York, New York 10009. I rang the bell but received no answer.

Sworn to before me this
19th day of April, 2023

_____

NOTARY PUBLIC, STATE OF NEW YORK
STEVEN MITCHELL
Reg. No. 01-MI-6326046
Qualified in New York County
Commission expires June 08, 2023

BOBBY ALI #871612

# EXHIBIT C

{00650852}

Filing # 170639607 E-Filed 04/10/2023 12:27:20 PM

IN THE CIRCUIT COURT OF THE 17th
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

MONARCH AIR GROUP, LLC.,
a Florida Limited Liability Company,

    Plaintiff,

CASE NO.:  CACE-22-017416

vs.

JOURNALISM DEVELOPMENT
NETWORK INC., a Maryland Corporation,
and LILY DOBROVOLSKAYA

    Defendants.

_____/

## ALIAS SUMMONS

THE STATE OF FLORIDA

To Each Sheriff of the State:

    YOU ARE COMMANDED to serve this summons and a copy of the complaint in this action on Defendant, LILY DOBROVOLSKAYA, by serving:

**LILY DOBROVOLSKAYA**
c/o Secretary of State
P.O. Box 6327
Tallahassee, FL 32314

    Defendant is required to serve written defenses to the complaint or petition on Joshua R. Kon, Esq., Plaintiff's attorney, whose address is: STOK KON + BRAVERMAN, One East Broward Boulevard, Suite 915, Fort Lauderdale, Florida 33301 within twenty (20) days after service of this summons on that Defendant, service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint.

Dated:     APR 21 2023

Clerk of the Court

By: _____
As Deputy Clerk of the Court **BRENDA D. FORMAN**

{00724996}    1

## IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

## IMPORTANTE

Usted ha sido demandado legalmente. Tiene 20 días, contados a partir del recibo de esta notificación, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefónica no lo protegerá. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podría ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guía telefónica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

# Submission Received! #230421037SOP

- Your submission has been received and **queued for staff review**.

- Submissions are reviewed in the order they are received. To see what date staff are currently reviewing, see **current processing dates**

- When this submission has been processed, we will send an email to the contact and submitter with the response letter(s) accepting or rejecting Substitute Service of Process attached.

- If you have questions about this submission, you may contact this office at ApostillesCertsCorpHelp@dos.myflorida.com. Please reference your tracking number **230421037SOP**. All other inquiries must be directed to the attorney(s) involved.



# EXHIBIT D

{00650852}



## FLORIDA DEPARTMENT OF STATE
Division of Corporations

April 26, 2023

Peretz Laine, Esq.

Pursuant to Chapter 48.161,48.181 Florida Statutes, substitute service of process was accepted for LILY DOBROVOLSKAYA in case number CACE-22-01741 and was filed on April 21, 2023 at 3:40 PM.

Plaintiff(s)
MONARCH AIR GROUP, LLC
v.
Defendant(s)
JOURNALISM DEVELOPMENT NETWORK and LILY DOBROVOLSKAYA

The Secretary of State does not forward documentation to the defendant. All inquiries on behalf of this defendant should be made to the attorneys involved.

Bradley J. Beech
Processor of Service

Division of Corporations
P.O. Box 6327, Tallahassee, Florida 32314

Letter No. 230421037SOP.01

Filing # 173833551 E-Filed 05/23/2023 07:23:19 PM

## IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT, IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO.: <u>CACE22017416</u>       DIVISION: <u>09</u>       JUDGE: <u>Levenson, Jeffrey R. (09)</u>

**Monarch Air Group, LLC**
,

Plaintiff(s) / Petitioner(s)

**UNIFORM TRIAL ORDER**
**Seventeenth Judicial Circuit**
**ORDER FOR MANDATORY**
**CALENDAR CALL**

v.

**JOURNALISM DEVELOPMENT NETWORK, INC., et al**
,

Defendant(s) / Respondent (s).

_____ /

## UNIFORM TRIAL ORDER

**THE UNIFORM TRIAL DATE LISTED HEREIN IS A FIRM TRIAL DATE AND DEADLINES WILL BE STRICTLY ENFORCED BY THE COURT. STRICT COMPLIANCE MEANS NO CONTINUANCES OR EXTENSIONS WILL BE GRANTED WITHOUT COURT ORDER UPON WRITTEN MOTION SETTING FORTH GOOD CAUSE, PURSUANT TO AOSC20-23, AMENDMENT 13 (May 6, 2021), AND FLA. R. GEN. PRAC. & JUD. ADMIN. 2.545(e).**

**FAILURE TO ATTEND CALENDAR CALL MAY RESULT IN EITHER THIS CASE BEING DISMISSED OR A DEFAULT BEING ENTERED.**

**TRIAL PERIOD COMMENCING:** <u>04-01-2024 to 04-26-2024</u> . This is a ( <u>4</u> ) week calendar.

**CALENDAR CALL:** <u>03-22-2024 at 9:00 AM</u>

[ 5 ]   DAYS       [ X ]   JURY       []   NON-JURY

*** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN,  CLERK 05/23/2023 07:23:19 PM.****

Case Number: CACE22017416

## I. <u>ORDER OF TRIALS:</u>

The order of trials set during this Trial Period will be determined at Calendar Call. Parties are subject to being called to commence trial during any portion of the above noted Trial Period.

## II. <u>TRIAL DATE:</u>

The Court has determined this case is ready for trial pursuant to Florida Rule of Civil Procedure 1.440. This case is set for trial before the undersigned Judge in Courtroom **16150 or Zoom: https://17thflcourts.zoom.us/j/109129436** , Broward County Courthouse, 201 S.E. 6th Street, Fort Lauderdale, Florida, 33301, as stated above. The trial date is a firm trial date pursuant to AOSC20-23, Amendment 13 (May 6, 2021).

## III. <u>CIVIL TRIAL POOL:</u>

Parties are advised that this case may be placed into the Seventeenth Judicial Circuit Court's "Civil Trial Pool" and is subject to being called for trial before any judge. If placed in the Civil Trial Pool, **parties must be prepared to proceed to trial if called.** Only the Division Judge or the Administrative Judge of the Seventeenth Judicial Circuit Court's Civil Division may grant a continuance of any case placed in the Civil Trial Pool.

## IV. <u>WITNESS LISTS:</u>

### A. NO LATER THAN ONE HUNDRED & TWENTY (120) DAYS PRIOR TO CALENDAR CALL:

<u>Fact Witnesses</u>: Parties must file and serve a list of names and addresses of all fact witnesses who are expected to testify at trial. Each party's fact witness list must include a brief description of the substance and scope of the testimony to be elicited from such witness. Both sides must cooperate in the scheduling of such witness depositions.

### B. NO LATER THAN NINETY (90) DAYS PRIOR TO CALENDAR CALL:

<u>Expert Witnesses:</u>

i. At the time of disclosure of all expert witnesses, the parties shall file and serve the names and addresses of all expert witnesses to be called at trial, including their complete and updated curriculum vitae, and all information regarding expert testimony that is required by Fla. R. Civ. P. 1.28(b)(5). Parties shall furnish opposing counsel with two (2) alternative dates of availability of all expert witnesses for the purpose of taking their deposition. Both parties shall cooperate in the scheduling of expert depositions.

ii. The parties shall also provide answers to standard form expert interrogatories pursuant to Fla.R.Civ.P. 1.280(b)(5). All reports or other data compiled by each disclosed expert which is intended to be used by the expert and/or referred to during his/her deposition testimony shall be provided electronically to the opposing party at least 72 hours prior to the date of the scheduled deposition.

### C. NO LATER THAN SIXTY (60) DAYS PRIOR TO CALENDAR CALL:

Case Number: CACE22017416

Rebuttal Witnesses: Parties must file and serve a list of names and addresses of any rebuttal witnesses within sixty (60) days.

## V. COMPULSORY MEDICAL EVALUATIONS ("CME"):
### A. NO LATER THAN NINETY (90) DAYS PRIOR TO CALENDAR CALL:
All CME and other examinations pursuant to Florida Rule of Civil Procedure 1.360 must be completed no later than ninety (90) days prior to Calendar Call.

## VI. DISCOVERY DEADLINES:
### A. NO LATER THAN SIXTY-FIVE (65) DAYS PRIOR TO CALENDAR CALL:
All final discovery must have been initiated at least sixty-five (65) days prior to Calendar Call.
### B. NO LATER THAN THIRTY (30) DAYS PRIOR TO CALENDAR CALL:
Parties must complete all discovery, including expert discovery in accordance with Florida Rule of Civil Procedure 1.280(b)(5), at least thirty (30) days prior to Calendar Call. Discovery conducted after this time period is strongly disfavored and will only be permitted by order of the Court under exceptional circumstances.
### C. ELECTRONICALLY STORED INFORMATION (ESI) DISCOVERY: ESI discovery procedures are governed by Seventeenth Judicial Circuit Administrative Order 2021-20-Gen, a copy of which is available on the Circuit's webpage (www.17th.flcourts.org).

## VII. MOTIONS:
### A. NO LATER THAN SEVENTY-FIVE (75) DAYS PRIOR TO CALENDAR CALL:
1. Motions to add a party or parties or to amend pleadings shall be filed and set for hearing no later than seventy-five (75) days before Calendar Call absent good cause shown. The deadline shall not conflict with Florida Rule of Civil Procedure 1.190(e), and the motion may be denied if there has been undue delay, bad faith, prejudice to the opposing side, dilatory motive on the part of the moving party or when the amendment would be futile.
### B. NO LATER THAN FORTY-FIVE (45) DAYS PRIOR TO CALENDAR CALL:
1. Dispositive Motions: must be filed and heard no later than forty-five (45) days before Calendar Call.
2. Deposition Objections: objections raised in depositions expected to be introduced at trial must be filed and heard no later than forty-five (45) days before Calendar Call.
3. Expert Challenges: motions challenging an expert witness ("Expert Challenges"), must be filed and heard no later than forty-five (45) days before Calendar Call.
4. Motions for Summary Judgment: must be filed and heard no later than forty-five (45) days prior to Calendar Call. Motions for summary judgment will not be heard at Calendar Call.
### C. NO LATER THAN THIRTY (30) DAYS PRIOR TO CALENDAR CALL:
1. Motions in Limine: must be filed and heard no later than thirty (30) days prior to Calendar Call.
2. All motions, other than motions in limine, not heard before Calendar Call will be deemed abandoned.

## VIII. JOINT PRETRIAL STIPULATION:
### A. NO LATER THAN TEN (10) DAYS PRIOR TO CALENDAR CALL:
1. The Joint Pretrial Stipulation contemplates a single document that must be filed and served, **with a courtesy copy served on the undersigned judge,** no later than ten (10)

Case Number: CACE22017416

days prior to Calendar Call.

2. The Joint Pretrial Stipulation requires that all agreed matters be fully identified and any disputed matters be specifically delineated with respect to each party.

3. At the time of the above noticed Calendar Call, all parties must be prepared to discuss all items set forth in Florida Rule of Civil Procedure 1.200(b).

**B. The Joint Pretrial Stipulation must contain the following in separately numbered paragraphs:**

1. <u>Statement of the Facts</u>: A concise, impartial statement of the facts of the case.

2. <u>Stipulated Facts</u>: A list of those facts that can be stipulated and require no proof at trial.

3. <u>Statement of Disputed Law & Fact</u>: A concise, impartial statement of those issues of law and fact that are to be tried.

4. <u>Exhibit Lists</u>: Each party must separately list all exhibits they intend to introduce into evidence. Each item must be listed by number and description on a separate schedule attached to the Joint Pretrial Stipulation. Each exhibit must be specifically described. **Generic descriptions of exhibits are subject to being stricken.** If any party objects to the introduction of any such exhibit, such objection **must be stated in the Joint Pretrial Stipulation**, setting forth the grounds with specificity. All exhibits must have been made available to all parties for examination. Parties must initial each other's exhibit lists and exhibits. **At trial, only those exhibits properly listed and initialed may be offered into evidence.**

5. <u>Demonstrative Exhibits</u>: all demonstrative exhibits (e.g., charts, graphs, enlargements of exhibits, etc.) intended to be used at a jury trial must be displayed to all parties at least ten (10) days before trial.

6. <u>Witness Lists</u>: Parties must furnish a written list containing the names and addresses of all witnesses intended to be called at trial in alphabetical order. Such list must designate the type of witness ("expert," "rebuttal," "impeachment," or otherwise) and must be attached to the Joint Pretrial Stipulation. All fact witness lists must include a brief description of the **substance and scope of the testimony** to be elicited from such witness. All expert witness lists must **designate the expert's specialties.** If any party objects to any witness, such objection must be stated in the Joint Pretrial Stipulation, setting forth the grounds with specificity. **At trial, only those witnesses properly and timely disclosed will be permitted to testify.**

7. <u>Jury Instructions</u>: If the trial is a jury trial, the parties must identify all agreed upon standard instructions and all special instructions. Copies of all agreed upon jury instructions and disputed jury instructions must be attached to the Joint Pretrial Stipulation identifying the party that proposed the instruction, along with copies of supporting statutory citations and/or case law.

8. <u>Verdict Forms</u>: If the trial is a jury trial, the jury verdict form must be designated as "agreed to" or "disputed" and must be attached to the Joint Pretrial Stipulation.

9. <u>Peremptory Challenges</u>: If the trial is a jury trial, the number of peremptory challenges for each party must be stated and attached to the Joint Pretrial Stipulation.

10. <u>Pending Motions</u>: Parties must set forth a list of all pending motions with copies attached to the Joint Pretrial Stipulation.

11. <u>Trial Estimate</u>: Each party must provide an estimate of the number of trial days required for presenting its side of the case.

12. <u>Expert Challenges</u>: All expert related issues involving any requests for hearings on related evidence must be noticed and heard—or agreed to by the parties—no later than forty-five (45) days prior to Calendar Call. FAILURE TO DO SO MAY CONSTITUTE

A WAIVER OF ANY EXPERT RELATED EVIDENCE ISSUE(S). It is within the discretion of the Court to remove any case with pending expert issues.

## IX. <u>COURT POLICIES:</u>
    A. Parties must do all things reasonable and necessary to assure the availability of witnesses for the entire Trial Period or to otherwise preserve witness testimony for trial as provided by the Florida Rules of Civil Procedure. *See* Fla. R. Civ. P. 1.300 & 1.460; *see also* Fla. R. Gen. Prac. & Jud. Admin. 2.545.
    B. The requirements of this Uniform Trial Order cannot be waived by stipulation **absent prior approval from the Court** pursuant to written agreement between the parties.
    C. This Uniform Trial Order may be tailored by the assigned Division Judge to conform to the particular requirements of the residential foreclosure and complex litigation divisions.
    D. At trial, there will only be one (1) official court record transcribed by one (1) court reporter. Plaintiff is responsible for arranging for a court reporter unless otherwise agreed. If a conflict exists, the parties must resolve it among themselves prior to Calendar Call.

## X. <u>CONTINUANCES:</u>
**No continuances will be granted without Court Order upon written motion setting forth good cause pursuant to AOSC20-23, Amendment 13 (May 6, 2021), and Fla. R. Gen. Prac. & Jud. Admin. 2.545(e). All motions seeking a continuance must comply with Fla. R. Civ. P.1.460 and Fla. R. Gen. Prac. & Jud. Adm. 2.545. Continuances requested for reasons relating to failure to follow this Order will not be granted.**
    A. CONTINUANCES will only be considered upon written motion filed with the Clerk of Court and served on the undersigned judge prior to the above noticed Calendar Call.
    B. NO CONTINUANCES will be granted for reasons that should have been readily apparent to the parties when this Uniform Trial Order was issued.
    C. NO CONTINUANCES will be granted if expert witnesses are unavailable because testimony may be preserved by deposition.
    D. NO CONTINUANCES will be granted for reasons relating to the failure to follow this Uniform Trial Order.

## XI. <u>MANDATORY MEDIATION:</u>
Mediation must commence no later than sixty (60) days prior to Calendar Call. The parties must comply with Florida Rules of Civil Procedure 1.700, 1.710, 1.720, and 1.730 as to the conduct of mediation. The parties may attend mediation through the use of communication technology (remotely) if mutually agreed upon. The Court will resolve any disagreement as to where or how mediation is to be conducted. Plaintiff's counsel is appointed lead counsel to facilitate and schedule the settlement conference with the mediator and all parties. The Court appoints:

    **CHARLES M. GREENE**
    **UWWM 900 S. PINE ISLAND ROAD SUITE 410 PLANTATION FL 33324**
    **cgreene@uww-adr.com**
    **954-261-6684**

as Mediator, unless, within thirty (30) days of this Uniform Trial Order, the parties choose a different Mediator, and file notice of that choice and the name of the substitute mediator with the Clerk of Court. Failure to attend mediation may result in sanctions.

## XII. <u>SANCTIONS:</u>

Case Number: CACE22017416

A. All parties should be familiar with Florida Rule of Civil Procedure 1.380 entitled "Failure to Make Discovery; Sanctions" and section 57.105, Florida Statutes, entitled "Attorney's fee; sanctions for raising unsupported claims or defenses; exceptions; service of motions; damages for delay of litigation."

B. FAILURE TO APPEAR, FAILURE TO FOLLOW TIME REQUIREMENTS, OR FAILURE TO FILE DOCUMENTS REQUIRED BY THIS COURT MAY RESULT IN THE DISMISSAL OF THE ACTION OR THE IMPOSITION OF SANCTIONS INCLUDING THE STRIKING OF PLEADINGS.

## XIII. SETTLEMENT NOTIFICATION:

Parties must immediately notify the Court in the event of settlement and submit a stipulation for an Order of Dismissal. Parties shall also cancel any and all pending hearings as a result of the settlement.

**Pursuant to Florida Rule of General Practice and Judicial Administration 2.516(h)(1), counsel must file this Uniform Trial Order with the Clerk of Court, serve any self-represented parties with this Uniform Trial Order, and file a "Certificate of Service" with the Clerk of Court, in compliance with Florida Rule of General Practice and Judicial Administration 2.516(f), certifying the self-represented party was served with this Uniform Trial Order.**

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida on <u>05-23-2023</u>.

CACE22017416 05-23-2023 12:28 PM

_____
Circuit Court Judge

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the ADA Coordinator, Room 20140, 201 S.E. Sixth Street, Fort Lauderdale, Florida 33301, 954-831-7721 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days. If you have a hearing or voice disability you can contact the court through the Florida Relay Service by calling 711.**

CC:

CHARLES M. GREENE, Email : cgreene@uww-adr.com
Dana J McElroy, Email : dlake@tlolawfirm.com
Dana J McElroy, Email : dmcelroy@tlolawfirm.com
Dana J McElroy, Email : bbrennan@tlolawfirm.com
James J. McGuire, Email : jmcguire@tlolawfirm.com
James J. McGuire, Email : tgilley@tlolawfirm.com
Joshua Kon, Email : jkon@stoklaw.com
Joshua Kon, Email : gortiz@stoklaw.com
Linda Riedemann Norbut, Email : lnorbut@tlolawfirm.com
Linda Riedemann Norbut, Email : jvanderhorst@tlolawfirm.com
Peretz Laine, Email : plaine@stoklaw.com
Peretz Laine, Email : gortiz@stoklaw.com
Robert A. Stok, Email : ssolis@stoklaw.com
Robert A. Stok, Email : service@stoklaw.com
Yosef Kudan, Email : ykudan@stoklaw.com

Filing # 174302595 E-Filed 05/31/2023 02:29:16 PM

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

MONARCH AIR GROUP, LLC
a Florida Limited Liability Company,

      Plaintiff,

                                CASE NO.: CACE-22-017416

v.

JOURNALISM DEVELOPMENT
NETWORK INC., A Maryland Corporation,
and LILY DOBROVOLSKAYA

      Defendants.

_____/

## NOTICE OF SERVING PROPOSAL FOR SETTLEMENT

Plaintiff, MONARCH AIR GROUP, LLC, by and through the undersigned counsel, and pursuant to Florida Rule of Civil Procedure 1.442 and Section 768.79 of the Florida Statutes, hereby give notice of serving an Offer of Judgment and Proposal for Settlement on Defendant, JOURNALISM DEVELOPMENT NETWORK INC, on May 31, 2023.

**[CERTIFICATE OF SERVICE ON FOLLOWING PAGE]**

{00731972}            STOK KON + BRAVERMAN
1 E. Broward Boulevard, Suite 915 • Fort Lauderdale, FL 33301 • P.954.237.1777 • F.954.237.1737 • E-mail: service@stoklaw.com

*** FILED: BROWARD COUNTY, FL BRENDA D. FORMAN, CLERK 05/31/2023 02:29:01 PM.****

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been filed and served via the Florida Courts E-Filing Portal on this **31st day of May 2023** to: Dana J. McElroy, dmcelroy@tlolawfirm.com; Thomas & LoCicero PL 915 Middle River Drive, Suite 309 Fort Lauderdale, FL 33304; James J. McGuire, Esq., jmcguire@tlolawfirm.com; Linda R. Norbut, Esq., lnorbut@tlolawfirm.com; Thomas & LoCicero PL 601 South Boulevard Tampa, FL 33606.

Respectfully submitted,

**STOK KON+ BRAVERMAN**
Attorneys for Plaintiff
One East Broward Boulevard, Suite 915
Fort Lauderdale, Florida 33301
Tel.: (954) 237-1777
Fax: (954) 237-1737
Email: service@stoklaw.com

*/s/ Joshua R. Kon*
PERETZ LAINE, ESQ.
Florida Bar No. 1038556
plaine@stoklaw.com
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
jkon@stoklaw.com
YOSEF Y. KUDAN, ESQ.
Florida Bar No. 1010261
ykudan@stoklaw.com

Filing # 174290963 E-Filed 05/31/2023 01:18:48 PM

**IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA**

MONARCH AIR GROUP, LLC,
a Florida Limited Liability Company,

        Plaintiff,

                                       CASE NO.: CACE-22-017416
                                       DIVISION 09

v.

JOURNALISM DEVELOPMENT
NETWORK INC., A Maryland Corporation,
And LILY DOBROVOLSKAYA,

        Defendants.

_____/

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION
FOR EXTENSION OF TIME TO SERVE DEFENDANT WITH PROCESS**

      Without waiving her rights to proper service of process and to challenge exercise by this

Court of personal jurisdiction, Defendant Lily Dobrovolskaya ("Defendant") hereby appears for

the limited purpose of opposing Plaintiff Monarch Air Group, LLC's ("Plaintiff") motion

seeking an extension of time to serve Defendant with process ("Motion"). In this regard,

Plaintiff apparently has been seeking to served Defendant through substituted service. Despite

having ample time, however, Plaintiff still has failed to properly serve Defendant. First, Plaintiff

has not established that substituted service on the Florida Secretary of State is appropriate under

Fla. Stat. § 48.161 (2023). Second, even if Plaintiff could do so, Plaintiff has failed to follow the

statutory procedure. Each point is discussed below.

      1.     Plaintiff filed its complaint on November 23, 2022. Despite alleging that

Defendant was "believed to be a Florida resident," a summons was issued by the Clerk less than

three weeks later to Defendant at a New York address. *See* Compl. ¶ 23.

      2.     After it became clear Plaintiff was running out of time to serve Defendant within

the 120-period mandated by Fla. R. Civ. P. 1.170(j), Plaintiff's counsel attempted to serve

Defendant via text message, as well as the social media platforms LinkedIn and Messenger. Plaintiff then moved the Court for an order deeming Defendant had been served, which the Court denied. Instead, this Court gave Defendant until April 23, 2023 to serve Defendant. *See* Order on Plaintiff's Motion for Court to Recognize Service by Other Means Under Section 48.102, Florida Statutes, entered April 4, 2023.

3.      Unable to do so, Plaintiff filed this Motion seeking a further extension to July 3, 2023.

4.      In the meantime, Plaintiff sought an alias summons to serve Defendant via the Florida Secretary of State, which was issued by the Clerk of the Court on April 21, 2023. Plaintiff asserts that it forwarded the alias summons to the Secretary of State on that same date. *See* Affidavit of Compliance Under Section 48.161 Florida Statutes, filed May 19, 2023, at ¶ 18. According to Plaintiff's counsel's affidavit, the Secretary of State accepted service on April 26, 2023 *and* directed Plaintiff's counsel to forward "documentation to the defendant." *Id.* at ¶ 19; Exh. D.

5.      As discussed below, however, Plaintiff has not properly served Defendant.

6.      **First**, Section 48.161 provides for substituted service on a nonresident individual who "has appointed or is deemed to have appointed the Secretary of State as such party's agent for service of process" or who is concealing his or her whereabouts. Fla. Stat. § 48.161(1) & (3) (2023).   Section 48.181 also provides that a non-resident individual or foreign business that "conceals its whereabouts" is deemed to have appointed the Secretary of State as its agent for service of process arising from any business venture in the state.  Fla. Stat. § 48.181(4) (2023). As a threshold matter, Plaintiff accordingly must establish that Defendant has concealed her whereabouts to employ substituted service.

7.      Here, Plaintiff has shown only that a process server has unsuccessfully tried on numerous occasions to serve Defendant at a New York address.  This is not enough to deem that Defendant is intentionally concealing her whereabouts to justify substituted service.  *See Clements v. Jace*, No. No. 8:17–cv–316–T–36MAP, 2018 WL 748911, at *4 (M.D. Fla. Jan. 22, 2018) (applying Florida law and finding the failure of service could not be attributed to defendants actively evading process).

8.      **Second**, even Plaintiff could properly use substituted service, Plaintiff has significantly failed to meet the remaining statutory requirements under Section 48.161. In this regard, statutes governing service of process are strictly construed and must be precisely followed. *See Jupiter House, LLC v. Deutsche Bank Nat'l Tr. Co.*, 198 So. 3d 1122, 1124 (Fla. 4th DCA 2016) (finding plaintiff failed to comply with affidavit requirements of Fla. Stat. § 48.161); *see also Monaco v. Nealon*, 810 So. 2d 1084, 1085 (Fla. 4th DCA 2002) (because statute allowing substitute service is an exception to personal service, "due process values require *strict compliance* with the statutory requirements") (citations omitted; emphasis in original); *Chapman v. Sheffield*, 750 So. 2d 140, 142 (Fla. 1st DCA 2000) (same).

9.      Specifically, Plaintiff was required to send "[n]otice of service and a copy of the process" to Defendant. *See* Fla. Stat. § 48.161(2) (2023) (emphasis added).  Plaintiff's counsel's affidavit *does not allege compliance* with this provision, as required. Accordingly, Plaintiff has not taken the steps required to serve Defendant via the Secretary of State.

10.     Plaintiff has had nearly six months to properly serve Defendant, and has failed to do so.  Under such circumstances, Plaintiff's motion for a further extension should be denied.

WHEREFORE, Defendant Lily Dobrovolskaya, appearing in a limited capacity and without waiving proper service of process and personal jurisdiction, requests that this Court deny Plaintiff's Motion.

3

THOMAS & LOCICERO PL

By: */s/ Dana J. McElroy*
    Dana J. McElroy, Esq.
    Florida Bar No. 845906
    dmcelroy@tlolawfirm.com
    915 Middle River Drive Suite 309
    Fort Lauderdale, FL 33304
    Phone: (954) 703-3416

    - and -

    James J. McGuire
    Florida Bar No. 0187798
    jmcguire@tlolawfirm.com
    Linda R. Norbut
    Florida Bar No. 1011401
    lnorbut@tlolawfirm.com
    601 South Boulevard
    Tampa, FL 33606
    Telephone: (813) 984-3060

    *Attorneys for Lily Dobrovolskaya*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this **31st** day of **March, 2023** the foregoing document was electronically with the Clerk of the Court via the E-Portal, and was served this same day on all counsel of record, either via transmission of Notices of Electronic Filing generated by the E-Portal or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

        By:    */s/ Dana J. McElroy*
                Attorney

Filing # 174387556 E-Filed 06/01/2023 12:44:05 PM

|  | IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA |
|---|---|

MONARCH AIR GROUP, LLC
a Florida Limited Liability Company,

        Plaintiff,               CASE NO.: CACE-22-017416

v.

JOURNALISM DEVELOPMENT
NETWORK INC., A Maryland Corporation,
and LILY DOBROVOLSKAYA

        Defendants.

_____/

## PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S AFFIRMATIVE DEFENSES

      Plaintiff, MONARCH AIR GROUP, LLC, under rule 1.140, Florida Rules of Civil Procedure, respectfully moves this Honorable Court to strike Defendant's legally insufficient affirmative defenses which it filed on May 17, 2023.

## MEMORANDUM OF LAW

      A motion to strike tests the legal sufficiency of the affirmative defense. *Burns, et al. v. Equilease Corp.*, 357 So.2d 786 (Fla. 3d DCA 1978). An insufficient response that fails to state a legal defense may be challenged by a motion to strike. *See* Fla. R. Civ. P. 1.140(b); *see also Buss Aluminum Prods., Inc. v. Crown Window Co.*, 651 So.2d 694 (Fla. 2d DCA 1995).

      A properly pleaded affirmative defense admits a cause of action asserted by the pleading, but avoids liability, wholly or partially, by allegations of excuse, justification, or other matters that will negate the cause of action. *St. Paul Mercury Ins. Co. v. Coucher*, 837 So.2d 483, 487 (Fla. 5th DCA 2002).

      "All affirmative defenses are pleas by way of confession and avoidance. They admit the allegations of the plea to which they are directed and allege additional facts that avoid the legal

{00732018}    STOK KON + BRAVERMAN
1 E. Broward Boulevard, Suite 915 • Fort Lauderdale, FL 33301 • P.954.237.1777 • F.954.237.1737 • E-mail: service@stoklaw.com
*** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN,  CLERK 06/01/2023 12:44:05 PM.****

effect of the confession." *Moore Meats, Inc. v. Strawn In & For Seminole Cnty.*, 313 So. 2d 660, 662 (Fla. 1975).

Allegations that purport to be affirmative defenses but which are merely denials or conclusions of law must be stricken. *Gatt v. Keyes Corp.*, 446 So.2d 211, 212 (Fla. 3d DCA 1984) ("matters raised by . . . affirmative defense simply denied the facts contained in the . . . complaint and did not raise any new matters to defeat the complaint. As such, the trial court acted properly in striking the second affirmative defense").

"Defenses are insufficient as a matter of law when they are 'conclusory in their content, and lacking in any real allegations of ultimate fact demonstrating a good defense to the complaint." *Morgan v. Bank of New York Mellon*, 200 So. 3d 792, 796 (Fla. 1st DCA 2016) (internal quotation omitted).

"Certainty is required when pleading defenses, and pleading conclusions of law unsupported by allegations of ultimate fact is legally insufficient" *Cady v. Chevy Chase Sav. & Loan, Inc.*, 528 So. 2d 136, 138 (Fla. 4th DCA 1988).

"Under Florida's fact pleading standard, an affirmative defense must contain 'a short and plain statement of the ultimate facts showing that the pleader is entitled to relief' to be properly pled." *Advanced Florida Med. Group, Corp. v. Progressive Am. Ins. Co.*, 6D23-482, 2023 WL 3668684, at *2 (Fla. App. 6 Dist. May 26, 2023) (quoting *Ranger Constr. Indus., Inc. v. Martin Co. of Daytona, Inc.*, 881 So. 2d 677, 680 (Fla. 5th DCA 2004).

"A careful analysis of each of the affirmative defenses reflects that they are, on the whole, conclusory in their content, and lacking in any real allegations of ultimate fact demonstrating a good defense to the complaint." *Cady*, 528 So. 2d at 137–38.

Defendant's First Affirmative Defense, for example, states that "[t]he Complaint fails to state claims against JDN upon which relief can be granted, for the reasons set forth in the defenses stated in this Answer and Affirmative Defenses."

This "affirmative defense" is a denial, and it is also conclusory.

Defendant's Third, Fourth, Fifth, Sixth, Eleventh, and Fourteenth "Affirmative Defenses" are also conclusory denials, not affirmative defenses, and this Court should thus strike them.

For example, Defendant's Third "Affirmative Defense" states that "[t]he statements and publication about which Plaintiff complains did not contain any false statements of fact concerning Plaintiff Monarch." This is simply a denial, and a conclusory one, at that.

Defendant's Fourth "Affirmative Defense" is also a denial of Plaintiff's claim that Defendant's statements about it are false and defamatory, because this "affirmative defense" simply alleges that Defendant's statements were neither false nor defamatory. The Fifth "Affirmative Defense" is flawed for the same reason.

This Court should also strike Defendant's Second, Seventh, Eighth, Ninth, Tenth, Twelfth, Thirteenth, Fifteenth, Sixteenth, Seventeenth, and Eighteenth Affirmative Defenses because they lack supporting ultimate facts.

Defendant's Second Affirmative Defense, for example, states that "[t]he statements and publication about which Plaintiff complains are privileged and protected by the First Amendment to the United States Constitution, Article 1, Section 4 of the Florida Constitution, and Florida's common law privileges, including but not limited to official reports, opinion, fair comment, and neutral reports." (emphasis added). Which statements are privileged and protected? Also, which common law privileges protect them?

"When a defendant raises the affirmative defense that the plaintiff failed to satisfy a

condition precedent to activate contractual duties, 'the defensive pleader has the burden of pleading and persuasion.'" *Advanced Florida Med. Group, Corp.* 6D23-482, 2023 WL 3668684, at *2 (quoting *Custer Med. Ctr. v. United Auto. Ins. Co.*, 62 So. 3d 1086, 1096 (Fla. 2010)). "The purpose of this requirement is 'to put the burden on the defendant to identify the specific condition that the plaintiff failed to perform—so that the plaintiff may be prepared to produce proof or cure the omission, if it can be cured.'" *Id.* (quoting *Colon v. JP Morgan Chase Bank, NA*, 162 So. 3d 195, 197 (Fla. 5th DCA 2015)).

Despite this, Defendant's Sixteenth Affirmative Defense merely states that "Plaintiff's claims are barred, in whole or in part, by its failure to satisfy all conditions precedent."

Which conditions precedent did Plaintiff fail to satisfy?

"In pleading the performance or occurrence of conditions precedent, it is sufficient to aver generally that all conditions precedent have been performed or have occurred. A denial of performance or occurrence shall be made **specifically and with particularity**." Fla. R. Civ. P. 1.120 (emphasis added).

Shockingly, however, Defendant alleges in its Seventeenth Affirmative Defense that "Plaintiff's claims are barred . . . by the applicable statute of limitations." The Article, however, shows that it was published on November 27, 2020, and Plaintiff's complaint was filed on November 23, 2022. The Complaint was thus filed within two years from when the Article was first published. What basis/premise does Defendant have to allege that Plaintiff's claims are barred by "the applicable statute of limitations"?

WHEREFORE, Plaintiff, Monarch Air Group, LLC respectfully requests that this Honorable Court strike all eighteen of Defendant's defective and legally insufficient Affirmative Defenses, together with such and further relief that this Honorable Court deems just and necessary.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed and served via the Florida Courts E-Filing Portal on this **1st day of June 2023** to: Dana J. McElroy, dmcelroy@tlolawfirm.com; Thomas & LoCicero PL 915 Middle River Drive, Suite 309 Fort Lauderdale, FL 33304; James J. McGuire, Esq., jmcguire@tlolawfirm.com; Linda R. Norbut, Esq., lnorbut@tlolawfirm.com; Thomas & LoCicero PL 601 South Boulevard Tampa, FL 33606.

Respectfully submitted,

**STOK KON+ BRAVERMAN**
Attorneys for Plaintiff
One East Broward Boulevard,
Suite 915
Fort Lauderdale, Florida 33301
Tel.: (954) 237-1777
Fax: (954) 237-1737
Email: service@stoklaw.com

*/s/ Peretz Laine*
PERETZ LAINE, ESQ.
Florida Bar No. 1038556
plaine@stoklaw.com
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
jkon@stoklaw.com
YOSEF Y. KUDAN, ESQ.
Florida Bar No. 1010261
ykudan@stoklaw.com

Filing # 175048727 E-Filed 06/10/2023 07:00:10 PM

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO. <u>CACE22017416</u>   DIVISION: <u>09</u>   JUDGE: <u>Levenson, Jeffrey R. (09)</u>

Monarch Air Group, LLC

Plaintiff(s) / Petitioner(s)

v.

JOURNALISM DEVELOPMENT NETWORK, INC., et al

Defendant(s) / Respondent(s)

_____/

<u>PROPOSE ORDER ON PLAINTIFF'S MOTION FOR EXTENSION OF TIME TO SERVE
DEFENDANT WITH PROCESS</u>

This cause came before the Court on June 8, 2023, on Plaintiff, MONARCH AIR GROUP, LLC's

Motion for Extension of Time to Serve Defendant, Lily Dobrovolskaya with process. Both counsel for the

Defendant and Plaintiff were present. This Court having reviewed Plaintiff's Motion, Defendant's response,

having heard Counsel's arguments, and otherwise being fully advised in the premises, it is hereby:

ORDERED AND ADJUDGED as follows:

1. Plaintiff's Motion is Granted.

2. Plaintiff will have 60 days from the date of the hearing (June 8, 2023) to serve Defendant, Lily

Dobrovolskaya.

3. Any purported process served on the Florida Secretary of State is invalid and quashed.

DONE AND ORDERED in Chambers at Broward County, Florida on <u>10th day of June, 2023</u>.

<u>CACE22017416 06-10-2023 4:44 PM</u>
Hon. Jeffrey Levenson
**CIRCUIT COURT JUDGE**
Electronically Signed by Jeffrey Levenson

Copies Furnished To:

*** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN,  CLERK 06/10/2023 07:00:09 PM.****

Case Number: CACE22017416

Dana J McElroy , E-mail : dmcelroy@tlolawfirm.com
Dana J McElroy , E-mail : jvanderhorst@tlolawfirm.com
James J. McGuire , E-mail : jmcguire@tlolawfirm.com
James J. McGuire , E-mail : tgilley@tlolawfirm.com
Joshua Kon , E-mail : jkon@stoklaw.com
Joshua Kon , E-mail : gortiz@stoklaw.com
Linda Riedemann Norbut , E-mail : lnorbut@tlolawfirm.com
Linda Riedemann Norbut , E-mail : bbrennan@tlolawfirm.com
Peretz Laine , E-mail : plaine@stoklaw.com
Peretz Laine , E-mail : gortiz@stoklaw.com
Robert A. Stok , E-mail : ssolis@stoklaw.com
Robert A. Stok , E-mail : service@stoklaw.com
Yosef Kudan , E-mail : ykudan@stoklaw.com

Filing # 175301665 E-Filed 06/14/2023 12:28:00 PM

**IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA**

MONARCH AIR GROUP, LLC,
a Florida Limited Liability Company,

Plaintiff,

v.

JOURNALISM DEVELOPMENT
NETWORK INC., a Maryland Corporation,
And LILY DOBROVOLSDKAYA,

Defendants.

CASE NO.: CACE-22-017416
DIVISION 09

_____/

**NOTICE OF SELECTION OF MEDIATOR**

Pursuant to this Court's Uniform Trial Order entered May 23, 2023, the parties hereby

notify the Court of their agreed upon mediator:

**Howard Tescher, Esq.**
Tescher Mediation Group, Inc.
401 E. Las Olas Boulevard, Suite 1400
Fort Lauderdale, FL 33301
Telephone: (954) 236-9600
www.teschermediation.com

Respectfully submitted,

THOMAS & LOCICERO PL

By: /s/ Dana J. McElroy
    Dana J. McElroy
    Florida Bar No. 845906
    dmcelroy@tlolawfirm.com
    915 Middle River Drive, Suite 309
    Fort Lauderdale, FL 33304
    Phone: (954) 703-3416

    -and-

    James J. McGuire

STOK KON+ BRAVERMAN

By: /s/ Peretz Laine
    Peretz Laine
    Florida Bar No. 1038556
    plaine@stoklaw.com
    Joshua R. Kon
    Florida Bar No. 56147
    jkon@stoklaw.com
    Yosef Y. Kudan
    Florida Bar No. 1010261
    ykudan@stoklaw.com

Florida Bar No. 187798
jmcguire@tlolawfirm.com
Linda R. Norbut
Florida Bar No. 1011401
lnorbut@tlolawfirm.com
601 South Boulevard
Tampa, FL 33606
Phone: (813) 984-3060

*Attorneys for Defendant JDN*

One East Broward Boulevard, Suite 915
Fort Lauderdale, FL 33301
Phone: (954) 237-1777

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this **14th** day of **June, 2023** the foregoing document was electronically with the Clerk of the Court via the E-Portal, and was served this same day on all counsel of record, either via transmission of Notices of Electronic Filing generated by the E-Portal or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

By: */s/ Dana J. McElroy*
Attorney

Filing # 175418714 E-Filed 06/15/2023 02:42:07 PM

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

MONARCH AIR GROUP, LLC
a Florida Limited Liability Company,

       Plaintiff,

       v.

JOURNALISM DEVELOPMENT
NETWORK INC., A Maryland Corporation,
and LILY DOBROVOLSKAYA,

       Defendants.

_____/

CASE NO.: CACE-22-017416
DIVISION 09

## PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION

Plaintiff, MONARCH AIR GROUP, LLC ("Monarch") pursuant to Rule 1.350 of the

Florida Rules of Civil Procedure, propounds its First Requests for Production to Defendant,

JOURNALISM DEVELOPMENT NETWORK INC. ("JDN" or "Defendant") which Defendant

shall answer in accordance with the Florida Rules of Civil Procedure.

**PLEASE TAKE NOTICE** that if any item of the said items have been lost or

destroyed, a written general description thereof, sufficient to identify them, with a statement(s)

of whether or not they have been lost or destroyed, and the approximate date of such loss or

destruction, as the case may be necessary.

**PLEASE TAKE FURTHER NOTICE** that the documents and/or materials herein

requested are believed to be in the possession, custody, or control of the party to whom the

request is directed. If it is still in existence, original documents should be provided; and, if not,

any copies in existence should be produced. This information sought by the request is relative

to the subject matter of this action and cannot otherwise be obtained without undue hardship.

In the event that all or part of the documents and/or material requested are not in the possession

{00733985}

Page 1 of 9
STOK KON + BRAVERMAN
1 East Broward Blvd, Suite 915 • Fort Lauderdale, FL 33301 • P.954.237.1777 • F.954.237.1737 • E-mail: service@stoklaw.com

*** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN,  CLERK 06/15/2023 02:42:07 PM.****

or control of the addressee, then the undersigned counsel further requests the identity and location of all persons having said documents and/or materials in their control. This request is made in good faith and for the purposes stated herein.

## DEFINITIONS AND INSTRUCTIONS

As used herein, the words and phrases set out below shall have the meaning or meanings prescribed from them.

1. "Document" or "documents" shall mean every original (and every copy of any original or copy which differs in any way from any original) of every writing or recording of any kind or description, whether handwritten, typed, drawn, sketched, printed or recorded by any physical, mechanical, electronic or electrical means whatever, including without limitation, books, records, computer listings, computer printouts, computer programs, and tapes upon which information is stored, papers, pamphlets, brochures, circulars, advertisements, specifications, blueprints, maps, plats, surveys, drawings, sketches, graphs, charts, plans, laboratory or engineering reports notebooks, worksheets, reports, lists, analyses, summaries, ledger accounts, audits, inventories, tax returns, financial statements, profit and loss statements, cash flow statements, annual or other periodic reports, prospectuses, registrations, correspondence, communications, telegrams, solicitations, minutes, stock ledgers, stock certificates, licenses, permits, calendars, appointment books, diaries, telephone bills and toll call records, expense reports, balance sheets, accountant's work papers, work sheets, commission statements, itineraries, agendas, payroll records, notes, memoranda including inter-office memoranda, checkbooks, canceled checks, receipts, contracts, agreements, instrument assignments, applications, offers, acceptances, proposals, financing statements, documents of title, appraisals, purchase orders, invoices, bills of lading, written memorials or oral communications, forecasts, photographs, photographic slides or negatives, films, filmstrips, tapes and recordings.

a. Documents shall also include matters stored in an electronic medium, such matters being, among others, voice mail messages and files; backup voice mail files; e-mail messages and files; word processing documents; spreadsheets; presentation documents; graphics; animations; images; instant messages and/or instant message logs; backup e-mail files; deleted e-mail data files;

{00733985}

program files; backup and archived tapes; temporary files; system history files; website log files; cache files; cookies and other electronically recorded information.

   b.   Electronic documents shall also include matters described as accurate data; deleted data; backup data; metadata; migrated data; replicate data; residual data; and legacy data.

   2.   The term "you" or "your" shall mean the Defendant JDN.

   3.   "Related to" or "relating to" shall mean directly or indirectly mentioning or describing, pertaining to, being connected with, or reflecting upon a stated subject matter.

   4.   "Person" includes a corporation, partnership or other business association or entity, natural person, and any government or governmental body, commission, board or agency.

   5.   The singular shall include the plural and the plural shall include the singular.

   6.   A masculine, feminine or neuter pronoun shall not exclude the other gender.

   7.   As used herein, "communication(s)" shall mean, without limitation, any transmission of information by one or more persons and/or between two or more persons by any means including, without limitation, e-mail, instant messaging, text messaging, telephone conversations, letters, telegrams, faxes, computer linkups, written memoranda, and face-to-face conversations.

   8.   If a request for production is silent as to the time span for which production is desired, production shall be made of all documents created within the past 5answ years from the date of service of this Request to Produce.

   9.   Each request shall extend to all documents which are or have been in the possession or subject to the control of the Defendant, his officers, agents or employees at any time during the period of time covered by this request.

   10.   "Identification" or "Identify" when referring to a document shall mean to set forth the author or originator, addressee, signatories, date, title or subject matter, and the present custodian of any copy thereof and the last known address of each such custodian.

   11.   The term "and" shall include the term "or" and the term "or" shall include the term "and". The term "any" shall include the term "all" and the term "all" shall include the term "any".

   12.   All words and terms used herein shall be construed consistently with the words

{00733985}

STOK KON + BRAVERMAN
1 East Broward Blvd, Suite 915 • Fort Lauderdale, FL 33301 • P.954.237.1777 • F.954.237.1737 • E-mail: service@stoklaw.com

and terms used in the pleadings filed in this matter and shall be deemed to have the same meaning as the words and terms used in the pleadings.

## DOCUMENTS UPON WHICH PRIVILEGE IS CLAIMED

For each document requested herein which is sought to be withheld under a claim of privilege, provide the following information:

1.    The place, approximate date, and manner of recording or otherwise preparing the document;

2.    The name and title of sender; and the name and title of the person who received the document;

3.    The name of each person or persons (other than stenographic or clerical assistant) participating in the preparation of the document;

4.    The name and corporation position, if any, of each person to whom the contents of the documents have heretofore been communicated by copy, exhibition, reading or substantial summarization;

5.    A statement of the basis on which privilege is claimed and whether or not the subject matter of the contents of documents is limited to legal advice or information provided for the purpose of securing legal advice;

6.    The number of the request to which the document is responsive; and the entity and corporate position, if any, of the person or persons supplying the attorney with the information.

## IDENTIFICATION OF DOCUMENTS

In an effort to promote an orderly presentation of documentary evidence in this case in the event of a trial, or to insure full compliance with this process and to facilitate the return of the documents to the owners thereof when they are no longer required, the Defendant should identify each document produced in response to this request with the initials of the Defendant (or some other identifying initials) and number each document consecutively, commencing with the number one (1). These markings should appear in the lower right hand corner of each document. The Defendant also should place the documents called for by each paragraph of this Request in a separate enclosure, which should be marked with Defendant's name, date of the request and the paragraph of the request to which the documents respond.

## DOCUMENTS REQUESTED

1.    Documents supporting or relating to the allegation in the article titled *Flight of the Monarch: US Gov't Contracted Airline one owned by Criminals with Ties to Russian Mob*

("Article") that employee(s) of Monarch were not paid on time, how much was not paid, and when the non-payment(s) allegedly occurred.

2.      Documents supporting or relating to the allegation in the Article that "Monarch Air Group has won U.S. government contracts worth over $6 million, and was making government flights as recently as September."

3.      Communications and documents exchanged by or between Defendant and the people quoted in article, including Gary Kalman, Paul Slavin, Seto Bagdoyan, and Jessica Tillipman

4.      Communications between Defendant and Monarch, including with Alina Gavrushenko

5.      Documents and communications supporting or relating to any investigation or analysis of what the Article says prosecutors said at a bail hearing that "We do not believe this business is legitimate" and drugs were "hidden in one of its planes," including any retractions of same by the prosecutors.

6.      Documents and communications supporting or relating to any investigation or analysis of a US Custom's hangar that the Article maintains exists at Fort Lauderdale Airport.

7.      Documents regarding any policies and procedures and communications regarding fact-checking and independent fact checkers used for the Article.

8.      Documents evidencing any individuals or entities, including but not limited to governments, advertisers or sponsors, who have provided financial support or funding to JDN/OCCRP in relation to the Article or Defendant's website generally, including the amount(s) and date(s) such was provided.

{00733985}

Page 5 of 9
STOK KON + BRAVERMAN
1 East Broward Blvd, Suite 915 • Fort Lauderdale, FL 33301 • P.954.237.1777 • F.954.237.1737 • E-mail: service@stoklaw.com

*Monarch v. JDN/OCCRP and Lily Dobrovolskaya*
Plaintiff's First Request for Production

9.      Documents supporting your contention that the statements about which Plaintiff complains are privileged and protected under the First Amendment to the United States Constitution.

10.     Documents, including research materials, reports, or other evidence, relied upon by JDN/OCCRP in the preparation of the Article.

11.     Documents and communications, including emails, letters, and any other written correspondence, between JDN/OCCRP and any third parties, including social media platforms, regarding the publication or dissemination of the Article.

12.     Documents supporting your contention that the statements and publication about which Plaintiff complains did not contain any false statements of fact concerning Monarch.

13.     Documents supporting your contention that the statements and publication, when considered in their entirety, are not false and defamatory in any material or significant respect.

14.     Documents supporting your contention that the statements and publication about which Plaintiff complains did not defame Plaintiff.

15.     Documents supporting your contention that that the statements and publication about which Plaintiff complains were not reasonably capable of false and defamatory interpretations.

16.     Documents supporting your contention that that the statements and publication about which Plaintiff complains constituted fair and accurate reports of judicial and/or official records, proceedings, and statements.

17.     Documents supporting your contention that the statements and publication about which Plaintiff complains concerned matters of public interest, concern, and importance.

{00733985}

**STOK KON + BRAVERMAN**
1 East Broward Blvd, Suite 915 • Fort Lauderdale, FL 33301 • P.954.237.1777 • F.954.237.1737 • E-mail: service@stoklaw.com

18.     Documents supporting your contention that the statements and publication about which Plaintiff complains concerned matters of public record.

19.     Documents supporting your contention that the statements and publication about which Plaintiff complains constitute protected opinion, the basis of which was fully disclosed or otherwise known or available.

20.     Documents supporting your contention that you did not intend or endorse any false, defamatory or actionable implications about the Plaintiff.

21.     Documents supporting your contention that Plaintiff is a public figure for purposes of the standard of fault applicable to the statements and publication at issue.

22.     Documents supporting your contention that the statements and publication about which Plaintiff complains were prepared and published in good faith and without negligence, express malice, or actual malice.

23.     Documents supporting your contention that the statements and publication about which Plaintiff complains did not cause Plaintiff to suffer actual injury and damages.

24.     Documents supporting your argument that Plaintiff's claims violate Section 768.295, Fla. Stat. (2022) (Florida's Anti-SLAPP law).

25.     Documents indicating Plaintiff's failure to satisfy all conditions precedent.

26.     Documents evidencing your belief that Plaintiff's claims are barred, in whole or in part, by the applicable statute of limitations.

27.     Documents related to Plaintiff's alleged failure to mitigate or prevent the damages about which it complains.

{00733985}

28.   Documents and communications regarding the whereabouts of LILY DOBROVOLASKAYA for purposes of personally serving her with the Complaint in this action.

29.   Communications regarding Monarch Air Group, LLC, Anatoly Golubchik, or Vadim Trincher.

30.   Documents exchanged by you regarding Monarch Air Group, LLC, Anatoly Golubchik, or Vadim Trincher.

31.   Documents and communications mentioning Monarch Air Group, LLC, Anatoly Golubchik, or Vadim Trincher.

32.   All documents and communications referencing the amount and frequency of visits the webpage with the Article received since its publication.

**[CERTIFICATE OF SERVICE ON FOLLOWING PAGE]**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been filed and

served via the Florida Courts E-Filing Portal this **15th day of June 2023** to all counsel of record.

Respectfully submitted,

**STOK, KON + BRAVERMAN**
1 East Broward Boulevard
Suite 915
Fort Lauderdale, FL 33301
P.954.237.1777
F.954.237.1737
service@stoklaw.com


*/s/ Joshua R. Kon*
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
jkon@stoklaw.com
PERETZ LAINE, ESQ.
Florida Bar No. 1038556
plaine@stoklaw.com

{00733985}

Page 9 of 9
STOK KON + BRAVERMAN
1 East Broward Blvd, Suite 915 • Fort Lauderdale, FL 33301 • P.954.237.1777 • F.954.237.1737 • E-mail: service@stoklaw.com

Filing # 175418714 E-Filed 06/15/2023 02:42:07 PM

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

MONARCH AIR GROUP, LLC
a Florida Limited Liability Company,

       Plaintiff,

CASE NO.: CACE-22-017416
DIVISION 09

v.

JOURNALISM DEVELOPMENT
NETWORK INC., A Maryland Corporation,
and LILY DOBROVOLSKAYA,

       Defendants.

_____/

## PLAINTIFF'S FIRST SET OF INTERROGATORIES

    Plaintiff, MONARCH AIR GROUP, LLC by and through the undersigned counsel,
pursuant to Florida Rule of Civil Procedure 1.350, hereby gives notice of serving its First Set of
Interrogatories to Defendant, JOURNALISM DEVELOPMENT NETWORK INC., which
Defendant shall answer in accordance with the Florida Rules of Civil Procedure.

## [CERTIFICATE OF SERVICE TO FOLLOW]

{00734045}                    STOK KON + BRAVERMAN
1 East Broward Blvd, Suite 915 • Fort Lauderdale, FL 33301 • P.954.237.1777 • F.954.237.1737 • E-mail: service@stoklaw.com

*** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN,  CLERK 06/15/2023 02:42:07 PM.****

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been filed and served via the Florida Courts E-Filing Portal this **15th day of June 2023** to all counsel of record.

Respectfully submitted,

**STOK, KON + BRAVERMAN**
1 East Broward Boulevard
Suite 915
Fort Lauderdale, FL 33301
P.954.237.1777
F.954.237.1737
service@stoklaw.com

*/s/ Joshua R. Kon*
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
jkon@stoklaw.com
PERETZ LAINE, ESQ.
Florida Bar No. 1038556
plaine@stoklaw.com

Filing # 175806604 E-Filed 06/21/2023 12:41:03 PM

IN THE CIRCUIT COURT OF THE 17th
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

MONARCH AIR GROUP, LLC.,
a Florida Limited Liability Company,

       Plaintiff,

CASE NO.:  CACE-22-017416

vs.

JOURNALISM DEVELOPMENT
NETWORK INC, A Maryland Corporation,
and LILY DOBROVOLSKAYA

       Defendants.

_____/

## NOTICE OF TAKING DEPOSITION *DUCES TECUM* IN AID OF SERVICE OF PROCESS

PLEASE TAKE NOTICE that the undersigned will take the deposition of the following individual:

| Name | Date/Time | Location |
|------|-----------|----------|
| **Gary Kalman/Representative of Transparency International** with knowledge of the documents requested in **Schedule A** and the areas of inquiry/topics of discussion in **Schedule B.** | Monday, July 17, 2023 at 11:00 a.m. | Via Zoom Video Conference |

Upon oral examination for the purpose of discovery, or use as evidence in this action, or for such other purposes as are permitted under applicable Florida Rules and/or Statutes before a Notary Public, or some other officer duly authorized by law to take depositions in the State of Florida or before some other officer authorized by law to administer oaths, who is not a relative, employee, attorney, or counsel of any of the parties, or a relative, or employee of such attorney or counsel, or financially interested in the action, and pursuant to adjournments, if any, by said office until said testimony shall be completed.

The deposition will continue from day to day until completed. You are hereby notified to be present at the time and place stated and you are required to bring with you the documents identified

in **Schedule A.** The documents requested may also be emailed to the undersigned attorney at jkon@stoklaw.com; gortiz@stoklaw.com.

> **In accordance with the Americans with Disabilities Act of 1990, persons needing a special accommodation to participate in this proceeding should contact Joshua R. Kon, Esq. at Stok Kon + Braverman, 1 East Broward Boulevard, Suite 915, Fort Lauderdale, FL 33301; via email at gortiz@stoklaw.com; or via phone at 954-237-1777, at least 7 days before the scheduled deposition, or immediately upon receiving this notification if there are less than 7 days before same. If you are hearing or voice impaired, call 711.**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been filed and served via the Florida Courts E-Filing Portal on this **21st day of June 2023** to: Dana J. McElroy, dmcelroy@tlolawfirm.com; Thomas & LoCicero PL 915 Middle River Drive, Suite 309 Fort Lauderdale, FL 33304; James J. McGuire, Esq., jmcguire@tlolawfirm.com; Linda R. Norbut, Esq., lnorbut@tlolawfirm.com; Thomas & LoCicero PL 601 South Boulevard Tampa, FL 33606.

Respectfully submitted,

**STOK KON+ BRAVERMAN**
Attorneys for Plaintiff
One East Broward Boulevard, Suite 915
Fort Lauderdale, Florida 33301
Tel.: (954) 237-1777
Fax: (954) 237-1737
Email: service@stoklaw.com

*/s/ Joshua R. Kon*
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
jkon@stoklaw.com

## SCHEDULE A

## INSTRUCTIONS

1. In producing documents, furnish all documents known or available to you, or in your possession, custody, or control, regardless of whether such documents are possessed directly by you or by any of your agents, employees, attorneys, representatives, investigators, or consultants or by any corporation, partnership, association, or other entity by which you are employed, in which you have an ownership interest, or with which you are affiliated in any manner.

2. If you object to any portion of any request, state your objection and identify those documents that you are producing.

3. Each request and part thereof, shall be answered separately, fully and completely without reference to any answer of any other request.

4. If you object to any request or part thereof on the basis of a claim of attorney-client, work product, or any other privilege(s), identify the privilege claimed as well and provide the following with respect to each such document statement or communication: the date thereof; identify all persons present, if an oral communication, or all persons who received a copy of such communications if written, and, the basis on which the privilege is claimed.

5. If you object to the scope of time of any request, state your objection and identify the time period for which you are producing documents.

6. If any document requested cannot be produced in full because it is in part privileged, partially destroyed, or for any other reason, produce such documents to the extent possible.

7. If you are aware of any documents or categories of documents which would be responsive to any request, but are no longer in your possession, custody or control, please identify each such document or categories of documents and state their current location.

8. To the extent any information requests may be satisfied by reference to a document, please identify such document in your response.

9. Unless otherwise indicated, the relevant time period referred to in this Request for Production is from 2010 to the present day.

## DOCUMENTS UPON WHICH PRIVILEGE IS CLAIMED

For each document requested herein which is sought to be withheld under a claim of privilege, provide the following information:

(a)    The place, approximate date, and manner of recording or otherwise preparing the document;

(b)    The name and title of sender; and the name and title of the person who received the document;

(c)    The name of each person or persons (other than stenographic or clerical assistant) participating in the preparation of the document;

(d)    The name and corporation position, if any, of each person to whom the contents of the documents have heretofore been communicated by copy, exhibition, reading or substantial summarization;

    (e) A statement of the basis on which privilege is claimed and whether or not the subject matter of the contents of documents is limited to legal advice or information provided for the purpose of securing legal advice;

    (f) The number of the request to which the document is responsive; and

    (g) The entity and corporate or business position, if any, of the person or persons supplying the attorney with the information.

## DOCUMENTS TO BE PRODUCED

1. Documents and communications regarding the whereabouts of LILY DOBROVOLASKAYA for purposes of personally serving her with the Complaint in this action.

2. Communications by or between you and JOURNALISM DEVELOPMENT NETWORK INC, A Maryland Corporation, the Organized Crime and Reporting Project, or LILY DOBROVOLSKAYA regarding Monarch Air Group, LLC, Anatoly Golubchik, or Vadim Trincher.

3. Documents exchanged by or between you and JOURNALISM DEVELOPMENT NETWORK INC, A Maryland Corporation, the Organized Crime and Reporting Project, or LILY DOBROVOLSKAYA regarding Monarch Air Group, LLC, Anatoly Golubchik, or Vadim Trincher.

4. Documents regarding the investigation and authoring of the December 2021 report titled "Private Investments, Public Harm" which mentions OCCRP and Trincher.

5. Documents and communications mentioning Monarch Air Group, LLC, Anatoly Golubchik, or Vadim Trincher.

*Case No.: CACE-22-017416*
*Page 5 of 5*

## SCHEDULE B

### Topics of Discussion

Pursuant to the Fla. R. Civ. P. 1.310(b)(6), you are requested to designate one or more officers, directors, managers, agents or other persons who shall appear and testify on the behalf of Transparency International regarding the following subjects of inquiry:

1. Facts and communications regarding the whereabouts of LILY DOBROVOLASKAYA for purposes of personally serving her with the Complaint in this action.

2. Communications by or between Gary Kalman/Transparency International and JOURNALISM DEVELOPMENT NETWORK INC, A Maryland Corporation, the Organized Crime and Reporting Project, or LILY DOBROVOLSKAYA regarding Monarch Air Group, LLC, Anatoly Golubchik, or Vadim Trincher.

3. Documents exchanged by or between Gary Kalman/Transparency International and JOURNALISM DEVELOPMENT NETWORK INC, A Maryland Corporation, the Organized Crime and Reporting Project, or LILY DOBROVOLSKAYA regarding Monarch Air Group, LLC, Anatoly Golubchik, or Vadim Trincher.

4. Facts regarding the investigation and authoring of the December 2021 report titled "Private Investments, Public Harm" which mentions OCCRP and Trincher.

5. Facts regarding Monarch Air Group, LLC, Anatoly Golubchik, or Vadim Trincher.

STOK KON + BRAVERMAN

One East Broward Boulevard, Suite 915 • Fort Lauderdale, FL 33301 • P.954.237.1777 • F.954.237.1737 • E-mail: service@stoklaw.com

Filing # 175806604 E-Filed 06/21/2023 12:41:03 PM

IN THE CIRCUIT COURT OF THE 17th
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

MONARCH AIR GROUP, LLC.,
a Florida Limited Liability Company,

     Plaintiff,

                        CASE NO.:  CACE-22-017416

vs.

JOURNALISM DEVELOPMENT
NETWORK INC, A Maryland Corporation,
and LILY DOBROVOLSKAYA

     Defendants.

_____/

### NOTICE OF TAKING DEPOSITION *DUCES TECUM*
### IN AID OF SERVICE OF PROCESS

     PLEASE TAKE NOTICE that the undersigned will take the deposition of the following

individual:

| Name | Date/Time | Location |
|---|---|---|
| Journalism development Network Inc. Representative(s), with knowledge of the documents requested in **Schedule A** and the areas of inquiry/topics of discussion in **Schedule B.** | Tuesday, July 18, 2023 at 11:00 a.m. | Via Zoom Video Conference |

     Upon oral examination for the purpose of discovery, or use as evidence in this action, or for

such other purposes as are permitted under applicable Florida Rules and/or Statutes before a Notary

Public, or some other officer duly authorized by law to take depositions in the State of Florida or

before some other officer authorized by law to administer oaths, who is not a relative, employee,

attorney, or counsel of any of the parties, or a relative, or employee of such attorney or counsel, or

financially interested in the action, and pursuant to adjournments, if any, by said office until said

testimony shall be completed.

The deposition will continue from day to day until completed. You are hereby notified to be present at the time and place stated and you are required to bring with you the documents identified in **Schedule A**. The documents requested may also be emailed to the undersigned attorney at jkon@stoklaw.com; gortiz@stoklaw.com.

**In accordance with the Americans with Disabilities Act of 1990, persons needing a special accommodation to participate in this proceeding should contact Joshua R. Kon, Esq. at Stok Kon + Braverman, 1 East Broward Boulevard, Suite 915, Fort Lauderdale, FL 33301; via email at gortiz@stoklaw.com; or via phone at 954-237-1777, at least 7 days before the scheduled deposition, or immediately upon receiving this notification if there are less than 7 days before same. If you are hearing or voice impaired, call 711.**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been filed and served via the Florida Courts E-Filing Portal on this **21st day of June 2023** to: Dana J. McElroy, dmcelroy@tlolawfirm.com; Thomas & LoCicero PL 915 Middle River Drive, Suite 309 Fort Lauderdale, FL 33304; James J. McGuire, Esq., jmcguire@tlolawfirm.com; Linda R. Norbut, Esq., lnorbut@tlolawfirm.com; Thomas & LoCicero PL 601 South Boulevard Tampa, FL 33606.

Respectfully submitted,

**STOK KON+ BRAVERMAN**
Attorneys for Plaintiff
One East Broward Boulevard, Suite 915
Fort Lauderdale, Florida 33301
Tel.: (954) 237-1777
Fax: (954) 237-1737
Email: service@stoklaw.com

*/s/ Joshua R. Kon*
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
jkon@stoklaw.com

## SCHEDULE A

## INSTRUCTIONS

1. In producing documents, furnish all documents known or available to you, or in your possession, custody, or control, regardless of whether such documents are possessed directly by you or by any of your agents, employees, attorneys, representatives, investigators, or consultants or by any corporation, partnership, association, or other entity by which you are employed, in which you have an ownership interest, or with which you are affiliated in any manner.

2. If you object to any portion of any request, state your objection and identify those documents that you are producing.

3. Each request and part thereof, shall be answered separately, fully and completely without reference to any answer of any other request.

4. If you object to any request or part thereof on the basis of a claim of attorney-client, work product, or any other privilege(s), identify the privilege claimed as well and provide the following with respect to each such document statement or communication: the date thereof; identify all persons present, if an oral communication, or all persons who received a copy of such communications if written, and, the basis on which the privilege is claimed.

5. If you object to the scope of time of any request, state your objection and identify the time period for which you are producing documents.

6. If any document requested cannot be produced in full because it is in part privileged, partially destroyed, or for any other reason, produce such documents to the extent possible.

7. If you are aware of any documents or categories of documents which would be responsive to any request, but are no longer in your possession, custody or control, please identify each such document or categories of documents and state their current location.

8. To the extent any information requests may be satisfied by reference to a document, please identify such document in your response.

9. Unless otherwise indicated, the relevant time period referred to in this Request for Production is from 2010 to the present day.

## DOCUMENTS UPON WHICH PRIVILEGE IS CLAIMED

For each document requested herein which is sought to be withheld under a claim of privilege, provide the following information:

(a) The place, approximate date, and manner of recording or otherwise preparing the document;

(b) The name and title of sender; and the name and title of the person who received the document;

(c) The name of each person or persons (other than stenographic or clerical assistant) participating in the preparation of the document;

(d) The name and corporation position, if any, of each person to whom the contents of the documents have heretofore been communicated by copy, exhibition, reading or substantial summarization;

(e)     A statement of the basis on which privilege is claimed and whether or not the subject matter of the contents of documents is limited to legal advice or information provided for the purpose of securing legal advice;

(f)     The number of the request to which the document is responsive; and

(g)     The entity and corporate or business position, if any, of the person or persons supplying the attorney with the information.

## DOCUMENTS TO BE PRODUCED

1. Documents and communications regarding the whereabouts of LILY DOBROVOLASKAYA for purposes of personally serving her with the Complaint in this action.

## SCHEDULE B

### Topics of Discussion

Pursuant to the Fla. R. Civ. P. 1.310(b)(6), you are requested to designate one or more officers, directors, managers, agents or other persons who shall appear and testify on the behalf of the Defendant regarding the following subjects of inquiry:

1. Facts and communications regarding the whereabouts of LILY DOBROVOLASKAYA for purposes of personally serving her with the Complaint in this action.