**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 23-cv-61256-JB**

MONARCH AIR GROUP, LLC,

    Plaintiff,

v.

JOURNALISM DEVELOPMENT
NETWORK, INC., and LILY
DOBROVOLSKAYA,

    Defendants.

_____/

**DEFENDANT JOURNALISM DEVELOPMENT NETWORK, INC.'S**
**MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**
**AS TO COUNT II OF THE COMPLAINT**
**AND INCORPORATED MEMORANDUM OF LAW**

Pursuant to Federal Rule of Civil Procedure 12(c), Defendant JOURNALISM DEVELOPMENT NETWORK, INC. ("JDN") moves for a judgment in its favor on Count II of the Complaint filed by Plaintiff MONARCH AIR GROUP, LLC ("Monarch"). The Complaint purports to assert counts against JDN for defamation per se (Count I) and defamation by implication (Count II), but this Motion is directed solely at Count II. [ECF No. 1-2 at pp. 7-18][1] The defamation by implication count fails because the news article upon which it is based simply does not imply the false and defamatory facts claimed by Plaintiff. Therefore, JDN is entitled to judgment as a matter of law on that count. More detailed grounds for this Motion are set forth in the accompanying Memorandum of Law.

---

[1]     On September 17, 2024, the Court dismissed Counts I and II of the Complaint as against co-Defendant Lily Dobrovolskaya. [ECF No. 83] On October 3, the Court terminated the case in its entirety as against Dobrovolskaya. [ECF No. 91]

## MEMORANDUM OF LAW

### Introduction

This is a defamation case in which Plaintiff (Monarch), a company providing air charter and aircraft leasing services, complains about an article titled "Flight of the Monarch: US Gov't Contracted Airline Once Owned by Russian Criminals" (the "Article"). [ECF No. 1-2 at p. 7, ¶ 1; Compl. Exh. A at pp. 20-33] The Article was published in November 2020 by Defendant JDN on its Organized Crime and Corruption Report ("OCCRP") webpage, as JDN acknowledges. [ECF No. 17, ¶ 1]

In Count I of the Complaint, Monarch sues for defamation per se, alleging that the Article contains certain false and defamatory statements of fact about Monarch. [ECF No. 1-2 at pp. 14-15, ¶¶ 53-58] JDN denies this. [ECF No. 17 at pp. 4-5, ¶¶ 53-58]

In Count II, Monarch sues not because of what the Article *actually says* but because of what the Article *allegedly implies*. In Monarch's view, the Article falsely implies "a defamatory connection between Monarch, criminals, and/or criminal activity." [ECF No. 1-2 at pp. 15-16, ¶ 60] Critically, there is no dispute that Monarch had a connection with criminals *in the past*. *See id.* at pp. 12-13, ¶ 43. The Complaint, however, contends that the Article falsely implies a later connection to criminals and/or criminal activity in 2017 and/or 2020. [*Id.* at pp. 12-13, ¶¶ 42, 44, 45(b)] This contention is wrong because the Article never implies any connection in 2017 or 2020 between criminals or criminal activity and Monarch. To the contrary, the Article repeatedly and expressly states – and even quotes Monarch's representative stating – that the criminals who were once owners of Monarch parted ways with the company in 2012. [*Id.* at pp. 20, 22, 23, 26, 27, 31]

While it is not clear, the Complaint might also be attempting to allege that the Article

falsely implies that Monarch did or does engage in drug smuggling. [*Id.* at p. 12, ¶ 41] Once again, however, the Article implies no such thing. Accordingly, JDN is entitled to judgment on the pleadings on Count II.

### Background

In November of 2020, JDN published the Article on its occrp.com website. [*Id.* at pp. 20-33] A revised version of the Article was published in June 2021. [*Id.* at ¶ 48; Compl. Exh. D; pp. 66-79][2] The Article reported on Monarch's business and explained that Monarch and one of its affiliates have been tasked with "moving fuel in Israel for the Department of Defense (DoD), flying people around Afghanistan, and transporting protected witnesses in the U.S. for the Marshals Service." [ECF No. 1-2; Compl. Exh. A at p. 21] The Article also reported truthfully on Monarch's history, including the criminal activity of two of its former owners. [*Id.* at pp. 20-26] And the Article quoted certain individuals questioning the wisdom of the U.S. government contracting with Monarch for the tasks described above. [*Id.* at p. 30]

Monarch's contention that the Article implies false facts about it appears to be based upon the following accurate information reported by JDN:

i.   *Two of Monarch's former owners are convicted criminals tied to the Russian Mob.*

The Article reported truthfully that Monarch's owners formerly included two men who, after parting ways with Monarch, were criminally convicted for their association with the Russian mob. Because these facts are true, the Complaint does *not* deny that two of Monarch's past owners are convicted criminals. Rather, it directly admits as much. [*See id.* at pp. 12-13, ¶¶ 42-43 (acknowledging that Monarch's past owners "were criminals")].

---

[2]     The revised version of the Article is titled "Flight of the Monarch: US Gov't Contracted Airline Once Owned by Criminals with Ties to Russian Mob" and contains corrections and clarifications which are not at issue in this lawsuit.  *See id.*

*ii.     Customs agents found 16 kilograms of cocaine on a Monarch aircraft.*

The Article also recounts the discovery by Customs agents of 16 kilograms of cocaine on a Monarch aircraft in 2011, although it resulted in no one being arrested. Again, because this is true, Monarch does *not* allege otherwise. In fact, Monarch acknowledges that cocaine was being smuggled on its aircraft. [*Id.* at p. 12, ¶¶ 39-41 (citing Monarch's own statement to JDN acknowledging that "[i]n 2011, a charter passenger was apprehended by the U.S. Customs and Boarder Protection for items in his personal possession")]

Consistent with Monarch's acknowledgment of the cocaine incident, the Article also accurately reports that Monarch's spokesperson "said the cocaine *belonged to a passenger*." [*Id.* at p. 29 (emphasis added)] The Article even quotes the Monarch spokesperson as stating that "'We have worked with the relevant authorities to develop and enhance existing procedures, to prevent this from happening again,' she said. 'In our 15 years of operations, this was the only occurrence.'" [*Id.*]

*iii.    A federal prosecutor stated during a criminal bail hearing that the government did not believe Monarch was a legitimate business.*

The Article likewise reports that during a 2013 bail hearing for one of the criminal former-owners of Monarch, a federal prosecutor stated that "We do not believe this business [Monarch] is legitimate." [*Id.* at p. 11, ¶ 35] Monarch does not dispute that the prosecutor made this statement, but instead alleges that the Article "deliberately omitted the other part of the story – that the prosecutor subsequently, in the same proceeding, apologized for misspeaking and calling Monarch an illegitimate business." [*Id.*] This allegation is demonstrably wrong, however, and is contradicted by the bail hearing transcripts, which are incorporated by reference into the Complaint and are discussed in greater detail below.

In sum, the Article reports truthfully that, despite its checkered history, Monarch has been

retained to provide sensitive services for the U.S. government – matters of undeniable public concern. [*See, e.g.*, ECF No. 83 (Order on Lily Dobrovolskaya's Motion to Dismiss for Insufficient Service or Process, Lack of Jurisdiction, and Failure to State a Claim) at p. 9 ("Undoubtedly, the purported criminal history of a company's previous owners, particularly a company contracted to perform sensitive tasks for the government, is a matter of public interest.")] As explained below, applying the First Amendment and Florida defamation by implication law to the Article, Monarch's defamation by implication claim fails.

**Discussion**

## I.  A Motion For Judgment On The Pleadings Is Governed By The Same Standards As A Rule 12(b)(6) Motion.

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Here, the pleadings initially closed on June 19, 2024. [ECF No. 62] The Court later granted Monarch until October 1, 2024, to amend the Complaint, but Monarch did not amend, so the pleadings are now closed. [ECF No. 83 at pp. 13-14; ECF No. 91] Accordingly, this Motion is being presented after the pleadings have closed but early enough not to delay trial, which is scheduled for August 25, 2025. [ECF No. 90]

 "A motion for judgment on the pleadings is governed by the same standard as a motion to dismiss under Fed. R. Civ. P. Rule 12(b)(6)." *RM Broad., LLC v. U.S. Dep't of Justice*, 379 F. Supp. 3d 1256, 1259 (S.D. Fla. 2019). Thus, the "ultimate question on a motion for judgment on the pleadings under Rule 12(c) is . . . whether the complaint states a claim for relief." *Rothenberg v. United Parcel Serv., Inc.*, No. 3:23-cv-94-MMH-LLL, 2023 WL 7282887, at *2 (M.D. Fla. Nov. 3, 2023) (internal quotation omitted). Accordingly, the Court must accept the factual allegations in the complaint as true, but legal conclusions "are not entitled to [an] assumption of

truth." *Id.* at *3 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). Moreover, the Court is permitted to grant judgment on fewer than all counts of the complaint. *See Gemini Ins. Co. v. Castro*, 723 F. App'x 797, 802 (11th Cir. 2018) (affirming grant of partial judgment on the pleadings); *see also Howard v. Kimley-Horn & Assocs., Inc.*, No. 21-11099, 2021 WL 4452536, *5 (11th Cir. Sept. 29, 2021) (same); *Barnwell v. Douglas Cty.*, 390 F. App'x 862, 863-64 (11th Cir. 2010) (same).

Although the Court's review of a motion for judgment on the pleadings is generally limited to the "four corners" of the pleadings, this Court may treat documents integral to the allegations of the complaint as being incorporated by reference without converting the motion to one for summary judgment. *See Spottswood Cos. v. Zurich Am. Ins. Co.*, No. 4:20-cv-10077-KMM, 2021 WL 2515255, at *4 (S.D. Fla. Jun. 14, 2021) (A "court may consider documents attached to a motion for judgment on the pleadings" when they are central to plaintiff's claims and authenticity is not challenged."). Moreover, when a complaint's incorporated exhibits "contradict the general and conclusory allegations of the pleading, the exhibits govern." *Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009) (internal quotation omitted).

This rule permitting review of documents that are central to a plaintiff's claim and not disputed "is particularly suited to defamation cases." *Comtech Telecomm. Corp. v. Charles*, No. 6:07-cv-250-Orl-22JGG, 2007 WL 9720811, at *3 (M.D. Fla. July 11, 2007); *see also Hoffman-Pugh v. Ramsey*, 312 F.3d 1222, 1225 (11th Cir. 2002) (affirming dismissal of defamation claim based upon book and explaining that the district court properly considered the "entire book," which was "referred to it in [the] complaint and . . . central to [its] claims."); *Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1119 (S.D. Fla. 2021) ("[T]he court is permitted to review and consider video footage properly incorporated by reference into the complaint.").

Moreover, Florida federal courts regularly grant judgment on the pleadings in connection with defamation claims. *See, e.g.*, *Horsley v. Rivera*, 292 F.3d 695, 703 (11th Cir. 2002) (instructing district court to enter judgment on the pleadings on defamation claim); *Rothenberg*, 2023 WL 7282887, at *6 (granting judgment on the pleadings on defamation claim); *Hendershott v. Ostuw*, No. 9:20-CV-80006-ROSENBERG/REINHART, 2020 WL 13111216, at *4 (S.D. Fla. Oct. 14, 2020) (same).

## II.      Standard For Defamation By Implication Claims.

A defamation by implication claim arises "in circumstances where *literally true* statements are conveyed in such a way as to create a *false impression*."  *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1108 (Fla. 2008) (emphasis added). Florida courts recognize a claim for defamation by implication in two circumstances: (1) where a defendant "juxtaposes a series of facts so as to imply a defamatory connection between them" or (2) where a defendant "creates a defamatory implication by omitting facts." *Id.* at 1106. As distinguished from a traditional defamation claim, a defamation by implication claim "arises, not from what is stated, but from what is implied" and "is premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements." *Id.* at 1106-07. Critically, to state a viable defamation by implication claim, the complaint must "allege that the underlying statements are true." *Sloan v. Shatner*, No. 8:17-cv-332-T-27AAS, 2018 WL 3769968, at *6 (M.D. Fla. June 22, 2018); *see also Rubinstein v. Ourian*, No. 20-21948-CIV-MORENO, 2021 WL 4134753, at *6 (S.D. Fla. Sept. 10, 2021) (same).

Just as critically, all of the defenses that apply to defamation claims are "extended to the tort of defamation by implication." *Rapp*, 997 So. 2d at 1108; *Turner v. Wells*, 198 F. Supp. 3d 1355, 1366 (S.D. Fla. 2016) ("***Turner I***"), *aff'd*, 879 F.3d 1254 (11th Cir. 2018) ("***Turner II***").

For purposes of this Motion, there are four key standards that must be applied to Plaintiff's defamation by implication claim.

A.     **The Court Determines, As A Question Of Law, Whether The Article Implies Defamatory Facts About The Plaintiff.**

As the Eleventh Circuit has explained, whether the Article's statements constitute defamation by implication is a question of law for the court to determine. *Turner II*, 879 F.3d at 1269; *Rubinstein*, 2021 WL 4134753, at *5. "That is, under Florida law, it falls to the courts in the first instance to determine whether the reasonable implications derived from a defendant's statements are as the plaintiff alleges." *Utterback v. Morris*, No. 5:23-cv-279-TKW/MJF, 2024 WL 3809368, at *3 (N.D. Fla. July 24, 2024), *report and recommendation adopted*, 2024 WL 3799423 (N.D. Fla. Aug. 12, 2024).

B.     **The Court Must Review The Article In Its Entirety.**

The question of whether a publication implies a defamatory meaning must be based upon "a reasonable person's perception of the entirety of a publication and not merely on individual statements." *Turner I*, 198 F. Supp. 3d at 1374 (internal quotation omitted). Accordingly, a "tortured and extreme reading of select facts" will not support a defamation by implication claim. *Id.* (internal quotation omitted); *see also Rubinstein*, 2021 WL 4134753, at *5 (statements must be considered "in the context of the publication"). If the "gist" of the publication as a whole does not convey the defamatory meaning claimed by the plaintiff, the defamation by implication claim fails. *Turner I*, 198 F. Supp. 3d at 1376.

C.     **Under The First Amendment, Publishers Are Not Required To Include Information Merely Because It Paints The Plaintiff In A More Positive Light.**

"The law of defamation is concerned with whether a publisher reports a story *truthfully*, not generously." *Turner II*, 879 F.3d at 1270 (internal quotation omitted). Indeed, so long as "the facts that a defendant reports are truthfully presented and [the defendant] did not omit facts so as

to create a defamatory implication, the court's inquiry should go no further." *Turner I*, 198 F.

Supp. 3d at 1371. This is because

> Courts must be slow to intrude into the area of editorial judgment, not only with respect to choices of words, but also with respect to inclusions in or omissions from news stories. Accounts of past events are always selective, and under the First Amendment the decision of what to select must almost always be left to writers and editors. *It is not the business of the government*."

*Id.* (emphasis added) (internal quotation omitted). Because it is not the business of the

government to tell the press how to report the news, "courts afford news media defendants wide

editorial discretion." *Nix v. ESPN, Inc.*, No. 1:18-cv-22208-UU, 2018 WL 8802885, at *7 (S.D.

Fla. Aug. 30, 2018) (dismissing defamation by implication claim).

### D.     A Defamation By Implication Claim Fails Where The Publication <u>Expressly</u> Contradicts The Alleged <u>Implication</u>.

As its name makes clear, a defamation by implication claim arises when a publication,

although technically truthful, can be fairly read as implying a false and defamatory fact about the

plaintiff. *Rapp*, 997 So. 2d at 1108 (defamation by implication arises in "circumstances where

literally true statements are conveyed in such a way as to create a false impression"). But when

the *express* words of the publication contradict the allegedly *implied* meaning of the story, the

Eleventh Circuit has made clear that no claim for *implied defamation* can stand. *See Turner II*,

879 F.3d at 1270 (plaintiff's defamation by implication claim "fails in light of the express words

in the Report"); *Utterback*, 2024 WL 3809368, at *4 (defendant's express use of past tense verbs

contradicted plaintiff's claim that the publication implied the plaintiff was *presently* engaged in

"continuing criminal conduct").

Application of these four key standards – along with other controlling law, discussed

below – shows that the Article does not imply any false and defamatory facts about Plaintiff.

Accordingly, JDN is entitled to judgment on the pleadings on Count II.

### III.  Read In Its Entirety, The Article Unequivocally States That Monarch's Criminal Owners Are <u>No Longer</u> Associated With The Company.

The Article reports that two individuals who were former owners of Monarch, Anatoly Golubchik and Vadim Trincher, are criminals. In particular, the Article states that Golubchik and Trincher

> were jailed in 2014 for operating an illegal gambling and extortion ring out of an apartment in Trump Tower in New York City. U.S. prosecutors said they were part of a 'far-reaching Russian-American organized crime ring' known as the Taiwanchik-Trincher Organization, under the protection of notorious Russian crime boss Alimzhan 'Taiwanchik' Tokhtakhounov.

[ECF No. 1-2 at p. 20] The Complaint does not dispute these facts.

The Article also reports that "[i]n a 2013 court document, prosecutors claimed Golubchik acted as Tokhtakhounov's 'enforcer,' and accused the men of laundering about $100 million on behalf of 'high-level criminals' – some of it through Monarch and another airline company Golubchik and Trincher owned in the U.S. called Skyway International." [*Id.* at p. 22] The Complaint never challenges these public-record facts, either.

Captions to photographs accompanying the Article note that Trincher "was sentenced to five years in prison in 2014 for operating an illegal gambling, money laundering, and extortion ring" and that Golubchik "was convicted of operating what New York prosecutors described as an illegal 'large scale sports book." [*Id.* at pp. 22, 24] These convictions, sentences, and prosecutorial statements are matters of public record and are not disputed by Monarch.

The Article, which was originally published in November 2020, also repeatedly states that Golubchik and Trincher are not currently affiliated with Monarch. Beginning with its title, the Article expressly states on at least eight (8) occasions that Golubchik and Trincher were *not* owners of Monarch or associated with the company in 2017 or 2020:

i.     Title: **"Flight of the Monarch: US Gov't Contracted Airline *Once Owned* by Russian Criminals."** [*Id.* at p. 20 (emphasis added)] The phrase "once owned," used in the Article's title, plainly means that Golubchik and Trincher do not currently own Monarch.

ii.    **"Golubchik and Trincher both left Monarch *in 2012,* before the airline won the DoD and the GSA contracts."** [*Id.* at p. 22 (emphasis added)] The Article identifies the year (2012) that Golubchik and Trincher left Monarch.

iii.   **"A spokesperson for the Defense Logistics Agency, which manages the U.S. military's supply chains, said the agency followed the proper procedures when vetting Monarch for a contract awarded in 2012 to deliver fuel to a military base in Israel. *Neither Golubchik nor Trincher* were 'involved in the bidding or performance of the contract,' he added in an email.'"** [*Id.* at p. 23 (emphasis added)] The Article expressly states that Golubchik and Trincher were not involved with Monarch when it was awarded U.S. government contracts.

iv.    **"Alina Gavrushenko, Monarch's director of marketing and public relations, said *the company has not been affiliated with Golubchik or Trincher since 2012.*"** [*Id.* (emphasis added)] The Article includes Monarch's own statement that the company's affiliation with Golubchik and Trincher ended in 2012.

v.     **"'Like many startups, especially in aviation, the *company has changed ownership* and evolved its business model over the years,' she said, adding: 'Our business operations are conducted with *full integrity and transparency.*'"** [*Id.* (emphasis added)] The Article quotes Monarch's statement that its ownership has changed and that it conducts its business with full integrity and transparency.

vi.    **"Golubchik and Trincher appeared in Monarch's paperwork *until 2012*, the year the airline won its first contract with the DoD. They are last mentioned as investors in a report *from April that year*, and records show they were *gradually replaced as managers* by Freedman-controlled entities."** [*Id.* at p. 26 (emphasis added)] The Article references public records reflecting that Golubchik and Trincher left Monarch in 2012.

vii.   **"*2012 — the last year* Golubchik and Trincher were known to be involved in the company."** [*Id.* at p. 31 (emphasis added)] Once again, the Article makes clear that Golubchik and Trincher have not been affiliated with Monarch since 2012.

viii.  **Timeline graphic showing Golubchik's and Trincher's ownership interests ended in 2012.** [*Id.* at p. 27] The Article also visually illustrates that Golubchik and Trincher left Monarch in 2012 with a timeline reflecting that fact.

As the Eleventh Circuit's *Turner II* decision mandates, these *express* statements explaining that Goulbchik and Trincher have not been owners of Monarch since 2012 preclude

Monarch's claim that the Article somehow *implies* that Monarch was still owned by criminals in 2017 or 2020. *See Turner II*, 879 F.3d at 1270; *Utterback*, 2024 WL 3809368, at *4.

*Turner II* constitutes the Eleventh Circuit's most thorough discussion of defamation by implication. James Turner was the offensive line coach for the NFL's Miami Dolphins football team. A player on the team, John Martin, had been the object of prolonged bullying within the Dolphins organization, leading to his quitting the team and to extensive media scrutiny and reporting. The NFL retained a law firm to investigate the bullying and to prepare a report on its findings (the "Wells Report"). *Turner II*, 879 F.3d at 1259.

The Wells Report recounted numerous incidents within the Dolphins' organization, including Turner's acquiescence in and failure to prevent the bullying of Martin. *Id.* Turner was fired after the report was issued and then sued Wells for defamation by implication, contending, among other things, that the report falsely implied that Turner implemented a so-called "Judas Code" among the players, such that anyone who "snitched" on other players was punished, and that the Judas Code was a key reason the bullying of Martin was never stopped. *Id.* at 1261, 1267-68. The district court dismissed Turner's defamation by implication claim, and the Eleventh Circuit affirmed, holding that the claim "fails in light of the *express words* in the Report," which "assigned responsibility for the fining system to the offensive linemen," not to Turner. *Id.* at 1270. The *Turner* decision compels the dismissal of Monarch's defamation by implication claim for the same reason – the Article expressly contradicts the implied meaning urged by Monarch.

The court in *Utterback* likewise looked to a publication's express language to find that the implied meaning being urged by the plaintiff was not reasonable. *Utterback,* 2024 WL 3809368, at *3.  Coincidentally, just as in this case, *Utterback* concerned the question of whether

a truthful statement about *past* criminal behavior falsely implied *current* criminal conduct by the plaintiff. In a presentation made to potential clients, Morris, a lawyer, spoke about his past dealings with the plaintiff, Utterback, a disbarred lawyer who had been convicted of money laundering:

> Why would I tell you the name of the person who sued me? Cause I want you to Google him. I want you to Google him. The first thing that will come up is a mug shot. This is a well-known disbarred attorney who can't get his license back because the State of Montana says he is not . . . to tell the truth and he is a convicted felon. He took money. Millions of dollars. Put them in a suitcase. Allegedly with some drug connection. Took the money. Millions of dollars in a suitcase. Tried to take through an airport down in another country. Got arrested. Got put in jail for a while and lost his bar license.

*Id.* at *2. Plaintiff sued for defamation by implication, claiming a variety of false implications, including that Morris's statement to the group of potential clients falsely implied that the plaintiff's 2003 money-laundering guilty plea negatively affected the work the plaintiff was doing *at present*, in 2017. *Id.* at *4.

The district court dismissed the plaintiff's claim because the defendant's statement could not reasonably be construed as conveying the alleged false implication. In reaching this conclusion, the court explained that

> Although the tense of words employed by Defendant is not dispositive, it is highly relevant. Defendant used the past tense when he mentioned Plaintiff's money laundering: 'took,' 'tried,' 'got arrested,' 'got put in jail'. . . . In this context, a reasonable person would understand Defendant's use of the past tense to indicate that these events *took place in the past, not that they were recurring events or a pattern of conduct*. Given the absence of any indicia of continuing criminal conduct in Defendant's statements, a reasonable person would not perceive Defendant's statements to be implying that Plaintiff's money laundering continued after he was arrested.

*Id.* (emphasis added).

Here, of course, the Court need not look to the verb tenses used by the Article because the Article's express words stated that the two criminal owners of Monarch *departed the*

*company in 2012* and have not been affiliated with the company since that time. Thus, as in the *Utterback* case, given the absence of any indicia in the Article of continuing criminal activity by Monarch or its owner, a reasonable reader would not perceive the Article to be implying that Monarch is *currently* associated with criminal activity. The Article does not imply what Monarch claims it implies.

Moreover, the Complaint never identifies any statements from the Article about the current owner of Monarch (David Gitman) or about Monarch's current conduct that would imply to a reasonable reader "a defamatory connection between Monarch, criminals, and/or criminal activity," as Monarch claims. [ECF No. 1-2 at pp. 15-16, ¶ 60] Nor could it. The Article accurately reports that David Gitman is the son of Jacob Gitman, who was in the past a co-owner of Monarch along with Golubchik and Trincher. [*Id.* at pp. 23, 26] But it identifies no criminal allegations about or questionable conduct by David Gitman. Nor does it report that Monarch or David Gitman are suspected or accused of any criminal conduct. Instead, it reports truthfully that David Gitman is the current sole owner and CEO of Monarch, while twice recounting that he declined to comment for the Article. [*Id.* at pp. 23, 26] Near its end, the Article provides the following information about the current state of Monarch Air Group:

> In addition to U.S. federal contracts, the Monarch Air Group lists international clients including the United Nations World Food Program, and Canada's Department of National Defence. Most recently, David Gitman boasted in a travel publication of Monarch's 'great synergy' with U.S. embassies to bring home citizens stranded in Latin America due to the COVID-19 crisis.

[*Id.* at p. 31] None of this *implies* in any manner that Monarch today is associated with criminals or criminal activity.

Nor do any other statements in the Article. For instance, the Article quotes the director of the U.S. chapter of Transparency International as providing his opinion that the U.S. government has been negligent by working with Monarch [*id.* at p. 21], but that statement is *not about*

Monarch and, in any event, constitutes non-actionable opinion. *Turner I*, 198 F. Supp. 3d at 1368 (opinions expressed by publisher are non-actionable, even though others might have "different" opinions). Just as critically, the Article also recounted an opposing opinion:

> A spokesperson for the Defense Logistics Agency, which manages the U.S. military's supply chains, said the agency followed the proper procedures when vetting Monarch for a contract awarded in 2012 to deliver fuel to a military base in Israel. Neither [of the criminal former owners] were 'involved in the bidding or performance of the contract,' [the spokesperson] added in an email.

[ECF No. 1-2, at p. 23]

Read as a whole, the Article simply does not imply that Monarch in 2017 or 2020 was associated with criminals or criminal activity. As such, Monarch's defamation by implication claim fails. *See Rubin v. U.S. News & World Report, Inc.*, 271 F.3d 1305, 1308-09 (11th Cir. 2001) (affirming dismissal of defamation claim because news story contained no implication that the plaintiff, an owner of a gold-refining business, unlawfully kept "two sets of books"; explaining that to find such an implication, the court would "expect to find some suggestion in this article that [plaintiff] is suspected or even accused of improper conduct," but "that is not what appears here").

## IV.    Under The First Amendment, JDN Is <u>Not</u> Required To "Say Something Nice" About Monarch.

So long as JDN reports accurately, it cannot be liable for defamation. And it is under no legal obligation to make positive or laudatory statements about Monarch or anyone else. If the free press rights guaranteed by the First Amendment mean anything, they mean that the press is entitled to report the news as it sees fit, not as the subjects of such reporting dictate:

> The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials – whether fair or unfair – constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time.

*Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974). Thus, it is beyond dispute that publishers "have no legal obligation to present a balanced view of what led up to [the publicized event]." *Turner II*, 879 F.3d at 1270 (internal quotation omitted). Accordingly, JDN had no legal obligation to extol Monarch's purported virtues in the Article.

Monarch does not seem to recognize this well-settled standard. Indeed, without clearly articulating it, Monarch seems to be claiming that the Article, while true, impliedly defamed Monarch by *failing to provide any endorsement of Monarch – i.e.*, by not saying that Monarch, today, is an entirely above-board organization and a solid corporate citizen (at least in its own self-serving view). As explained above, however, this position is wholly at odds with the freedoms guaranteed by the First Amendment.

In sum, the Article cannot be read as implying that Monarch in 2017 or 2020 was associated with criminal activity merely because it did not expressly report that Monarch in 2017 or 2020 was law-abiding. As the *Turner I* court explained, "[a] publisher need not include facts in a report simply because they reflect favorably on a subject; nor should that publisher feel coerced into including such facts out of fear of a defamation lawsuit." *Turner I*, 198 F. Supp. 3d at 1371. Because the Article does not falsely imply that Monarch is associated with criminals or criminal conduct, it does not impliedly defame Monarch, and judgment on the pleadings should be granted.

## V.   The Article Accurately Reports On The Cocaine Incident And Does Not Imply Anything False About Monarch.

While it is not entirely clear, Monarch also seems to be contending that JDN falsely implied that Monarch was engaged in drug smuggling because the Article truthfully reported on an incident in which customs agents discovered 16 kilograms of cocaine in a duffle bag on a Monarch aircraft in 2011, for which no one was arrested, and which Monarch says belonged to a

passenger. The Article's references to the cocaine incident are as follows:

> On one occasion, customs agents in Miami discovered 16 kilograms of cocaine on one of Monarch's planes. . . .
>
> . . . .
>
> . . . . Then in 2011, according to a submission from prosecutors at Golubchik's bail hearing two years later, Florida customs agents discovered 16 kilograms of cocaine hidden in one of its planes.
>
> A former Monarch pilot, who was not on the flight, told OCCRP the plane was searched by customs agents when it returned to Fort Lauderdale International Airport from Haiti. They found a duffle bag full of cocaine inside. The crew was detained for several hours, he said, along with the person who had chartered the flight, a frequent customer whose name he did not recall. The pilot thought it was strange that the aircraft was then released.
>
> "I've seen in previous years, when the airplane was involved with drugs and it was in a hanger and it was not to be moved," he said. "It was under the control of customs."
>
> The U.S. Customs and Border Protection Agency refused to release any information about the discovery of the cocaine, or explain why no one was arrested.
>
> Gavrushenko, Monarch's spokesperson, said the cocaine belonged to a passenger. "We have worked with the relevant authorities to develop and enhance existing procedures, to prevent this from happening again," she said. "In our 15 years of operations, this was the only occurrence."

[ECF No. 1-2 at pp. 22, 28-29] The Article's illustrated timeline also notes that in 2011 "Florida customs agents discover[ed] 16 kilograms of cocaine hidden in one of Monarch's planes." [*Id.* at p. 27]

Monarch, of course, does *not* deny Customs agents discovered 16 kilograms of cocaine on a Monarch flight in 2011 or that no arrest resulted. Nevertheless, Monarch asserts that the Article falsely accuses it of "drug smuggling," [*see id.* at p. 12, ¶ 37], but that plainly is not what the Article says. Rather, the Article sets forth public record facts about the discovery of illicit drugs on a Monarch aircraft, recounts what a Monarch pilot knew and did not know about the

event, and quotes Monarch's explanation of the incident. The Article does not state that illicit

drugs have been found on *other* Monarch flights and never accuses Monarch of smuggling drugs

or of being suspected of doing so. The Complaint cannot explain how the Article's accurate

reporting purportedly *implies* something false about Monarch, because it plainly does not.

## VI.   The Article Accurately Quotes A Federal Prosecutor Saying That The Government Did Not Believe Monarch Was A "Legitimate" Business; Contrary To Monarch's Contention, The Prosecutor Never Withdrew That Statement.

Finally, Monarch seems to be claiming that the Article implies that Monarch is engaged

in criminal activity because it quoted a statement about Monarch made by a federal prosecutor at

a bail hearing for Monarch's former owner, Golubchik, but failed to report that the prosecutor

later retracted his statement. [*Id.* at pp. 11-12, ¶¶ 35-36] This is false.

Because the federal prosecutor's statements at Golubchik's bail hearings are central to

Monarch's defamation by implication claim, and because the authenticity of the bail hearing

transcripts – which are docket entries in the matter titled *U.S. v. Alimzhan Tokhtakhounov,*

*Anatoly Globuchik, et al.*, No. 1:13-cr-00268-JMF (S.D.N.Y.) and are publicly available on

PACER – is not in doubt, they are incorporated by reference into the Complaint and may be

considered in ruling on this Motion. *See Spottswood*, 2021 WL 2515255, at *4.[3]

A review of the April 24, 2013, bail hearing ("First Bail Hearing") transcript and

subsequent April 29, 2013, bail hearing ("Second Bail Hearing") transcript shows that, contrary

to Monarch's allegations, the federal prosecutor never "in the same proceeding, apologized for

misspeaking and calling Monarch an illegitimate business," as Monarch maintains. [ECF No. 1-2

at p. 11, ¶ 35] Rather, at the First Bail Hearing, the prosecutor raised the issue of Golubchik

---

[3]     Attached as **Exhibit 1** is a true and correct copy of the April 24, 2013, bail hearing transcript and as **Exhibit 2** is a true and correct copy of the April 29, 2013, bail hearing transcript in the matter titled *U.S. v. Alimzhan Tokhtakhounov, Anatoly Globuchik, et al.*, No. 1:13-cr-00268-JMF (S.D.N.Y.). (The First Bail Hearing transcript is ECF No. 206 in that matter and the Second Bail Hearing Transcript is ECF No. 213 in that matter.)

being *a flight risk* and the government's concern that he might use a Monarch aircraft to escape, stating: "Owning an airplane company allows you obviously to leave quite easily. . . . [I]t provides him the opportunity to flee."   [Exh. 1 at 10:13-18] Golubchik's defense counsel countered this argument by telling the Court that "[t]he plane [company] is shut down." [*Id.* at 21:3-4] (To be clear, the Article does *not* quote or refer to either of these statements.)

At the Second Bail Hearing, Golubchik's defense counsel revised his position, stating that Golubchik was *no longer* an owner of Monarch and accusing the prosecution of telling "lies" by initially claiming that Golubchik owned Monarch, while later acknowledging, at the Second Bail Hearing, that Golubchik "doesn't own it anymore" but now merely "*has contacts with the plane company.*" [Exh. 2 at 19:7-9, 22:22 – 23:4 (emphasis added)]

In response, the prosecutor stated: "Defense counsel likes to accuse the government of misstating things. We have been completely candid. We may have – the airplane company I guess it went bankrupt because of this cocaine issue. I fall on my sword, your Honor." [*Id.* at 45:18-21] As is obvious, the federal prosecutor "fell on his sword" in conceding that Monarch no longer factored into *his flight risk analysis*, since the company either was not operating flights or was no longer owned by Golubchik. But the prosecutor never retracted or apologized for stating that the government viewed Monarch as illegitimate. Indeed, at *both* Bail Hearings he asserted that Monarch was utilized for money laundering. [Exh. 1 at 10:14-18; Exh. 2 at 8:9-12]

Monarch cannot cite to any statement by the federal prosecutor that the government considered Monarch "legitimate" or that it erred by referring to Monarch as not being "legitimate," because that never happened, as is shown by the incorporated Bail Hearing transcripts. Of course, where documents "incorporated by reference contradict the general and conclusory allegations of the pleading," as they do here, "the exhibits govern." *Goldberg v. Nat'l*

*Union Fire Ins. Co.*, 143 F. Supp. 3d 1283, 1291 (S.D. Fla. 2015); *CC-Aventura, Inc. v. Weitz Co., LLC*, No. 06-21598-CIV, 2007 WL 117935, at *4 (S.D. Fla. Jan. 10, 2007) ("if an allegation in the complaint is contradicted by a document incorporated by reference therein and which reveals facts foreclosing recovery as a matter of law, dismissal is appropriate").

Quite simply, Plaintiff's assertion that the Article omits the prosecutor's retraction of his statement that Monarch is not "legitimate" is demonstrably untrue because it is disproved by the Bail Hearing transcripts. The Article is accurate, does not imply anything false about Monarch, does not omit any exonerating prosecutorial statement, and therefore cannot support a defamation by implication claim.

Finally, Florida's fair report privilege provides that a publisher cannot be liable in defamation for fairly and accurately reporting the contents of an official document or public record, such as the transcript of the First Bail Hearing. *See generally Stewart v. Sun Sentinel Co.*, 695 So. 2d 360, 362 (Fla. 4th DCA 1997) (affirming trial court dismissal of defamation claims against the media for reporting based on official documents or press releases); *Woodard v. Sunbeam Television Corp.*, 616 So. 2d 501, 502-03 (Fla. 3d DCA 1993) (same).  Here, a comparison of the Article and the Bail Hearing transcripts shows that the Article fairly and accurately reported the federal prosecutor's statement, which means that, under Florida law, the Article's recitation of the prosecutor's statement is privileged. For this additional reason, JDN cannot be liable for defamation by implication.

## CONCLUSION

WHEREFORE, JDN respectfully requests that the Court grant this Motion, grant judgment in JDN's favor on Count II the Complaint, and grant such other and further relief as the Court deems just.

THOMAS & LOCICERO PL

By:  */s/ Dana J. McElroy*
       Dana McElroy
       Florida Bar No. 845906
       dmcelroy@tlolawfirm.com
       Daniela Abratt-Cohen
       Florida Bar No. 118053
       dacohen@tlolawfirm.com
       915 Middle River Drive
       Suite 309
       Fort Lauderdale, FL 33304
       Phone:  (954)703-3416

       James J. McGuire
       Florida Bar No. 187798
       jmcguire@tlolawfirm.com
       601 South Boulevard
       Tampa, FL 33606
       Phone:  (813) 984-3060

       *Attorneys for Defendant Journalism*
       *Development Network, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this **11th** day of **November, 2024**, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all parties and counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

       /s/ *Dana J. McElroy*
       Attorney