# EXHIBIT 2

D4tngolc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

        v.                    13 Cr. 268 (JMF)

ANATOLY GOLUBCHIK,

             Defendant.

------------------------------x

                              New York, New York
                              April 29, 2013
                              11:15 a.m.

Before:

                  HON. JESSE M. FURMAN,

                              District Judge

                      APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
BY:  JOSHUA NAFTALIS
     Assistant United States Attorney

JEFFREY LICHTMAN
JEFFREY EINHORN
     Attorneys for Defendant

ALSO PRESENT:

Pretrial Services Officer Jeff Steimel
FBI Special Agent Robert Hanratty

               SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

D4tngolc

(Case called)

MR. NAFTALIS:  Good morning, your Honor.  Joshua Naftalis for the government.  With me is Special Agent Rob Hanratty from the FBI and Jeff Steimel from pretrial services.

THE COURT:  Good morning.

MR. LICHTMAN:  Good morning.

Jeffrey Lichtman and Jeffrey Einhorn for Mr. Golubchik.

THE COURT:  Good morning.  The defendant is present. As an initial matter, Mr. Lichtman, I have signed the stipulation for substitution of counsel.  I don't know if this hit the docket sheet, but that should be taken care of.

MR. LICHTMAN:  Thank you, your Honor.

THE COURT:  We are here on the government's appeal from the bail granted by Magistrate Judge Freeman on April 24.

As you all know, my review is obviously de novo.  That being said, I have reviewed the transcript of the bail hearing before Magistrate Judge Freeman, so I am familiar with that. Why don't I hear from first from the government, since it is the government's appeal.

MR. NAFTALIS:  Yes, your Honor.  Thank you.

The government's position before Judge Freeman and before your Honor is that detention is appropriate.  As a backdrop, Judge Freeman set bail of $10 million to be secured pretrial -- excuse me, home incarceration, electronic

D4tngolc

monitoring, GPS monitoring, no phones to be monitored by the FBI -- no phones in the house, the FBI to be permitted to monitor all of his family's phones, no Internet.

This package dictates detention. This is why you have detention. The burden on the FBI to dedicate all their resources monitoring someone who committed his crimes from home means the defendant should be detained. I am going to go through dangerousness and flight, but as a threshold matter the package that Judge Freeman proposed is so burdensome and so great it means that detention is appropriate.

The number $10 million that your Honor saw, it was pulled out of the air. The defendant lied about his assets on the pretrial services report. The defense counsel said $3 million. All of a sudden assets are coming out and $10 million is OK.

There is more money missing from here, too, like the 5.5 million in the hedge fund that we just froze. This man hides money. He's lying to the Court. Detention is appropriate.

MR. LICHTMAN: Your Honor, I'm sorry. I hate to interrupt. I am having a heck of a time hearing. I don't know if it is the acoustics.

THE COURT: The acoustics in here are definitely a little challenging. I am asking everybody to keep their voices up and make sure you speak into the microphone even with the

D4tngolc

microphone.

MR. NAFTALIS:  Is that better?

THE COURT:  Why don't you try.  Mr. Lichtman, if you have trouble let me know.

MR. NAFTALIS:  Your Honor, the government's position is that the government is very concerned about them seeking detention as you know.  We sought detention with respect to Vadim Trincher.  He is in the exact same situation as the defendant.  Judge Francis ordered him detained.  Judge Francis was very familiar with the case.  The defendant Mr. Trincher made a bail application.  It was denied.

Mr. Golubchik, Mr. Trincher, and Mr. Tokhtakhounov are the three people in charge of an international RICO conspiracy involving money laundering, massive ties to Russia.

Mr. Trincher is detained.  Mr. Tokhtakhounov is a fugitive.  There is no reason why Mr. Golubchik should be bailed.

The same reasons that apply to Mr. Golubchik apply to Mr. Trincher.  They are named in the same counts.  They were laundering tens of millions of dollars overseas.  They have connections to Mr. Tokhtakhounov, who, as we have mentioned at the arraignment before your Honor, is a four, the highest level of organized crime figure in the Soviet Union -- former Soviet Union, with connections to the highest level of politicians.

Tens of millions of dollars are coming from Ukraine,

D4tngolc

Russia, through Cyprus here. As I mentioned, we are freezing a lot of it here. There is a lot of it overseas. Cyprus is freezing accounts as we speak, and we are finding more and more.

THE COURT: Since you have paused, let me first confirm that Mr. Lichtman can hear. If not, I may suggest that you just do this from the podium, which I suspect may make things a little easier.

MR. LICHTMAN: That might be easier.

THE COURT: Secondly, let me ask you a couple of questions regarding things you just mentioned.

First of all, you mentioned the $5.5 million hedge fund, but that's the first I have heard of that.

Can you elaborate?

MR. NAFTALIS: Sure. As of right now, we have faxed a freeze letter to a hedge fund in LA where Mr. Trincher and Mr. Golubchik each have $5.5 million. It is frozen -- certainly not disclosed to your Honor, to Judge Freeman, certainly not disclosed to pretrial services. It just shows the moving target of just making up numbers to make Judge Freeman feel comfortable the man will not run.

Another example of assets that were not disclosed, he owns another apartment in New York, which is not on here, which is -- I forget the number that came up last, on the 24th, but it was a multimillion dollar apartment that somehow just didn't

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

get disclosed.

The man has the assets to run, he has the connections overseas to run. So I will start with, Judge, risk of flight and come back to dangerousness then because we are on money, your Honor.

As we mentioned, it is an international money laundering conspiracy. Defense counsel is going to stand up here and say there are people like Mr. Dreier, Mr. Madoff, who stole a lot of money.

This case has nothing to do with a domestic person stealing money. This is an organized crime case. It is a RICO case it is a money laundering case it is a extortion case the a case connected to overseas.

There was never any allegation that Mr. Dreier had connections to organized crime in Russia. This is a man who is an Israeli citizen, he has property in France, he spent an extended period of time overseas in Israel and France, and we arrested him when he got back here.

We waited for him to come back, and we think if he is out he will run. As we mentioned, the indictment alleges tens of millions at least $40 million coming from Russia through Cyprus into the United States either directly to Golubchik and Mr. Trincher, or washed through hedge funds such as the one we just mentioned, or real estate investments.

As an example of washing, the defendant lists his

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

claimed legitimate job as Haggard Realty on the pretrial services report. It is a fraud. That is a money laundering vehicle.

The defendants take their money from overseas, they put it into real estate here, and it comes out as rental payments, hedge fund dividends, to try to hide it from the government.

As another example of lying to the Court, when the defendant came into the United States from his trip overseas, he said he owned a gas station, that was his employment.

I don't see anything about a gas station in the pretrial services report in terms of his employment. He says he does Haggard Realty.

THE COURT: He told whom that he --

MR. NAFTALIS: U.S. customs. When you fill out the card when you come in, what do you do here. He said he owned a gas station. He does own a gas station, but he doesn't tell the Court about it, and he doesn't say that is his employment history.

In terms of assets overseas and payments, we mentioned he and Mr. Trincher and the other members of the Taiwanchik-Trincher organization paid Mr. Tokhtakhounov between ten and twelve million dollars in one period of time, simply for his protection, for his ability to extort money. If you have that kind of money, you have the ability to run.

D4tngolc

Just in terms of background, I think that my colleague mentioned it to you at the arraignment, this is a huge sports book betting operation.

The settle point, or the amount when a bettor would have to settle up with the defendants was $500,000.  It wasn't like you lost $50,000 you have to pay.  If you have swings of $500,000, that's when you owe money.  It shows just how much money is moving through this organization.

The defendant faces 90 years in prison.  That is a lot of time.  He has a lot of money.  We mentioned before Judge Freeman the defendant has or did have an ownership interest in two airline companies, which were money laundering vehicles.

One of them is called Skyway.  One of them was called Monarch.  We believe he still has contacts.  To the extent I suspect that defense counsel will say he's somehow gotten rid of these investments, he has contacts with an airline company, another indicia of flight.

One of these airplanes was found with 16 kilograms of cocaine on it.  I am not saying it was his.  But it is a company he used, and that is a lot of cocaine to find.

Defense counsel's other argument is this is not a man who has a fake ID.  He's not a man who's lied.  As I've gone over it, he's lied to the Court, he's lied to customs, he's hidden money.  The MO of this operation is to hide money from the government.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:13-cr-00268-JMF Document 213 Filed 05/30/13 Page 9 of 58

D4tngolc

As I mentioned, they worked from home. They used Skype, they used e-mail, they used different phones.

They kept money in different accounts under different names. So, as an example, Northside Capital, which we have mentioned is one of the Cyprus money laundering vehicles. It is not in Mr. Golubchik's name. They put it in someone else's name to hide it. Who knows how many different entities they have set up with other people using different people's names.

Mr. Golubchik puts money in his son's name. To hide money from the government, there is money in the son's name in this hedge fund which came from Mr. Golubchik we believe.

As your Honor is aware, it is not too hard to get a fake ID. The fact that he doesn't have one right now doesn't mean that he can't easily get one and he can't get out of this country with his financial assets, his ties overseas, the money hidden, and the like.

Let me come back to dangerousness, your Honor.

The Second Circuit, as your Honor is aware, has recognized that a leader of a criminal enterprise, if alleged in an indictment, that satisfies the dangerousness prong for purposes of detention, that is U.S. v. Urena, 986 F.2d 631 to 632, U.S. v. Colombo, 777 F.2d at 99 to 100.

The defendant is alleged to have committed at least two -- in the racketeering conspiracy, one of the patterns of racketeering is extortion. He is also charged with a

D4tngolc

substantive extortion conspiracy. Extortion is a crime of violence, your Honor under 18 U.S.C. Section 3142(e) as defined in Section 16.

Mr. Golubchik's connection is to Mr. Tokhtakhounov, the way this operation worked is to use Mr. Tokhtakhounov's literal presence to scare people into paying. He is the kind of person, if you don't pay, he has the ability to exert force or threat of force or the use of force and violence on people.

I mentioned before Judge Freeman, an example where Mr. Golubchik and Mr. Tokhtakhounov were on the phone about a debt owed. Mr. Tokhtakhounov says I'm going to get more than we're owed because I know that he'll pay me. That is extortion.

Another example, in mid 2012, Northside Capital, which is the shell company in Cyprus controlled by Mr. Golubchik, though kept in someone else's name to hide it, sent $300,000 to a man named Gary Zelesky. Mr. Zelesky essentially ran frauds or a Ponzi scheme.

Less than a month later Mr. Zelesky is at a hotel meeting with his business partner, with a man named Brian Weiss Mr. Zelesky kills him, and he then commits suicide.

There is violence around. Present at this meeting is a man named Gene Furman, an uncharged coconspirator of this organization. I am not saying that this is extortion per se. People getting killed with money going from one associate to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

another causes us concern, your Honor.

In sum, your Honor, Mr. Trincher is facing the exact same exposure, has similar ties overseas, and was detained by Judge Francis, who heard about 20 presentments.

We only sought detention for a couple of people: Mr. Trincher, which was granted. Mr. Golubchik's counsel at that time saw the writing on the wall. Mr. Trincher went first. Mr. Golubchik's lawyer said, I will consent without prejudice to make an application.

He was going to get detained in our opinion, your Honor. To come back in front of a different judge to get a different result just doesn't seem fair to us.

We sought detention with respect to two other people, I believe one of whom was charged with extortion. Candidly, Judge Francis granted bail.

This man is much more dangerous, has multiples the amount of money and has ties overseas. We don't see a reason why this man should be bailed.

Coming back to the burden, I haven't been doing this that long. I admit your Honor was a prosecutor at one point, obviously is a judge now. To put the FBI to the burden of monitoring three and four cell phones on a 24-hour basis until June 2014 means that he should be detained. To put a man under GPS home detention and monitoring means he should be detained.

If any, if you could set up the circumstance, I don't

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

know why we would have pretrial detention, because we should just have the FBI monitoring everyone from their home.

This is a man who committed crimes from home. He avoided detection by using a scheme where he thought he could. There is nothing to prevent someone from bringing a cell phone into this man's house, making a call and pretending that he's complying.

For those reasons, your Honor, we believe that detention is appropriate, and I'm happy to answer any questions.

THE COURT: Yes. I have a few questions.

First of all, I take it that this is a presumption case, that extortion or the racketeering conspiracy qualifies as a crime of violence under Section 16; is that correct?

MR. NAFTALIS: I actually don't think it is a presumption case. I was hoping it was, but I don't believe it is, your Honor.

Extortion is a crime of violence, but it doesn't qualify under the presumption part of the statute. I believe the Second Circuit -- I could get you the cite, but I don't believe that we would get the presumption.

But I think we satisfy the dangerousness prong and I believe we satisfy the risk-of-flight prong. It is a crime of violence, as referenced in the statute for purposes of the normal dangerousness to the community, but I don't believe we

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

get the presumption like in a felon in possession or a narcotics case.

THE COURT: OK.

Number two, can you give me -- I take it that Urena and Colombo, those were sort of more conventional Mafia-type organized crime cases, is that correct?

MR. NAFTALIS: Yes.

And I believe U.S. v. Gotti in the Eastern District, which relied on the charge of extortion as well. That one is a very similar fact pattern. I cited your Honor the Second Circuit cases that the Eastern District relied on, but they are organized crime cases with money laundering and extortion, at least the Gotti case was.

THE COURT: Were there allegations or evidence of actual physical violence and murders in connection with those cases; and, to the extent there were, are there any in this case?

MR. NAFTALIS: I don't know the facts honestly, your Honor, of those cases. In this case we are not alleging at this point that there is any connection to a murder. What we are seeing is this is a person who is connected intimately, has talked to a frequent basis to Mr. Tokhtakhounov.

Mr. Tokhtakhounov is in a different situation from any sort of organized crime figure in the United States. The organized crime figures here do not associate with the highest

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

levels of the American governments, that is what

Mr. Tokhtakhounov is. He is able to literally, a Vor is above

the law, they literally exist above the law. I know it sounds

odd to us sitting in this courtroom. People are afraid of this

man because of who he is, the assets he has, the influence he

brings.

The example I gave about the murder, I cannot proffer

that that is connected to the gambling. It is suspicious to us

that Northside Capital, which is the money laundering vehicle

used by this organization, sends money to a man, $300,000 in a

loan. A month later there is a murder suicide here involving a

man who was part of the gambling organization, Mr. Furman.

I cannot proffer that that is like a Mafia hit. I am

not saying that. I am just saying here's an example that we

have. Of course, there may be more. This is what I can offer

you right now.

THE COURT: OK. Two questions: One, you have argued

that this defendant is, for all intents and purposes,

equivalent to Mr. Trincher, who was detained.

MR. NAFTALIS: Right.

THE COURT: As defense counsel pointed out before

Magistrate Judge Freeman, Mr. Trincher is charged in a specific

extortion, an actual substantive extortion charge with respect

to a live person, whereas this defendant is not. Granted, this

defendant is charged with an extortionate conspiracy, or at

D4tngolc

least as part of the one of the racketeering acts.

Can you just elaborate on what this defendant's particular role was with respect to the acts of the extortion, and perhaps in conjunction with that -- you have cited one call with Mr. Tokhtakhounov in which it sounds like he said I am going to get more, but I am not quite sure what this defendant's role was in either that particular episode or more generally.

I guess what I am driving at is, can you elaborate on what this particular defendant's role was in any acts of extortion that you expect to prove at trial or as part of this case --

MR. NAFTALIS: Sure.

The calls that we have intercepted between Mr. Golubchik, Mr. Trincher, and Mr. Tokhtakhounov involve planning extortion.

We have an example in the indictment with respect to Mr. Trincher. We did not charge Mr. Golubchik with that specific extortion, but the conspiracy is that they used Mr. Tokhtakhounov's influence, use of force, the fear of the use of force to get people to pay.

What else they did, do I have a specific example beyond the one in the indictment that goes to Mr. Golubchik?

Sitting here right now, no, your Honor, but the calls are them planning it. The example I have with Mr. Golubchik

D4tngolc

and Mr. Tokhtakhounov, they are planning it together.

It is not like Mr. Tokhtakhounov is bragging and Mr. Golubchik sits there silently. They are partners in crime. They are collecting together, and Mr. Tokhtakhounov is the one who has the influence and can say, Don't worry, they are not going to mess with me.

Mr. Golubchik sits at the very top. The people below him are obviously the ones who generally do the collecting.

So that's why he's charged with conspiracy. Mr. Trincher happened to get picked up on a wire. It is a little bit, you know, luck obviously that that example we have.

I don't have a specific example with respect to Mr. Golubchik. But the fact that even Judge Freeman saw that this was someone who needs to be locked in his home and monitored 24/7 means that this person is a danger.

And dangerousness isn't just violence; it's committing the crimes, it's continuing to commit the crimes. And the fact that the FBI, with all their drained resources and everything else, they would have to put multiple men to monitor a phone for someone who should be in jail just seems like a misallocation of resources.

THE COURT: What if the defendant had to pay for that?

MR. NAFTALIS: There is still nothing to prevent him from coming in with a phone, a burner phone. What concerns us, your Honor, is defense counsel stood up and says, I've got a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

great package, $3 million.  This is really going to mean a lot to him.

Then all of a sudden it is 10 because he was lying to pretrial services about his assets.  Lying to the Court about your assets in an attempt to get out means you can be detained.

There still is no reference to this hedge fund, this apartment.  That's another 10 million.  I am not sure he could stand up here and say 3 million is enough to keep this person there when they failed to disclose to the Court there is another 10 million.

That is just here in the United States.  There's Cyprus, there's Russia, there's whatever else is hidden.

I believe that there is too much emphasis on the dangerousness.  I think the whole package is this someone who should be detained.

He has the ability to flee.  He has connections overseas.  He has money.  He has access to someone with power and can make threats of violence.

Mr. Trincher -- Mr. Golubchik actually has more access to money than Mr. Trincher.  Mr. Golubchik was more of the money launderer.  So his ability to get funds and run, I don't know why you would lie about having funds here unless you are trying to keep them.

In fact, Mr. Golubchik tried to redeem these hedge funds assets.  Certainly he didn't tell the Court about having

D4tngolc

them.  It wasn't like he forgot about them in the last week since he was arrested.  He sought to redeem them.  Also left out in front of the house --

THE COURT:  How does he do that if he was detained?

MR. NAFTALIS:  Someone called the hedge fund or sent an e-mail and said we'd like to redeem.  It is not like quarterly resumption.  It's one of these more liquid hedge funds where there's like two days' notice.

I find it a bit disingenuous for someone to say he is not a threat and will put up a bond, and then to not tell the Court about their client having all these assets, making redemptions.  I am not sure why.

This is not Mark Dreier.  That's what I am probably going to hear.  This is not Bernie Madoff.  This is a person involved in organized crime with massive ties overseas who is engaging in money laundering, who is charged, a grand jury found probable cause to find this man committed the conspiracy, extortion conspiracy.

There are no extortion charges against either of these men, to my knowledge.  This is of a different type -- this is a person more akin to the Gotti, the Second Circuit cases about traditional La Cosa Nostra-type organized crime.  But this also has the added foreign contacts element with huge amounts of money.

THE COURT:  All right.  Thank you very much.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

MR. NAFTALIS:  Thank you.

THE COURT:  Mr. Lichtman.

MR. LICHTMAN:  Thank you, your Honor.

You know, we have heard a lot about fairness, lies, misleading the Court, and the fact that this defendant is exactly situated as Mr. Trincher was.

Let me explain some of the lies from the government, which frankly is stunning that I am having to say that in this courthouse.

First of all, this is not a presumption case, as Mr. Naftalis correctly pointed out.  3142(e)(2) and (3) specifically talk about the presumptions.

It is 3142(f) which allows for detention hearing.  We don't even get a detention hearing unless there is either a crime of violence, which is in (f)(1)(A), or if the government can show that there is a serious risk that such person will flee or obstruct justice, and that is (f)(2)(A).

Once we get to the hearing, we go back to (e)(2), which talks about when there is a presumption which based on dangerousness, and then we go to (e)(2)(iii), which talks about the presumption for flight and dangerousness.

Neither of those circumstances, as Mr. Naftalis pointed out, this time they don't hold, and this is simply a case that triggers a hearing because of the violence that is alleged with the extortion, and it is still the government's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

burden by clear and convincing evidence on violence and preponderance of evidence on flight.

However, during the Trincher hearing, and I didn't know this last time, Judge, because I am under a tremendous disadvantage here. There's been no detention letter filed before with the magistrate, magistrates plural. There's been no detention letter filed here.

So, I walk into court both times, and I am at their mercy pretty much. They put forth facts, and I'm supposed to have the 25,000 taps, phone taps reviewed beforehand that I haven't received.

I'm supposed to know about hedge funds. None of that has been given to me beforehand, so I am at a tremendous disadvantage.

What they didn't tell you in the Trincher hearing was that they proffered that it was a presumption case, wrongly proffered that. What they didn't tell you is that in the Trincher case the judge detained Mr. Trincher not on the dangerousness ground, clearly one basis due to risk of flight.

They don't mention that. So we are supposed to have a holding is what they are saying, is that we are supposed to use that as a holding, it's precedent to hold this defendant, even though in the Court before there was no issue on dangerousness ultimately found.

They didn't mention that to you. That is misleading.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

Secondly, with regard to Trincher, they don't mention that there's $2 million worth of casino chips found in his apartment upon arrest and $75,000 in cash.

They didn't mention that either. That something that might be indicia of flight, which ultimately led to his detention.

Yes, is it mentioned before Judge Freeman? No.

is it mentioned here? Of course not, because it doesn't help their cause, which is to get this man detained at any cost.

But there's more.

We are told that, well, it's the exact same case. 3142(g) specifically talks about factors of each defendant. It is not just because a Court finds someone either dangerous or risk of flight.

You have to show that there are no conditions that would reasonably guarantee that there would be no danger problem to the community or that there would be a flight risk. So you can find that the defendant is dangerous or is a potential flight risk, but if there are conditions either alone or combined which will reasonably assure the Court, that person is bailed.

What they didn't mention is that this is the entirety of the Trincher proffer: "My client's" -- I'm quoting -- "my client's married and his wife is here in the courtroom. I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

submit to your Honor that a bail package involving some much less restrictive methods, such as home where the client is monitoring, and a certain amount of cash alternative in addition to a personal recognizance bond signed by another financially sound (inaudible) should be more than sufficient to require my client to appear in court as necessary."

Does that sound likes the conditions that we put forth?

It is not even close.

THE COURT:  Mr. Lichtman, I understand you are just responding to an argument, fairly responding to an argument that the government has made regarding Mr. Trincher and his similarity or lack therefore and your view.  Whether I detain Mr. Golubchik or grant him bail will be on the basis of factors and considerations that are specific to him.

MR. LICHTMAN:  Fair enough.

THE COURT:  Why don't we move off Mr. Trincher.

MR. LICHTMAN:  Fair enough.

THE COURT:  I think that has limited probative value at the end of the day.

MR. LICHTMAN:  I do as well.

Your Honor, at bottom what we have here is actually, you know, Judge, before I get into an introduction, I want to talk about one other problem that relates to this defendant.

If you notice, during the last hearing before Judge

D4tngolc

Freeman, obviously your Honor read that we learned about the plane company that he owned. Last time he owned the plane company. A few days later, well, now he doesn't own it anymore, but he has contacts with the plane company.

Pretty shocking difference when one man supposedly owns a plane company that's waiting outside his apartment in Fort Lee, if you would listen to them.

And then the next day, a few days later, well, it seems like we might have made a little mistake. We might have pushed the envelope too far.

Well, let me tell you what I did. About 15 minutes after I got back from Court last week, I went on the Florida Division of Corporation website, and I looked up these companies.

What did it show? 2009, 2010, 2011 he is an owner. He's listed as one of the principals. Then he disappears because he sold his interest in the company. That took me 15 seconds to figure out.

But when you are trying to get detention by any means necessary, you may slide the facts a little bit. The fact is it took me a second to figure out that he has no ownership interest.

I was in Court with him, and I asked him because that is the first I heard about the plane company. I didn't know that this existed until they brought it up.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

I said to him, What's with the plane company?

I misunderstood what he said, and I think I actually said that the company doesn't exist anymore. There is an issue of communication here. I am not saying that he requires an interpreter, but it would have been just as easy for me to say, well, he sold his interest the last couple of years in both companies, and I had difficulty communicating with him a little bit so I learned, at least what I gleaned from him was that the company didn't exist anymore.

It wasn't until I got back and looked at it myself to see that it didn't, and I also spoke to one of the people that work in the company right now and confirmed it.

These are things that they could have done, but they didn't want to because why not just say it to a Court and figure maybe we can get away from it.

I think we can expect a little bit of backup before such things are said. It is such an important issue of flight if someone owns a plane company.

But at bottom, this is a very large gambling case. We are told about the Colombo case and the Gotti case. I'm familiar with both. The Colombo case had murder. The Gotti case the entire case was violence. Every single thing in that case was permeated with violence. I know the case. Violence, violence, violence.

What we have here is a very large gambling case with

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

money laundering of the gambling proceeds.

International gambling, Internet betting, it's a huge gambling operation that we have been told about. That's the enterprise of which he's charged in.

These are not people that joined with a blood oath, that said we are going to keep this enterprise alive until the end of time, or we should burn in hell like the saint in our hands.

It is not that kind of organization. It is an international gambling company. Yes, enterprise; yes, there are allegations of extortion as well.

But what the allegations show, and they are hard pressed when your Honor really got to it, is that this is not the type of extortion where they're extorting all the businesses on the street in the neighborhood or they're doing things like that to grab money where the violence is inherent in every part of the organization.

No. What happens here is that Mr. Golubchik is charged with having a gambling operation in Russia, to rich wealthy Russian people. Then, if some of the rich, wealthy betters don't pay up, there's the allegation that a Russian organized crime member -- he's not part of the family, the Russian organized crime family, you notice they didn't say that -- that he's then used, that Vor is used to sort of provide the intimidation to make sure that the Russians in

D4tngolc

Russia pay their debt.

There is no allegation that he's involved in anything in America, of using extortion of anything specific.  And there is no allegation that he's part of this Russian organized crime syndicate that the lead defendant is.

That lead defendant is in Russia, has not come back for over a decade.  He was indicted in 2002 for bribing Salt Lake City Olympics officials, and he is under indictment since then.

So the idea that his connection in Russia, which is solely used to get people to pay their debt somehow transfers to here, it is just not realistic.  It is not that type of organized crime case, your Honor.

THE COURT:  Can you address the allegations that the defendant failed to disclose or even hid various assets, including the hedge fund, possibly the gas station, the apartment on 76th Street?

It strikes me that those are fairly serious allegations, and to the extent that I am weighing whether there is a preponderance of the evidence --

MR. LICHTMAN:  Understood.

THE COURT:  -- which suggests that he is a risk of flight, that is a serious consideration.

MR. LICHTMAN:  Judge, I can tell you that with regard to the gas station, I am looking through my notes here, and it

D4tngolc

states that he owns a gas station, that he did not tell pretrial services when he was interviewed, and I was prepared to tell the Court that. I've got that in here now.

The problem was, is that there was some significant misunderstanding of everything that was going on that day. He talked about certain assets. One asset is a $5 million apartment in Manhattan is in his name. The idea that he would purposely try to hide an apartment in his name that was in the indictment frozen as proceeds, it is not the kind of thing that someone would hide, Judge, unless there was perhaps a misunderstanding.

I can't speak to it because I wasn't there, but that's not the kind of thing you hide. He couldn't understand me in court, so I am not surprised that he when got rousted and got arrested that he didn't mention an apartment that hey knew about that was in his name in Manhattan that was a block away from the other address of an apartment that he rented.

So that's all I can say to that, is that I don't believe there was any effort to mislead with regard to the hedge fund. The government says that it is not in his name I believe is what they have said.

THE COURT: I think they said that some of the assets were in his son's name, but not all of them. I don't know exactly, but I definitely took it that it was largely in his name or at least substantially.

D4tngolc

MR. LICHTMAN: It is hard -- again, I would say that he didn't have an interpreter that was there that day. He made some mistakes when he was interviewed that I think we have to say were so obvious that part of it has to be a language issue, and it's proven by the fact that I was sitting with him in court and I couldn't communicate with him well.

THE COURT: Can I stop you there because he doesn't have an interpreter today either, and he didn't have an interpreter at the arraignment where he answered my questions in English and my deputy specifically asked all counsel if anyone needed an interpreter, and there was one defendant who indicated that he did and an interpreter was provided. But this defendant did not utilize the services of that interpreter, even at the arraignment.

So, number one, I have concerns about later being told that he didn't understand any of these proceedings; and, number two, I don't entirely buy it because when asked if he needed an interpret he didn't accept the invitation, not to mention he's been present in this country for 24 years, if I am not mistaken.

MR. LICHTMAN: I think it is actually less, your Honor, but that's well taken.

The fact is Russian is his first language; English is not his first language. I don't think he requires an interpreter but I can tell you, my associate can certainly

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

support this, when I was in prison with him last week, I think on Friday I went to see him, he didn't understand what the word "remand" was. I think that he speaks English, he understands English to some level, but I don't think that it's necessarily the level that we do here. I don't think he requires an interpreter, Judge, but there is definitely some issues with regard to communication.

THE COURT: You can't have it both ways.

MR. LICHTMAN: I understand.

THE COURT: If he doesn't understand it sufficiently for you to proffer to me that that may explain why millions and millions of dollars of assets are not reported to pretrial services, but tell me, as he basically did himself, that he doesn't require the assistance of an interpreter for the court proceedings, those two things don't mesh.

MR. LICHTMAN: I understand that, Judge. I understand it is a problem. I would say's that all the tapes, the 25,000 tapes in the case in which he's been recorded, I haven't heard a single one. They haven't been produced. I have no doubt that they are in Russian. I think it is a problem with somebody who understands a lot of English, a reasonable amount of English, but doesn't understand every single thing.

I am not going to use that and say solely that's the reason why there were some errors with pretrial services. I wasn't there, but there certainly has been some communication

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

issue problems.

The fact that he didn't divulge a $5 million apartment a block away from another address that he gave just doesn't smack of someone that is looking to hide something with regard to the hedge fund. Money, that is a different story. At least arguably I can understand why that would be something where someone would want to hide it.

It doesn't make any sense with regard to the apartment. I don't think that was a lie.

THE COURT: And the gas station?

MR. LICHTMAN: The gas station I learned because we talked about what happened, and he says I wasn't aware that I was supposed to give every single asset. I own a gas station in New Jersey, which is why I have it in here. I was prepared to alert the Court to that. I'm happy to show the line where that's in there, your Honor.

If I can get past dangerousness, because obviously your Honor is focusing on the flight risk issue.

I brought up the Madoff and Dreier examples to show that they had zillions of dollars, exponentially more than him, all over the world.

The fact that they don't have organized crime connections in Russia, I don't think that necessarily tips the hand on the issue of flight risk. We have guys in that case that were lying to the SEC every single day. Dreier was going

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

to meetings in Canada using a fictitious name. You don't have that here. You don't have an issue where they found identifications.

I am told by the government, well, it's easy to make an identification. Well, it's easy to do a lot of things, but it didn't exist here. You don't have the identification, you've got cases in which fake identifications, credit card fraud existed with pictures of him with a different name, the defendant, in which people were bailed out.

You don't have any of that indicia of flight that you have here. You don't have it. You just don't have it. And you don't have somebody with criminal record like we had in all these other cases. You don't have any of that.

So what we do have is perhaps someone who is an American citizen who lives in an apartment with his wife and two children, including an eight-year-old daughter. We've got a house, that apartment being put up which houses the entirely family. We have his mother-in-law's apartment.

Now I went from $3 million to $10 million. Judge, he doesn't have to put up any additional money for me to make the restrictions more onerous on him and his cosigners. That's really what the $10 million was, not that he doesn't have to put up $10 million in property. It was secured by the same amount of property.

Now, we also said that they can search the house

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

whenever they want.  They can monitor the calls.  I understand that there is a claim that this is some sort of difficulty for the FBI.  Well, there's case after case, as your Honor pointed out, in which these sort of restrictions are put in place.  It happens.

THE COURT:  I have to tell you I have never heard of a case where the permission is granted the government to essentially tap the defendant's phone.

MR. LICHTMAN:  I have.  I can give you names of some that I have been involved in over the years.

THE COURT:  Who pays for that?

MR. LICHTMAN:  The United States v. Natar Antonio, which was an Eastern District case before Judge Hurley that I was involved in.

I believe in Dreier they were allowed as well to tap phones.  I know other cases I have been involved in, because I have made this proffer before.  They don't have to tap them. They are allowed to whenever they want.  They are allowed to come into the home whenever they want.

The idea that this is somehow so onerous, they managed to tap 25,000 phone calls in a few-month period, and also having to get a tap order from the Court.

We are willing to give all that.  They can do what they want with it.  The fact is there's case after case in which these sort of restrictions have been put in place.  I

D4tngolc

know, I have been doing this for 23 years I have had some cases in which these sort of restrictions have been put in.

THE COURT: There does come a point where you replicate detention to such a degree that somebody may as well be detained, no?

MR. LICHTMAN: It is a mini MCC argument. That is in the Second Circuit I think it was United States v. Urena in which that term was brought up, mini MCC. The type of mini MCC that was discussed in that case, which is not evident from Judge Freeman's order was when you have guards outside the home that they had in Madoff and Dreier.

Where there is actual guards that the defendant paid for, as your Honor pointed out. So, in those cases there was a belief that there was a risk of flight, but the conditions were such that they could ameliorate any reasonable belief that the defendant would run.

Now, if I can, Judge, there are cases that I brought up last time on the issue of flight. This Chan Ming Fon case, which was just January of this year, in the Southern District, a Taiwanese citizen who lived in Singapore and made $10 million in the scheme was bailed.

I've got another one. This Verutian Emroyan, Judge Fox granted bail to an Armenian citizen who was a member of a violent organized criminal enterprise which used violence and threats of violence to ensure respect for and payments to the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

leadership. This was a $100 million Medicare fraud. Some of the victims were threatened to be disemboweled. There were discussions of killing people who didn't show respect.

Now, Emroyian, not only was he not an American citizen, like the defendant, he had a massive criminal record. He was on probation on another crime when he was arrested on the present one in January.

He was convicted of making a false statement on a CTR report, received 33 months in prison. He lied on his tax returns and also used fraudulent credit cards. That shows dishonesty. He also used aliases in connection with the crimes he committed and was found in possession of identification documents with his picture on them, none of the things that we have here, none of them.

That is an actual risk of flight when you arrest someone and you find identifications in another person's name with your picture. That is someone who is preparing to leave; not, well, he owned a plane company, but now he doesn't own it, but he knows somebody who might be working at the plane company.

A lot of this is just not realistic, and it doesn't pass the burden that they have. It just simply doesn't. It is a lot of conjecture. The only thing, frankly -- and I will be honest here as I have to all the time -- that I think it at least speaks to the issue of flight is the hedge fund money and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:13-cr-00268-JMF Document 219 Filed 05/30/13 Page 35 of 58

D4tngolc

the apartment in New York that was not mentioned.

The rest of this, frankly, there are hundreds of cases, I could be here until Friday giving you cases in which there are infinitely worst circumstances on flight in which defendants have been bailed.

THE COURT:  Why don't you address those things.  Because I am not persuaded that there is justification to detain him on the grounds of dangerousness.  I will put that out there.

But I am given serious pause about the risk of flight because of, number one, a combination of or the combination of his overseas ties, which strike me as quite extensive, including to somebody who is alleged to be a high-level member of organized crime in Russia, because he appears to have substantial assets, and because he failed to disclose many of those assets, suggesting to me, quite frankly, that he made some effort to conceal them from the Court, however stupid that effort was.

The combination of those things gives me serious pause.  To the extent that the government's burden is simply to show by a preponderance that there are no combination of conditions that would reasonably assure his appearance in Court, that is a substantial argument.  So why don't you address those things.

MR. LICHTMAN:  I would say, first of all, the ties or

D4tngolc

the foreign ties obviously we are talking about the individual in Russia who is the lead defendant in the case that he supposedly has ties with, unlike in Trincher.

THE COURT: Not just that. He also has extensive travel. He is a dual citizen with another country. I mean, all of that.

MR. LICHTMAN: OK. What we have here, the dual citizen with another country he has turned over. He voluntarily turned over and gave his passports to the agents when he was arrested.

What you are saying basically, your Honor, is that there are things that make you uncomfortable, that perhaps would let the government get past their preponderance of evidence burden.

THE COURT: Yes.

MR. LICHTMAN: But there has to be the weighing with conditions that would reasonably ameliorate that concern.

Now what I would say is when you have the tremendous moral suasion of five close friends of his basically wiping out their entire life savings forever, that's something that would ameliorate that condition.

The fact that it is his family home that houses his wife, son and eight-year-old daughter, that is another. The home that his mother-in-law lives in, that is something else.

THE COURT: And the family home is the one in Fort Lee

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

New Jersey?

MR. LICHTMAN:  Yes.  That was obviously not designated proceeds.  It was bought before I suppose the allegations in this case.

THE COURT:  The mother-in-law's home is the one in Brooklyn?

MR. LICHTMAN:  Yes.  That's correct.

THE COURT:  I presume they would be subject to approval by the government, but who are the five financially responsible persons that you have proffered?

MR. LICHTMAN:  Judge, we've got Alex Schinderman, who is a project leader at NYU.  We've got a Michael Schwartzman, the computer programmer in Morgan Stanley.

THE COURT:  What are their relationships to the defendant?

MR. LICHTMAN:  These are friends of the family.  And of him.

We've got a Scott Drese, who is a CEO of a company in Dallas.  We have Vadim Castel, who is a real estate developer in Brooklyn.  I've got an Alex Furbitsky, who is a former Army man.  He retired from the Army.  He works at the medical diagnostics place.  That is five.

Judge, I have actually got some more.  We have a software systems analyst at McGraw Hill named Elena Gocharov. And we've got -- I can't pronounce the first name, Judge, even

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

though I'm half Russian -- Liudmyla Yushchenko, who owns a hair salon.

You've got people from the community who are willing to stand up for him, Judge, and know that they will be completely wiped out should this man run.

He's facing 90 years statutorily. 20 years I think is the top on any count, Judge. We know that's not what the guidelines are. That's just the statutory piled on top of each other consecutive.

We actually have another suretor as well, who owns a pharmacy in Pennsylvania, Judge. The point is that we've got a tremendous amount of restriction. This is not a mini MCC situation, which actually in certain cases, as we saw with Dreier and Madoff, has actually been allowed at their expense because they have paid.

We have been wrapped up so tight, there is no computers in the house, there is no access to Internet. They are allowed to come in any time they want and check. We have to give a letter from the cable company to show that there is no Internet.

I don't see how, when you look at all those restrictions, how anybody realistically can say that this is beyond a reasonable risk of flight. I just don't think that it is there. Just the fact that they want him detained, if this were a traditional organized crime case, where the tentacles of

D4tngolc

the organization are all over the country and the world, it is not that kind of case.  It is a gambling case that, if not for the extortion, we wouldn't even have a hearing on the issue of dangerousness.  It is not that sort of case.

We asked point blank, well, what did he do.  I don't mean to get back to dangerousness, I think it goes a little bit to the credibility of the proffer.  What did he actually say?  He was on phone when somebody said maybe we could get more money than the person owed.

There are three specific extortions in a seven-year period that are charged, with three specific victims.  He's not charged with any of them.

They had seven years, seven years of criminality.  They have looked at him, every possible cavity has been looked into.  There is no allegations of specific violence, there is no allegations that he was preparing to flee, and three of the defendants in this case from what I understand, Judge, were questioned during the pendency of this investigation.

Did he run?  Talk about looking into the heart and mind of a defendant who is now claimed to be a flight risk, there were people in this organization that were approached by the FBI, with all of his far flung assets, he could have picked up his family and moved to Israel.  But he didn't.  He didn't because he's not a flight risk.

That's when he didn't have the $10 million bail,

D4tngolc

that's when he didn't have the computers out of the house, that's when he didn't have the five financially responsible cosponsors, that's when he didn't have the government permitted to search the house whenever they want or to tap his phones.

they should welcome the opportunity to tap his phone, Judge. They did it enough in the case.

THE COURT: Can you address the question of cost? It would, I presume, be quite expensive. Is that something the government should pay or something that the defendant, given his means, should pay?

MR. LICHTMAN: You mean the tapping of the phones, Judge?

THE COURT: Yes.

MR. LICHTMAN: Judge, I think that it would be something that the government should bear because they are going to be collecting that evidence and using that against him if possible.

So, in essence, we are paying for them to create evidence. If it is something that the defendant could afford, I don't know. They froze all of his accounts that were left in the country, Judge, so I don't even know that he could afford such a thing.

THE COURT: That is subject to the same sort of minimization requirements that a normal wiretap would be subject to?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

MR. LICHTMAN:  I wouldn't ask for that, no.  I didn't ask for that.  I didn't ask for any Title III restriction.  I said simply they are entitled to tap the phone, as we have done in other cases.

THE COURT:  What if he speaks to you?

MR. LICHTMAN:  Well, he's allowed to have, I understand, one phone that he is allowed to use.

I would say that if the government is listening in, and there is privileged conversations, obviously I am not going to waive that, and I think that if that's minimization, normally minimization refers to things that do not relate to the crimes that are in the wiretap order, but certainly privileged conversations the government shouldn't be permitted to listen in on.

But frankly, Judge, I'll tell you this, if he's out on bail, it would make it easier for him to review 25,000 tapes in this case that are in Russian, a little tougher to do in the MCC.

I have no problem with any discussions that I have with him being done in my office.  I have no problem with that.  He's got a GPS device.  This isn't the traditional bracelet, your Honor, where we've seen in cases someone can cut off a bracelet and disappear.

The GPS is every step of the way.  When you have the bracelet, as your Honor knows, you have to call up pretrial

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

services and say I am going to be at my lawyer's for six hours today. They shut the machine off. That is what happens.

Talk about a fiction. That's what happens. With the GPS, completely different. They know where you are every second of day, including when you are going your lawyer's office. They can track you every step of the way. That is a tremendous ability to monitor that does not exist in traditional electronic monitoring cases. It is very rarely used, and we offered it. The judge accepted it.

THE COURT: OK.

MR. STEIMEL: Your Honor, Jeff Steimel with pretrial services.

There are some limitations to the GPS. Obviously, the unit has to be able to see the sky. If a person goes into a subway we would not have GPS location. Also at Midtown, because of the tall buildings, sometimes we have some issues with that.

I just bring that to your Honor's attention.

MR. LICHTMAN: I would say, with regard to that, there won't be any subways taken on the trip from Fort Lee, New Jersey, to my office, unless there are new ones that I am not aware of.

We will obviously let the government know every time he leaves, we'll let pretrial services know. There won't be any issue. They will know exactly where he's coming from,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

which will be his house to my office, which is not far, it's G.W. Bridge, I am right along the FDR, and that's it.

He will be in my office, he will then leave. He will then go back to his home. So they will have a tremendous amount of ability to monitor him. The phones, the house, the computers, he won't have any of that in the house.

The Internet, which is how we were told the crimes were committed, through Skype. That issue is gone now.

THE COURT: Do you know of other cases in which this permission to tap the phones has been granted and how that works in practice?

MR. STEIMEL: Your Honor, I don't know specific cases. I used to work in Brooklyn. There were instances, I believe, if I recall correctly there were done, but it has been so long, I can't give you any specifics on it. I will tell you that it is very onerous and --

THE COURT: On whom?

MR. STEIMEL: Onerous on the government to monitor that, and then, on top of that, given the technology now of cell phones, how small they are, you might know of five, but anyone can sneak in a cell phone at this point.

You can't jam a residence where it cannot receive telephone signals. The FCC will not allow that. It is very problematic with respect to knowing what kind of device, communication devices are in the house.

D4tngolc

It not only, doesn't just go to cell phones, that goes to tablets, to any type of smart phone which has Internet capability. It is a daunting task, and I understand that the condition can be in place, but it will be very, very, very difficult to enforce, if it's enforceable at all.

MR. LICHTMAN: Your Honor what I would say to that is that one way to ensure that there is not any issue with the phones in the case is the fact that he's only going to be using one phone.

If your Honor would like to make it that the only time he calls out is to his attorney, I'm prepared to do that as well. But I have been involved in cases where the government has had permission to listen in on phone calls. I am not saying that they are listening around the clock, but certainly a pen register can be used to see what numbers are called. That is not a very onerous task to see what's been called, so I don't know that it has to be as onerous as it sounds, your Honor.

THE COURT: OK. I have to say I think you need to think about the waiver of attorney-client privilege or any other privilege that may apply. I certainly know that the case law, if the government were aware of, for example, somebody makes a call from the MCC and there's a notice that says calls may be recorded, if they call their attorney notwithstanding that warning, I think there is case law suggesting that that is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

a waiver of the privilege because you are not taking steps to protect the confidentiality of the communications.

If he calls his lawyer or makes a spouse call that would otherwise fall within the privilege, knowing that the government may be listening in, I don't know why a similar argument wouldn't apply.

MR. LICHTMAN: I think that's fair and I agree. I can't deny that is a fair argument, and if he's he out on bail and has the ability to come to my office, which is probably half an hour away tops, I don't see any reason why the only conversations we would have over the phone is I would like to come see on you this date at this time.

THE COURT: All right. Anything further?

MR. LICHTMAN: I think that is all, your Honor.

THE COURT: Mr. Naftalis briefly, if you have any response?

MR. NAFTALIS: Yes, your Honor, very briefly.

Defense counsel likes to accuse the government of misstating things. We have been completely candid. We may have -- the airplane company I guess it went bankrupt because of this cocaine issue. I fall on my sword, your Honor.

This case is about money being hidden. This is not just a gambling case. I think that the defense attorney is blowing smoke honestly. This is not a gambling case. This is an organized crime RICO extortion case. That's like saying the

Case 1:13-cr-00268-JMF Document 219 Filed 03/30/13 Page 46 of 58

D4tngolc

Mafia is just avoiding taxes, your Honor.

There is money involved, huge amounts of money. Judge Francis specifically held, whether or not this is a presumption case, detention.

So, to accuse the government of misleading, Mr. Harris was forthcoming. I thought he said, I don't know, I believe it might be a presumption case. And Judge Francis handled it very properly and he said, I don't care if it is a presumption case, you are getting detained.

The defendant was found with $150,000 in one of his safe deposit boxes, cash that was hidden. I don't know why you would keep $150,000 of cash in a safe deposit box. That is what a checking account is for usually. That is called hiding assets.

Let's add that to the hedge fund, the gas station, Cyprus, Russia, the apartment.

THE COURT: Was that money seized by the government?

MR. NAFTALIS: It was.

But, again, why would you hide $150,000 in your apartment?

The defense counsel referenced, but Mr. Trincher was found with $2 million in chips. That's true.

Why does one keep $2 million in chips? Why does one keep $150,000 cash in a safe deposit box? Because you are committing crimes. That would be the inference that could be

D4tngolc

drawn.

The defense counsel still hasn't addressed this burden issue. He says, oh, it happened before. I don't know of any case, your Honor doesn't know of any case -- there's some hypothetical cases floating. No one can point to how it was done, who pays for it, the monitoring of this. To make Agent Hanratty and his entire team monitor these calls, the counter argument is only if they want to, so then it is shame on us for not catching this.

This is sort of a bizarre argument that, well, I am giving you access, but you don't have to do it. I don't know about the waiver issues, the Title III issues how that works. But it seems like a very dangerous argument, the same way that he of argues, oh, my client doesn't know what's going on, but he knows what's going on.

It is sort of saying what you want to say to get what you want. This is a mini MCC. Basically we are saying that anybody who wants to can just set up one at home and the FBI should just be sitting in the wire room listening.

With regard to minimization, I think we have been minimizing. I don't know one way or the other, but I don't think you can say you don't have to minimize, but if it is attorney-client privileged, you should hang up. That is called minimization.

THE COURT: I take it Mr. Lichtman is saying he

D4tngolc

consents to just monitoring his phone without regard for minimization, without regard for privilege. He recognizes that it may well constitute a waiver of any privilege.

MR. NAFTALIS: Complete waiver of attorney-client privilege?

MR. LICHTMAN: Yes.

THE COURT: It is OK for him to say that. I am wondering if that way he will be the consequence.

MR. NAFTALIS: It sets us up for an awkward record when that happens, your Honor.

With respect to the monetary amount of the bond, I think this is detention. I think this is clear detention. This is why detention is necessary.

A man commits crimes from his home, he commits crimes using shell account set up under false names. Let me just read a quote for you from a wire.

Mr. Tokhtakhounov says to Mr. Golubchik: How is our business going?

This is their joint business.

With respect to Mr. Golubchik setting up the Northside account under a separate name, he tells a man named Vadim, a different Vadim from Mr. Trincher: Remember Northside, the company I opened up in your name.

OK. This is a man who sits up things to hide things. The $10 million number, this is pocket change. The amount of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

money flying around here is huge, and the fact that we can go from 3 to 10, and we will just throw it on some friends, I don't know who these people are.

Even if they are financially responsible, the amount of money to keep him here will not keep him here, and the burden on the FBI is so immense.

I don't know why he is fighting so hard to set up this system other than to crush the government with cost and to allow his client the opportunity to commit crimes from home with a burner cell phone, as pretrial services referenced.

He wants his kids to be able to bring in their tablets because he said something about their school work. All of a sudden the exceptions start swallowing this rule.

The detention is set up to keep somebody from committing more crimes who might run. That's why you would be detained.

I don't want to sort of belabor it. I think your Honor has the general idea.

THE COURT: I do.

MR. NAFTALIS: With respect to the last point, we interviewed a few people. We never mentioned the couple of people we interviewed, Mr. Golubchik, Mr. Trincher. We were talking about a totally different side of the case, the domestic poker case.

We talked to a couple of people. It was no secret.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:13-cr-00268-JMF Document 219 Filed 05/30/13 Page 50 of 58

D4tngolc

Mr. Golubchik has nothing to do with poker.  He has to do with an international organized crime RICO conspiracy, and we were very careful not to tell anybody.

The Tokhtakhounov indictment, Mr. Harris and I only appeared in the 2002 case after the arrests.  We weren't like appearing like, hey, we're still paying attention to you guys.

We were making all efforts to keep our investigation secret, and to say that somehow we were flaunting what we were doing, no.  It is just a misstatement of the government's concern about flight.

As I said, the government planned the takedown based on Mr. Golubchik's whereabouts because we believed he would flee.  We didn't care about someone who lives in LA who was committing a poker -- who we have been investigating for years.

THE COURT:  Can you address the allegation, I don't know why it came out for the first time a moment, that there was $150,000 cash found in the safe in Mr.  Golubchik's house. That does strike me as slightly unusual.

MR. NAFTALIS:  Safe deposit box.

THE COURT:  Safe deposit box.

MR. LICHTMAN:  That is the first I am learning of it. I would accept as being true there was $150,000 in cash in the apartment.

THE COURT:  Apparently a safe deposit box?

MR. LICHTMAN:  In a what?

D4tngolc

THE COURT: Safe deposit box.

MR. LICHTMAN: In the bank.

THE COURT: I guess.

MR. NAFTALIS: We had to get a search warrant. There was $150,000 in cash in a safe deposit box.

THE COURT: Where was the safe deposit box? In a bank?

MR. NAFTALIS: In a bank, like in New York.

MR. LICHTMAN: I am assuming that was in the defendant's name.

MR. NAFTALIS: Excuse me, in Fort Lee, New Jersey, in the defendants' name, in his wife's name, which he uses. As I said, we believe he uses family members' names to hide money, for example, putting money into the hedge fund in his son's name.

MR. LICHTMAN: What would I say about that is the fact that he has $150,000 in a safe deposit box that is in either his name or his wife's name in a bank right near his apartment hardly strikes me to the level of international intrigue in terms of risk of appearance.

Obviously we are not here to give the man a medal. This is not a rotary club coronation right here. This is a very serious criminal case.

But the fact remains that that money was not hidden in somebody else's name. It was in his and his wife's safe

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

deposit box.  If it's in his and his wife's safe deposit box, it's bad; if it's in somebody else's name, it is evidence of something bad.  You almost can't win here.

Yes, there was $150,000 in cash in the safe deposit box in the town that he lives in.  In regard to what I think is an important point is the fact that there are were people who were questioned by the government agents in this case, and we're told this had nothing to do with Mr. Golubchik.

I would disagree, because Count 18 charges one of the defendants, along with Mr. Golubchik, in a money laundering conspiracy.  That defendant was interviewed by agents.

So, at least according to the government, unless they are claiming that he doesn't know someone who is charged with him in a money laundering conspiracy, which certainly would go against them when they are trying to show some proof, the fact is that that defendant had the opportunity, according to the government, we think to tell Mr. Golubchik that the heat was on, that they were looking.

He didn't run.  He mad no attempt to run.  When they arrested him, there was no ID, there was no effort to try to leave, nothing at all.

All we are told about is a plane company that, quote, I guess this is what happened.  Well, guessing is not enough, Judge.  You've got a pretty serious standard.  I understand that it's difficult and I am making this tough on the

D4tngolc

government. I apologize for that. But this man, according to them is facing 90 years in prison and has 25,000 tapes. As Judge Weinstein has said in other cases, it is much tougher to fight a case from the MCC or the MDC than it is while you are out on bail.

That's why I'm fighting, Judge, because that is what defense lawyers do, we try to fight the evidence in cases. I apologize that I am making it difficult. When they needed to tap 25,000 calls, they weren't complaining then.

Now, because we are allowing them to tap his phones, suddenly that is the straw that broke the proverbial back.

Judge, the fact is there are conditions that will ameliorate the concern. He will be locked up tight. They have the opportunity to listen to his calls. They have people from the community that will be destroyed if he leaves. There is tremendous moral suasion there, and the fact is that conditions exist, period.

Thank you, Judge.

THE COURT: Thank you.

All right.

Pursuant to the Section 3142, the question for me is whether there is a condition or combination of conditions that will reasonably assure the appearance of the defendant as required and the safety of any other person and the community.

It is government's burden to show by clear and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

convincing evidence that the defendant presents a danger to the community, and by the lesser standard of a preponderance of the evidence, that the defendant presents a risk of flight.

The factors that I must consider in making that determination are set forth in subsection (g) of the statute.

They include the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a firearm; the weight of the evidence against the person; the history and characteristics of person, including his physical and mental condition; family ties; employment; financial resources; length of residence in the community; community ties; past conduct; history relating to drug or alcohol abuse; criminal history and record concerning appearance in court proceedings; and the nature and seriousness of the danger to any person or the community that would be imposed by the person's release.

Now, I have already indicated that I do not think the government has carried its burden of showing by a clear and convincing evidence that no combination of conditions could reasonably assure the safety of the community.

Notwithstanding the extortion components of the indictment, I just haven't heard allegations or evidence that tie this defendant so clearly to it that conditions could not be set in my mind to address that. Certainly, given the higher standard, I don't think the government has met that standard.

D4tngolc

Now, I think the risk of flight is a much closer call, and I have already indicated that I am given serious pause by the combination of the defendant's ties to other countries and Russia in particular, and the indications that he has substantial assets and substantial assets that he has tried to conceal or at least failed to disclose to the Court.

Now, that being said, although I confess that I am not without a doubt, I do think that, or I am persuaded by defense counsel that there is a combination of conditions, namely, the quite onerous conditions that Magistrate Judge Freeman set, that would reasonably assure the defendant's appearance as required.

The bottom line is, number one, that $10 million bond cosigned by five financially responsible persons and persons that presumably will have some reasonably close relationship to the defendant, I think the prospect that he will flee and basically destroy those people financially is low.  I think the combination of GPS and other restrictions that Magistrate Judge Freeman articulated are sufficient to address the risk of flight.

I confess that I think the combination of conditions here is unusual, and I think Mr. Naftalis has a point, that they at some point create or replicate detention to such a degree that detention would be appropriate.

But, that being said, I think the defendant has

D4tngolc

consented to them and consents to, for example, the monitoring of his telephone; and I think that to the extent that the question for me is whether the combination of those conditions will reasonably assure his appearance and address any risk to the community, I think they do adequately.

With respect to the cost of the monitoring, when push comes to shove, it's the government's choice how much it wants to monitor.

I think the critical point is that the defendant is consenting to that monitoring, and the government can monitor to whatever extent it wants. So, if it wants to put a pen register on his phone and ensure that he is not making calls to Mr. Tokhtakhounov or other persons in Russia, and choose to monitor on an as-needed basis from there, it may.

I think from the defendant's perspective, he will not know whether the government is monitoring his calls. He will simply know that the government has the ability to monitor his calls. And I think that that in and of itself is a significant condition and a serious disincentive to him either committing any further crimes or making plans to flee.

All of which leads me to find that there are a combination of conditions that would reasonably assure the defendant's appearance as required and address any risk to the community.

For that reason, I will basically adopt or continue

D4tngolc

the bail conditions that were set by Magistrate Judge Freeman.

Mr. Golubchik, let me warn you, as I think Magistrate Judge Freeman did, first of all, the defendant is to remain detained until all of the conditions are met, as Magistrate Judge Freeman set.

And I do want to say that I think the government will fairly seek to ensure that the financially responsible persons who agree to sign on the bond are in fact people with moral suasion over the defendant such that the defendant would not flee knowing that they would be financially destroyed by his decision to do that.

If there are any disputes with respect to the government's approval or disapproval of any prospective cosigners, then I am willing to hear those disputes, but I think that is a critical factor in my approving this bail package, so everybody should be aware of that.

Mr. Golubchik, let me warn you, as Magistrate Judge Freeman did, that if you fail to appear in court or if you violate any of the other conditions of your release:

Number one, a warrant will be issued for your arrest;

Number two, you may detained pending trial;

Number three, you may be charged with a separate crime of bail jumping, which is subject to an additional penalty of up to five years' imprisonment; and,

Number four, you and anyone, as I just mentioned, who

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4tngolc

signs the bond will be responsible for paying the full amount of the bond. That is up $10 million.

So you have to understand that those are the consequences of your not complying with the terms of your release if or when you are released.

Do you understand all that, Mr. Golubchik?

THE DEFENDANT: Yes, your Honor.

THE COURT: Is there anything else we need to deal with, Mr. Lichtman?

MR. LICHTMAN: No, your Honor.

THE COURT: Mr. Naftalis?

MR. NAFTALIS: No, your Honor. Thank you.

THE COURT: All right. Then we are adjourned.

I thank everybody for their patience.

(Adjourned)