**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
(FT. LAUDERDALE DIVISION)

MONARCH AIR GROUP, LLC,                    CASE **NO.: 23-cv-61256-JB**
A Florida Limited Liability Company,
      Plaintiff,

v.

JOURNALISM DEVELOPMENT
NETWORK, INC., a Maryland Corporation,

      Defendant.

_____/


**PLAINTIFF'S RESPONSE IN OPPOSITION TO JOURNALISM DEVELOPMENT**
**NETWORK, INC.'S MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**

Plaintiff, Monarch Air Group, LLC ("Monarch"), responds in opposition to Journalism Development Network, Inc.'s ("JDN") Motion for Partial Judgment on the Pleadings.

## <u>INTRODUCTION AND BACKGROUND</u>

Monarch, a recognized leader in the private jet brokerage industry, sued JDN and Lily Dobrovolskaya (the "Author") for publishing a defamatory article on November 27, 2020, titled "*Flight of the Monarch: US Gov't Contracted Airline Once Owned by Russian Criminals.*" The article, published on the Organized Crime and Corruption Report Project's ("OCCRP") website and its Russian counterpart, istories.com, contains multiple false, misleading, and damaging statements about Monarch and its owners. Among these are baseless implications of criminal activity and purported ties to the Russian Mafia, which have caused significant reputational harm and emotional distress to Monarch and its leadership.

Monarch promptly alerted OCCRP to the publication's inaccuracies and misleading nature. Yet JDN's response was slow, evasive, and misleading, even after acknowledging that it needed to correct the Article. JDN failed to engage an independent fact-checker as required by its own policies and procedures—further showing its disregard for accuracy and the truth. Despite Monarch's repeated requests for timely corrections and retractions, JDN refused to take meaningful steps to mitigate the harm caused by its false statements, even after conceding that the Article included falsities. Instead, it allowed the Article to remain online, perpetuating a misleading and damaging narrative about Monarch.

Now, JDN has moved for Judgment on the pleadings on Monarch's defamation by implication claim. This Motion is misleading. Rather than presenting the facts as pleaded in the Complaint, the Motion reflects JDN's subjective narrative of events, which does not resolve the significant factual disputes central to this case. JDN's motion underscores the contested nature of

the claims and highlights the unresolved issues that cannot be resolved through a judgment on the pleadings.

## DISCUSSION

### I.   Judgment on the Pleadings Standard

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is proper when no issues of material fact exist, and the moving party is entitled to judgment as a matter of law based on the substance of the pleadings and any judicially noticed facts." *Cunningham v. Dist. Attorney's Office*, 592 F.3d 1237, 1255 (11th Cir. 2010). A court ruling on a 12(c) motion must "accept all the facts in the [pleadings] as true and view them in the light most favorable to the nonmoving party." *Id*. A motion for judgment on the pleadings is subject to the same analysis as a motion to dismiss pursuant to Rule 12(b)(6), as described above." *Ray'Quan Harding v. Transunion LLC & others*, No. 23-23775-CIV, 2024 WL 4826448, at 4 (S.D. Fla. Nov. 19, 2024) (citing *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998)).

### II.   Defamation by Implication Standard

Florida recognizes a cause of action for defamation by implication. *See Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1123–24 (S.D. Fla. 2021) (citing *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098 (Fla. 2008)). "Defamation by implication arises, not from what is stated, but from what is implied when a defendant (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts...." *Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1254 (S.D. Fla. 2014) (citing Jews for Jesus, 997 So. 2d at 1106). In other words, "[d]efamation by implication is premised not on direct statements but on false suggestions, impressions and implications arising *from otherwise truthful statements*." *Jews for Jesus*, 997 So. 2d at 1107 (citation and quotation omitted) (emphasis added). Moreover,

an implication is defamatory if it "tends to injure the plaintiff's 'business or reputation, or occupation [ ]'" in the view of at least a "substantial and respectable minority" of the community. *Jews For Jesus, Inc.*, 997 So. 2d at 1115 & n.16. The relevant "community" is a plaintiff's "personal, social, official, or business relations." *Id.* at 1115 (quoting *Land v. Tampa Times Publ'g Co.*, 67 So. 130, 130 (Fla. 1914)). "[W]hether the statement in question from [the Article] created a false impression rising to the level of defamation by implication is a fact-based inquiry left to the province of the jury." *Akai Custom Guns, LLC v. KKM Precision, Inc.*, 707 F. Supp. 3d 1273, 1295 (S.D. Fla. 2023)

### a. The Article as a whole implies that Monarch, at the time of the article, was associated with criminals.

JDN contends that "Read in Its Entirety, the Article Unequivocally States That Monarch's Criminal Owners Are No Longer Associated with The Company." [ECF No. 95 at pp. 10]. To support this argument, JDN selectively highlights certain statements within the Article that they claim reinforce this position. But the Article examined in its entirety—as JDN recognizes this Court must do—the Article conveys the implication that Monarch was affiliated with criminals, at the time of publication.

The Article's title alone, "Flight of the Monarch: US Gov't Contracted Airline Once Owned by Russian Criminals," sets the tone and suggests an ongoing association with criminal elements. The context of where the Article is published—on the Organized Crime and Corruption Report Project's ("OCCRP") website and its Russian counterpart, istories.com—is also critical. OCCRP's stated mission is "to spread and strengthen investigative journalism around the world and expose crime and corruption so the public can hold power to account." *See*, [https://www.occrp.org/en/about-us] and [ECF No.1 ¶ 25]. By virtue of this mission, readers

reasonably expect that companies or individuals featured in OCCRP's publications are engaged in crime, corruption, or both, thereby further reinforcing the defamatory implication.

JDN emphasizes that the Article states "at least eight times" that Golubchik and Trincher were not owners or associated with Monarch in 2017 or 2020. [ECF No. 95 at 10]. But this selective focus conveniently ignores contradictory statements and the broader narrative woven throughout the Article. JDN itself acknowledges in its Motion that the Article delves deeply into the Anatoly Golubchik's ("Golubchik") and Vadim Trincher's ("Trincher") alleged criminal history, their purported ties to the Russian mob, and their alleged association with Monarch. *Id*.

Missing from JDN's carefully curated list of statements, but admittedly mentioned later by JDN, is the Article's claim that "the company is currently owned by the son of Golubchik and Trincher's former business partner." [ECF No. 1 ¶45 (b)]. While this statement is technically accurate—David Gitman is indeed the son of Jacob Gitman—it serves no practical purpose other than to imply that Monarch is currently associated with criminals. This statement prompts readers to question whether Golubchik and Trincher are truly unaffiliated with Monarch or whether there is a deeper, undisclosed connection.

By juxtaposing David Gitman, without naming him, with Golubchik and Trincher—convicted criminals who were charged long after their involvement with Monarch and who had no association with the company for over seven years—the Article implicitly links these criminals to Monarch and Gitman at the time of publication. This insinuation contradicts JDN's assertion that the Article disassociates Golubchik and Trincher from Monarch and perpetuates a defamatory implication that cannot be resolved through cherry-picked statements. Or so a jury could find.

JDN relies on *Turner v. Wells*, 198 F. Supp. 3d 1355, 1366 (S.D. Fla. 2016) ("*Turner I*"), *aff'd*, 879 F.3d 1254 (11th Cir. 2018) ("*Turner II*"), and *Utterback v. Morris*, No. 5:23-CV-279-

TKW/MJF, 2024 WL 3809368 (N.D. Fla. July 24, 2024), report and recommendation adopted, No. 5:23-CV-279-TKW-MJF, 2024 WL 3799423 (N.D. Fla. Aug. 12, 2024), for the position that "these express statements explaining that Goulbchik and Trincher have not been owners of Monarch since 2012 preclude Monarch's claim that the Article somehow implies that Monarch was still owned by criminals in 2017 or 2020." [ECF No. 95 at pp. 11-12]. Such reliance is misplaced. JDN omits that in the Court's analysis of whether the Statements constitute defamation by implication, "the inquiry turns on whether the 'gist' of the publication is false." *Turner v. Wells*, 879 F.3d 1254, 1269 (11th Cir. 2018) (citing *Jews for Jesus, Inc*., 997 So.2d at 1107-08) (explaining that liability attaches to a defendant who has the details right but the "gist" wrong). "Whether the publication is defamatory becomes an issue of fact for the jury only where the publication is susceptible of two reasonable interpretations, one of which is defamatory." *Id*. (citing *Hallmark Builders, Inc.*, 733 F.2d at 1464; *Miami Herald Publ'g Co. v. Ane*, 423 So. 2d 376, 389 (Fla. 3d DCA 1982)).

As recognized in *Utterback*, "[a]lthough the tense of the words employed by Defendant **is not** dispositive, it is highly relevant." *Utterback*, 2024 WL 3809368, at 4 (emphasis added). While JDN uses past tense in parts of the Article, the overarching narrative is clear: Monarch has a questionable history, and that history is worth scrutinizing and exposing, even into the present and future. [ECF No. 1 ¶33]. This raises the question: what was JDN's objective in writing the Article? What did they hope to achieve by recounting allegations from years ago, especially when they assert that those events have no present-day connection to Monarch? The Article's entire premise is that Monarch should receive more scrutiny because its former owners were convicted. Either the Article implies Monarch is connected to criminals or the Article serves no public purpose.

Whether a statement subject to multiple interpretations has a defamatory implication is a jury question. *Akai Custom Guns, LLC v. KKM Precision, Inc.*, 707 F. Supp. 3d 1273, 1284 (S.D. Fla. 2023). In the case, the plaintiff demanded $1,000,000 and insurance disclosures from the defendant to resolve its manufacturing defect claims. *Id.* at 1283. The defendant denied the claim. *Id.* In response to the plaintiff's voluntary recall and business disruptions, the defendant published an "Open Letter" on a third-party's Facebook page, questioning whether the plaintiff's legal threats were genuine or to deflect blame. The plaintiff sued for defamation by implication over the letter's content. *Id at* 1284. The defendant moved for summary judgment, arguing the statement lacked the false implication required for defamation. *Id.*

The court disagreed with the defendant, holding that "whether the statement in question from [the defendant's] Open Letter created a false impression rising to the level of defamation by implication is a fact-based inquiry left to the province of the jury." *Id.* at 1295. "Here, [the defendant]'s statement pondering whether 'this is just a threat to cover up and lay blame on us' may be reasonably interpreted as creating a defamatory impression that Plaintiffs caused the gun barrels at issue to fail because of their own professional incompetence. In addition, the statement could be interpreted as implying some form of wrongdoing on the part of Plaintiffs, via a 'threat,' a 'cover up,' or some other nefarious implication. By omitting the context of the statement and the accompanying facts relevant to the parties' dispute, [the defendant]'s statement creates certain impressions in the mind of a reasonable interpreter. These impressions may be both defamatory and false, and they may rise to the level of defamation by implication. In any event, **these potential interpretations create a genuine issue of material fact** with respect to Count XII; as such, summary judgment as to Count XII is denied." *Id.* at 1296. Thus, when a statement's meaning is

STOK KON + BRAVERMAN

1 East Broward Blvd, Suite 915 • Fort Lauderdale, FL 33301 • P.954.237.1777 • F.954.237.1737 • E-mail: service@stoklaw.com

ambiguous or open to differing reasonable interpretations, it is the jury's role to resolve such factual disputes, not the Court's at the judgment on the pleadings or summary judgment stage.

The nature of defamation by implication is precisely that the harmful insinuation is not explicitly made. If the Article had outright claimed that David Gitman or Monarch is currently engaged in criminal activity, the claim would fall under defamation per se. Instead, the implication arises from the Article's cumulative effect. When the Article is read in its entirety, as this Court must do, a reasonable person could easily perceive the *gist* of it as suggesting that Monarch's history is steeped in criminality, and by extension, that it is now tainted and unworthy of government contracts.

JDN argues that the Article "accurately reports that David Gitman is the son of Jacob Gitman, who was in the past a co-owner of Monarch along with Golubchik and Trincher. But it identifies no criminal allegations about or questionable conduct by David Gitman. Nor does it report that Monarch or David Gitman is suspected or accused of any criminal conduct. Instead, it reports truthfully that David Gitman is the current sole owner and CEO of Monarch." This statement, while superficially accurate, entirely sidesteps the essence of defamation by implication and the Article's cumulative effect.

The Article devotes pages to detailing the criminal history and alleged mob ties of Golubchik and Trincher, painting them in an unquestionably unfavorable light. While it does state that these individuals are no longer affiliated with Monarch, the rhetorical device employed creates the overarching implication that the company is affiliated with criminals by the statement that "[t]he company is currently owned by the son of Golubchik and Trincher's former business partner." After presenting extensive negative history about Golubchik and Trincher, this statement serves no purpose other than to cast doubt on Monarch's current integrity.

Juxtaposing details about Russian mob ties and criminal charges in the Article with the implication that there remains some connection between the parties, subtly yet effectively implies that David Gitman and Monarch are not truly free from the shadows of Golubchik and Trincher's past. Much like in *Akai*, by leading readers down this path, the Article's statements can be interpreted as implying wrongdoing or suggesting a nefarious connection—that Monarch continues to have ties to the criminals whose alleged activities JDN treated as significant enough to detail at length.

By weaving this insinuation throughout the Article, JDN bolsters its misleading narrative that Monarch is unworthy of trust or government contracts. The Article devotes considerable attention to Golubchik and Trincher's criminal history, painting them in an undeniably negative light, only to later link David Gitman, through his familial relationship, to these former Monarch associates. This point is enhanced by the Article not naming David Gitman as the owner and by calling him "the son of Golubchik and Trincher's former business partner." This rhetorical tactic— juxtaposing detailed criminal allegations with a present-day connection to Gitman—implies that Monarch's current operations remain tainted by its past, even without explicitly stating so, and, because that is a reasonable interpretation, it ultimately is for a jury to decide. Otherwise, the Article serves no purpose. This carefully constructed implication directly supports Monarch's claim of defamation by implication and demonstrates the misleading nature of JDN's reporting.

JDN attempts to mislead the Court by offering an arbitrary example, stating that the Article's quotation of "the director of the U.S. chapter of Transparency International…is not about Monarch and in any event, constitutes non-actionable opinion" and that "[j]ust as critically, the Article also recounted an opposing opinion…" [ECF No. 95 at pp. 14-15] This appears to be JDN's

attempt to argue that they fairly reported on Monarch. But this argument is misleading, as it neither addresses the standard applicable in this case nor the claims brought against JDN.

The inclusion of such examples does not absolve JDN from liability for the defamatory implications embedded throughout the Article, as the critical issue is not whether opposing opinions were quoted but whether the Article, when read in its entirety, conveys a false and damaging narrative about Monarch. Moreover, JDN's assertion that the quote from the director of the U.S. chapter of Transparency International "was not about Monarch" is disingenuous at best and serves as a transparent attempt to divert the Court's attention. The section right before the quote explicitly states:

> "Monarch has carried out various tasks for U.S. authorities, including carrying protected witnesses for the Marshals Service and transporting fuel in Israel for the Department of Defense (DoD). One of its affiliates, WAB International, also subcontracted jobs transporting passengers and cargo for the DoD in Afghanistan."

[ECF No. 1 at Exhibit **D** pp. 61] The Article includes the following statement from Gary Kalman, director of the U.S. chapter of Transparency International: "The negligence is startling," said Gary Kalman. "Airlines with a history of criminal affiliation contracted by the government to transport protected witnesses is something we'd expect to see in a spy novel, not in a news report." *Id*. Nowhere in the Article does it state that Kalman's comment was not about Monarch. In fact, the Article further quotes Kalman, stating: "Gary Kalman of Transparency International said the fact that Monarch was able to transport protected witnesses, despite the dubious backgrounds of its former owners, shows the need for more thorough checks on companies that are awarded public contracts." *Id*. at 70.

These statements, made by the same individual, within the same Article, and explicitly referencing the same company, make it clear that Kalman's remarks *are* about Monarch—or, at

the very least, JDN juxtaposed the statements so that a reasonable reader would interpret them as such. The Article explicitly outlines the context of Kalman's comments, and any assertion by JDN that these remarks are unrelated to Monarch is both disingenuous and unconvincing and should not be accepted by this Court because the allegations need to be considered in the light most favorable to Monarch. Moreover, whether the statements are classified as "opinion" is irrelevant to Monarch's claims. This Court must examine the Article as a whole, including the way JDN framed and presented these opinions to create false and defamatory implications, rather than narrowly focusing on the opinions themselves. The framing and context provided by JDN are central to the misleading narrative conveyed in the Article, supporting Monarch's defamation by implication claim.

JDN's selective focus on unrelated statements just distracts from the core issue: the Article's misleading and defamatory implications about Monarch's alleged ties to criminal activity. Ultimately, OCCRP's stated mission is to "*uncover the truth on crime and hold those accountable,*" and a reasonable reader, when viewing the Article as a whole, could infer that Monarch remains associated with these criminals and should not have been, or should not be, awarded government contracts. At a minimum, reasonable readers could differ as to the implications being made by the Article, which precludes granting a motion for judgment on the pleadings. This deliberate post hoc framing, which contradicts its claimed mission, underscores JDN's attempt to obscure the essence of its reporting and evade accountability for the significant harm caused.

> **b.  The First Amendment does not protect JDN from falsely implying that Monarch, at the time of the article, was associated with criminals.**

As an initial note, "[w]hile an affirmative defense can support a Rule 12(c) motion for judgment on the pleadings, it can do so **only** where it is (1) definitively ascertainable from the

complaint and other sources of information that are reviewable at [the pleadings] stage, and (2) [these] facts establish the affirmative defense with certitude.'" *Bartlett v. Mut. Pharm. Co. 659* F. Supp. 2d 279, 280 (D.N.H. 2009*), quoting Citibank Glob. Markets, Inc. v. Rodriguez Santana*, 573 F.3d 17, 23 (1st Cir. 2009) (Emphasis added.) "Thus, when material issues of fact are raised by the answer and the defendant seeks judgment on the pleadings on the basis of this matter, his motion **cannot** be granted." § 1368 Judgment on the Pleadings—Practice Under Rule 12(c), 5C Fed. Prac. & Proc. Civ. § 1368 (3d ed.). In its Answer, JDN raised the First Amendment as an Affirmative Defense, which inherently introduces issues of material fact that preclude the entry of a judgment on the pleadings. As shown in the Plaintiff's Complaint and reiterated throughout this Response, genuine disputes exist regarding whether the article implies that Monarch is currently associated with criminals, whether the article selectively presents statements—such as those concerning Monarch's former owners and a prosecutor's remarks—in a manner that creates misleading implications, and whether the First Amendment protects the statements JDN made in the article that the Plaintiff contends are defamatory.

When all allegations in the Plaintiff's Complaint are accepted as true and the facts are construed in favor of the Plaintiff as the non-moving party, material issues remain unresolved. Furthermore, JDN has provided no legal authority supporting the notion that the First Amendment offers blanket protection for statements that are defamatory or create defamatory implications. There is thus no legal or factual basis to grant Judgment on the Pleadings under the First Amendment defense.

JDN's First Amendment Affirmative Defense still fails. JDN attempts to invoke the First Amendment to support its unfounded assertion that "[s]o long as JDN reports accurately, it cannot be liable for defamation. And it is under no legal obligation to make positive or laudatory

statements about Monarch or anyone else." [ECF No. 95 at pp. 14-15]. Nowhere in the Complaint does Monarch assert a claim requiring JDN to make "positive comments." Instead, Monarch's claims seek only to ensure that statements made about it and its owners are truthful and not deliberately crafted to create a false narrative tying them to criminals in the present who stopped being involved with the company over a decade ago.

The First Amendment does not shield JDN from liability for publishing defamatory implications, and JDN can point to no provision of the Constitution or applicable case law that affords such protections. In fact, case law makes clear that "defamation by implication claims are governed under Florida law by the same privileges and protections afforded traditional defamation claims." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1108 (Fla. 2008) ("All of the protections of defamation law that are afforded to the media and private defendants are therefore extended to the tort of defamation by implication."); *Larreal v. Telemundo of Florida, LLC*, 489 F. Supp. 3d 1309, 1321 (S.D. Fla. 2020). The U.S. Supreme Court has also held that "[s]preading false information in and of itself carries no First Amendment credentials. '[T]here is no constitutional value in false statements of fact.'" *Herbert v. Lando*, 441 U.S. 153, 171 (1979) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974)).

As referenced above, JDN's Article implied that Monarch is currently associated with criminals, perpetuating a false and defamatory narrative. The First Amendment does not provide JDN with blanket protection to publish false and misleading implications under the guise of journalistic freedom. Established legal precedent confirms that defamation by implication, like direct defamation, is not protected speech when it spreads falsehoods or misleads readers. Given the false implications woven throughout the Article and the existence of reasonable disputes about its meaning, there is no basis for granting judgment on the pleadings in JDN's favor. Monarch's

claims are grounded in fact and law, and JDN's reliance on the First Amendment is a clear misapplication intended to evade liability.

### c.   The Article implies Monarch was complicit in the cocaine incident.

JDN makes the argument that "Monarch asserts that the Article falsely accuses it of drug smuggling, but that plainly is not what the Article says." [ECF No. 95 at pp. 17]. As stated above, the nature of defamation by implication is precisely that the harmful insinuation is not made explicitly. If the Article had outright claimed that Monarch was "drug smuggling," the claim would fall under defamation per se. Instead, the implication arises from the Article's cumulative effect. When the Article is read in its entirety, as this Court is required to do, a reasonable person could easily perceive the *gist* of it as implying that Monarch was involved in the smuggling of cocaine, in reality found on the personal belongings of a passenger.

The Article explicitly states that "[o]n one occasion, customs agents in Miami discovered 16 kilograms of cocaine on one of Monarch's planes." [ECF No. 1 at Exhibit D 62]. JDN supports that statement in the very sentence by saying that federal "[p]rosecutors noted the seizure at Golubchik's bail hearing in 2013, adding of the airline: '[w]e do not believe this business is legitimate.'" *Id*. The Article reiterates the incident, stating that "[t]hen in 2011, according to a submission from prosecutors at Golubchik's bail hearing two years later, Florida customs agents discovered 16 kilograms of cocaine hidden in one of its planes." *Id*.

The Article goes further, weaving in mysterious and suggestive innuendos, such as the claim that "U.S. Customs and Border Protection Agency refused to release any information about the discovery of the cocaine, or explain why no one was arrested," and that "[t]he pilot thought it was strange that the aircraft was then released." *Id*. While the Article does eventually include a (mis)quote from Monarch's spokesperson clarifying that "the cocaine belonged to a passenger," and that "[w]e have worked with the relevant authorities to develop and enhance existing

procedures, to prevent this from happening again," it notes that "[i]n our 15 years of operations, this was the only occurrence." *Id.*

The Article's deliberate repetition of the incident involving the discovery of cocaine on one of Monarch's planes, combined with speculative commentary and suggestive language, creates a misleading narrative that implies ongoing criminality or wrongdoing. While the Article briefly acknowledges that the cocaine was found in the personal belongings of a passenger, it minimizes this fact and instead focuses heavily on the technicality that the drugs were discovered on Monarch's plane, including by putting the cocaine incident on its timeline graphic. JDN further obfuscated this point by intentionally misquoting Monarch's comment that "the cocaine was found in a passenger's luggage," and instead changing the comment to "the cocaine belonged to a passenger." By prioritizing this framing and sensationalizing the incident, the Article encourages readers to question Monarch's legitimacy and integrity, bolstering a defamatory implication that the company itself was complicit in criminal activity.

The juxtaposition of details about Russian mob ties, criminal charges, and the implication that drugs were smuggled on Monarch's planes—paired with the OCCRP's mission to expose crime and corruption—further reinforces this narrative. By associating David Gitman and Monarch with the alleged activities of Golubchik and Trincher, while disproportionately emphasizing the discovery of cocaine on Monarch's plane, the Article subtly suggests a lingering connection to past criminal behavior. Much like in *Akai*, the Article steers readers toward an interpretation that Monarch is still linked to these criminals and potentially other illegal actions, despite such allegations being unfounded. This calculated and damaging narrative supports Monarch's claims of defamation by implication, as it misleads readers into believing there is an ongoing wrongdoing tied to the company.

### d. __The Article does not accurately quote the federal prosecutor.__

As an initial note, "where a movant relies on or sets forth allegations [that] 'were not presented or contained in the pleadings, including new exhibits, the Court cannot consider them without converting the motion into a motion for summary judgment.'" *Reeves v. United States*, 526 F. Supp. 3d 1226,1232 (S.D. Fla. 2021) *citing Bernath v. Seavey*, No. 2:15-cv-358-FtM-99CM, 2015 WL 13805064, at 1 (M.D. Fla. Sept. 29, 2015). "[T]o the extent [JDN] relies on or making allegations in the instant motion that were not presented or contained in the pleadings, __including new exhibits__, the Court cannot consider them without converting the motion into a motion for summary judgment. This case is still in its infancy and converting this matter into a motion for summary judgment would be improper, as the parties have not had a reasonable opportunity to present all material that is pertinent to a motion for summary judgment." *Bernath v. Seavey*, No. 2:15-CV-358-FTM-99CM, 2015 WL 13805064, at 1 (M.D. Fla. Sept. 29, 2015). As in *Bernath*, JDN improperly introduces new evidence—here, transcripts from the alleged bail hearings—that were not included as exhibits in the Plaintiff's Complaint. By relying on these transcripts, JDN effectively transforms its Motion for Judgment on the Pleadings into a Motion for Summary Judgment. This approach is procedurally improper, particularly given that discovery in this case remains ongoing and has not yet closed. The opportunity to uncover and present all material facts is still forthcoming, rendering JDN's motion premature and untimely at this stage.

As its final substantive point, JDN asserts that "Plaintiff's assertion that the Article omits the prosecutor's retraction of his statement that Monarch is not 'legitimate' is demonstrably untrue because it is disproved by the Bail Hearing transcripts." But JDN's argument improperly relies on its own unilateral interpretation of the prosecutor's statements, ignoring that the meaning and implications of those statements are subject to interpretation. This ambiguity underscores the existence of factual disputes that preclude judgment on the pleadings.

The Article selectively presents the prosecutor's statement that "[w]e do not believe this business is legitimate" without offering crucial context or acknowledging the prosecutor's prior and subsequent clarifications. At first, the prosecutor stated that "[t]hese are airplane companies. They have a legitimate purpose in that they are airline companies." [Exh. 3 at 10:10-11]. Following this, the prosecutor made statements that Monarch is "not legitimate," but later admitted he was wrong and told the court he "falls on his sword" with respect to his prior comments about Monarch. [Exh. 4 at 46:18-21].

JDN argues that the prosecutor's retraction was limited to his flight risk analysis for the defendant in the bail hearing, but this is just JDN's interpretation. The Article provides no such clarification or explanation, leaving readers with only the prosecutor's isolated statement about Monarch being "not legitimate." This omission leads readers to infer that the prosecutor's statement was a broader condemnation of Monarch as a company and not limited to the context of assessing flight risk.

The misleading nature of the Article becomes even more pronounced when viewed in its entirety. The isolated statement about Monarch's legitimacy is juxtaposed with repeated references to Monarch's alleged ties to the Russian mob and the discovery of cocaine on one of its planes. This deliberate framing amplifies the implication that Monarch remains tainted by criminal associations and is inherently illegitimate. The Article's selective focus on the prosecutor's isolated comments on Monarch's legitimacy, without providing the surrounding context of his retraction and apology, bolsters a false and damaging narrative.

What the prosecutor was apologizing for, and the scope of his comments are inherently subject to interpretation. While JDN contends that the retraction pertained only to the flight risk analysis, a reasonable juror could conclude that the prosecutor's "falling on his sword" applied to

his broader comments about Monarch's legitimacy. By omitting this context and selectively presenting only the negative aspects of the prosecutor's statements, the Article creates a defamatory implication that Monarch was and remains illegitimate, a point that no one contends is true.

At the very least, reasonable jurors could differ in their interpretation of the prosecutor's comments and the Article's implications, reinforcing that this issue cannot be resolved on the pleadings. JDN's unilateral interpretation is not dispositive, and the omissions and framing in the Article support Monarch's claims of defamation by implication.

Shoehorned into the end of JDN's Motion is the contention that "Florida's fair report privilege provides that a publisher cannot be liable in defamation for fairly and accurately reporting the contents of an official document or public record, such as the transcript of the First Bail Hearing." [ECF No. 95 at pp. 20]. While this proposition is accurate in principle, JDN omits a critical predicate finding that must be satisfied for the fair report privilege to apply: "[f]or the fair report privilege to apply a defendant must have presented a fair and accurate report of the source documents." *Dershowitz v. Cable News Network, Inc.*, 541 F. Supp. 3d 1354, 1366 (S.D. Fla. 2021) (citing *Folta v. New York Times Co.,* No. 1:17CV246-MW/GRJ, 2019 WL 1486776 at 6 (N.D. Fla. Feb. 27, 2019)). JDN's selective presentation of the bail hearing transcripts fails to meet this standard.

The Article does not fairly or accurately report the full context of the prosecutor's statements from the bail hearing. Instead, it isolates the prosecutor's comment that "we do not believe this business is legitimate" while omitting crucial statements that provide balance and context. The prosecutor first stated, "[t]hese are airplane companies. They have a legitimate purpose in that they are airline companies." [Exh. 3 at 10:10-11]. After making the isolated

statement that Monarch is "not legitimate," the prosecutor subsequently admitted error, telling the court he "falls on his sword" regarding his prior comments about Monarch. [Exh. 4 at 46:18-21]. These clarifications and retractions are essential to a full and fair understanding of the prosecutor's statements, yet the Article fails to include them.

Instead, the Article frames the prosecutor's isolated statement as an unqualified condemnation of Monarch's legitimacy. By omitting the prosecutor's initial acknowledgment of legitimacy and subsequent retraction and apology, the Article misleads readers into believing that the prosecutor definitively labeled Monarch an illegitimate business. This selective presentation skews the narrative and fails to provide readers with a fair account of the hearing. At the very least, reasonable readers' minds may differ as to the interpretation of the prosecutor's statements, especially in the absence of critical context. This ambiguity alone precludes judgment on the pleadings, as it demonstrates the existence of genuine issues of material facts.

The Article also compounds this misleading narrative by juxtaposing the prosecutor's statement with sensationalized claims about Monarch's alleged ties to the Russian mob and drug smuggling. This framing amplifies the defamatory implication that Monarch is inherently illegitimate and tainted by criminality, further distorting the actual content of the bail hearing. The fair report privilege does not shield JDN from liability for selectively quoting from official transcripts to create a false and damaging narrative. *See Dershowitz v. Cable News Network, Inc*., 541 F. Supp. 3d 1354, 1361 (S.D. Fla. 2021) *citing Rasmussen v. Collier County Publ. Co*., 946 So. 2d 567, 571 (Fla. 2nd DCA 2006) ("The privilege extends to the publication of the contents of official documents, as long as the account is reasonably accurate and fair.")

The fair report privilege seeks to protect truthful and impartial reporting of public records, not to shield publishers who selectively edit or omit critical context to mislead readers. JDN's

Article does not meet the standard for a fair and accurate report, as it distorts the prosecutor's comments and their context, creating a narrative that deviates from the actual content of the bail hearing transcripts. The absence of context, combined with the reasonable potential for differing interpretations, further undermines JDN's argument and confirms that judgment on the pleadings is inappropriate in this case.

## **CONCLUSION**

Making all inferences for Monarch, as the law mandates at this stage, JDN's Motion for Judgment on the Pleadings must fail. The Court must accept as true all allegations in Monarch's Complaint and construe all inferences in the light most favorable to Monarch. Under this standard, Monarch has more than sufficiently alleged facts supporting its claims of defamation by implication. JDN's selective presentation of evidence and reliance on a self-serving narrative cannot erase the broader defamatory implications embedded within its publication. The Article, as a whole, conveys a false and damaging narrative about Monarch's current associations, integrity, and operations, making the claims appropriate for a jury's consideration. At this stage, these unresolved factual disputes and differing reasonable interpretations preclude granting JDN's Motion.

Monarch has also shown how the Article strategically weaves together past associations, criminal allegations, and selective omissions to imply present wrongdoing—despite JDN's assertions to the contrary. This manipulation of context and framing creates an actionable case of defamation by implication, as recognized by Florida law. The core issue is not whether specific statements were technically accurate but whether the cumulative effect of the Article's language

and structure creates a misleading and harmful impression of Monarch.

WHEREFORE, Plaintiff respectfully requests that the Court deny JDN's Motion for Judgment on the Pleadings on Count II of the Complaint and grant such other and further relief as the Court deems just.

## **REQUEST FOR HEARING**

The Plaintiff is requesting a hearing on the Defendant's Motion for Judgment on the Pleadings [ECF No. 95], and this instant Response in Opposition, pursuant to Local Rule 7.1 (b)(2). The Plaintiff believes that an allotment time of one **hour** would suffice for the Court to hear the Defendant's Motion and the Plaintiff's Response. A hearing on JDN's Motion for Judgment on the Pleadings is crucial to address the significant legal and factual complexities presented. By introducing new evidence, JDN has effectively converted its motion into a premature request for summary judgment, which is procedurally improper while discovery remains ongoing. The fact-intensive nature of defamation by implication, coupled with unresolved disputes about the article's implications and the applicability of the First Amendment, warrants careful judicial scrutiny. A hearing would allow the Court to resolve these procedural and substantive issues efficiently, ensuring a fair and informed progression of the case.

<u>**CERTIFICATE OF SERVICE**</u>

      **I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed and served via the CM/ECF portal on December 9, 2024 to: Dana J. McElroy, dmcelroy@tlolawfirm.com; Thomas & LoCicero PL 915 Middle River Drive, Suite 309 Fort Lauderdale, FL 33304; James J. McGuire, Esq., jmcguire@tlolawfirm.com; Linda R. Norbut, Esq., lnorbut@tlolawfirm.com; Thomas & LoCicero PL 601 South Boulevard Tampa, FL 33606.

                                   Respectfully submitted,

                                   **STOK KON+ BRAVERMAN**
                                   Attorneys for Plaintiff
                                   One East Broward Boulevard
                                   Suite 915
                                   Fort Lauderdale, Florida 33301
                                   Tel.: (954) 237-1777
                                   Fax: (954) 237-1737
                                   Email: service@stoklaw.com

                                   */s/ Joshua R. Kon*
                                   JOSHUA R. KON, ESQ.
                                   Florida Bar No. 56147
                                   jkon@stoklaw.com
                                   YOSEF Y. KUDAN, ESQ.
                                   Florida Bar No. 1010261
                                   ykudan@stoklaw.com