UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CV-61256-BECERRA/STRAUSS

**MONARCH AIR GROUP, LLC,**

    Plaintiff,
v.

**JOURNALISM DEVELOPMENT
NETWORK, INC.,**

    Defendant.
_____/

## REPORT AND RECOMMENDATION

THIS MATTER came before the Court upon Defendant's Motion for Partial Judgment on the Pleadings as to Count II of the Complaint ("Motion") [DE 95], which has been referred to me for a report and recommendation [DE 171]. I have reviewed the Motion, the Response [DE 106] and Reply [DE 114] thereto, and all other pertinent portions of the record. For the reasons discussed herein, I respectfully **RECOMMEND** that the Motion [DE 95] be **DENIED**.

## BACKGROUND

This defamation action stems from Defendant, Journalism Development Network, Inc.'s ("JDN"), publication of an allegedly defamatory article ("Article") about Plaintiff, Monarch Air Group, LLC ("Monarch"), on JDN's Organized Crime and Corruption Report ("OCCRP") website. Complaint [DE 1-2] ¶¶ 1, 22, 24. JDN initially published the Article – *Flight of the Monarch: US Gov't Contracted Airline Once Owned by Russian Criminals* – on November 27, 2020. *Id.* ¶ 1; [DE 1-2] at 20-31. In June 2021, JDN published a revised version of the Article – now titled *Flight of the Monarch: US Gov't Contracted Airline Once Owned by Criminals with Ties to Russian Mob* – after Monarch complained about, and JDN's principal officer

acknowledged, certain inaccuracies in the Article. Complaint ¶¶ 5, 29, 47; [DE 1-2] at 66-77. But Monarch alleges that the revised Article remained defamatory. Complaint ¶ 9.

The instant Motion solely pertains to Count II of the Complaint, wherein Monarch brings a claim for defamation by implication. Monarch alleges that the Article "impl[ies] a defamatory connection between Monarch, criminals, and/or criminal activity" by "juxtaposing and/or conveying incomplete information and/or omitting facts." *Id.* ¶ 60. In other words, while the Article never expressly states that Monarch is presently (i.e., at the time of publication) engaged in criminal activity or associated with criminals, Monarch alleges that the Article "falsely paints [Monarch] to be involved in criminal activity" or insinuates that Monarch is "presently associated with criminals." *Id.* ¶¶ 18, 44; *see also id.* ¶¶ 31-43, 45(b), 50.

What follows in the remainder of this Background section is a summary of the Article.[1] The Article begins by stating that "[a]n American aviation company [Monarch] that has transported protected witnesses for the U.S. government was once part-owned by two men who worked with a major Russian-American organized crime group." While the two men, Anatoly Golubchik ("Golubchik") and Vadim Trincher ("Trincher"), left Monarch in 2012, the Article notes that Monarch "is currently owned by [David Gitman ("D. Gitman")] the son of Golubchik and Trincher's former business partner [Jacob Gitman ("J. Gitman")]." Golubchik and J. Gitman first became investors in Monarch in 2008. "[T]hey soon invited more investors on board, and within three years the clique had taken control of the company." Trincher joined Monarch as an investor in 2011 (around the time the "clique" took control of Monarch).

---

[1] Aside from two sentences that cite to the Complaint, the remainder of this background section comes from the Article itself.

2

In 2013, the year after Golubchik and Trincher left Monarch, the two men were arrested and criminally charged. And in 2014, they were "jailed . . . for operating an illegal gambling and extortion ring." Prosecutors said that Golubchik and Trincher "were part of a 'far-reaching Russian-American organized crime ring' . . . under the protection of [a] notorious Russian crime boss." "In a 2013 court document, prosecutors claimed Golubchik acted as [the Russian crime boss's] 'enforcer' and accused the men of laundering about $100 million on behalf of 'high-level criminals' – some of it through Monarch and another airline company Golubchik and Trincher owned in the U.S. called Skyway International." According to prosecutors, Golubchik, Trincher, and the Russian crime boss operated "an illegal 'large-scale sports book' that was used to launder approximately $100 million from former Soviet Union countries through Cyprus-registered shell companies."

The Article also details certain information about Monarch that was disclosed at Golubchik's 2013 bail hearing. At that hearing, prosecutors noted that on one occasion (in 2011), customs agents had seized 16 kilograms of cocaine that they discovered hidden on one of Monarch's planes. According to the Article, a Monarch spokesperson "said the cocaine belonged to a passenger," but the spokesperson actually referred to items in a passenger's "personal possession" (as opposed to stating the cocaine "belonged to a passenger"). Complaint ¶¶ 39-41. After noting the cocaine seizure at Golubchik's bail hearing, prosecutors added that they did "not believe this business [Monarch] is legitimate." Monarch alleges that the Article "deliberately omitted" that the prosecutor subsequently apologized for misspeaking and referring to Monarch as an illegitimate business. Complaint ¶ 35.

Aside from discussing Golubchik's and Trincher's criminal history, the Article states that "[t]wo other investors who ran [Monarch] afterwards also had legal troubles, and one fled a warrant

3

for his arrest in the U.S. and remains on the lam." "Nonetheless, an OCCRP investigation shows Monarch Air Group has won U.S. government contracts worth over $6 million, and was making government flights as recently as September [2020]." As of September 2020 (two months before the Article was published), Monarch was still brokering government flights under an open-ended 10-year contract awarded in 2014. Over the years, work Monarch has done for the Government has included transporting fuel to Israel (between 2012 and 2015) and transporting people in the witness protection program (at least in 2017).

      One source the Article references is Gary Kalman, the director of the U.S. chapter of Transparency International. Kalman provided his opinion regarding the fact that the Government has contracted with Monarch to conduct tasks such as transporting protected witnesses. The Article quotes Kalman as stating, "[t]he negligence is startling" and that "[a]irlines with a history of criminal affiliation contracted by the government to transport protected witnesses is something we'd expect to see in a spy novel, not in a news report." The Article also indicates that Kalman "said the fact that Monarch was able to transport protected witnesses, despite the dubious backgrounds of its former owners, shows the need for more thorough checks on companies that are awarded public contracts." According to Kalman, "[c]ommon sense says that contracts should be clearly vetted before going to entities with a history of criminal affiliation, but there is no legal mandate that we check. That is a significant gap in the law, and this story is a prime example of how such a gap might be dangerously exploited." However, a spokesperson for the Defense Logistics Agency said the agency followed proper procedures when vetting Monarch for a 2012 contract to deliver fuel to Israel.

## LEGAL STANDARD

"Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014) (quoting *Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001)). "A motion for judgment on the pleadings is governed by the same standard as a motion to dismiss under Rule 12(b)(6)." *Samara v. Taylor*, 38 F.4th 141, 152 (11th Cir. 2022) (quoting *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1350 (11th Cir. 2018)). The Court "accept[s] the facts alleged in the complaint as true and view[s] them in the light most favorable to the plaintiff." *Johnson v. City of Atl.*, 107 F.4th 1292, 1297 (11th Cir. 2024) (citations omitted). "[T]he factual allegations 'must be enough to raise a right to relief above the speculative level'—with 'enough facts to state a claim to relief that is plausible on its face.'" *Samara*, 38 F.4th at 152 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).

## ANALYSIS

### A. APPLICABLE LAW

Under Florida law, a cause of action for defamation by implication is "premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements." *Ozyesilpinar v. Reach PLC*, 365 So. 3d 453, 460 (Fla. 3d DCA 2023) (quoting *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1107 (Fla. 2008)). The cause of action "applies in circumstances where literally true statements are conveyed in such a way as to create a false impression." *Jews for Jesus*, 997 So. 2d at 1108. "Even if the words are not literally false, they may still be defamatory if 'the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts.'" *Johnston v. Borders*, 36 F.4th 1254, 1275 (11th Cir. 2022) (quoting *Jews for Jesus*, 997 So. 2d at

1108). Thus, a defamation by implication claim "arises, not from what is stated, but from what is implied when a defendant (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts, such that he may be held responsible for the defamatory implication." *Readon v. WPLG, LLC*, 317 So. 3d 1229, 1237 (Fla. 3d DCA 2021) (quoting *Jews for Jesus*, 997 So. 2d at 1106). Nonetheless, "[t]he protections afforded to defendants in defamation actions apply to the tort of defamation by implication." *Ozyesilpinar*, 365 So. 3d at 460 (citing *Jews for Jesus*, 997 So. 2d at 1108).

The defamation-by-implication "inquiry turns on whether the 'gist' of the publication is false." *Turner v. Wells*, 879 F.3d 1254, 1269 (11th Cir. 2018) (citing *Jews for Jesus*, 997 So. 2d at 1107-08). "While defamation law shields publishers from liability for minor factual inaccuracies, it also works in reverse, to impose liability upon the defendant who has the details right but the 'gist' wrong." *Readon*, 317 So. 3d at 1237 (quoting *Jews for Jesus*, 997 So. 2d at 1107-08) (alteration adopted). Whether a publication is defamatory by implication is only a jury issue "where the publication is susceptible of two reasonable interpretations, one of which is defamatory." *Turner*, 879 F.3d at 1269 (citations omitted); *see also Johnston*, 36 F.4th at 1275 ("Where a statement is subject to two possible interpretations and one is defamatory, it is for the jury to decide whether the statement is in fact defamatory."). Otherwise, "[w]hether the defendant's statements constitute defamation by implication is a question [of] law for the court to determine." *Turner*, 879 F.3d at 1269 (citations omitted). In making that determination, the court must consider a publication "'in its totality' and in context rather than piecemeal and in isolation." *Johnston*, 36 F.4th at 1275 (citations omitted); *see also Skupin v. Hemisphere Media Grp., Inc.*, 314 So. 3d 353, 356 (Fla. 3d DCA 2020) ("[T]he court . . . 'must construe the statement in its totality, examining not merely a particular phrase or sentence, but all the words used in the

publication.'" (quoting *Hay v. Indep. Newspapers, Inc.*, 450 So. 2d 293, 295 (Fla. 2d DCA 1984))). Additionally, the court should construe the publication "'as the common mind would understand it,' and not 'in their mildest or most grievous sense.'" *Johnston*, 36 F.4th at 1275 (citation omitted).

### B. DISCUSSION

Here, based on the Complaint and the Article,[2] a reasonable jury could conclude that the Article is defamatory by implication. In Count II of the Complaint, Monarch alleges that the Article "impl[ies] a defamatory connection between Monarch, criminals, and/or criminal activity" by "juxtaposing and/or conveying incomplete information and/or omitting facts." Complaint ¶ 60. JDN parses out three alleged defamatory implications from the allegations of the Complaint. First, JDN views the allegations of Count II (combined with the general allegations) as claiming that the Article implies a present-day (at the time of publication) connection between Monarch and its current owner (D. Gitman) on the one hand and Golubchik and Trincher on the other hand. Second, JDN views the Complaint as potentially attempting to allege that the Article implies Monarch did or does engage in drug smuggling. Third, JDN addresses Monarch's allegation that the Article's statement that a prosecutor – at Golubchik's 2013 bail hearing – said he did "not believe [Monarch] is legitimate" is defamatory by implication because the Article omitted that the prosecutor later

---

[2] The Court can consider the Article, which is an exhibit to the Complaint. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *F.T.C. v. AbbVie Prod. LLC*, 713 F.3d 54, 63 (11th Cir. 2013) ("At the motion-to-dismiss stage, we consider the facts derived from a complaint's exhibits as part of the plaintiff's basic factual averments." (citation omitted)); *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007) ("[W]hen the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern." (citation omitted)).

apologized for misspeaking. While JDN attempts to separate these three issues, the reality is that a reasonable jury could find that the Article, *viewed as a whole*, is defamatory by implication.[3]

Regarding the first issue, JDN contends that the Article expressly and repeatedly states that Golubchik and Trincher were no longer owners of Monarch and that they left Monarch in 2012. According to JDN, the "*express* statements explaining that Golubchik and Trincher have not been owners of Monarch since 2012 preclude Monarch's claim that the Article somehow *implies* that Monarch was still owned by criminals." [DE 95] at 11-12 (emphasis in original). It is true that the Article makes clear that Golubchik and Trincher left Monarch in 2012. But the Complaint is not premised upon an alleged implication that Golubchik and Trincher still own an interest in or control Monarch. While the Complaint does allege that the Article insinuates D. Gitman and Monarch "were still associated with Monarch's former owners—some who were criminals," Complaint ¶ 42, the alleged defamatory implication is not limited to Golubchik and Trincher and their relationship with Monarch. Again, the alleged implied "defamatory connection" is a broader implied connection "between Monarch, criminals, and/or criminal activity." *Id.* ¶ 60.

---

[3] In the Motion, JDN argues that under the First Amendment, it has wide editorial discretion and that it is not required to "say something nice" about Monarch. [DE 95] at 15. While that is true, JDN's First Amendment arguments do not change the result here. It is well-recognized that "[t]rue statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions by the First Amendment." *Turner*, 879 F.3d at 1262. However, it is unclear from the Motion how JDN believes the First Amendment supposedly precludes JDN's liability under the facts alleged in this case. In its Reply, JDN says it "does not claim the First Amendment bars all claims for defamation by implication." [DE 114] at 7. Rather, it emphasizes (in addressing its First Amendment arguments) its Fourth Affirmative Defense pleads, *inter alia*, that the "statements and publication . . . when considered in their entirety as required by applicable law, were not reasonably capable of the false and defamatory interpretations, effects and/or implications alleged by Plaintiff." *Id.* However, for the reasons discussed in this Report, a reasonable jury could find that the Article considered in its entirety is capable of the defamatory implication alleged by Plaintiff.

A jury, viewing the Article in its totality, could reasonably find that the Article implies a pattern – one that began when the "clique" that included Golubchik, Trincher, and J. Gitman took control of Monarch in 2011 – whereby Monarch and the individuals at the helm of Monarch are criminals or fraudsters. Obviously, the details in the Article regarding criminal wrongdoing largely pertain to Golubchik and Trincher. And Monarch does not contend that the Article inaccurately reports any facts regarding Golubchik's and Trincher's criminal history or that they owned interests in Monarch until 2012. Nonetheless, as Monarch correctly points out, one reviewing the Article as a whole could reasonably conclude that the Article implies that Golubchik and Trincher remained connected to Monarch and/or the Gitmans after Golubchik and Trincher left Monarch.

Significantly, the Article attempts to link Golubchik and Trincher to D. Gitman by noting that Monarch "is currently owned by the son of Golubchik and Trincher's former business partner." A reasonable jury could find that in doing so, the Article is attempting to imply a continued connection. Moreover, a reasonable jury could find that the Article also separately implies that J. Gitman may still be involved in at least one other aviation company with Golubchik and Trincher. After noting that J. Gitman denied having any "business relations" with Golubchik and Trincher since 2013, the Article states: "However, public records show that Gitman partnered with Golubchik and Trincher in at least four aviation companies. Panama-based SkyWay International Holding still lists all three men as corporate officers." Although the Article then notes J. Gitman's statement that the company was never active, a reasonable jury could find that the Article is implying that, contrary to J. Gitman's denial, J. Gitman continued to have some business relationship with Golubchik and Trincher. So, the Article is juxtaposing the fact that Golubchik and Trincher were owners of Monarch, facts regarding their business relationship with J. Gitman, and the fact that the current owner of Monarch is the son of Golubchik's and Trincher's

9

former business partner (J. Gitman).  A reasonable jury could find that the Article wants the reader to believe that Golubchik and Trincher remain connected to Monarch and/or D. Gitman by juxtaposing these facts.  And JDN's caveats are not enough to overcome that reasonable implication.  *Cf. McQueen v. Baskin*, 377 So. 3d 170, 178 (Fla. 2d DCA 2023) ("[A]ctionable defamatory statements do not become nondefamatory when, as here, the context of the statements swallows up the caveats.").

Moreover, a reasonable jury could find that the larger implication from the Article as a whole is that the criminal or fraudulent activity of Monarch and its owners is not limited to Golubchik and Trincher.  In fact, while the Article begins by discussing Golubchik and Trincher (and spends more time discussing their criminal history than the history of other Monarch owners), the third paragraph of the Article notes that "[t]wo other investors who ran Monarch" *after* Golubchik and Trincher "also had legal troubles, and one fled a warrant for his arrest in the U.S. and remains on the lam."  Additionally, the Article also later mentions how J. Gitman was found liable in a civil lawsuit in 2017 of misleading investors in some other venture.  Thus, the Article juxtaposes true facts regarding those involved in Monarch in a manner that would allow a reasonable jury to find a pattern of untrustworthy individuals running Monarch.  And while the Article does not state that D. Gitman has personally engaged in, or been accused of, any criminal or civil wrongdoing, a reasonable jury could find that the Article implies that nearly everyone else who acquired an interest in Monarch since 2008 has engaged in, or been accused of, wrongdoing (including D. Gitman's father).  As Monarch argues, a reasonable person (or the common mind) reading the Article in its entirety could perceive the gist of the Article "as suggesting that Monarch's history is steeped in criminality, and by extension, that it is now tainted and unworthy of government contracts."  [DE 106] at 8.

As to the second and third issues JDN parses out, the allegations regarding the cocaine incident and the prosecutor's statement regarding the legitimacy of Monarch, JDN is correct that certain of Monarch's allegations regarding these issues are implausible. To the extent Monarch maintains that the statements in the Article about the two issues are defamatory by implication on their own, Monarch is incorrect. However, the Article's statements regarding the two issues go to the larger gist of the Article.

With respect to the cocaine incident, the Article noted that, "in 2011, according to a submission from prosecutors at Golubchik's bail hearing two years later, Florida customs agents discovered 16 kilograms of cocaine hidden in one of [Monarch's] planes." The Article also relayed that Monarch's spokesperson said the cocaine "belonged to a passenger." In the Complaint, Monarch alleges that the Article implied Monarch was involved in drug smuggling by stating that 16 kilograms of cocaine were found hidden in one of Monarch's planes. Complaint ¶¶ 37-38. Monarch also alleges that it said the cocaine was in a passenger's "personal possession," but that JDN "changed Monarch's response to obfuscate that the cocaine was in a passenger's personal possession and instead wrote that 'Monarch's spokesperson said that the cocaine belonged to a passenger.'" *Id.* ¶ 40. Contrary to Monarch's allegation, no reasonable jury could find that the Article "accuses Monarch of drug smuggling," *id.* ¶ 37, particularly when the Article does not do more to affirmatively suggest that Monarch played an active role in the cocaine incident or insinuate any similar incidents occurred. And whether the cocaine "belonged to a passenger" or was discovered in a passenger's "personal possession" does not reasonably bear on whether Monarch was actively involved in drug smuggling. The Article does arguably suggest that Monarch was *possibly* complicit to some extent in the cocaine incident by stating that the cocaine was "hidden in one of [Monarch's] planes." But that alone is not enough to reasonably conclude

11

that the Article implies Monarch was involved in smuggling drugs. Nonetheless, the inclusion of the apparently isolated cocaine incident – an incident that occurred nearly a decade before publication – goes to the larger theme of the Article. That is, Monarch and multiple individuals at the helm of Monarch over the years (beyond just Golubchik and Trincher) have played some role in criminal or other legal wrongdoing.

Likewise, although the Complaint includes implausible allegations related to the prosecutor's statement regarding Monarch's legitimacy, the inclusion of the prosecutor's remark goes to the larger theme (or gist) of the Article. Monarch seems to allege that, even separate and apart from the rest of the Article, JDN defamed Monarch (by implication) by reporting that the prosecution said it did not believe Monarch was legitimate. Whereas Monarch's other defamation-by-implication contentions are premised upon a juxtaposition theory, Monarch contends the Article's inclusion of the prosecutor's legitimacy statement created a defamatory implication by omitting facts.

According to Monarch, the Article omitted that the prosecution "apologized for misspeaking and calling Monarch an illegitimate business." Complaint ¶ 35. I have reviewed the relevant portions of the transcripts from the 2013 bail hearings.[4] At the first bail hearing, the prosecution stated,

---

[4] The parties dispute whether the Court can consider the bail hearing transcripts in connection with the Motion. JDN correctly posits that the Court is permitted to do so. "[W]hen ruling on a Rule 12(b)(6) or 12(c) motion, a court generally may not consider matters outside of the pleadings without treating the motion as a motion for summary judgment." *Johnson*, 107 F.4th at 1298. "However, '[t]here are two exceptions to this conversion rule: (1) the incorporation-by-reference doctrine and (2) judicial notice.'" *Id.* (quoting *Baker v. City of Madison*, 67 F.4th 1268, 1276 (11th Cir. 2023)). The incorporation-by-reference doctrine allows a court to consider a document not referred to in or attached to a complaint "if the document is (1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged." *Id.* at 1300. The centrality requirement is satisfied here because the bail hearing transcripts show "all the relevant conduct" giving rise to Monarch's allegations regarding the prosecution's legitimacy statement. *See*

> Owning an airplane company allows you obviously to leave quite easily. The airplane company not only was used for laundering money; in 2011 Miami customs discovered 16 kilos of cocaine on one of these planes. We do not believe this business is legitimate. Realistically it is used to launder money and it provides him the opportunity to flee.

[DE 95-1] at 11. A few days later (at the second hearing), the prosecution stated, "Defense counsel likes to accuse the government of misstating things. We have been completely candid. We may have -- the airplane company I guess it went bankrupt because of this cocaine issue. I fall on my sword, your Honor." [DE 95-2] at 46.

What is evident from the prosecution's statement at the second hearing is that it was responding to defense counsel's accusation that the prosecution was "misstating things." And the transcript shows that what defense counsel accused the prosecution of misstating was that Golubchik owned an interest in Monarch at the time of the bail hearing. *See id.* at 24-25. Regardless, even if there is more than one reasonable way to interpret what the prosecutor was apologizing for, Monarch's allegation that the prosecutor apologized (or "fell on his sword") for "calling Monarch an illegitimate business," Complaint ¶ 35, is not a reasonable inference. Therefore, the inclusion of the statement in the Article about the prosecution saying it did not believe Monarch was a legitimate business is not independently defamatory.

Nonetheless, the inclusion of the prosecution's *speculative*, off-the-cuff remark regarding Monarch's legitimacy – one made seven years before the Article was published – goes to the gist of the Article. That is, a reasonable jury could find that the common mind's takeaway from the

---

*Swinford v. Santos*, 121 F.4th 179, 187 (11th Cir. 2024). Additionally, Monarch does not challenge the authenticity of the transcripts. Therefore, the Court may consider the transcripts without converting the Motion to a motion for summary judgment. Moreover, the second exception to the conversion rule, judicial notice, also applies – the Court can take judicial notice of the bail hearing transcripts. *See U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 812 n.4 (11th Cir. 2015) ("Courts may take judicial notice of publicly filed documents, such as those in state court litigation, at the Rule 12(b)(6) stage.").

Article is that Monarch is not a legitimate company *because of its connection to criminals, fraudsters, and/or criminal activity*. Notably, the Article spends a significant amount of time discussing past events – events related to Golubchik's and Trincher's criminal wrongdoing chief among such events. And the Article juxtaposes facts regarding those events and the legal troubles of other Monarch investors to – among other facts – the fact that Monarch was still "making government flights as recently as September" 2020 (two months before publication). The Article juxtaposes these events using the word "nonetheless," such that a reasonable jury could draw the implication that the criminal and legal history of Monarch and its owners should have precluded Monarch from continuing to make government flights. Although the Court must not place too much focus on a single word or phrase, *see Byrd v. Hustler Mag., Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983), the presence of such an implication is even greater when considering the Article as a whole. In fact, the Article also relies on Kalman's statements to link Monarch's "history of criminal affiliation" to Monarch's present ability to transport protected witnesses, implying that the former should preclude the latter. As indicated above, Kalman stated, *inter alia*, the following:

> [T]he fact that Monarch was able to transport protected witnesses, despite the dubious backgrounds of its former owners, shows the need for more thorough checks on companies that are awarded public contracts.
>
> Common sense says that contracts should be clearly vetted before going to entities with a history of criminal affiliation, but there is no legal mandate that we check . . . . That is a significant gap in the law, and *this story is a prime example of how such a gap might be dangerously exploited*.

[DE 1-2] at 76 (emphasis added) (internal quotation marks omitted).

Additionally, in viewing the factual allegations (including what is set forth in the Article) in the light most favorable to Monarch, the Court should not overlook that OCCRP's stated mission is to "expose[] crime and corruption so the public can hold power to account." [DE 1-2] at 58. Monarch contends that this is significant in adding to the implication that JDN published the

Article on OCCRP to expose ongoing crime or corruption involving Monarch. JDN replies that Monarch does not cite any case law showing that the name or mission of a website is relevant. While Monarch probably overemphasizes, and JDN probably underemphasizes, OCCRP's mission, the bottom line is that a reasonable jury could find that OCCRP's mission provides additional context and bears on whether the Article implies that Monarch *remains* connected to criminals or criminal activity. Ultimately, a reasonable jury could conclude that – even if the details in the Article are true – the overall gist of the Article is defamatory.

## CONCLUSION

For the reasons discussed above, I respectfully **RECOMMEND** that the Motion [ECF No. 95] be **DENIED**.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Jacqueline Becerra, United States District Judge. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**DONE AND SUBMITTED** in Fort Lauderdale, Florida this 19th day of May 2025.

*[Signature: Jared Strauss]*
Jared M. Strauss
United States Magistrate Judge