**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
(FT. LAUDERDALE DIVISION)

MONARCH AIR GROUP, LLC,                    CASE NO.: 23-61256-CIV-JB
a Florida limited liability company,

       Plaintiff,

v.

JOURNALISM DEVELOPMENT
NETWORK INC.,

       Defendant.

_____/

**<u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON COUNT I</u>**
**<u>OF THE COMPLAINT AND DEFENDANT'S AFFIRMATIVE DEFENSES</u>**
**<u>NOS. 1-3, 5, 6-7, & 9-15.</u>**

Plaintiff, Monarch Air Group, LLC ("Monarch"), moves under Federal Rules of Civil Procedure 56 for Partial Summary Judgment against the Defendant, Journalism Development Network Inc. ("JDN") on Count I and on JDN's affirmative defenses Nos. 1-3, 5, 6-7, & 9-15.

## INTRODUCTION

This case is about deliberate, damaging falsehoods. JDN, through its Organized Crime and Corruption Reporting Project, published an Article that falsely branded Monarch—a government-contracted air carrier, vetted by the United States government—as an illegitimate company entangled in cocaine smuggling, and operating with a reckless disregard for safety . The Article, titled *Flight of the Monarch: U.S. Gov't Contracted Airline Once Owned by Criminals with Ties to Russian Mob*, misreports that Florida customs agents discovered 16 kilograms of cocaine hidden in one of Monarch's planes, quotes a 2013 bail hearing remark that Monarch was not a legitimate business, and highlights ownership ties to individuals convicted of organized crime offenses. *See* Pl.'s Statement of Facts ("SOF") ¶¶ 4, 5, & 10. It explains that employees resigned after Monarch stopped paying them, that the airline struggled to find replacements, and includes a former owner's claim that Monarch's new management began cutting corners on safety. *Id.* ¶¶ 15 & 18. The Article also asserts that the government should not have allowed Monarch to transport people in the witness protection program in 2017. Throughout, it links current Monarch to its past owners' criminality and raises doubts about its legitimacy and fitness to hold government contracts—despite JDN possessing direct, unequivocal evidence disproving these allegations and ignoring Monarch's repeated clarifications and demands for correction.

The undisputed record shows that Monarch never concealed narcotics; the cocaine was found in a passenger's personal possession, exactly as Monarch explained before and after publication. *Id.* 6. The government's own sentencing memorandum, which JDN had in its files, directly contradicted the isolated bail hearing remark JDN cherry-picked to portray Monarch as "not legitimate." *Id.* ¶¶ 11-13. The record is clear Monarch never compromised safety, yet JDN published an uncorroborated accusation from a biased former insider who openly admitted he hoped to ruin Monarch's business. *Id.* ¶¶ 19 & 21. Rather than verify these claims or request comment, JDN ignored Monarch's clarifications, withheld known exculpatory facts, and published a narrative designed to factualize wrongdoing where none existed—conduct that easily satisfies reckless disregard for the truth under controlling law.

These statements are defamation per se because they strike at the heart of Monarch's

reputation and its ability to operate lawfully and safely as an air charter provider—injury that is presumed and further supported by uncontroverted evidence of actual reputational and economic harm. *Id.* ¶¶ 3, 28- 31. JDN's scattershot affirmative defenses fail on the same undisputed facts: it cannot prove truth, substantial truth, fair report, or opinion privilege; there was no legitimate public controversy to render Monarch a public figure; Monarch provided detailed, timely pre-suit notice and filed suit within Florida's statute of limitations; and Monarch took reasonable steps to mitigate its damages. *Id.* ¶¶ 37-38. No genuine factual disputes remain on any element of Monarch's claim or any of JDN's defenses referenced. Summary judgment should thus be granted.

## I.     <u>LEGAL STANDARD</u>

"A party may move for summary judgment, identifying each claim or defense…on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment…." Fed. R. Civ. P. 56(a). "A dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Eliminator, Inc. v. S. Belle Fishing, LLC*, 606 F. Supp. 3d 1229, 1232 (M.D. Fla. 2022) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A fact is material if it may 'affect the outcome of the suit under the governing law.'" *Id.*

"For issues the movant must prove, the 'movant must affirmatively show the absence of a genuine issue of material fact and support its motion with credible evidence demonstrating that no reasonable jury could find for the non-moving party on all of the essential elements of its case.'" *Eliminator, Inc.* at 1233 (citation omitted). "But for issues the non-movant bears the burden, the movant has two options: (1) point out a lack of evidence to support the nonmoving party's case; or (2) provide 'affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial.'" *Eliminator, Inc.* at 1233 (citing *United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Cntys.*, 941 F.2d 1428, 1437-38 (11th Cir. 1991)). "The party opposing the motion may not simply rest upon mere allegations or denials of the pleadings; after the moving party has met its burden of coming forward with proof of the absence of any genuine issue of material fact, the nonmoving party must make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. *Esanu v. Oceania Cruises, Inc.*, 49 F. Supp. 3d 1078, 1080 (S.D. Fla. 2014) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). "[The Court] may not undertake credibility determinations or weigh the evidence when reviewing the record." *See Eliminator, Inc.* at 1233 (citing *Latimer v.*

*Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010)). "What's more, '[t]he court need consider only the cited materials, but it may consider other materials in the record.'" *Eliminator, Inc*. at 1233 (citing Fed. R. Civ. P. 56(c)(3)).

## II.      **MEMORANDUM OF LAW**

"Defamation is generally defined as 'the unprivileged publication of false statements which naturally and proximately result in injury to another.'" *Akai Custom Guns, LLC v. KKM Precision, Inc.*, 707 F. Supp. 3d 1273, 1293 (S.D. Fla. 2023) (citation omitted). The defamation elements are: "(1) publication; (2) falsity; (3) that the defendant acted with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) that the statement at issue was defamatory." *Id.* (citing *Johnston v. Borders*, 36 F.4th 1254, 1275 (11th Cir. 2022). "Words are defamatory when they 'tend to subject one to hatred, distrust, ridicule, contempt or disgrace, or tend to injure one in one's business or profession.'" *Id.* (citing *Seropian v. Forman*, 652 So. 2d 490, 495 (Fla. 4th DCA 1995)). If the publication can bear only one meaning, the question of defamation is for the judge. *See McIver v. Tallahassee Democrat, Inc.*, 489 So. 2d 793, 794 (Fla. 1st DCA 1986) (citation omitted).

### a.   **Count I (Defamation *per se*)**

"Defamation per se does not require any additional explanation to prove the defamatory nature of the statement. Florida law holds that certain statements are so harmful in nature that they are presumed defamatory as a matter of law." *Akai Custom Guns*, 707 F. Supp. 3d at 1294 (citation omitted). "In a defamation per se action, the injurious nature of the statement is apparent from the words in the statement itself and the court consequently takes notice of that fact." *Id.* (citing *Campbell v. Jacksonville Kennel Club, Inc*., 66 So. 2d 495, 497 (Fla. 1953)). "The plaintiff is therefore not required to allege general damages, because the harm is readily apparent." *Id*. "A publication may be defamation per se when, considered alone without innuendo: (1) it charges that a person has committed an infamous crime…; [2] it tends to subject one to hatred, distrust, ridicule, contempt or disgrace; or [3] it charges conduct, characteristics, or a condition incompatible with the proper exercise of a lawful business, trade, profession or office which thereby tends to injure one in his trade or profession." *Id.* (citing *Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953)).

#### i.   **Cocaine Incident**

The Article's assertion that "Florida customs agents discovered 16 kilograms of cocaine hidden in one of [Monarch's] planes" is a direct, allegation attributing serious criminal conduct to

Monarch and is defamatory per se. *See* SOF at ¶ 5.

First, the claim that drugs were "hidden" in Monarch's aircraft directly asserts that Monarch was complicit in international drug smuggling. This is not figurative or ambiguous: it leaves readers with the clear impression that Monarch was involved in narcotics trafficking—an infamous crime that inherently invites public contempt. *Miami Herald Publishing Co. v. Ane*, 423 So. 2d 376, 390 (Fla. 3d DCA 1982) ("A false and defamatory statement accusing someone of crime is considered to be per se actionable without proof of special damage."). In *Ane*, the court found a publication falsely linking the plaintiff to a truck carrying narcotics, was per se defamatory because a "reasonable person could interpret [such] statements to mean that [the plaintiff] was heavily implicated in serious drug offense." *Id*. at 389. Here, the false claim that Monarch's aircraft concealed narcotics, when Monarch was not involved, is defamation per se.

Second, the statement directly injures Monarch's business. Monarch's clients depend on Monarch's integrity and regulatory compliance. *See* SOF at ¶ 3. Its clientele, high-net-worth people do not do business with drug smugglers. *Id*. Claiming that Monarch facilitated cocaine smuggling destroys that credibility and thus is defamation per se. *Akai Custom Guns*, 707 F. Supp. 3d at 1293.

Moreover, this was not a mere oversight. Monarch told JDN, before and after publication, that the statement was false but JDN still published it. *See* SOF at ¶¶ 6-8. Monarch responded to JDN's request for comment saying that the drugs were in a passenger's personal possession—not hidden in the plane—and that it fully cooperated with law enforcement. *Id*. Yet JDN misleadingly paraphrased Monarch's full response: "Monarch's spokesperson said the cocaine belonged to a passenger." *Id.* 7. This stripped the crucial context that the drugs were in the passenger's personal possession—hidden from Monarch—and were not hidden on the plane by Monarch, making the Article's statement both misleading and affirmatively false.

Compounding the harm, JDN did not timely correct the falsehood. Monarch repeatedly demanded corrections beginning in March 2021, yet the partial corrections were not made until June 2021—months beyond the ten-day window required under Fla. Stat. § 836.08(1), mandating corrections be published "in as conspicuous place and type" as the original statement within ten days from receiving the notice. SOF at ¶¶ 32-34. The delayed, incomplete corrections underscore JDN's disregard for accuracy.

This was the JDN's intent, further illustrated by JDN choosing to publish the Article in this forum which JDN claims is devoted to exposing corruption and organized crime—while choosing

the headline ("*Flight of the Monarch: U.S. Gov't Contracted Airline Once Owned by Criminals with Ties to Russian Mob*"). Doing so places Monarch under a banner of organized crime, intensifying the defamatory impact. *See* SOF at ¶ 4. Thus, JDN's cocaine smuggling allegation is defamatory per se and JDN is liable.

ii.     <u>**Accusation of Illegitimacy**</u>

The Article's "illegitimacy" statement is defamation per se because it conveys to reasonable readers that Monarch was operating unlawfully and entangled in organized crime—despite JDN deliberately withholding evidence to the contrary. The Article quotes a single prosecutorial remark—"We do not believe this business is legitimate"—with reference to a drug seizure and repeated references to convicted former lenders whose loans had were repaid long before. *Id.* ¶ 10 & 43. This statement, and its purposeful placement alongside the drug seizure, leads an ordinary reader to conclude that Monarch was complicit in criminal wrongdoing.

JDN concealed the prosecutor's later statement in sentencing memoranda that the money was laundered through legitimate businesses, including an airplane company—Monarch. *Id.* ¶ 11. JDN knew about the sentencing memoranda and recklessly ignored them because it would negate the Article's premise. *Id.* ¶¶ 12-13. JDN also knew that the U.S. General Services Administration found no wrongdoing or compliance issues with Monarch. *Id.* ¶¶ 26-27. Despite this exculpatory finding and the prosecutor's correction, JDN omitted both and presented only the outdated remark. JDN's own fact checker agreed that it should have been included. *Id.* ¶ 14 ("[l]et's say if -- if I am a reporter, and I'm looking at it right now, yes, I would include this.").

Calculatedly presenting an outdated statement while concealing the known correction parallels *Army Aviation*, 504 F. Supp. 2d at 1258–59, where defendants spread false statements that the plaintiff violated safety standards, impugning its professional integrity. The court found such statements actionable because they "prejudiced [the plaintiff's] ability to conduct its trade or business, deterred third persons from dealing with it, assailed its management, and impugned its method of doing business." *Id.* at 1259. Like the false safety claims in *Army Aviation*, JDN's presented statements it knew were false while recklessly omitting facts directly undermining Monarch's standing in a highly competitive, sensitive industry, and jeopardizing its contractor and client relationships. This defamation per se harmed Monarch's reputation and business relationships, and Monarch is thus entitled to summary judgment

### iii.  Imputing Dangerous and Unethical Conduct in Business

The Article's statement that Monarch's former operations director "left when he felt that the new owners started cutting corners on safety" is independently actionable as defamation per se. *See* SOF at ¶ 18. "Per se defamatory statements must impute conduct to plaintiffs 'incompatible with the essential functions of their respective jobs.'" *Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1250–51 (S.D. Fla. 2014) (citation omitted). "[A] defendant publishes a 'pure opinion' when the defendant makes a comment or opinion based on facts which are set forth in the publication or which are otherwise known or available to the reader or listener as a member of the public." *See Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018). "Mixed opinion is based upon facts regarding a person or his conduct that are neither stated in the publication nor assumed to exist by a party exposed to the communication. Rather, the communicator implies that a concealed or undisclosed set of defamatory facts would confirm his opinion." *See Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1379 n. 13 (S.D. Fla. 2006).

This accusation does exactly that: it charges Monarch's ownership with compromising core air safety standards—fundamental to its operations and place in the market. See SOF ¶ 3 ("But if you're accusing an aviation company of undermining the absolutely most important thing in aviation, which is safety…"). While this statement may facially appear as an opinion, it is not. At best, this is a mixed opinion: the Article presents the bare assertion that Monarch's new owners "started cutting corners on safety" but does not disclose any underlying facts to support that charge, nor is any factual basis otherwise known or available to the reader. Nowhere else in the Article does JDN allege or explain any facts substantiating this serious claim, leaving readers with the fact it rests on undisclosed, verifiable wrongdoing. Falsely accusing an aviation company of maintenance improprieties is an attack on its core safety obligations and is defamatory per se. *Army Aviation*, 504 F. Supp. 2d at 1260

The record confirms the statement is false. Monarch has never compromised or relaxed safety requirements. *See* SOF ¶ 19. Yet JDN recklessly disregarded the truth: it never asked Monarch for comment on the safety allegation or otherwise corroborate Slavin's statement. *Id*. ¶20. Slavin admitted that he is unaware of any wrongdoings by Monarch, David Gitman, or Jacob Gitman since his departure from Monarch. *Id*. ¶22. And Slavin could not identify a single instance or produce any documentation showing any concern that funds were withheld for aircraft maintenance or safety. *Id*. ¶23. This failure to investigate or verify serious charges is reckless

indifference that proves actual malice. *See Tobinick v. Novella*, 108 F. Supp. 3d 1299, 1310 (S.D. Fla. 2015) (citation omitted); *Readon v. WPLG, LLC*, 317 So. 3d 1229, 1236 (Fla. 3d DCA 2021).

Throughout discovery, JDN produced no credible source, document, or testimony supporting the claim. It relied solely on Slavin's unverified statement, a disgruntled former owner who admitted to JDN that he "hope[s] this article squashes David Gitman and what is left of Monarch." *See* SOF at ¶ 21. This bias should have prompted some scrutiny—interviewing other witnesses, checking safety logs, or at minimum seeking Monarch's response. Yet JDN did none of this, showing its reckless disregard for the truth. Because the statement accuses Monarch of conduct striking at the core of its business—safe air transportation—its defamatory character is apparent, and damages are presumed. *Klayman*, 22 F. Supp. 3d at 1251.Monarch is thus entitled to summary judgment finding JDN liable for this per se defamatory statement.

### iv.    <u>Damages</u>

"Compensatory damages for defamation are not limited to out-of-pocket loss; the injured party may recover damages resulting from impaired reputation and standing in the community, humiliation, mental anguish, and suffering…. There is no exact standard for fixing the compensation to be awarded on account of such elements of damage. Any award should be fair and just in the light of the evidence." *See Army Aviation*, 504 F. Supp. 2d at 1259. "Further, '[o]f course, all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury." *Id*. (quoting *Gertz v. Welch, Inc*., 418 U.S. 323,349 (1974)). "A corporation can bring a defamation claim in its own name for imputation defamatory to the corporation's stockholders, officers or employees, where that corporation has suffered special damages flowing from the defamation." *See Falic v. Legg Mason Wood Walker, Inc*., 347 F. Supp. 2d 1260, 1270 (S.D. Fla. 2004) (citation omitted). A plaintiff that cannot prove actual damages is still entitled to nominal damages. *See Army Aviation*, 504 F. Supp. 2d at 1262 ("Nominal damages are awarded to vindicate a right where a wrong is established but no damage is proved").

JDN's defamatory statements damaged Monarch. Monarch's employees experienced anxiety and reputational embarrassment, diminishing morale. *See* SOF at ¶ 28-31. Monarch incurred $26,000 for a targeted Google Ads campaign to suppress the Article in search results for "Monarch Air Group" and counteract the reputational harm from the defamatory Article. *Id*. Monarch also lost at least $10,000 in client revenue due to leads deterred by the Article's

prominence and the amplified perception that Monarch was careless and corrupt. *Id*. Additionally, Monarch's leadership and staff suffered public humiliation, emotional distress, and reputational harm from being falsely linked to cocaine smuggling and unsafe practices—attacks that strike at Monarch's core. *Id*.

Unlike in *Army Aviation*, Monarch has presented competent record evidence detailing these damages: reduced employee morale, the focused online reputation-repair campaign ($26,000), mental anguish and humiliation, and lost business revenue ($10,000). This aligns with *Army Aviation's* holding that "there is no exact standard for fixing the compensation to be awarded on account of such elements of damage" and that general damages for defamation properly include harm to reputation, mental suffering, humiliation, and lost standing in the community. *Army Aviation* at 1259–1260.

Even if the Court concludes that summary judgment is inappropriate for Monarch's actual damages, the Court should nonetheless award nominal damages to vindicate Monarch's rights and to recognize the wrongful nature of JDN's misconduct. *See Army Aviation*, 504 F. Supp. 2d at 1262.

**b. Affirmative Defenses**

**i. First, Fifth, and Seventh Affirmative Defense**

JDN's first affirmative defense broadly asserts that the statements challenged in this action are privileged under the First Amendment, Article I, Section 4 of the Florida Constitution, and Florida common-law doctrines including substantial truth, the fair report privilege, fair comment, and opinion. [D.E. 17]. The fifth defense again invokes the fair report privilege, and the seventh reframes the same allegations as opinion or rhetorical hyperbole. These affirmative defenses fail for the same reasons. *Id*. And these defenses are also insufficient as a matter of law for Monarch's defamation by implication claim because the record shows that JDN selectively omitted or juxtaposed material facts to create a false and defamatory overall narrative, even if isolated facts were literally true. *See Klayman,* 22 F. Supp. 3d at 1254.

JDN has the burden to prove that the defamatory statements are true but JDN does not have competent evidence to do so. Their truth defense thus fails. *See Miami Herald Pub. Co. v. Brautigam,* 127 So. 2d 718, 723 (Fla. 3d DCA 1961). Here, the record forecloses any genuine dispute that the statements are materially false and defamatory. Monarch has provided undisputed evidence that: (1) the cocaine was found in a passenger's personal bag, not "hidden" in Monarch's plane; (2) Monarch has never failed to pay its employees (3); JDN relied solely on an unverified,

biased source without verifying the statement as to safety; and (4) the government's later sentencing memorandum directly contradicts the isolated bail hearing remark about Monarch's legitimacy. JDN has not identified any reliable witness, document, or government report supporting their version of events. Given this complete absence of supporting proof, no reasonable jury could find that the statements are true or even substantially true in any material respect. JDN's mere assertion—without record evidence—is insufficient to defeat summary judgment. Monarch is therefore entitled to summary judgment on this defense.

JDN's fifth affirmative defense repeatedly asserts that the statements are protected under the fair report privilege. [D.E. 17]. This defense fails for the same reasons as the first affirmative defense. Florida recognizes this privilege only when the publication provides a fair and accurate account of an official proceeding or public record. *See Dershowitz v. Cable News Network, Inc.*, 541 F. Supp. 3d 1354, 1366 (S.D. Fla. 2021) ("[F]or the fair report privilege to apply a defendant must have presented a fair and accurate report of the source documents."); *see also Miami Herald Pub. Co. v. Brautigam*, 127 So. 2d 718, 723 (Fla. 3d DCA 1961) (privilege lost if the report is inaccurate or misleading); *Stewart v. Sun Sentinel Co*., 695 So. 2d 360, 362 (Fla. 4th DCA 1997). Here, JDN selectively quoted an isolated bail hearing remark—"we do not believe this business is legitimate"—while deliberately omitting the later sentencing memoranda clarifying that any criminal proceeds were laundered through legitimate businesses, including Monarch. JDN possessed these memoranda but did not include its conclusions in the Article. *See* SOF ¶¶ 11-13. Additionally, JDN ignored Monarch's pre-publication clarifications that the cocaine was found in a passenger's personal possession, not hidden in the plane, and that no customs hangar exists at Fort Lauderdale. *Id*. ¶¶ 6-9. By misrepresenting and omitting this exculpatory context, JDN forfeited any fair report privilege. Its fifth affirmative defense therefore fails as a matter of law.

JDN's seventh affirmative defense asserts that the challenged statements are mere opinion or rhetorical hyperbole. [D.E. 17]. This also fails because the statements are explicit factual allegations capable of being proven true or false, as discussed above. Statements implying verifiable facts are actionable even if couched as opinion. *See Milkovich v. Lorain J. Co*., 497 U.S. 1, 18–19 (1990); *Johnson v. Clark*, 484 F. Supp. 2d 1242, 1247 (M.D. Fla. 2007) . JDN presented these statements as factual findings based on an investigative exposé—not rhetorical hyperbole. They provide undisclosed facts that are false or incomplete. Thus, the opinion defense also fails.

ii.        <u>Second Affirmative Defense</u>

JDN's contention that Monarch cannot recover for statements allegedly directed at David Gitman or Jacob Gitman—and that statements about the Gitmans are not "of and concerning" Monarch—is legally incorrect and factually unsupported. [D.E. 17 at pp. 7]. This argument is also insufficient for defamation by implication because statements about individuals that cast doubt on their integrity or criminal ties can, when presented in context, imply defamatory meaning about the company they own or control.

First, a corporation may recover for defamation where statements directed at its owners, officers, or employees harm the corporation's reputation, business relations, or integrity. *Falic*, 347 F. Supp. 2d at 1270 ("A corporation can bring a defamation claim in its own name for imputation defamatory to the corporation's stockholders, officers or employees."). And a corporation may recover for defamation "just as an individual, where a publication prejudices it in the conduct of its trade or business, deters third persons from dealing with it, *assails its management*, impugns its methods of doing business or inflicts injury on its credit or business." *McIver v. Tallahassee Democrat, Inc*., 489 So. 2d 793, 794 (Fla. 1st DCA 1986) (citation omitted) (emphasis added)

Second, the challenged statements directly target Monarch as a corporate entity, not merely the Gitmans personally. JDN's Article repeatedly intertwines David and Jacob Gitman's backgrounds (and its former owners' and investors') and alleged criminal ties with Monarch's legitimacy, using their history to question the company's trustworthiness and fitness as a government contractor. For example, the Article states that Monarch is "currently owned by the son of Golubchik and Trincher's former business partner" and frames Monarch's present operations as tainted by those connections. *See* SOF ¶ 41. The entire narrative—beginning with the headline *Flight of the Monarch: US Gov't Contracted Airline Once Owned by Russian Criminals*—uses the Gitmans' alleged ties to cast doubt on Monarch itself. This is not separate commentary about private individuals; it is a direct attack on Monarch's integrity as a business.

The idea that defamatory statements about an owner/management/employees are unrelated to the company is implausible where, as here, the individuals and the company are portrayed as one and the same for credibility and regulatory fitness. The allegations about the Gitmans are presented specifically to undermine confidence in Monarch's legitimacy and reputation. Florida law does not support JDN's attempt to sever statements about an individual involved with a company and the company itself; the company is merely a legal fiction. Thus, corporations can

10

recover for statements that "assail its management" or "impugn its methods of doing business." *McIver*, 489 So. 2d at 794. That is precisely what the Article does: it attacks Monarch's management and business through the Gitmans' alleged conduct and relationships to suggest Monarch cannot be trusted and should not get government contracts. The statements at issue thus are "of and concerning" Monarch and plainly affect its trade, credit, and ability to secure government and non-government contracts. This affirmative defense is meritless, and Monarch is entitled to summary judgment striking it.

### iii.        Third Affirmative Defense

JDN's third affirmative defense—that the statements, when considered in their entirety, are "not false and defamatory in any material or significant respect" and are "substantially true"—is not a legally cognizable affirmative defense. [D.E. 17 at pp. 7]. It is no more than a general denial of an essential element of Monarch's defamation per se claim: falsity. An affirmative defense must assert some additional fact or legal doctrine that would bar recovery even if the allegations are true. *See Boldstar Tech., LLC v. Home Depot, Inc.*, 517 F. Supp. 2d 1283, 1291 (S.D. Fla. 2007) ("The defendant must allege some additional facts supporting the affirmative defense"). Just denying the Article's falsity is not an affirmative defense; it is a pure denial that should not separately pled from the answer. A defense that merely points out a defect in the plaintiffs prima facie case, such as demonstrating a missing element of the claim, is not an affirmative defense. *In re Egidi*, 386 B.R. 884, 895 n.9 (Bankr. S.D. Fla. 2008) (citation omitted).

Even if treated as a valid defense, JDN can produce no evidence to support it. As explained above, the record shows that the statements are materially false and defamatory. This failure of proof is equally fatal to any defense against defamation by implication, because JDN cannot produce any credible evidence that the Article's overall misleading narrative is true or justified in context. JDN's bare assertions, without record evidence, cannot defeat summary judgment. Monarch is therefore entitled to judgment on this defense.

### iv.        Sixth Affirmative Defense

JDN's affirmative defense that the bail statements concern matters of public record and public interest—and therefore preclude presumed damages—fails as a matter of law and is contradicted by the undisputed record. [D.E. 17 at pp. 9]. As explained above in Section (iii)(b)(i), JDN did not fairly and accurately report the relevant criminal proceedings. Florida's fair report privilege requires a publisher to present a fair and accurate report of the source document or

proceeding. *Dershowitz*, 541 F. Supp. 3d at 1366. This defense is also insufficient for defamation by implication because selectively quoting an isolated statement while omitting material clarifications misleads the reader and distorts the true gist of the official record—precisely what the fair report privilege does not protect.

This was not an innocent oversight. The record shows JDN acted with reckless disregard for the truth by knowingly ignoring the government's own correction that directly contradicted the misleading "gist" created by the orphaned bail remark. JDN had the sentencing memoranda during its editorial process yet chose to suppress it to protect the Article's defamatory narrative. *See* SOF ¶¶ 11-13. At minimum, a basic, good-faith investigation would have revealed this critical context—meaning JDN knew, or unquestionably should have known, that its selective reporting of the bail hearing was incomplete and misleading. JDN chose to ignore this critical context because it negated the Article's premise that Monarch should not receive government contracts because it was connected to Russian criminals. The sentencing memoranda show that Monarch was Golbchik's and Trincher's victims and JDN further victimized Monarch by ignoring the memoranda. This failure to check an obvious source in its possession, combined with deliberately omitting key clarifications, shows JDN's actual malice. *See Ane*, 423 So. 2d at 389–90.

Second, JDN cannot invoke a broad "public interest" shield when the record shows there was no credible basis to portray the Article as addressing any legitimate matter of public interest or controversy. Gary Kalman—a source JDN quoted to bolster its theme—testified that he conducted no independent investigation of Monarch and had no firsthand knowledge of any misconduct by its current owners. *See* SOF ¶ 24. Kalman further admitted that if Monarch had passed government vetting and secured U.S. Marshals Service contracts—which it did—there would have been no basis for any suspicion or further scrutiny at all. *Id.* ¶¶ 24-25. These admissions confirm that no genuine, ongoing public controversy existed about Monarch's present-day legitimacy when JDN published the Article. Instead, JDN invented a corruption narrative and public concern by reviving old allegations from almost a decade ago, ignoring the government's clarifications, and presenting no current misconduct. Just branding the story "anti-corruption reporting" does not change an unfounded narrative into a legitimate public interest matter.

A matter qualifies as a genuine public controversy only if its resolution affects people beyond the immediate parties and has "foreseeable and substantial ramifications for nonparticipants." *Silvester v. Am. Broad. Companies, Inc.*, 839 F.2d 1491 (11th Cir. 1988) (citation

omitted). Here, there is no evidence that any such ongoing controversy existed regarding Monarch's business or government contracts. And Kalman's testimony confirms that the Article has no ramifications for nonparticipants. Throughout this litigation, JDN repeatedly claimed that the Article focused on Monarch's past ownership and operations—not its operations at the time of publishing—underscoring that there was no live public debate the parties. *See* SOF at ¶ 42. Instead, JDN manufactured an artificial "public interest" angle by dredging up ancient allegations and ignoring government clarifications. Publishing a misleading or incomplete story under an "anti-corruption" label does not convert a decayed issue into a current or legitimate public controversy under *Waldbaum*. Nor does publishing a misleading or incomplete story under an "anti-corruption" label. Accordingly, this defense fails both legally and factually and Monarch is entitled to judgment on this affirmative defense

### v.   Ninth Affirmative Defense

JDN's ninth affirmative defense asserts that Monarch is a public figure and therefore must prove actual malice to recover. [D.E. 17 at pp. 10]. This defense fails both legally and factually and is also insufficient for defamation by implication because the undisputed record shows Monarch never voluntarily injected itself into any public controversy, and JDN's own source confirmed there was no genuine public interest in Monarch's present-day operations when the Article was published.

First, no reasonable jury could find that Monarch is a public figure. A limited liability company does not automatically become a public figure merely because it holds government contracts or operates in a regulated industry. See *Wolston v. Reader's Dig. Ass'n, Inc.*, 443 U.S. 157, 167–68 (1979) (Private parties are "not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention."); *see also Time, Inc. v. Firestone*, 424 U.S. 448, 454 (1976).

A plaintiff is a limited-purpose public figure only if the defendant proves both that there was a public controversy and that the plaintiff *voluntarily* injected itself into it to influence its resolution. *Gubarev v. BuzzFeed Inc.*, 354 F. Supp. 3d 1317, 1325–30 (S.D. Fla. 2018) (emphasis added). "Newsworthiness alone is not proof of a public controversy." *Id.* at 1326–27. Mere involvement in something attracting public attention does not make one a public figure. *Bair v. Clark*, 397 So. 2d 926, 927 (Fla. 4th DCA 1981)

Applying this test in *Gubarev*, the Court rejected BuzzFeed's claim that tech owners were

public figures based on widely reported allegations of Russian hacking. The plaintiffs lacked "special prominence" in the debate and had not attempted to influence its resolution. *Id*. at 1328–30. The same applies here. Any "controversy" arose from JDN's selective reporting of decade-old facts about prior owners, not from Monarch's actions. *Id*. JDN's source Gary Kalman admitted he did no independent investigation, had no firsthand knowledge of wrongdoing by Monarch's current owners, and conceded that passing federal vetting would eliminate any basis for suspicion. *Id*. ¶¶ 24-27. This mirrors *Gubarev*, where passive connection to a broader news story did not create public figure status. Accordingly, no reasonable jury could find Monarch is a public figure.

Even if Monarch were treated as a limited-purpose public figure, the undisputed record, proves actual malice as a matter of law. JDN purposefully refused to reflect that Monarch was not complicit in hiding its passenger's drugs, JDN ignored the prosecutor's own representations and clarification to the Court which contradicted the Article's cherry-picked quote, JDN withheld clarifying documents in its possession, JDN relied on a biased former insider for the "cutting corners" claim, and JDN failed to verify the nonpayment allegation. JDN repeated the serious safety claim without independent corroboration, relying exclusively on Slavin—a disgruntled ex-owner who admitted he "hope[d] this article squashes David Gitman and what is left of Monarch." *Id.* ¶ 21. Despite his bias, JDN never told its readers of Slavin's ill intent and conducted no meaningful investigation. Deliberately omitting contrary documents, relyong on a biased source, and failing to verify serious allegations shows JDN's reckless disregard for the truth. *St. Amant v. Thompson*, 390 U.S. 727, 731–32 (1968); *Tobinick*, 108 F. Supp. 3d at 1310; *Readon*, 317 So. 3d at 1236. Slavin admitted that he is unaware of any wrongdoings by Monarch, David Gitman, or Jacob Gitman since he left Monarch. *Id.* ¶ 22. And Slavin could not identify a single instance or produce any documentation showing any concern that funds were withheld for aircraft maintenance and safety. *Id.* ¶ 23. Accordingly, no reasonable jury could find Monarch to be a public figure—and even if it were, the undisputed record establishes actual malice as a matter of law. Monarch is entitled to judgment as a matter of law on this defense.

    **vi.**      **Tenth Affirmative Defense**

JDN's tenth affirmative defense is a threadbare assertion that the statements and publication were prepared and published in good faith and without negligence, express malice, or actual malice. [D.E. 17 at pp. 10]. It does not identify which statements this applies to or include any factual basis supporting the claim. As such, it fails to put Monarch on fair notice of any specific

factual or legal ground and amounts to an impermissible conclusory denial rather than a true affirmative defense. See *Losada v. Norwegian (Bahamas) Ltd.*, 296 F.R.D. 688, 690 (S.D. Fla. 2013) (an affirmative defense must raise facts distinct from a simple denial of the plaintiff's allegations). This defense is also insufficient for defamation by implication because the record shows that JDN knowingly omitted or distorted key facts to create a false and defamatory narrative, which defeats any presumption of good faith as a matter of law.

Even if construed substantively, the record conclusively defeats this defense. As detailed above in Section (iii)(b)(i), JDN ignored Monarch's detailed pre-publication clarifications explaining that the cocaine was found in a passenger's personal possession and that neither the company nor its staff concealed drugs. JDN also had in its possession the government's subsequent sentencing memorandum clarifying that criminal proceeds were laundered through "legitimate businesses", including an airline company, which is Monarch, yet it suppressed that record and instead quoted only an isolated, outdated bail hearing comment that Monarch was "not legitimate." This selective reporting and concealment of contrary official records is the opposite of "good faith" journalism.

The evidence also shows reckless disregard for the truth—the very definition of actual malice. For example, JDN relied on Slavin, a biased former insider, for the "cutting corners" allegation despite his email explicitly stating he hoped the story would "squash" Monarch and its current owner. *See* SOF at ¶ 21. Despite Slavin's obvious vendetta, JDN failed to disclose that or verify his claims with any operational or safety data. At his deposition, Slavin admitted that he is unaware of any wrongdoings by Monarch, David Gitman, or Jacob Gitman since his departure from Monarch. *Id.* ¶ 22. Nor could Slavin identify a single instance or produce any documentation or correspondence showing any concern that funds were allegedly withheld for aircraft maintenance and safety. *Id.* ¶ 23. Separately, JDN relied solely on an uncorroborated statement from a single former employee to claim Monarch failed to pay wages, never checking payroll records, seeking more witnesses, or even giving Monarch the opportunity to comment. *See* SOF at ¶ 17. Monarch's own sworn discovery responses and testimony confirm that this allegation was false.

These deliberate editorial choices—ignoring clarifications, suppressing contrary official documents, and relying on biased or unverified sources—show JDN's reckless disregard for the truth. *St. Amant*, 390 U.S. at 731–32; *Tobinick*, 108 F. Supp. 3d at 1310; *Readon*, 317 So. 3d at

1236. Accordingly, this vague defense fails both as a matter of pleading and on the undisputed facts. Monarch is entitled to judgment as a matter of law on JND's tenth affirmative defense.

**vii.**     **Eleventh Affirmative Defense**

JDN's eleventh affirmative defense—that the statements did not cause Monarch to suffer actual injury or damages for which JDN is liable—is legally improper and factually unsustainable. [D.E. 17 at pp. 10]. As pleading matter, this defense is not a true affirmative defense but merely denies an essential element of Monarch's claim—causation and damages. Courts routinely strike or disregard such "affirmative defenses" because they do not add any factual or independent legal bar to recovery. See *Losada*, 296 F.R.D. at 690. Nor does this defense address the nature of Monarch's defamation by implication claim, which requires a fact-based inquiry into whether the false implication harmed Monarch's reputation and business relationships—an issue for which Monarch has presented unrebutted record evidence of concrete harm and expense.

Even if treated substantively, this defense fails. Monarch has shown that it suffered actual and quantifiable harm directly caused by JDN's false and defamatory statements. Monarch incurred at least $26,000 for a targeted "MAG brand campaign" to counteract the reputational harm and search engine impact of the defamatory Article. Monarch also lost at least $10,000 in business revenue from deterred customer leads, and had internal morale and productivity costs, and experienced reputational embarrassment and distress. *See* SOF at ¶ 28-31. At a minimum, if the Court were to find Monarch did not suffer any damages, which it did, Monarch would still have a right to nominal damages to vindicate a right where a wrong is established.

JDN has produced no evidence to dispute these damages or show that any portion of Monarch's claimed losses were caused by something other than the publication. Mere speculation or blanket denial is insufficient to withstand summary judgment. No reasonable jury could find in JDN's favor on this defense given the unrebutted evidence of real, measurable loss. Monarch is thus entitled to judgment as a matter of law on the eleventh affirmative defense.

**viii.**     **Twelfth Affirmative Defense**

JDN's twelfth affirmative defense invokes Florida's Anti-SLAPP statute, Section 768.295, Fla. Stat., claiming Monarch's claims infringe JDN's freedom of speech on a matter of public concern. [D.E. 17 at pp. 10]. This defense is duplicative of JDN's sixth and ninth affirmative defenses, which likewise assert that the publication addressed a matter of public concern and that Monarch is a public figure. It should therefore be stricken or disposed of on summary judgment

for the same reasons those defenses fail. Moreover, this defense is insufficient as a matter of law for defamation by implication because the Anti-SLAPP statute does not shield knowingly false or recklessly misleading speech. *See Mishiyev v. Davis*, 402 So. 3d 443, 448 (Fla. 2d DCA 2025) ("The legislature tied the protections of the Anti-SLAPP statute to speech 'protected' by the First Amendment of the United States Constitution and Article I, section 5, of the Florida Constitution; and it **clarified that the prohibition against lawsuits challenging protected speech applied only to claims 'without merit and primarily because' of protected speech**.") (emphasis added). Here, JDN has no protected speech interest in publishing false and defamatory allegations, and this action has merit based on the undisputed record. Accordingly, Florida's Anti-SLAPP statute does not apply.

On the merits, this Anti-SLAPP defense fails. Florida's Anti-SLAPP law protects free speech only when the speech truly concerns a legitimate public issue or controversy. *See* § 768.295(3), Fla. Stat. (2022). As detailed above in Section (iii)(b)(iv) and consistent with *Silvester*, 839 F.2d at 1491 (citation omitted), there was no genuine public controversy about Monarch's operations at the time of publication. JDN's own source, Kalman, admitted that if Monarch passed federal vetting for U.S. Marshals Service contracts—which it did—there would be no reason for further scrutiny. *See* SOF at ¶ 24-27. This fact confirms that JDN manufactured an artificial controversy by dredging up stale allegations from a decade ago while ignoring official documents that contradicted the defamatory narrative.

Florida's Anti-SLAPP statute also only prohibits a person from filing a suit that is both "without merit" and filed "primarily" because the person against whom the suit was filed exercised the constitutional right of free speech on a public issue. *Bongino v. Daily Beast Co.*, LLC, 477 F. Supp. 3d 1310, 1321 (S.D. Fla. 2020) (citation omitted). This statute has no application here because Monarch's suit is plainly with merit: the record contains extensive evidence that JDN published serious factual allegations that were false and made with actual malice, as detailed above in Section (iii)(b)(i & vi). Moreover, knowingly false or recklessly defamatory statements are not constitutionally protected "free speech." *See Trump v. Am. Broad. Companies, Inc.*, 742 F. Supp. 3d 1168, 1183 (S.D. Fla. 2024) (citing *Dershowitz*, 541 F. Supp. 3d at 1365) ("But the privilege does not protect media where the omission of important context renders a report misleading"). Attaching a "public concern" label does not shield false factual allegations from liability under Florida law. Accordingly, the twelfth affirmative defense is redundant of other failed defenses and

independently lacks merit. Monarch is entitled to judgment as a matter of law on this defense.

ix.     **Thirteenth and Fourteenth Affirmative Defense**

JDN's thirteenth affirmative defense asserts that Monarch failed to satisfy conditions precedent under Section 770.01, Florida Statutes. This is incorrect. Nowhere in Section 770.01 does it require a Plaintiff to list each offending sentence verbatim. The statute requires only that "the plaintiff shall, at least 5 days before instituting such action, serve notice in writing on the defendant, specifying the article or broadcast and the statements therein which he or she alleges to be false and defamatory." Fla. Stat. § 770.01. "Sections 770.01 and 770.02 work together 'to afford newspapers and periodicals an opportunity to make full retraction in order to correct inadvertent errors and mitigate damages, as well as to save them the expense of answering to an unfounded suit for libel.'" *Mazur v. Ospina Baraya*, 275 So. 3d 812, 817 (Fla. 2d DCA 2019) (quoting *Bridges v. Williamson*, 449 So. 2d 400, 401 (Fla. 2d DCA 1984)). This defense is also insufficient for the implication claim because defamation by implication is based on the gist and overall context of the Article as a whole. *Turner v. Wells*, 879 F.3d 1254, 1269 (11th Cir. 2018). It is clear from Monarch's pre-suit correspondence and the Complaint that JDN was fully on notice that Monarch's claim includes the defamatory implication created by how the statements are presented together

Here, Monarch more than satisfied that standard. Before filing suit, Monarch exchanged detailed written correspondence with JDN's editorial staff starting in March 2021—well before initiating this lawsuit in November 2022. *See* SOF at ¶ 38. In these emails, Monarch explicitly identified the false or misleading allegations that form the basis of this suit—including the comments regarding Monarch's spokesperson's statement that the cocaine belonged to a passenger, the implication that border patrol turned a blind eye to the cocaine incident, and that the company is currently owned by the son of Golubchik and Trincher's former business partner. *Id*. Monarch provided documentary evidence contradicting these claims, including clarification that the narcotics were found in a passenger's personal bag with no involvement by Monarch's staff, and pointed JDN to government records showing Monarch's vetted status with the U.S. Marshals Service. *Id*. Monarch demanded corrections, objected in detail to the misleading narrative and specific statements, and made clear that the entire thrust of the Article—not just isolated lines— was false and defamatory. *Id*. JDN cannot credibly claim surprise when it chose to disregard these clarifications, withhold exculpatory context, and publish the Article materially unchanged. Monarch's prompt, specific correspondence gave JDN exactly the notice the law requires and

fulfilled the purpose of Section 770.01. *See Cousins v. Post-Newsweek Stations Florida, Inc.*, 275 So. 3d 674, 681 (Fla. 3d DCA 2019) ("Cousins's presuit notice enabled Post-Newsweek to investigate the allegations and thereupon, issue a partial clarification.").

JDN's fourteenth affirmative defense—asserting that some or all of Monarch's claims are barred by the two-year statute of limitations for defamation under Florida law, based on an alleged failure to include certain statements in a presuit notice—fails for the same reason. Monarch's Complaint was timely filed on November 23, 2022—within two years of the Article's initial publication on November 27, 2020. *See* SOF at ¶ 37. Florida's two-year limitations period runs from the date of first publication. Fla. Stat. § 95.11(5)(h). Monarch's claims fall squarely within this period. JDN's argument that certain statements are time-barred for lack of presuit notice fails because Monarch's detailed written notice covered the entire gist and substance of the Article, including the same factual points now singled out. *See* SOF at ¶ 38.

Accordingly, Monarch complied fully with Section 770.01 and timely filed its Complaint under Florida's two-year limitations period. JDN's editorial staff was on full notice of all factual allegations now at issue and chose not to correct or retract them before suit. There is no genuine dispute on these points. Monarch is therefore entitled to judgment as a matter of law on JDN's thirteenth and fourteenth affirmative defenses.

### x.        **Fifteenth Affirmative Defense**

JDN's fifteenth affirmative defense, which asserts that Monarch's claims are barred "in whole or in part" due to a supposed failure to mitigate damages, is legally insufficient and factually unsupported. [D.E. 17 at pp. 11-12]. JDN's fifteenth affirmative defense, which asserts that Monarch's claims are barred "in whole or in part" due to a supposed failure to mitigate damages, is legally insufficient and factually unsupported. [D.E. 17 at pp. 11–12]. This defense is also irrelevant to defamation by implication because the gist-based harm flows directly from the Article's overall false narrative, which Monarch promptly attempted to counter through brand campaigns, correction demands, and other mitigation efforts that JDN cannot dispute.

As a threshold matter, this defense lacks factual detail explaining how Monarch supposedly failed to mitigate its damages. An affirmative defense must give the plaintiff fair notice of the specific factual basis for the defense, not just conclusory labels or boilerplate. *See Boldstar Tech*, 517 F. Supp. 2d at 1291. Here, JDN offers no facts at all identifying what actions Monarch could have taken but did not, nor do they allege how any specific portion of Monarch's claimed damages

19

could have been avoided through reasonable diligence. As pled, this defense is nothing but an unadorned legal conclusion, which is insufficient as a matter of law. *Id*.

Furthermore, the undisputed evidence affirmatively shows that Monarch did, in fact, take prompt and substantial steps to mitigate the reputational harm caused by JDN's defamatory publication. Monarch launched a targeted "MAG brand campaign" costing $26,000 to counteract the damage to its reputation and online search presence caused by the false allegations. *See* SOF ¶¶ 39-40. This proactive response included paid digital advertising and search result management to prevent the defamatory story from misleading customers and business partners. *Id*. No evidence in the record suggests Monarch failed to pursue any reasonable avenue to limit its damages. On the contrary, Monarch took timely and significant action at its own expense to blunt the harm. *Id*.

Given this clear record, JDN cannot carry their burden to show any genuine dispute that Monarch failed to mitigate its damages. With no factual support or conflicting evidence, no reasonable jury could find in JDN's favor on this defense. Monarch is thus entitled to judgment as a matter of law on the fifteenth affirmative defense for failure to mitigate damages.

## CONCLUSION

The undisputed evidence establishes that JDN's defamatory Article falsely accused Monarch of cocaine smuggling, illegitimacy, and compromising safety, with knowledge of the falsity or, at a minimum, reckless disregard for the truth. These statements, published despite Monarch's clarifications and JDN's possession of contradictory evidence, constitute defamation per se, causing presumed and actual damages totaling $63,000, including reputational harm, lost revenue, and mitigation costs. JDN's affirmative defenses—truth, fair report, opinion, public figure status, lack of notice, statute of limitations, and failure to mitigate—fail as a matter of law, as they are unsupported by evidence and contradicted by the record. No genuine issue of material fact remains. Monarch is entitled to partial summary judgment on Count I and JDN's affirmative defenses Nos. 1-3, 5, 6-7, and 9-15, to hold JDN accountable and restore Monarch's reputation.

**[CERTIFICATE OF SERVICE ON FOLLOWING PAGE]**

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed and served via the CM/ECF filer on June 23, 2025 to: Dana J. McElroy, dmcelroy@tlolawfirm.com; Thomas & LoCicero PL 915 Middle River Drive, Suite 309 Fort Lauderdale, FL 33304; James J. McGuire, Esq., jmcguire@tlolawfirm.com; Daniela Abratt-Cohen, Esq., dabratt@tlolawfirm.com ; Thomas & LoCicero PL 601 South Boulevard Tampa, FL 33606.

Respectfully submitted,

**STOK KON+ BRAVERMAN**
Attorneys for Plaintiff
One East Broward Boulevard
Suite 915
Fort Lauderdale, Florida 33301
Tel.: (954) 237-1777
Fax: (954) 237-1737
Email: service@stoklaw.com
*/s/ Joshua R. Kon*
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
jkon@stoklaw.com
YOSEF Y. KUDAN, ESQ.
Florida Bar No. 1010261
ykudan@stoklaw.com