**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 23-cv-61256-JB**

MONARCH AIR GROUP, LLC,

    Plaintiff,

v.

JOURNALISM DEVELOPMENT
NETWORK, INC.,

    Defendant.

_____/

**DEFENDANT JOURNALISM DEVELOPMENT NETWORK, INC.'S**
**MOTION FOR SUMMARY JUDGMENT**
**<u>AND INCORPORATED MEMORANDUM OF LAW</u>**

Pursuant to Federal Rule of Civil Procedure 56, Defendant JOURNALISM DEVELOPMENT NETWORK, INC. ("JDN") moves for summary judgment on both Counts of the Complaint filed by Plaintiff MONARCH AIR GROUP, LLC ("Monarch"): Count I for defamation *per se* and Count II for defamation by implication. With respect to both Counts, there is no genuine issue of material fact and JDN is entitled to judgment as a matter of law. More detailed grounds for this Motion are set forth in the accompanying Memorandum of Law.

## MEMORANDUM OF LAW

### Introduction and Background

This is a defamation case in which Plaintiff (Monarch), a company providing air charter brokering services, complains about an investigative news article titled "Flight of the Monarch: US Gov't Contracted Airline Once Owned by Russian Criminals" (the "Article"). [Complaint, ECF No. 1-2 ("Compl.") at 7, ¶ 1; Exh. A at 20-33] The Article was published in November 2020 by Defendant JDN on its Organized Crime and Corruption Report ("OCCRP") webpage. A revised version of the Article was published in June 2021. [*Id.* at ¶ 48; Exh. D; at 66-79][1]

The Article reported truthfully on Monarch's history, including its founding in 2005 by original owner Paul Slavin, the introduction of several new owners in the 2008-2011 timeframe, Slavin's departure from the company, and various ownership changes. [Compl. Exh. A at 20-26] It recounted that two of the owners, Anatoly Golubchik and Vadim Trincher, who left in 2012, were criminals associated with the Russian mob and later sentenced to prison. [*Id.* at 20] The Article described Monarch's business and prior owners, including Jacob Gitman and Boruch Freedman, and explained that Monarch and one of its affiliates received government contracts for "moving fuel in Israel for the Department of Defense (DoD), flying people around Afghanistan, and transporting protected witnesses in the U.S. for the Marshals Service." [*Id.* at 21] As this Court noted, "[u]ndoubtedly, the purported criminal history of a company's previous owners, particularly a company contracted to perform sensitive tasks for the government, is a matter of public interest." [ECF No. 83 at 9] The Article quoted numerous sources, including Slavin, as well as one of the former owners (Jacob Gitman), former Monarch pilots, government officials, and Monarch's spokesperson, among others. The Article also explained that in its early days, Monarch provided air cargo transportation services using its own aircraft, but in recent

---

[1]  The revised version of the Article is titled "Flight of the Monarch: US Gov't Contracted Airline Once Owned by Criminals with Ties to Russian Mob" and contains corrections and clarifications which are not at issue in this lawsuit.  [*See id.*]

years had ceased providing its own flights and started brokering chartered flights for clients. [*Id.* at 28, 31]

In Count I of the Complaint, Monarch sues for defamation *per se*, alleging that the Article contains two false and defamatory statements of fact about Monarch. [Compl. at ¶¶ 53-58] Contrary to those allegations, Monarch alleges in Count II that the Article defamed it by implication, meaning the Article presented *true facts* in such a way as to imply false and defamatory facts. [*Id.* at ¶¶ 59-62] JDN denies both claims. [ECF No. 17 at ¶¶ 53-62]

<u>First Allegedly False and Defamatory Statement – the Slavin Statement</u>

A court should not review an allegedly defamatory statement in isolation but instead should consider it in context. *Turner v. Wells*, 198 F. Supp. 3d 1355, 1376 (S.D. Fla. 2016) ["*Turner I*"], *aff'd*, 879 F.3d 1254 (11th Cir. 2018) ["*Turner II*"]. In context, the first statement Monarch identifies as false and defamatory appears in the Article's broader discussion of the new owners who joined Monarch in 2008-2011 and of Slavin's related decision to leave Monarch. The allegedly defamatory statement (the "**Slavin Statement**") is underlined below:

> While Slavin had initially welcomed his new investors, the partnership turned sour.
>
> "Unfortunately for me it became obvious that Boruch Freedman wanted control of the airline and used withholding of funds to affect the daily operation of the airline," said Slavin. "I was then double-crossed by Jacob Gitman, who gave his and Golubchik's voting shares to Freedman."
>
> Slavin said he was voted out as CEO in 2011. <u>At first he stayed on as director of operations, but left when he felt the new owners started cutting corners on safety</u>.

[Compl. Exh. A at 27; ¶ 45.a (emphasis added)] Monarch alleges that because JDN did not seek Monarch's comment on this statement, it was "publishing a biased and defamatory narrative and leading its readers to believe that Monarch does not care about the safety of its passengers." [*Id.*]

<u>Second Allegedly False and Defamatory Statement – The Russell Statement</u>

The second allegedly false and defamatory statement (the "**Russell Statement**") appears during the Article's discussion of Monarch losing its air carrier certificate between 2016 and 2018, when it changed its business from flying airplanes to brokering charter flights:

> Between January and April 2016, Monarch's director of operations, chief pilot, and maintenance director all quit. A pilot who spoke to OCCRP anonymously said <u>employees resigned after Monarch stopped paying them, and the airline struggled to find replacements</u>.

> In May that year, the airline requested the FAA remove its only aircraft from its "Operation Specifications," a legal designation that allowed it to run commercial operations like private chartered flights. Without any planes that met FAA requirements, or key staff members to run them, its air carrier certificate was revoked in February 2018.
>
> But Monarch is still authorized to broker charter flights with other FAA-certified air carriers.

[Compl. Exh. A at 30; ¶ 45.c] Once again, the Complaint alleges that JDN did not provide Monarch an opportunity to comment on this statement and thus "publish[ed] a biased defamatory narrative and [led] its readers to believe that Monarch does not pay its employees." *Id*.[2]

*The Alleged Implications*

In Count II, Monarch complains that true facts in the Article were juxtaposed, or that facts were omitted from the Article, in such a way as to "imply a defamatory connection between Monarch, criminals, and/or criminal activity." [Comp. ¶ 60] The only true fact that the Complaint identifies as being juxtaposed to create a defamatory implication is: "the company is currently owned by the son of Golubchik and Trincher's former business partner." [*Id*. at ¶ 45.b]

The Magistrate Judge recently recommended denial of JDN's Motion for Partial Judgment on the Pleadings as to Count II for defamation by implication. [ECF No. 172; the "R&R"] In so doing, the R&R essentially found that the Article as a whole could imply that Monarch and the individuals "at the helm" of the company are "criminals or fraudsters;" that the criminal or fraudulent activity of Monarch and its owners is not limited to Golubchik and Trincher; that Monarch and multiple individuals running the company played some role in criminal or other legal wrongdoing; and that Monarch remains connected to "criminals, fraudsters, and/or other criminal activity." [*Id*. at 9-10, 12, 14-15] JDN has objected to the R&R on multiple grounds. [ECF No. 173]

**Summary Judgment Standard**

Summary judgment is proper where there is "no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*,

---

[2] The quoted confidential source was Monarch's former Chief Pilot, Ron Russell, who later agreed to waive confidentiality, and whose interview for the Article is discussed below. *See* JDN's Statement of Material Facts in Support of Its Motion for Summary Judgment, ECF Nos. 204, 205 ("SOF") ¶ 81.

477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. A genuine issue of material fact exists when "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "For factual issues to be considered genuine, they must have a real basis in the record." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) (citation omitted). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

The moving party has the initial burden of showing the absence of a genuine issue as to any material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). "Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial." *Valdez v. Miami-Dade Cnty.*, No. 19-20647-Civ-Scola, 2020 WL 2113499, at *3 (S.D. Fla. May 4, 2020). If the record, taken as a whole, cannot lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The nonmovant's evidence must be significantly probative to support the claims." *Valdez*, 2020 WL 2113499, at *3.

To safeguard the freedom of the press protected by the First Amendment, courts have long favored prompt resolution of legally untenable claims against the news media.  Courts accordingly have a "prominent function" in deciding whether such cases should proceed. *See Stewart v. Sun Sentinel Co.*, 695 So. 2d 360, 363 (Fla. 4th DCA 1997) ("pretrial dispositions are 'especially appropriate' because of the chilling effect these cases have on freedom of speech") (internal quotation omitted). This preference echoes the concern expressed by the United States Supreme Court in *New York Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964), that unless such cases are summarily handled, publishers will be forced to steer so far wide of the "unlawful zone" that public debate would by stymied. Moreover, speech on matters of public concern is entitled to "special protection" under the First Amendment.  *Darlow v. Babineck*, No. 21-13020, 2022 WL 15345444, at *2 (11th Cir. Oct. 27, 2022).

### Monarch Must Choose Either Count I Or Count II

A traditional defamation claim, such as Count I, requires that Monarch prove that JDN

published a false and defamatory fact about Monarch. By contrast, a defamation by implication claim arises from reporting, by juxtaposition or omission, true facts. Thus, if the Article makes false and defamatory statements of fact, as Monarch alleges in Count I, then it cannot provide the basis for an implication claim. But if the Article reports true facts so as to create a false implication, as Monarch claims in Count II, then it cannot provide the basis for a traditional defamation claim. These two mutually exclusive claims are permissible at the pleadings stage under Fed. R. Civ. P. 8(d)(2), but cannot exist now, at the evidentiary-proof stage. Thus, at least either Count I or Count II is necessarily subject to summary judgment.[3] As explained below, summary judgment should be granted as to both.

Argument

I.      **JDN Is Entitled To Summary Judgment On The Slavin Statement.**

A.      **The Slavin Statement Is Not "Of And Concerning" Monarch.**

To support its defamation claim, Monarch must show that "Defendant published a false and defamatory statement of and concerning [Monarch]." *Molenda v. Hoechst Celanese Corp.*, 60 F. Supp. 2d 1294, 1303 (S.D. Fla. 1999); *see also Mile Marker, Inc. v. Petersen Publ'g, L.L.C.*, 811 So. 2d 841, 845 (Fla. 4th DCA 2002). As the Supreme Court has explained, to prevail on its defamation claim, Monarch is "required to show specific reference" to itself in the allegedly defamatory publication. *Rosenblatt v. Baer*, 383 U.S. 75, 83 (1966). "Whether a statement may reasonably be interpreted as 'of and concerning' a plaintiff should be treated like other issues regarding defamatory meaning, as a question of law to be decided in the first instance by the court." Rodney A. Smolla, 1 *Law of Defamation* § 4:39 (2d ed.); *see also McIver v. Tallahassee Dem., Inc.*, 489 So. 2d 793, 794 (Fla. 1st DCA 1986) (affirming entry of summary judgment where allegedly defamatory statements in news article about individual were not "of and concerning" his related corporation as a matter of law).

Here, the Slavin Statement is about the *individuals* who were owners of Monarch in 2011, not about Monarch the company, and certainly not about Monarch the company in 2020. The relevant subsection of the Article (titled "A Russian Takeover") is specifically about the

---

[3] *See Phelps v. Ramsay*, No. 21-10070-CIV-MARTINEZ-BECERRA, 2023 WL 3038834, at *16 (S.D. Fla. Mar. 31, 2023) (defamation *per se* and defamation by implication are distinct and mutually exclusive claims) (citations omitted); *see also Rush Creek Ranch, LLLP, v. Adams*, No. 5:08-cv-149-Oc-10GRJ, 2009 WL 10670504, at *3 (M.D. Fla. Apr. 21, 2009) (granting summary judgment on mutually exclusive contract-related claims).

5

group of owners who replaced Slavin in 2011. It begins by stating: "With the 2008 financial crisis threatening to ground Monarch Air, . . . its owner, career pilot Paul Slavin needed an injection of funds." [Compl. Exh. A at 23] The Article recounts that new investors -- Golubchik, Trincher, and Jacob Gitman -- joined the company and "invited more investors on board, and within three years the clique had taken control of the company." [*Id.*] Moreover, as the Article reports, an "important" addition to this group was "Boruch 'Bob' Freedman, who joined the company in April 2011." [*Id.* at 26] And it reports that Slavin sold his shares in 2011. The Article further provides a timeline graphically showing that when Slavin sold his shares, the "new owners" (plus an individual named Gennady Gryaznov) became the sole owners of Monarch. [*Id.* at 27]

It is in this context -- indeed, directly below the ownership timeline -- that the Slavin Statement appears. Slavin is quoted as saying, "Unfortunately for me it became obvious that ***Boruch Freedman*** wanted control of the airline and used ***withholding of funds*** to affect the daily operation of the airline." [*Id.* (emphasis added)] The Article then reports that "Slavin said he was voted out as CEO in 2011. At first he stayed on as director of operations, but left when he felt ***the new owners*** started cutting corners on safety." [*Id.* (emphasis added)]

Viewed in the context of the Article's text, the timeline, and Slavin's express words, it is self-evident that the Slavin Statement is not about Monarch in 2020 but rather about the actions of Boruch Freedman and the other "new owners" in 2011, none of whom owned the company when the Article was published. [SOF ¶¶ 20, 26, 27 70] Thus, the Statement is not "of and concerning" Monarch. *See Jones v. Cmty. Newspapers, Inc.*, No. 3:05-cv-240-J-16MMH, 2006 WL 2507610, at *1, *3 (M.D. Fla. Aug. 29, 2006) (statement that the two Jones brothers indicted for conspiracy and distribution of crack cocaine were the owners of "Jones Trucking on State Road 17 in Palatka" was not of and concerning the trucking company); *McIver*, 489 So. 2d at 793 (allegedly defamatory statement that "McIver, President of Southeastern Realty, has testified before a federal grand jury in Tampa investigating bribery and kickbacks," was not a statement of and concerning his company, Southeastern Realty).

**B.     The Slavin Statement Is True Or Substantially True.**

A false statement of fact is essential in a defamation case. *See Turner II*, 879 F.3d at 1267. "True statements. . .are protected from defamation actions by the First Amendment." *Id.* at 1262. Indeed, "[t]ruth may not be the subject of either civil or criminal sanctions where

discussion of public affairs is concerned." *Garrison v. La.*, 379 U.S. 64, 74 (1964). Moreover, so long as a statement is substantially true, it is not actionable in defamation. *Nelson v. Associated Press*, 667 F. Supp. 1468, 1477 (S.D. Fla. 1987). A statement is not false unless it would have a "different effect on the mind" of the reader from that which the pleaded truth or accurate facts would have produced. *Turner I*, 198 F. Supp. 3d at 1365 (citation omitted). Additionally, as noted above, the Court must consider the broader context of the Article when assessing the truth of the challenged statement. *See Turner II*, 879 F.3d at 1262-63.

The Slavin Statement provides that Slavin left Monarch when the new owners started withholding funds, which is true. ███████████████████████████████████████ ███████████████████████████████████, and Slavin himself ██ testified that in 2011 the new owners *withheld funds* that Slavin requested. [SOF ¶¶ 72, 75] Because this factual statement is true, it cannot support a defamation claim. *Turner II*, 879 F.3d at 1262. It appears that Monarch's real gripe is not about the *factual* matter presented in the Slavin Statement (*i.e.*, that the new owners withheld funding), but rather about Slavin's *opinion.* But, as explained below, JDN cannot be liable in defamation for reporting Slavin's opinion about that fact.

### C.      JDN Cannot Be Held Liable For Slavin's Protected Opinion.

"A false statement *of fact* is absolutely necessary if there is to be recovery in a defamation action." *Zorc v. Jordan*, 765 So. 2d 768, 771 (Fla. 4th DCA 2000) (quotation omitted; emphasis added); *Hallmark Builders Inc. v. Gaylord Broad. Co.*, 733 F.2d 1461, 1464 (11th Cir. 1984). Thus, a statement must be objectively verifiable or falsifiable to be actionable in defamation. *Turner I*, 198 F. Supp. 3d at 1369-70. By contrast, "statements of pure opinion are protected from defamation actions by the First Amendment." *Turner II*, 879 F. 3d at 1262. Whether a statement is one of opinion or fact is a question of law for the court. *Id.* at 1262-63. Under Florida law, a defendant publishes a "pure opinion" when the defendant makes a comment or opinion based on facts set forth in the publication or which are otherwise known or available to the reader or listener as a member of the public. *Id.*; *see also Turner I*, 198 F. Supp. 2d at 1366; *Sullivan v. Barrett*, 510 So. 2d 982, 984 (Fla. 4th DCA 1987).

Based upon the disclosed fact that the new owners in 2011 withheld funding Slavin requested, the Article reports that Slavin "felt" the new owners were cutting corners on safety and as a result he left the company. Slavin testified at deposition to his "belief" that more funding was needed for the appropriate level of maintenance and safety. [SOF ¶ 72] ████

████████████████████████  [SOF ¶ 77] Because the Article presented the fact that the new owners were withholding funding in 2011 while simultaneously offering Slavin's commentary on that situation, the Slavin Statement is protected as pure opinion. *Turner I*, 198 F. Supp. 2d at 1366. Monarch may not agree with Slavin's opinion, but such disagreement does not constitute falsity and is not actionable. *Markle v. Markle*, No. 8:22-cv-511-CEH-TGW, 2024 WL 1075339, at *7 (M.D. Fla. Mar. 12, 2024); *Hoon v. Pate Constr. Co., Inc.*, 607 So. 2d 423, 429 (Fla. 4th DCA 1992) (same). Thus, summary judgment should be granted on the Slavin Statement.

## II.      Monarch Cannot Prove Recoverable Damages Or Actual Malice For Count I.

In a defamation *per se* claim, damages typically are presumed, but under Florida law there is no longer a cause of action for "libel *per se*" against a media defendant such as JDN; rather, "a plaintiff suing a media defendant must nevertheless plead and prove actual injury." *Edelstein v. WFTV, Inc.*, 798 So. 2d 797, 798 (Fla. 4th DCA 2001); *see also Mid-Fla. Television Corp. v. Boyles*, 467 So. 2d 282, 283 (Fla. 1985). In fact, in defamation cases involving media defendants, such as this one, "fault *and* proof of damages must always be established." *Blake v. Giustibelli*, 182 So. 3d 881, 884-85 (Fla. 4th DCA 2016) (emphasis added); *see also Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1119 (S.D. Fla. 2021) (in defamation *per se* claim against media defendant, plaintiff must show both "malice and damages.")

For Monarch to succeed on Count I, it must then prove that JDN published the Slavin and Russell Statements with actual malice (meaning JDN knew the Statements were false or acted with reckless disregard to their truth or falsity, *see Turner II*, 879 F.3d at 1273) and that the Statements caused damages that Monarch, as a corporation, is entitled to recover. Monarch has no admissible evidence to make either showing.

### A.      Monarch Has No Evidence Either Statement Caused Recoverable Damages.

"Since a corporation has no reputation in the sense that an individual has, it is only with respect to its credit, property or business that a corporation can be injured by a false publication." *St. Paul Fire & Marine Ins. Co. v. Naples Cmty. Hosp., Inc.*, 585 So. 2d 374, 376 (Fla. 2d DCA 1991) (internal quotation omitted); *Open Sea Distrib. Corp. v. Artemis Distrib., LLC*, 692 F. Supp. 1151, 1203-04 (M.D. Fla. 2023) (granting summary judgment because corporation failed to prove actual damages, such as lost customers, attributable to allegedly defamatory statement). Here, Monarch has no evidence of damage to its credit, property, or business resulting from the

Slavin or Russell Statements. Thus, its defamation claim fails as to those Statements.



[SOF ¶ 90]

[SOF ¶ 91]

[SOF ¶ 92]

[SOF ¶ 93]

Monarch has identified no witnesses whose understanding of Monarch's reputation changed as a result the Slavin or Russell Statements, no admissible evidence that it actually lost any business, and no evidence that its credit was damaged. Quite simply, Monarch has no evidence linking the Statements to any actual damages or injury. Summary judgment on Count I is mandated on this basis alone.

**B.      Monarch Has No Evidence Of Actual Malice.**

Actual malice exists only when a speaker makes a false statement of fact "with knowledge that it was false or with reckless disregard of whether it was false." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). "The inquiry in a case involving actual malice is *not* whether the defendants acted negligently or imprudently in publishing the challenged statements." *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1197 (11th Cir. 1999) (emphasis added). Instead, actual malice is a subjective standard under which the plaintiff must prove that the *publisher* actually "acted with a high degree of awareness of . . . probable falsity," or "in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Plaintiff's evidence must also satisfy the clear and convincing standard. *Tobinick v. Novella*, 108 F. Supp. 3d 1299, 1309 (S.D. Fla. 2015) ("[T]he evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind.") (internal quotation omitted).

Because actual malice is a subjective standard, and because JDN is a company and not a person, Monarch must prove that the individual(s) responsible for publication acted with actual malice. *N.Y. Times*, 376 U.S. at 287 (actual malice must be "brought home to the persons" in the "organization having responsibility for publication"); *Mile Marker*, 811 So. 2d at 847 (same); *see*

*also Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (2d Cir. 2013) ("the plaintiff must identify the individual responsible for publication of a statement, and it is that individual the plaintiff must prove acted with actual malice"). Thus, Monarch must prove that JDN's editors or publisher acted with actual malice in publishing the Slavin and Russell Statements.[4]

There is no record evidence here that Monarch knew the Slavin or Russell Statements were false or entertained serious doubts about their truth. Monarch took the deposition of JDN's publisher and Rule 30(b)(6) witness Andrew Sullivan, its Editor Jared Ferrie, its Deputy Editor in Chief Julia Wallace, and Olena LaFoy, who fact-checked the Article. None of the witnesses testified that they doubted the truth of the Slavin or Russell Statements. [SOF ¶¶ 84-85] Monarch also deposed the Article's author, Lily Dobrovolskaya, but there is no testimony that she doubted the truth of the Statements. [SOF ¶ 86]

Without direct evidence of actual malice, Monarch must rely upon circumstantial evidence. But "courts must be careful not to place too much reliance" on indirect evidence purportedly showing actual malice. *Don King Prods., Inc. v. Walt Disney Co.*, 40 So. 3d 40, 44 (Fla. 4th DCA 2010) (internal quotation omitted). In *St. Amant*, the Supreme Court identified the types of circumstantial evidence that could show that the defendant acted with actual malice, even when he or she testifies they believed the publication was true. According to the Court, a defendant's averments of good faith may not be persuasive:

> [W]here a story is *fabricated* by the defendant, is the *product of his imagination*, or is based *wholly on an unverified anonymous telephone call.* Nor will they be likely to prevail when the publisher's allegations are so *inherently improbable* that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are *obvious reasons to doubt the veracity of the informant or the accuracy of his reports*.

390 U.S. at 732 (emphasis added).

As a result, Florida courts have identified these same categories of circumstantial evidence as those that might support a clear and convincing showing of actual malice. *See Readon v. WPLG, LLC*, 317 So. 3d 1229, 1236 (Fla. 3d DCA 2021) (listing proper circumstantial evidence of actual malice as including evidence that is "fabricated, . . . wholly imaginary, based

---

[4]  Because the Article's author, Lily Dobrovolskaya, is not a party to this action and was not a JDN employee when she authored the Article, her alleged "fault" is not germane to whether JDN published with actual malice. Nevertheless, there is no evidence that she acted with actual malice either.

on an unverified anonymous source, inherently improbable, or obviously worthy of doubt");
*Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 705 (11th Cir. 2021) (same). There is no
circumstantial evidence in this case that meets the *St. Amant* standards.

The Slavin Statement was not fabricated or wholly imaginary, since Slavin made the
Statement in an email to the reporter. [SOF ¶¶ 68, 71] Nor is the Statement based upon an
unverified anonymous source, inherently improbable, or obviously worthy of doubt. Slavin was
an experienced pilot and the founder of Monarch who gave up his ownership interest in Monarch
in 2011 [SOF ¶¶ 9, 71], and his explanation for why he did so is wholly plausible (and, as shown
above, true). Likewise, the Russell Statement was not fabricated or wholly imaginary. It was
made by Monarch's former Chief Pilot, Ron Russell, and was recorded. [SOF ¶¶ 78, 80] Russell
was not an unverified source: ██████████████████████████████████████

████████████████████ [SOF ¶ 83] And the Statement was not inherently improbable or obviously
worthy of doubt. ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

[SOF ¶ 82]

In sum, the record evidence simply cannot support an actual malice finding and certainly
does not create a high degree of probability that JDN knew or in fact entertained serious doubts
about whether the Slavin or Russell Statements were false. Thus, summary judgment should be
granted on Count I.[5]  *See Dunn,* 193 F.3d at 1198.

## III.   Summary Judgment Should Be Granted On Defamation By Implication Claim.

Summary judgment should be granted on Count II of Monarch's Complaint for
defamation by implication because (a) the Magistrate's R&R rejected two of the statements
Monarch alleged gave rise to the purported false implications, either by juxtaposition or
omission; (b) Monarch did not specifically plead that the other statements identified by the R&R

---

[5] Monarch additionally alleges that the Article (as a whole) "falsely paints Plaintiff to be
involved in criminal activity," and accordingly "constitutes defamation *per se.*" [Compl. at ¶¶ 18,
19; *see also* ¶¶ 31-44] Monarch therefore must similarly plead and prove actual injury and actual
malice with regard to the Article as a whole and its alleged implications, which Monarch has not
done and cannot do. *See Corsi*, 519 F. Supp. 3d at 1124 (protections afforded media defendants
for defamation equally apply to implication claims). As more fully discussed *infra*, any alleged
implications are substantially true or otherwise non-actionable opinion.  Moreover, Monarch has
no evidence that JDN intended to accuse the company of criminal activity, corruption, drug
smuggling or unfitness for government contracts. [SOF ¶ 87] Summary judgment should be
granted on this basis as well.

were true, but were juxtaposed to falsely implicate Monarch; (c) the true statements in the Article, along with the undisputed facts revealed in discovery, establish that Monarch actually was connected to criminal and fraudulent activity at all relevant times, which makes the Article's alleged implications true or substantially true; and (d) statements constituting protected opinion are not actionable as defamation by implication. Accordingly, even assuming that this Court adopts the R&R's findings and conclusions, JDN still is entitled to summary judgment based on the undisputed facts and applicable law, as discussed below.

## A. The Article Did Not Impliedly Defame Monarch Through Omission.

Monarch's Complaint identifies two statements as impliedly defamatory by omission, namely: (1) a description of an incident where 16 kilograms of cocaine was found on a Monarch flight and (2) a statement by a federal prosecutor at a 2013 bail hearing that the government did not consider Monarch to be a legitimate business. [Compl. ¶¶ 35-41] According to Monarch, because JDN omitted certain details, the first statement implies that Monarch is involved in "drug smuggling." [*Id.* at ¶¶ 37-38] With respect to the second statement, the Complaint asserts that JDN omitted the prosecutor's apology for referring to Monarch as not legitimate. [*Id.* at ¶¶ 35-36] But the R&R has already concluded that these two statements do not, as a matter of law, give rise to the implications alleged by Monarch. According to the R&R, "no reasonable jury could find that the Article 'accuses Monarch of drug smuggling.'" [R&R at 11] Likewise, the notion that the prosecutor apologized for calling Monarch an illegitimate business "is not a reasonable inference" that can be drawn from reviewing the relevant hearing transcripts. [*Id.* at 13] Monarch did not object to these findings. Thus, Monarch cannot now proffer those implications to the jury, meaning summary judgment must be granted as to each.

## B. The Article Did Not Impliedly Defame Monarch By Juxtaposing True Facts.

Under Florida law, defamation by implication claims arise either by omission or where "literally true statements" are "juxtapose[d]" to "imply a defamatory connection between them." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1108 (Fla. 2008). Monarch claims that the Article implies "a defamatory connection between Monarch, criminals, and/or criminal activity." [Compl. ¶ 60] But that claim fails as well because (1) the implication identified by the R&R is not based upon statements that the Complaint pleads; (2) the alleged implication of a continuing connection to criminals, fraudsters and/or other criminal activity is true; and (3) the alleged implication that Monarch should not have been awarded government contracts or trusted with

transporting witnesses is protected opinion on a matter of public concern. Each is discussed below.

### 1.     The Complaint Does Not Plead The Facts Relied Upon By The R&R.

A plaintiff claiming defamation by implication must "put [the] Defendant on notice of the specific facts [the defendant has] (supposedly) manipulated in [its] effort to 'weave' a tapestry of defamation." *Markle v. Markle*, 2024 WL 1075339, at *25; *Block v. Matesic*, No. 21-61032-CIV-ALTMAN/Hunt, 2023 WL 8527670, at *9 (S.D. Fla. Dec. 8, 2023) (dismissing implication claim because plaintiff's pleadings had not "connected the dots" by specifically identifying the true statements or omitted facts underlying the claim).

In denying JDN's motion for judgment on the pleadings, the R&R relied upon five statements in the Article as creating the defamatory implication, but those statements *are not pled* in the Complaint. In particular, the R&R relied upon the following statements: (1) "However, public records show that Gitman partnered with Golubchik and Trincher in at least four aviation companies. Panama-based SkyWay International Holding still lists all three men as corporate officers"; (2) "Two other investors who ran Monarch," after Golubchik and Trincher left, "also had legal troubles, and one fled a warrant for his arrest in the U.S. and remains on the lam"; (3) "In 2017, [Jacob] Gitman was found liable in a civil lawsuit of misleading investors . . . and the plaintiff "was awarded $3.8 million in damages"; (4) that Monarch was "nonetheless . . . still "making flight as recently as September" 2020; and (5) quoting Gary Kalman, head of Transparency International, as saying the "fact that Monarch was able to transport protected witnesses, despite the backgrounds of its former owners, shows the need for more thorough checks on companies that are awarded public contracts. Common sense says that contracts should be clearly vetted before going to entities with a history of criminal affiliation, but there is no legal mandate that we check. . . That is a significant gap in the law, and this story is a prime example of how such a gap might be dangerously exploited."  [R&R at 9-14]

Monarch's Complaint *does not* plead or identify any of these statements. Nor did Monarch plead that the statements identified in the R&R were true but juxtaposed in such a way as to create a false and defamatory implication.  Monarch's implication claim accordingly fails to the extent it is based upon them. *Markle*, 2024 WL 1075339, at *25 (implication claim failed because complaint "fail[ed] to identify the literally true facts that would serve as the basis for such a claim"); *Block*, 2023 WL 8527670, at *9 (dismissing implication claim that did not plead

how true facts were used to create false implication). Thus, summary judgment should be granted on Count II for any implication arising from never-pled statements.

### 2. The Alleged Implication of a Continuing Connection to Criminals, Fraudsters and/or Criminal Activity Is True Or Substantially True.

JDN denies that the Article implies "a defamatory connection between Monarch, criminals, and/or criminal activity."[6] Among other things, whether Monarch has a "connection" to criminals or fraudsters or criminal activity is not a statement of fact and is not subject to verification. Thus, it cannot be actionable in defamation. *Trump v. Cable News Network, Inc.*, 684 F. Supp. 3d 1269, 1276 (S.D. Fla. 2023). Moreover, because the Article does not juxtapose facts about Monarch with facts about companies or owners *unrelated* to Monarch to create a false implication, it does not impliedly defame Monarch. *See Turner I*, 198 F. Supp. 3d at 1375-76 ("The basis of the libel lies in the juxtaposition of truthful statements about *one company* with truthful statements about the illegal operations of *an independent company of the same name located in a different state*.") (emphasis added; internal quotation omitted).

Nevertheless, inasmuch as Monarch is permitted to proceed upon the theory that the Article implies such a "connection," the implication is true or substantially true, and thus not actionable. *See Jews for Jesus*, 997 So. 2d at 1108 n.13 (holding that "truth remains and available defense" where the alleged implication is true); *Ramos v. Miami Herald Media Co.*, 132 So. 3d 1236, 1236-37 (Fla. 3d DCA 2014) (affirming dismissal of implication claim because implication was true); *see also Smith v. Cuban Am. Nat'l Found.*, 731 So. 2d 702, 707 (Fla. 3d DCA 1999) (falsity only exists if the "publication is substantially and materially false").

According to the Merriam-Webster Dictionary, "connection" means, among other things, "the action of connecting: the state of being connected," including for example a "causal or logical relation or sequence," a "contextual relation or association," or a "relationship of personal intimacy (as of family ties)." *See* https://www.merriam-webster.com/dictionary/connection. Applying this admittedly imprecise definition, Monarch in 2020 undoubtedly had a "connection" to criminals, or criminal activity, or fraudsters because Monarch had a "contextual relationship

---

[6] The Complaint identifies only one specific statement as purportedly giving rise to this implication: "the company is currently owned by the son of Golubchik and Trincher's former business partner." [Compl. ¶ 45.b] According to the Complaint, "[b]y specifically juxtaposing [David] Gitman to these convicted criminals – who were charged after they left Monarch, and were not partners in Monarch for over seven years – [the Article] insinuates these criminals were connected to Monarch and Gitman when the Article was published." [*Id.*]

or association" with its own history and with its former owners.

Indeed, the Article goes to great lengths to describe the context for this relationship or association, explaining when various individuals started *and ended* their ownership and what crimes or fraudulent activities they engaged in or were convicted for. [Compl. Exh. A at 22-27] It likewise explains Monarch's relationship to the cocaine incident (the cocaine was discovered in a passenger's bag on a Monarch aircraft, but no one was arrested) and provides Monarch's statement distancing itself from that incident. [*Id.* at 28-29] It similarly provides the assessment of federal prosecutors that Monarch was used as a vehicle for money laundering for the Russian Mob, meaning it had a "contextual relation or association" with a serious criminal enterprise. [*Id.* at 22] The Article likewise explains that Monarch's current owner, David Gitman, has a "relationship of personal intimacy" with its former owner, Jacob Gitman, because Jacob Gitman is his father and sold the company to him. [*Id.* at 26-27] Jacob Gitman himself was found liable for fraud as the Article reports. [*Id.* at 23-24] But there are other important facts showing that Monarch in 2020 undoubtedly had a "connection" with criminals, criminal activity, or fraudsters. As explained in greater detail below, the discovery conducted in this matter, the truthful facts reported in the Article which were not challenged by Monarch, and other important facts not even included in the Article all make clear it implies nothing false about Monarch.

The following facts about Monarch, its history, its former owners, and its current owner are not in dispute. Indeed, to the extent that the Article reports these facts, they are deemed true because Monarch never alleges they are false and because an implication claim necessarily arises from the publication of *true facts*. *See Turner I*, 198 F. Supp. 3d at 1365.

- Anatoly Golubchik was an owner and managing member of Monarch from 2008 to 2012. During that time, he was engaged in extensive criminal conduct in connection with the Russian mob. In 2014, he was convicted of conspiring to violate the RICO Act and sentenced to five years in prison. To this day, and despite these facts, Jacob Gitman continues to associate with Golubchik. [SOF ¶¶ 11, 13-14, 16, 18, 23, 24, 28, 29, 36]

- Vadim Trincher was an owner and managing member of Monarch from 2011 to 2012 through Skyway International. During that time, he was engaged in extensive criminal conduct in connection with the Russian mob. In 2014, he was convicted of conspiring to violate the RICO Act and sentenced to five years in prison. [SOF ¶¶ 16, 18, 23-24, 28-29]

- The Article reports, and the Complaint does not challenge, that public records show that

Golubchik, Trincher, and Jacob Gitman also partnered together in at least four companies and, as of November 2020, when the Article was published, one of those companies (Panama-based SkyWay International Holding) still listed all three as officers. [Compl. Exh. A at 26]

- Boruch Freedman was an owner of Monarch from 2011 to 2014. The Article reports and the Complaint does not dispute that, in 2016, he fled an arrest warrant in the U.S. and remains on the lam. Despite this fact, Jacob Gitman visits with Freedman when he travels to Israel. [Compl. Exh. A at 21; SOF ¶¶ 22-23, 25-26, 60]

- In 2011-2012, Gennady Gryaznov was an owner of Monarch through his shares of Skyway International. He also owned Sky KG Airlines. As the Article explains and the Complaint does not dispute, reports state that Sky KG leased aircraft to Somali pirate leader Mohamed Abdi Hassan. Before Hassan was arrested, he purportedly used the aircraft from SKY KG as part of his own airline that laundered the proceeds from his piracy efforts. [Compl. Exh. A at 26; SOF ¶¶ 17-18, 23, 24]

- Jacob Gitman was an owner of Monarch starting in 2008. The Article says he gave up his ownership interest in 2016, but discovery has revealed that he remained an owner until March 2020 (several months before the Article was published). In 2015, a Kansas jury found Jacob Gitman liable for fraud, resulting in a multi-million dollar judgment which he has never paid.  [SOF ¶¶ 14, 27, 50-52]

- David Gitman became Monarch's CEO in 2011. Thus, he was CEO while the company was owned and managed by Golubchik, Trincher, Freedman, Gryaznov, and Jacob Gitman. [SOF ¶¶ 18, 21, 23, 24]

- When Jacob Gitman sold the company, he did not sell it via an arm's-length transaction to an unrelated buyer, but instead sold it to his son, David Gitman. David Gitman became an owner of Monarch in 2013, at the same time that Freedman and Jacob Gitman were owners. ███████████████████████████████████████████████ [SOF ¶¶ 25-27]

- In 2011, while David Gitman was CEO, Customs officers discovered 16 kilograms of cocaine in a passenger's bag on a Monarch flight, but no one was arrested or cited. Jacob Gitman confirmed that no one was arrested or cited for the incident, which "really surprised" him.  [SOF ¶¶ 21, 37-38]

- In Golubchik's criminal case, a federal prosecutor told the Court Monarch was used as a vehicle for money laundering, as the Article reports and which the Complaint does not challenge. Moreover, Jacob Gitman testified that Golubchik in fact provided a $1 million dollar loan to purchase Monarch in 2008, but he has no idea where Golubchik obtained the money. According to the sentencing memoranda in Golubchik's and Trincher's criminal cases, both men were working with the Russian Mob in 2008, and used an "airplane company" to launder money.  [SOF ¶¶ 11, 12, 30-35]

- David Gitman, Jacob Gitman, Boruch Freedman and Monarch itself all were sued in 2017 in Miami-Dade Circuit Court, and accused of "improperly siphon[ing] off in excess of $10 million" from WAB International, Inc. ("WAB"). WAB was Freedman's company and a judgment debtor of the plaintiffs. In particular, all four, and other Gitman-related companies, were accused of making and accepting fraudulent transfers to divert funds away from WAB. The multi-million dollar fraudulent transfer claims against Monarch, the Gitmans and Freedman were pending in 2020 when the Article was published. [SOF ¶¶ 23, 53-57]

- In July 2020, just a few months before JDN published the Article, JPMorgan Chase Bank's ("Chase") Global Payments Anti-Money Laundering Oversight Committee placed Monarch on an internal interdiction list, which resulted in the cancellation of wire transactions to Monarch from Chase accounts.  As a result, Monarch and David Gitman filed a lawsuit against Chase.  [ECF No. 1-3 at ¶¶ 12, 21]

- Public records from the lawsuit show the interdiction request stated that Monarch and Skyway were identified for review by an "external referral, and were identified in the media and through transaction activity as moving millions of dollars between each other and additional entities in Russia, the USA, and offshore jurisdictions." [SOF ¶¶ 62]

- A Chase executive testified that the "external referral" related to a 2019 Congressional subpoena issued by the House Financial Services Committee, which was investigating financial industry compliance, "particularly in the areas of correspondent banking and know-your-customers anti-money laundering policies and practices." [SOF ¶¶ 64-65]

- Chase identified Jacob Gitman on the 2020 interdiction list as using his various businesses to "move tens of millions of dollars between his related businesses and to/from companies in off-shore jurisdictions in a short period of time with no business

purpose identified."   [SOF ¶¶ 63]

In light of these facts, there can be no legitimate dispute that -- from 2008 through the Article's publication in 2020 -- Monarch, David Gitman, and Jacob Gitman had a substantial "contextual relation or association" or a "family ties" with criminals, criminal activity, and/or fraudsters. Thus, the Article's alleged implication accordingly is true or substantially true.  No rational jury could find that in Monarch in 2020 had *no connection* to criminals or fraudsters. Summary judgment should therefore be granted on Count II.

### 3.   Implication Concerning Government Contracts is Protected Opinion.

The Complaint alleges, without identifying any particular statement, that the Article "insinuates" Monarch should not have been awarded government contracts because of its alleged connection to criminal activity or been "trusted with transporting people in the witness protection program." [Compl. ¶¶ 33, 34, 42] The R&R identifies two statements, not pled in the Complaint, which allegedly imply that the company should have been precluded from making government flights because of Monarch's history with Golubchik and Trincher and other legal troubles of Monarch investors. [R&R at 14] Specifically, the R&R cited to the undisputed statement that Monarch was still making flights as of September of 2020, and comments by Gary Kalman concerning need for -- and lack of -- more thorough government vetting of companies with a history of criminal affiliation.  [*Id.*]

But the alleged implication is not actionable because the statement and related comments are protected opinion based on true facts, including as reported in the Article, or otherwise publicly-known or disclosed. "[I]t is well settled in Florida that commentary or opinion based on accurate facts set forth in an article are not the stuff of libel." *Turner II*, 879 F.3d at 1265 (citations omitted); *see also Beck v. Lipkind*, 681 So. 2d 794, 795 (Fla. 3d DCA 1996) ("'[o]pinions cannot be defamatory. Pure opinion occurs when a defendant makes a comment or opinion based on facts which are set forth in the article or which are otherwise known or available to the reader or listener as a member of the public.'") (citations omitted). Such protection is especially appropriate where, as this Court already has recognized, the reporting involves a matter of "public interest," *i.e.*, "the purported criminal history of a company's previous owners, particularly a company contracted to perform sensitive tasks for the government." [ECF No. 83 at 9]

####   a.      The Article Reports on Monarch's Government Contracts.

Here, it is undisputed ███████████████████████████████████████████████

████, when Golubchik and Trincher *still were* part owners of the company. [SOF ¶¶ 14, 18,

23, 40] ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ [SOF ¶ 42] ███████████████

████████████████████████████████████████████████████████████

██████████████████████████████████ [SOF ¶ 43] ████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████ [SOF ¶ 45]

████████████████████████████████ [SOF ¶ 44] ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████  [SOF ¶ 46]   Nor is there any evidence that Monarch ever disclosed to the government

the fraud claims against Monarch or Jacob Gitman, David Gitman, or Boruch Freedman.

####   b.      Reported Comments about Government Contracts.

The Article reports that Monarch was transporting protected witnesses for the U.S.

Marshals Service under a contract first awarded in 2014, and was making government flights as

recently as September of 2020 (which is just two months prior to publication of the Article).

[Compl. Exh. A at 21, 22]  The Complaint does not challenge the truth of this reporting, ████████

█████████████████████████████████ [SOF ¶ 48] Based on these, and other reported true

or publicly-available facts, the Article quoted U.S. Transparency International Director Gary

Kalman as follows:

> The negligence is startling . . . Airlines with a history of criminal affiliation
> contracted by the government to transport protected witnesses is something we'd
> expect to see in a spy novel, not in a news report.

[Compl. Exh. A at 21]

The Article later reports that, in 2017, "the Marshals Service twice hired Monarch to

transport people in the witness protection program and the Justice Prisoner and Alien

Transportation System, which moves prisoners around the country."  [*Id.* at 29-30]  Kalman is

then quoted as opining that "the fact that Monarch was able to transport protected witnesses,

despite the dubious background of its former owners, *shows the need for more thorough checks on companies that are awarded public contracts.*"  [*Id.* at 30 (emphasis added)]  And finally, the Article quotes Kalman putting forward that:

> "Common sense says that *contracts should be clearly vetted before going to entities with a history of criminal affiliation, but there is no legal mandate that we check,*" [Kalman] said.  "That is a significant gap in the law, and this story is a prime example of how such a gap *might be* dangerously exploited."

[*Id.* (emphasis added)]

Although it is self-evident from the express wording, Kalman testified that he was referring to the *negligence of the government* and the need for a *more thorough vetting process by the government*; and not any negligence or wrongdoing by Monarch in 2020. [SOF ¶ 47] Whether a company's particular criminal history is worth scrutinizing is plainly an issue of individual opinion, and expressing an opinion on that issue cannot, as a matter of law, constitute a false and defamatory implication of fact. Indeed, the notion that some other reader might come to a "different conclusion upon review of these facts does not make the Defendant's evaluation . . . anything other than [protected] opinion." *Turner I*, 198 F. Supp. 3d at 1368; *see also Vesselov v. Harrison*, No. 24-10396, 2024 WL 4449685, at *4 (11th Cir. Oct. 9, 2024) (finding that an expert's statement was an opinion and therefore did not imply false facts about the plaintiff). Here, the Article reports and it is undisputed that Monarch in fact was owned in part by two convicted felons, Golubchik and Trincher, who were linked to wide-ranging crimes as members of a dangerous Russian organized crime syndicate.  [SOF ¶¶ 18, 23-24, 28-29]

Under such circumstances, Kalman's critical opinions are about the government are protected by the First Amendment. *See Folta v. N.Y. Times Co.*, No. 1:17cv246-MW/GRJ, 2019 WL 1486776, at *12 (N.D. Fla. Feb. 27, 2019) (noting the importance of upholding legal protections enabling effective reporting about the government).

## CONCLUSION

WHEREFORE, JDN respectfully requests that the Court grant summary judgment in JDN's favor on Counts I and II of Plaintiff's Complaint.

## REQUEST FOR HEARING

JDN respectfully requests oral argument of one hour on this Motion. Because of the breadth of the reporting, the underlying undisputed facts, testimony, and records, JDN believes oral argument would assist the Court in addressing any questions about the facts and legal issues.

THOMAS & LOCICERO PL

By: */s/ Dana J. McElroy*
    Dana McElroy
    Florida Bar No. 845906
    dmcelroy@tlolawfirm.com
    Daniela Abratt-Cohen
    Florida Bar No. 118053
    dacohen@tlolawfirm.com
    915 Middle River Drive
    Suite 309
    Fort Lauderdale, FL 33304
    Phone:  (954)703-3416

    James J. McGuire
    Florida Bar No. 187798
    jmcguire@tlolawfirm.com
    601 South Boulevard
    Tampa, FL 33606
    Phone:  (813) 984-3060

    *Attorneys for Defendant*
    *Journalism Development Network, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this **23rd** day of **June, 2025**, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all parties and counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

    */s/ Dana J. McElroy*
    Attorney